**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2005 FEB 18  A II: 5?

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

DEPUY SPINE HOLDING
CORPORATION, INC. as General Partner
of DEPUY SPINE SALES LIMITED
PARTNERSHIP,

   **Plaintiff,**

  v.

JOHN MIEYR and TRINITY SPINE, INC.,

   **Defendants.**

Civ. Action No.  05-102770-RGS

---

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Defendants John Mieyr and Trinity Spine, Inc. (collectively, "Mieyr") hereby oppose Plaintiff's Motion for Preliminary Injunction on grounds that Plaintiff DePuy Spine Holding Corporation, Inc., as general partner of Depuy Spine Sales Limited Partnership ("DePuy Spine") cannot establish any of the four factors necessary for an injunction to issue, namely: (1) DePuy Spine cannot demonstrate a likelihood of success on the merits of its claims; (2) DePuy Spine cannot prove that it would suffer irreparable harm by allowing Mieyr to continue to provide services to the four doctors at issue; (3) the balance of harm strongly favors Mieyr; and (4) the public interest would be best served by allowing the doctors to choose who should assist them in spinal-related surgeries.  For these reasons, as more fully discussed below, Plaintiff's Motion for Preliminary Injunction should be denied.

## FACTUAL BACKGROUND

On or about March 29, 2004, DePuy Spine Sales Limited Partnership entered into a Sales Representative Agreement ("Agreement") with Trinity Spine, Inc. and its principal, John Mieyr to distribute DePuy Spine spinal-implant products. A true and accurate copy of the Agreement is attached hereto as Exhibit A.

The Agreement provided, in relevant part:

1.   Appointment and Territory

a.   Subject to the provisions set forth in this Agreement, the Company appoints Representative and Representative accepts appointment as the Company's Representative to market all those Company products identified on Schedule A ("Products") to customers in the sales territory identified on Schedule B (the "Territory"). *Representative's representation of the Products identified on Schedule A-1 shall be represented in the Territory on an exclusive basis.* The Products identified on Schedule A-2 shall be represented in the Territory by Representative on a non-exclusive basis.

Exhibit A, Page 1 (emphasis added). The Agreement provided exclusive rights to Mieyr to market certain products within his assigned territory, which included six hospitals within Tarrant County, Texas. Exhibit A, Schedules A and B.

DePuy's Material Breaches of the Agreement

In direct violation of the exclusivity provision of the Agreement, between March 29, 2004, and December 31, 2004, DePuy Spine allowed Rob Walker and other representatives to sell DePuy Spine products to doctors within Mieyr's designated territory which products were designated under the Agreement as exclusive to Mieyr. Transcript of the Deposition of John Mieyr, attached hereto as Exhibit B, Pages 53-54. As a result of DePuy's breach, Mieyr lost at least $40-50,000 in commissions. Exhibit B, Pages 58-60. Mieyr notified DePuy Spine that they were breaching the terms of the Agreement several times throughout the life of the contract, including in November 2004. Exhibit B, Pages 53-66. See Email Correspondence, attached

2

hereto collectively as Exhibits F2-F3.

DePuy also breached the Agreement by failing to provide sales programs that it promised to provide. As stated in the Agreement, "The Company shall conduct periodic sales training programs and provide technical and other information regarding the Products." Exhibit A, Page 3. At no time did DePuy Spine provide the required sales training programs to Mieyr during the term of this contract. Occasionally throughout Mieyr's history with DePuy Spine, Mieyr went to training put on by DePuy. At all times persons outside DePuy – usually doctors, attended. DuPuy required payment from everyone, including Mieyr, to attend. In fact, Mieyr *conducted* sales training and technical training courses for other representatives on behalf of DePuy Spine.

DePuy Spine further breached the Agreement in that it exerted control over Mieyr, in breach of Paragraph 9(a) of the Agreement, which states in pertinent part:

> The Company shall neither have nor exercise any control over the manner in which Representative and Principal perform their duties under this Agreement.

Exhibit A, Page 11. In the spring of 2004, however, soon after the Agreement had begun, DePuy ordered Mieyr to continue servicing Physicians Metroplex Hospital, even though it was not paying its bills. Exhibit B, Page 57-58. Despite Mieyr's warnings and requests not to continue servicing the hospital, DePuy Spine was adamant that he continue with the hospital. Exhibit B, Page 57-58. The bills were never paid. Exhibit B, Page 57-60. Mieyr's commission checks from DePuy Spine were reduced by thousands of dollars due to the failure of Physicians Metroplex to pay its bills. Exhibit B, Page 57-60; Exhibit F1.

DePuy's Inequitable Conduct

In order to induce Mieyr to sign the Agreement, Mieyr was told by Tom Slott, Area Vice President and an authorized agent of DePuy Spine, that although the Agreement only reflected a contract term of less than one year, Mieyr would be given a multi-year contract at the end of

2004, if he met his quota. Exhibit B, Page 61, 64. Relying on these promises and assurances, Mieyr signed the Agreement. Exhibit B, Page. 61. In December, 2004, despite having exceeded his quota, Mieyr was told by DePuy Spine that the Agreement was not going to be renewed for the next year; was then told that it was going to be renewed; and finally that it was not going to be renewed. Exhibit B, Page 40, 24, 26, 31.

DePuy Spine Has No Customer Goodwill

Following expiration of the Agreement, which DePuy Spine had declined to renew (in breach of its promise to do so) Mieyr began distributing for Globus Medical, Inc. ("Globus"), a company that distributes devices used in spinal implant surgery. Exhibit B, Page 12-15. Dr. John Sazy, Dr. William Mitchell, Dr. David Gray, and Dr. Hubbard, four doctors who had previously done business with DePuy Spine through Mieyr, decided that they would no longer do business with DePuy Spine. Transcript of the Deposition of Dr. David Gray, attached hereto as Exhibit C, Page 16-17. All four doctors requested that Mieyr continue to service their needs and provide the ancillary services, including observation and assistance during the actual surgeries, that he had previously provided to them. Exhibit C, Page 14-17; Transcript of the Deposition of Dr. William Mitchell, attached hereto as Exhibit D, Page 9-14; Transcript of the Deposition of Dr. John Sazy, attached hereto as Exhibit E, Page 14-17. The doctors stated that after observing DePuy Spine's disrespectful and unethical treatment of Mieyr, these doctors had no intention of ever purchasing DePuy Spine products again. Exhibit C, Page 43-45, Exhibit D, Page 9-10, Exhibit E, Page 15-16.

## ARGUMENT

## DEPUY SPINE CANNOT SATISFY THE FOUR PRONGED TEST REQUIRED FOR INJUNCTIVE RELIEF TO ISSUE.

### A.    Massachusetts Law Places The Burden On The Plaintiff.

The standard for obtaining a preliminary injunction is familiar. *Ocean Spray Cranberries, Inc. v. Pepsico, Inc.*, 160 F.3d 58, 60 (1st Cir.1998). The burden of proof is on the plaintiff. *Id.*; *Equal Employment Opportunity Comm'n v. Astra USA, Inc.*, 94 F.3d 738, 742 (1st Cir.1996). The court is required to weigh four factors. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996); *Astra*, 94 F.3d at 742. The first is whether the plaintiff has shown a likelihood of success on the merits. *Ross-Simons*, 102 F.3d at 15. The second is whether the plaintiff has established an imminent threat of irreparable harm in the absence of a preliminary injunction. *Id.* The court is also required to balance the hardship to the plaintiff if no injunction is issued against the hardship to the defendants if the requested injunction is ordered. *Id.* In addition, the court must consider the effect of the proposed injunction on the public interest. *Id.*

As the First Circuit has said on a number of occasions, the likelihood of success on the merits is of primary importance. *Id.* at 16 (citing cases). It is the *sine qua non* for obtaining a preliminary injunction. *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1225 (1st Cir.1993); *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir.1993). In addition, a preliminary injunction is an equitable remedy. *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). It does not issue automatically even if the foregoing criteria indicate that an injunction is warranted. *Converse Constr. Co. v. Massachusetts Bay Transp. Auth.*, 899 F.Supp. 753, 760 (D. Mass.1995). Thus, a court may properly consider any inequitable conduct by the plaintiff. The

court may also consider any adverse impact on the public interest for which a bond cannot compensate and withhold relief for this reason alone. *Weinberger*, 456 U.S. at 312-13, 102 S.Ct. 1798; *Converse*, 899 F. Supp. at 760.

**B.    DePuy Spine Cannot Demonstrate A Likelihood Of Success On The Merits.**

        **1.    There Was No Goodwill Or Confidential Information Given To Mieyr That He Subsequently Disclosed To Unauthorized Third Parties.**

A restrictive covenant may be used to protect a business's legitimate interest in its goodwill. *New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977). A restrictive covenant that protects an employer from ordinary competition, however, does not serve a legitimate business interest. *Marine Contractors Co. v. Hurley*, 365 Mass. 280, 287-88 (1974); *Richmond Bros., Inc. v. Westinghouse Broadcasting Co.*, 357 Mass. 106, 111 (1970). An employer's goodwill consists of its "positive reputation in the eyes of its customers or potential customers ... [and] is generated by repeat business with existing customers or by referrals to potential customers." *Marine Contractors Co.*, 365 Mass. at 287-89. In order for an individual to infringe on the former employer's goodwill that individual must be "in a position ... to develop close relationships with a wide range of [the employer's] customers or suppliers." *All Stainless, Inc.*, 364 Mass. at 777; *Oxford Global Resources, Inc. v. Guerriero*, Civ. Action No. 03-12078-DPW (D.Mass.2003).

Massachusetts public policy favors the right of an employee to move from job to job unencumbered by restrictions that are not narrowly tailored to protect an employer's interests in the goodwill of a business, a trade secret, or confidential business information. "It long has been settled that contracts restraining freedom of employment can be enforced only when they are reasonable and not wider than is necessary for the protection to which the employer is entitled

and when not injurious to the public interest." *Club Aluminum Co. v. Young*, 263 Mass. 223, 225 (1928)(Rugg, C.J.). An employee "may carry away and use the general skill or knowledge acquired during the course of the employment." *Dynamics Research Corp. v. Analytic Sciences Corporation, et. al.*, 9 Mass.App.Ct. 254, 267 (1980), *citing Junker v. Plummer*, 320 Mass. 76, 79 (1946).

In the instant case, there is no risk that Mieyr will misappropriate DePuy Spine's goodwill in its customers as there is no goodwill to appropriate. Exhibit C, Page 16; Exhibit D, Page 10; Exhibit E, Page 15-17. Drs. Mitchell, Sazy, Gray, and Hubbell have already informed DePuy Spine that due to DePuy Spine's mistreatment of Mieyr, they would no longer be purchasing any DePuy Spine products. Exhibit C, Page 14-16; Exhibit D, Page 20; Exhibit E, Page 15-17.

Additionally, Dr. Gray testified that he would not continue to use DePuy Spine products because DePuy Spine chose not to keep him informed about the status of Mieyr's contract. Exhibit C, Page 15-17. By not coming to Dr. Gray and telling him in advance that DePuy Spine was not going to be renewing Mieyr's contract, Dr. Gray was unable to make preparations for his departure and it affected his ability to schedule surgeries. Exhibit C, Page 15-17. As Dr. Gray pointed out, first DePuy Spine was going to renew Mieyr's contract, then they weren't, then they were again, and then finally they didn't. Exhibit C, Page 18. The way that the entire situation was handled was extremely disrespectful to the surgeons and caused all of them a great deal of inconvenience. Thus, issuing an injunction against Mieyr would serve no useful purpose in preserving goodwill as there is no goodwill left to preserve.

Along with goodwill, courts have also recognized a legitimate business interest in confidential and proprietary information. *See New England Canteen Service, Inc.*, 372 Mass. at

674 (describing 6 factor test). Information about a third party is not confidential, however, if competitors could obtain the same information directly from the third party. *See Banner Indus. v. Bilodeau*, 15 Mass. L. Rptr. 705, 2003 WL 831974, *4 (Mass. Super. Ct. 2003) (manufacturer lists not confidential because others could obtain same information directly from the manufacturers). Similarly, information obtainable from publicly available sources is not confidential. *Hamburger v. Hamburger*, 4 Mass. L. Rptr. 409, 1995 WL 579679, *2 (Mass.Super.Ct.1995) ("customer lists are not considered trade secrets if the information is readily available from published sources, such as business directories").

The information given to Mieyr for dissemination to doctors could not possibly be considered confidential information. Information concerning DePuy Spine products and techniques were freely shared with all interested "customers," primarily doctors and other medical providers. These customers or potential customers were not subject to any sort of confidentiality agreement or non-disclosure agreement that would prohibit them from discussing the products or techniques with other medical professionals. In fact, it is that very word of mouth propagation that DePuy Spine encourages in order to better sell their products. And as such, DePuy Spine cannot now claim that same information is "confidential" and has been disclosed to third parties without authorization by Mieyr.

Further, this "confidential" information shared by Mieyr is also taught in medical school classes and continuing medical education courses. The information could also be found in books and other educational literature. In short, it was publicly available information. Therefore, DePuy Spine failed to provide any confidential information to Mieyr as promised by the terms of the Agreement and Mieyr has not disclosed any information that is not readily available from other sources or disseminated to third parties who are not also bound by the same non-disclosure

agreement with DePuy Spine.  As such, the injunction should not issue.  *See Moulton v. Lee, 2004 Mass. Super. LEXIS 51 (2004)* (denying preliminary injunction where information that plaintiff alleged was "confidential" was not confidential and could have been obtained from third parties).

Massachusetts courts will grant relief to protect a trade secret only where one is attempting to use or disclose it in violation of some general duty of good faith.  *Optical Publishing Co. v. McCue*, 1984 U.S. Dist. LEXIS 17989, *15-16 (D. Mass. 1984) *(citing Junker v. Plummer*, 320 Mass. at 80).  Here, DePuy has made no showing that Mieyr has used DePuy's confidential information or has any plans to do so.  Thus, the injunction should not issue.  *See Id.* (denying request for preliminary injunction).

**2.    Depuy Spine's Material Breach of The Agreement Excuses Mieyr From The Non-Compete Provision Of The Agreement.**

"It is well established that a material breach by one party excuses the other party from further performance under the contract."  *Ward v. American Mutual Liability Insurance Co.*, 15 Mass.App.Ct. 98, 100, 443 N.E.2d 1342 (1983).  It is also plain that a material breach of an employment agreement by an employer may discharge an employee from further obligation under a non-compete provision of that agreement.  *Id.* at 101, 443 N.E.2d 1342.

Under the Agreement, Mieyr was promised an exclusive sales territory.  Exhibit A, Page 1.  Yet DePuy Spine sent representatives into his sales territory and allowed them to market and distribute DePuy Spine products.  Exhibit B, Page 53-55.  Mieyr was promised training.  Exhibit A, Page 3.  Mieyr not only did not receive confidential training (and what he did obtain he paid for), but actually conducted training on behalf of DePuy Spine.  Mieyr was promised confidential information.  Exhibit A, Page 5.  As more fully discussed above, Mieyr did not receive any

9

information that was not readily available to the doctors and other medical personnel members. And finally, Mieyr was promised that his contract would be renewed for multiple years upon meeting quota.  Exhibit B, Page 60-62.  After Mieyr exceeded quota, Mieyr's contract was summarily terminated. Exhibit B, Page 61.

DePuy Spine has breached multiple portions of the Agreement and now seeks to enforce the very agreement which they themselves have blatantly disregarded.  Essentially, DePuy Spine wants to have its cake and eat it, too.  DePuy Spine wants to have the ability to run roughshod over their sales representatives, such as Mieyr, fail to provide the tools and resources that they have promised those sales representatives, impede the sales representatives' ability to meet their quotas and perform their duties under the agreement, but then asks this Court to hold those sales representatives accountable to the portions of the agreement which are beneficial to DePuy Spine.  DePuy Spine's breach of the material terms of the Agreement warrants a denial of the preliminary injunction requested.  Mieyr cannot be forced to comply with a contract that has already been materially breached by DePuy.

**C.    If Injunctive Relief Is Granted, It Is Mieyr, The Four Doctors Involved, And Their Patients That Will Suffer Irreparable Harm, Not DePuy Spine.**

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  *Astra*, 94 F.3d at 743 (*quoting Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)).  "Irreparable harm" is proven if, absent an injunction, the plaintiff will "suffer[] a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons*, 102 F.3d at 19.

"A finding of irreparable harm must be grounded on something more than conjecture,

10

surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank*, 370 F.3d at 162. "[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons*, 102 F.3d at 19; *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6-7 (1st Cir.1991); *Pub. Svc. Co. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir.1987); *Regan v. Vinick & Young (In re Rare Coin Galleries of Am.)*, 862 F.2d 896, 902 (1st Cir.1988). Rather, the threat of irreparable harm must be real and "immediate." *Fundicao Tupy S.A. v. United States*, 841 F.2d 1101, 1102-03 (Fed.Cir.1988); *Auto. Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 116 (1st Cir.1968). As a general rule, harm which can be adequately compensated with money damages is not considered to be irreparable. *Interco, Inc. v. First National Bank of Boston*, 560 F.2d 480, 485 (1st Cir.1977); *Itek Corp. v. First National Bank of Boston*, 730 F.2d 19, 22 (1st Cir.1984).

In the instant case, DePuy Spine alleges that it will suffer irreparable harm if the injunction does not issue due to Mieyr's disclosure of confidential information and appropriation of customer goodwill. As explained above, however, DePuy Spine has no goodwill with respect to these four doctors, nor does Mieyr have, nor has he disclosed, any confidential information. The doctors, because of the way that DePuy Spine treated Mieyr, requested Mieyr continue working with them. Exhibit B, Page 32-24; Exhibit C, Page 44-48; Exhibit D, Page 23-24; Exhibit E, Page 14-15. Mieyr is not using any kind of confidential information that he was given during the course of his employment with DePuy Spine. In fact, he is using training and techniques that he shared with other members of DePuy Spine, training and techniques that he had acquired from years of observation and training from other doctors and other sources. DePuy Spine gave Mieyr absolutely no confidential information. As such, there are no grounds for an injunction to issue. *See Robert Half Int'l, Inc. v. Buoncontri*, 2003 Mass. Super. LEXIS

67, * 13 (refusing to issue injunctive relief where no evidence that employee had disclosed confidential information).

### D.    The Balance of Harms Weighs In Mieyr's Favor.

If this Court grants the preliminary injunction against Mieyr, Mieyr will be estopped from observing and assisting the abovementioned doctors in the surgeries that have already been scheduled. These surgeries have been scheduled months in advance and, barring other medical complications, must proceed as scheduled. Restraining Mieyr from observing and assisting with these surgeries restrains the doctors' ability to practice medicine. In fact, as set forth in their depositions, such an action would be directly detrimental to the doctors' practices and their patients. *See* Exhibits C, D, E. And *that* is certainly against the public interest.

DePuy Spine's target market is limited and the doctors included in that target market are easily discernible. Thus there is not some secret client list. Most of these doctors are members of the North American Spine Society. At the Society meetings, all the vendors display the products in which they deal. Thus, the functionality of the products are openly displayed to the public and to the doctors intent upon using them. If there is something unique about the product, it is typically patented and protected in that manner. Thus, a Sales Representative cannot "steal" an idea from one company for another company's benefit simply by changing employment.

And finally, ultimately, it is the patient that stands to benefit from the best equipment for the case at hand at the least cost. Most of the training completed by Mieyr has been over the course of his entire career by his own observation, experience, and teaching by hands-on surgeries with orthopedic surgeons in the operating room. Here, the overriding public policy of trying to do surgery with the best product, at the lowest cost and in the safest manner vastly outweighs any need for a temporary restraining order or preliminary injunction.

Mieyr is now with a new company; he has had to learn new equipment and devices. While the functionality of the equipment may be essentially the same, the doctors still exercise independent choice for what is in the best interest of the patient. The doctors involved that decided not to use DePuy Spine products anymore did so based upon their best professional judgment. Exhibit C, Page 14-16; Exhibit D, Page 20; Exhibit E, Page 15-16. Holding Mieyr hostage to a non-compete and barring or slowing a surgery is not in the public interest. These doctors need the freedom to make the best choice for their patients and noncompete clauses come second in life and death situations.

### E.    The Public Interest Favors Denying the Preliminary Injunction.

"[A] trial court need not make findings concerning the third and fourth factors [of the preliminary injunction analysis] if the moving party fails to establish either of the first two factors." *Abbott Labs. v. Selfcare, Inc.*, 17 F. Supp.2d 43, 50 (D.Mass.1998) (alterations in original) (*quoting Polymer Techs. v. Bridwell*, 103 F.3d 970, 973-74 (Fed.Cir.1996)). Since Plaintiff has failed to prove that there is a likelihood of success on the merits of the case or that DePuy Spine will suffer irreparable harm absent injunctive relief, there is no need for this Court to proceed any further with this line of analysis.

However, if the Court decides that a full analysis is necessary, a review of the public interest prong of the preliminary injunction standard reveals life and death considerations. In cases involving restrictive covenants between private parties performing private work, analysis of the "public interest" prong is usually confined to brief platitudes. While "the public and the individual have an interest in every person carrying on his trade or occupation freely," *Woolley's Laundry v. Silva*, 304 Mass. 383, 387, 23 N.E.2d 899 (1939), it is also "beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." *New*

*England Tree Expert Co. v. Russell*, 306 Mass. 504, 508-09, 28 N.E.2d 997 (1940). Fortunately, the test is *not* whether enforcing the restrictive covenant would advance the public interest, but, more simply, whether enforcement would be "consonant with the public interest," *Novelty Bias Binding Co.*, 342 Mass. at 716, 175 N.E.2d 374, or *"not injurious to the public interest,"* *Woolley's Laundry*, 304 Mass. at 387, 23 N.E.2d 899 (emphasis added).

Mieyr's career choice places him in the position of providing direct support to doctors doing dangerous and risky spinal surgery. Mieyr is not dealing in interchangeable widgets, where the decision to purchase either widget A or widget B hinges on the price or extraneous features offered. Mieyr is dealing in spinal-implant devices and providing vital support for those devices that carry life and death implications. Exhibits B, C, D, & E generally. Allowing Mieyr to continue to provide support services to four doctors who have already advised DePuy Spine that they will not purchase DePuy Spine products anyway will only serve the public interest. A restraint of Mieyr's ability to continue to provide such support services would be injurious to the public interest and would serve no useful purpose whatsoever. These doctors need John Mieyr in surgery with them performing vital tasks and drastically reducing the extraordinary risks associated with spine surgery.

### F.    DePuy Spine's Inequitable Conduct Weighs Against Issuance Of A Preliminary Injunction.

DePuy Spine's actions have been disingenuous from the onset. Mieyr was induced into signing the Agreement with DePuy Spine based upon promises from an authorized DePuy Spine representative, area vice-president Tom Slott, that his contract would be a multi-year contract with an exclusive territory. Exhibit B, Page 61. Instead, his contract was terminated after less than nine months. During those nine months, another sales representative was allowed to distribute DePuy Spine products within Mieyr's "exclusive" territory. Exhibit B, Page 53-55.

14

Mieyr's agreement with DePuy Spine was breached by DePuy, thus excusing him from the non-compete provision of that Agreement.

Further, where an employee is discharged without cause or if the discharge is inequitable or unreasonable, a court may consider this a factor leaning against enforcing the non-compete. *Kroeger v. The Stop & Shop Companies*, 432 N.E.2d 566 (Massachusetts Ct. App. 1982); to a similar effect is *Economy Grocery Stores Corp. v. McMenamy*, 195 N.E. 747 (Massachusetts 1935). Mieyr was meeting his quota; in fact, he far exceeded his quota during the time that he was employed by DePuy Spine. Exhibit B, Page 37-38. Mieyr developed good relationships with the doctors and other medical personnel with whom he was dealing. He was a benefit to DePuy Spine. And yet DePuy Spine terminated his contract with no notice, either to him or to the doctors and medical personnel with whom he dealt. Notions of equity and fair-dealing demand that a preliminary injunction be denied.

## CONCLUSION

WHEREFORE, for all the above reasons, Mieyr requests that this Court:

(i)     Order that the Ex Parte Temporary Restraining Order it issued against Mieyr on February 10, 2005 is withdrawn and/or expired;

(ii)    Deny DePuy Spine's Motion for Preliminary Injunction;

(iii)   Award Mieyr reasonable attorneys fees and costs; and

(iv)    Provide such other and further relief as this Court deems just and proper.

Respectfully Submitted,

**JOHN MIEYR AND TRINITY SPINE, INC.**

By their Attorneys,

Robbyn P. Wysocki
BBO#: *Pending*
Texas State Bar No. 22115600
McCUE WYSOCKI, P.C.
14135 Midway Road, Suite 250
Dallas, Texas 75254
(972) 490-0808

Jeffrey A. Dretler
BBO #558953
PRINCE, LOBEL, GLOVSKY & TYE LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

## CERTIFICATE OF SERVICE

I, Jeffrey A. Dretler, attorney for the defendants in the above referenced matter, hereby certify that on this 18th day of February, 2005, I served the within document upon the Plaintiff by hand delivering a copy thereof to its counsel of record, Joseph F. Shea, Nutter, McClennan & Fish, LLP, World Trade Center West, 155 Seaport Boulevard, Boston, MA 02210-9628.

Jeffrey A. Dretler

16

## SALES REPRESENTATIVE AGREEMENT

THIS AGREEMENT is effective as of the 28th day of January, 2004 (the "Effective Date"), and is among DePuy Spine Sales Limited Partnership, a Massachusetts limited partnership, having a place of business at 325 Paramount Drive, Raynham, Massachusetts 02767, (the "Company" ), and , a Trinity Spine Inc., a Texas corporation, having a place of business at 4406 Shadywood Lane, Cooleyville, Texas 76034, ("Representative").

_(handwritten: 29th    March)_

## RECITALS

1.    The Company is engaged in the business of designing, manufacturing and selling devices and instruments for the treatment of spinal and/or neurologic disorders.

2.    Representative is engaged in soliciting sales of medical devices in the Territory (as hereinafter defined). John Mieyr is the owner of all or substantially all of the outstanding stock of Representative and is an active participant in the business of Representative ("Principal").

3.    The Company desires to engage Representative and Principal to sell the Company's products and Representative and Principal desire to do so, all upon the terms and conditions as hereinafter set forth. The parties desire to terminate the Sales Representative Agreement dated January 1, 2002 as of the Effective Date of this Agreement and replace the Sales Representative Agreement dated January 1, 2002 with this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, upon the terms and subject to the conditions contained herein, hereby agree as follows:

1.    **Appointment and Territory**.

a.    Subject to the provisions set forth in this Agreement, the Company appoints Representative and Representative accepts appointment as the Company's Representative to market all those Company products identified on Schedule A ("Products") to customers in the sales territory identified on Schedule B (the "Territory"). Representative's representation of the Products identified on Schedule A-1 shall be represented in the Territory on an exclusive basis. The Products identified on Schedule A-2 shall be represented in the Territory by Representative on a non-exclusive basis.

b.    From time to time during the term of this Agreement, the Company may, but shall not be required to, offer new products for sale in the Territory ("New Products"). With regard to the marketing of New Products in the Territory, Company shall have the right, in its sole discretion, to:

2

(i) on thirty (30) days prior written notice to Representative, require Representative to market and solicit sales of New Products on an exclusive basis in which case such New Product shall be deemed to be added to Schedule A hereof;

(ii) on thirty (30) days prior written notice to Representative, require Representative to jointly introduce and market such New Products in conjunction with the efforts of the Company or its DePuy and/or Johnson & Johnson Affiliates (as defined below); or

(iii) introduce and market such New Products on the Company's own behalf or through its DePuy and/or Johnson & Johnson Affiliates (as defined below) on an exclusive basis, in which event such New Products shall not be made available to Representative.

The Company shall have the sole and exclusive right to establish the terms under which New Products will be marketed and to make all decisions regarding such marketing arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Notwithstanding anything to the contrary contained in this Agreement, Company shall not be liable to make any payment to Representative with regard to a New Product if Company introduces and markets such New Product pursuant to Section 1(b)(iii) hereof. All of Representative's obligations regarding Products shall also apply to any New Products which are added to this Agreement.

 c. Representative acknowledges that the Company shall have the right to discontinue the sale in the U.S. of any Product identified on Schedule A-1 or Schedule A-2 or any New Product added during the term of this Agreement at any time. The Company shall use reasonable efforts to provide advance notice of the discontinuance of any Product or New Product. If the Company discontinues the sale of a Product or New Product as provided herein, such Product or New Product shall be removed from this Agreement.

 d. The Company shall have the right to enter into Co-Marketing Arrangements (as defined below) with its DePuy and/or Johnson & Johnson Affiliates (as defined below) related to the marketing, representation and sale of New Products. As used herein, "Co-Marketing Arrangement" means that New Products subject to the arrangement will be marketed, represented and sold in the Territory through the sales forces of the Company and its DePuy and/or Johnson & Johnson Affiliates. The Company reserves the sole right to establish the terms under which New Products will be co-marketed and to make all decisions regarding such Co-Marketing Arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Products currently subject to a Co-Marketing Arrangement are identified on Schedule A-2. As used herein, the term "Affiliates" means any person, corporation, partnership or business organization which, directly or indirectly, controls, is controlled by or is under common control with, the Company.

2.    **Sales Quotas**.

a.    On an annual basis, after taking into account Representative's sales projections and other information provided to the Company under Section 5(b) hereof, the Company will establish Representative minimum sales quotas for each Product line for each sales area located within Representative's Territory (the "Quotas") as set forth in Schedule C.

b.    Quotas for any New Products offered to Representative and Principal will be established by the Company at or near the launch of each New Product.

3.    **Obligations of the Company**.

a.    The Company shall provide Representative with such sales literature, brochures, price lists, samples, and other related materials as the Company deems necessary; provided, however, the Company may charge Representative, and Representative shall pay, a reasonable charge for such materials.

b.    The Company shall conduct periodic sales training programs and provide technical and other information regarding the Products

c.    The Company shall accept and fill customer orders for Products according to its credit and ordering policies and procedures in effect from time to time, provided, however, that the Company may accept or reject any order, in whole or in part, in its sole discretion.

d.    Subject to all of the conditions set forth in this Section 3(d), the Company shall defend, indemnify and hold harmless Representative and its employees and agents, from and against any and all causes of action, claims, suits, proceedings, damages and judgments by third parties (collectively, "Claims"), to the extent that such Claims are based solely on an alleged manufacturing or design defect in a Product sold by Representative. In the event that any Claim is asserted against Representative, Representative shall provide written notice to the Company within ten (10) days after learning of such Claim. The Company will have the right to select counsel, and conduct and control at its expense the defense against and settlement of such Claim in its own name, or if necessary in Representative's name and the Company's defense counsel may act on Representative's behalf regardless of whether such Claim has also been asserted against the Company. Representative will cooperate with and make available to the Company such assistance and information as may be reasonably requested by the Company, and Representative will have the right to participate in the defense, including representation by independent counsel, at Representative's expense, provided that under such circumstances, Representative will have the right to compromise and settle the Claim only with the prior written consent of the Company. If, in connection with any Claim it is determined by the Company that Representative acted beyond its authority, or failed to comply with any of its obligations under Sections 4 and 7 of this Agreement, the Company shall be immediately relieved of its obligations to Representative under this Section 3(d).

4

### 4.    Obligations of Representative and Principal.

a.    Representative agrees that its sales representatives will devote their best efforts and sufficient working time to soliciting sales of each Product line set forth in Schedule A-1 and Schedule A-2 to all applicable accounts and customers in each sales area located in the Territory, perform customary marketing support and service activities for such customers, and meet or exceed the sales Quotas established pursuant to Section 2 hereof for each Product line for each sales area located within Representative's Territory.

b.    Representative shall maintain an appropriate place of business in the Territory and an appropriate number of qualified, trained and competent sales representatives, each with the level of expertise necessary to properly solicit sales of Products and to perform support and service activities for customers in the Territory. Representative shall recruit and hire qualified sales representatives based upon a hiring profile provided by the Company.  The Company may elect to interview candidates for sales representative positions and to approve or disapprove such candidates based upon the hiring profile.  The Company shall have the right to approve the number of sales representatives engaged by Representative, how such sales representatives are trained and deployed, and the sales areas and accounts located within the Territory assigned to such sales representatives.

c.    Neither Representative nor Principal, nor any employees, agents, independent contractors,  or any owners of any shareholders of the Representative  shall solicit sales, accept any customer orders, or sell any Products  in their own name or on their own account.  In the event any Products are shipped to Representative or any of the aforementioned parties for delivery to a customer, such party  will not alter any Products, original packages for Products  or repackage the Products  in any way prior to delivery.  In addition, Representative shall maintain accurate records of the lot number of Products and the names of each of the customers to which such Products  were sold and report such information to the Company within ten (10) days following the sale.

d.    Representative will not alter or modify the Product(s) in any way prior to delivery to Customers.  Representative shall at all times conduct its activities on behalf of the Company in accordance with the labeling limitations on the Products, the terms of this Agreement, the Company's written policies and procedures, and in compliance with applicable state and federal laws in effect from time to time, including the FDA's quality system regulations (QSR) and/or good manufacturing practice (GMP) regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures.  Representative shall provide the Company with such information and data as may be requested by Company pursuant to this Agreement.

e.    Representative and Principal agree that during the term of this Agreement, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly; (i) sell, offer for sale, promote, receive or solicit orders for products that are competitive with any products of the Company ("Competitive Products"); or (ii) accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products.  The determination of what constitutes Competitive Products shall rest solely with the Company's president.  Competitive Products, if any,

5

permitted to be sold notwithstanding the provisions of this Section 4(e) shall be identified on Schedule E hereto.

f.     Representative and Principal acknowledge and affirm that they have received Confidential Information (as such term is defined in Section 5(a) of this Agreement) and other trade secret information of the Company and further agree to protect that information and that as a material inducement to the Company to enter into this Agreement, and in consideration of the Company entering into this Agreement and the other consideration provided for herein, the receipt and sufficiency of which are hereby acknowledged by Representative and Principal, that for a period of one year following the termination of this Agreement for any reason, including its termination for non-renewal by any party, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly engage in the sale of Competitive Products in the Territory or accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products.

g.     Representative and Principal acknowledge and affirm that their sales representatives have received Confidential Information (as such term is defined in Section 5(a) of this Agreement) and other trade secret information of the Company and further agree that their sales representatives will protect that information and that they will not knowingly employ, engage or contract with as a sales representative or in any other capacity any person who directly or indirectly (i) sells, offers for sale, promotes, receives or solicits orders for Competitive Products; or (ii) accepts compensation of any kind from any person providing or engaging in the sale of Competitive Products; or (ii) who has not entered an agreement prohibiting the sale of Competitive Products for a one (1) year period following termination of such engagement, employment or contract, all in such manner and to the same extent as Representative and Principal agree to be bound pursuant to this Agreement. Each such agreement between Representative, Principal and their sales representatives shall provide that such provisions are for the benefit of the Company and that the Company may enforce such provisions directly. Representative and Principal agrees to provide the Company with complete copies of all such agreements with its sales representatives and further agrees to modify such agreements as requested by the Company to achieve the purposes of this Section 4(g).

h.     Representative and Principal further agree that during the term of this Agreement, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly (i) sell, offer for sale, promote, receive or solicit orders for any products that are competitive with any products of other subsidiaries of DePuy, Inc. ("DePuy Competitive Products"); or (ii) accept compensation of any kind from any person providing or engaging in the sale of DePuy Competitive Products, without the express written consent of the Company's president and upon such terms as the Company, in its sole discretion, may reasonably impose. DePuy Competitive Products, if any, permitted to be sold notwithstanding the provisions of this Section 4(h) shall be identified on Schedule E hereto.

i.     Representative and Principal further agree that they will not knowingly engage as a sales representative or in any other capacity any person who directly or indirectly engages in the sale of DePuy Competitive Products or accepts compensation of any kind from any person providing or engaging in the sale of DePuy Competitive Products.

6

j.    Representative and Principal further agree that neither Representative nor Principal nor any member of Principal's immediate family will engage in, derive or accept compensation from or have any other ownership interest in (other than as a passive investor) any other commercial or business activity involved in the sale of medical devices, biologics or other products used in the treatment of any medical condition, without the express written consent of the Company's president and upon such terms as the Company, in its sole discretion, may reasonably impose. This provision shall not be construed as requiring Representative and Principal to discontinue any current commercial or business activities or investments, except to the extent that continuation of those activities or investments would constitute competitive activities prohibited by Sections 4(e) or 4(g). Any activities permitted notwithstanding this Section 4(j) shall be identified on <u>Schedule E</u> hereto.

k.    Upon termination of this Agreement by Representative or Principal during its term, or if the Company should terminate this Agreement due to a material breach by Representative or Principal of any of their obligations under Section 4(e) – (j) of this Agreement, then in addition to any other legal or equitable remedies available to the Company, the Company shall have the right in its sole discretion and for no additional consideration to Representative or Principal:

(i)    to direct Representative and/or Principal to immediately assign to the Company all non-competition or similar agreements described in Section 4(g) above; and

(ii)    to solicit, contract with, or hire any sales representatives of Representative and/or Principal.

Representative and Principal agree that it would be difficult to quantify damages for a breach of Section 4(k)(i) and that Company is entitled to preliminary injunctive relief and specific performance in the event of any such breach.

l.    Representative agrees that its sales representatives shall be adequately trained in the sale and use of the Products and shall attend all training sessions required by the Company and utilize such training materials as provided by Company. In addition, Representative shall make its sales representatives available, at its expense, to attend all national meetings and conferences and, if requested by the Company, shall help with exhibits, workshops, etc. at such meetings and conferences. Representative and its sales representatives shall attend all applicable regional meetings in the Territory as directed by the Company .Representative and Principal agree to cause their sales representatives to attend and participate in training and educational programs regarding the Products and the DePuy and J&J policies and procedures referenced in this Agreement. Representative and Principal agree to train and periodically provide refresher training to all its new and current sales representatives regarding such policies and procedures. Representative shall, upon request, provide the company with a written certification of compliance with all such laws, regulations, policies, procedures and guidelines.

m.    Representative shall not make any representation or statement, written or otherwise, concerning prices, terms of delivery, terms of payment or conditions of sale

7

except and to the extent that the same is specifically authorized by the Company. Representative shall have no right or authority to make any price guarantees, offer or agree to any discounts and/or accept any orders on the Company's behalf or return any Products to the Company without prior written authorization by the Company.

n.    Neither Representative nor Principal will knowingly submit to the Company any information known by Representative or Principal to be false, inaccurate or misleading regarding: (i) sales of Products; (ii) customers to whom Products were sold; (iii) expenses which were or are to be paid or reimbursed in whole or in part by the Company; or (iv) the inventory of Products in the Territory. Neither Representative nor Principal shall engage in the practice of direct billing of Products to any person. For purposes of this section, direct billing shall mean any transaction involving a third party's acquisition, use or lease of Product which results in such third party being invoiced or charged a price or rental fee(s) for Product by Representative or Principal or by an entity in which Representative, Principal or a member of Principal's immediate family has a financial interest.

o.    Representative and Principal represent that they understand and agree to conduct their business in compliance with all applicable laws and regulations, including but not limited to laws and regulations pertaining to the marketing and sale of medical products to healthcare providers, and in compliance with the AdvaMed Code of Ethics. Representative and Principal further agree to conduct their business in compliance with Company's and Johnson & Johnson's written policies and procedures, including but not limited to sales policies, inventory policies and procedures, instrument policies and procedures, and policies, procedures and guidelines for health care compliance, protection of PHI, and reporting of adverse events to the Company. Representative and Principal further agree that their sales representatives will be bound by the same Company and Johnson & Johnson written policies and procedures, including but not limited to sales policies and procedures, inventory policies and procedures, and policies, procedures and guidelines for health care compliance. Representative and Principal shall not employ or contract with any individual or entity excluded from a Federal health care program as outlined in Sections 1128 and 1156 of the Social Security Act. Representative and Principal shall, upon request, provide the Company with a written certification of compliance with all such laws, regulations, policies, procedures and guidelines. Representative and Principal agree to maintain all records required to substantiate compliance with all such laws, regulations, policies, procedures and guidelines and the terms of this Agreement for the term of the Agreement plus an additional six years. Representative and Principal agree that the Company or its designated representatives shall have the right to audit the business and records of Representative for the purpose of determining compliance with all such laws, regulations, policies, procedures and guidelines and the terms of this Agreement; however, Representative shall have the right to redact from its books and records any information that is not related to the above-referenced compliance issues.

p.    Representative and Principal represent and warrant that each of them is free to enter into this Agreement, and that neither Representative nor Principal is bound by any other contract or agreement with any other party that would prohibit either of them from providing the services to the Company required of them pursuant to this Agreement.

8

q.    Representative and Principal will notify Company in writing of any changes in the name or corporate structure, including the state of incorporation, under which Representative or Principal intends to do business before such changes are effective.

r.    Representative shall be responsible for all inventory consigned to Representative and shall be financially liable for any lost inventory. The Company shall have the right to determine appropriate levels of inventory in Representative's possession. The Company shall have the right to deduct inventory losses from Representative's commissions.

### 5.    **Representative Reports.**

a.    At the Company's request, Representative shall periodically provide information on its activities within the Territory with respect to the Products. Representative shall provide the Company on a monthly and quarterly basis with the names, account coverage, and portion of Representative's overall minimum sales quota assigned to each of its sales representatives for the Products in the Territory. The Company shall have the right to approve Representative's allocation of its overall quota to its sales representatives. Representative agrees to reallocate its overall quotas among its sales representatives upon the Company's request.

b.    Thirty (30) days prior to the end of each calendar year quarter, Representative shall prepare and submit to the Company a sales projection of Product sales for each Product line in each sales area in the Territory for the subsequent calendar year quarter, in a format requested by the Company. Prior to execution of this Agreement for the first year and no later than November 1 for any subsequent calendar year that this Agreement is in effect, Representative shall prepare and submit to the Company an annual business plan, containing such information as shall be requested by the Company.

c.    Representative will report to Company any and all complaints received from any source with respect to Products, including without limitation, reports of adverse events involving the Products. Such reports shall be promptly made or, at any rate, within the time required by applicable law and regulations. Representative will maintain a record of all complaints it receives consistent with applicable Company, Johnson & Johnson and governmental guidelines.

### 6.    **Confidentiality; Trademarks.**

a.    Representative and Principal shall hold in confidence and agree not to disclose or use for their benefit or the benefit of any third party, and to cause Representative's sales representatives not to disclose to others or use (other than pursuant to the terms of this Agreement), any Confidential Information (as hereinafter defined). Confidential Information shall mean any information that relates to the business of the Company and its Affiliates (including Johnson & Johnson), including without limitation, the terms of this Agreement, including its Schedules, customer lists, number and location of sales representatives, names and significance of customers and their employees and representatives, preferences, needs and requirements, purchase histories, and other customer-specific information, business and operations strategies, sales and marketing

9

strategies, sales quotas, sales volumes and strategies, products in development, financial information and commissions structure. As further provided in Section 11, upon termination of this Agreement for any reason, Representative and Principal agree to return to the Company any property or documents that relate to or that contain Confidential Information that are in Representative's and/or Principal's possession, custody or control, but Representative's and Principal's obligation of confidentiality shall survive termination of this Agreement however arising. Representative and Principal further acknowledge that they may be receiving and processing Protected Health Information ("PHI") as that term is defined in 45 C.F.R. Section 164.501 from the Company or on its behalf, that has been disclosed subject to a HIPAA authorization, under 45 C.F.R. Section 164.508 or to a Business Associate Agreement(s) between the Company and a healthcare provider or institution, copies of which shall be provided to the Representative by the Company. Representative and Principal will collect, hold, use and disclose such information only for the purposes authorized in the Business Associate Agreement and as expressly directed by the Company. Representative and Principal shall not disclose any PHI to any third party or use PHI for any purpose, commercial or otherwise. Representative and Principal shall either (a) remove any PHI from its records and/or systems no later than thirty (30) days after receipt of such PHI or (b) take reasonable measures to ensure the security and confidentiality of such PHI. Representative's and Principal's failure to comply with this Section shall be considered a material breach of this Agreement and Company shall have the right to immediately terminate this Agreement.

b.    The Products are marketed under certain trademarks that are and shall remain the sole and exclusive property of the Company. Representative shall have no interest in or right to use the trademarks, except the right to use them solely in connection with the solicitation of sales of the Products in the Territory pursuant to this Agreement. Representative shall not use any of the trademarks, including the Company's name or logo, as part of its business name, except that Representative will refer to itself as a Sales Representative for the Company on its stationery and business cards which shall be subject to approval in advance by the Company.

7.    **Representations and Warranties.**

a.    Warranties on Products are limited exclusively to the express warranties set forth in the Company's price list (if any) and Product labeling and any other warranties of any kind or description, including warranties of merchantability or fitness, express or implied, are disclaimed unless otherwise specifically stated in writing by the Company. Representative shall make no false or misleading representations with respect to the Products. Representative shall make no express or implied warranties of any kind regarding the Products without Company's prior written consent and approval. Representative and Principal shall not engage in any advertising or promotion of any of the Company's Products, New Products or Co-Marketed Products in any form of media without the Company's prior written consent and approval. Representative shall limit its statements and claims regarding the Products, including safety and efficacy, to those which are consistent with the Company's labeling and promotional materials for the Products. In marketing the Products, Representative and its sales representatives shall use only the promotional materials provided by the Company; and neither Representative nor its sales

representatives shall develop, create or use any other promotional material or literature for the marketing of Products.

b.     Representative shall not make any representations and/or warranties for any Products other than provided in Section 7(a). In the event Representative subjects itself to liability to a user-customer by failing to conduct its activities in accordance with the preceding sentence, then Representative alone shall be responsible to the user-customer, and Representative shall not have any recourse against the Company for such matter.

8.     **Commissions.**

a.     During the term of this Agreement, the Company shall pay Representative commissions on all sales of Products made by Representative to customers located within the Territory. Representative shall not receive commissions on sales of co-marketed Products made in the Territory by Affiliates of the Company, unless otherwise agreed to in writing by the Company. Such commissions shall be paid on the Net Sales Prices (as defined below), established by the Company from time to time, of the Product at the rates set forth on Schedule D-1, as amended from time to time. Commission rates on New Products will be established by the Company at the launch of each New Product. "Net Sales Price" means the gross amounts invoiced by the Company to its customers, less returns and allowances actually allowed or made, freight charges, and taxes, if applicable. Commissions will be earned when the Company ships the Product and receives a customer purchase order number. All commissions shall be subject to the credits and/or charge backs referred to below.

b.     All commissions payable hereunder shall accrue monthly based on the Company's monthly reporting period as identified on Schedule D-2 with respect to all Products shipped with purchase order numbers during such month. Commissions shall be paid on or before the last day of the month following the monthly reporting period during which such commissions accrued. Commissions payments shall also reflect any appropriate adjustments, whether for current or past commissions or to take into account discounts, returns and allowances actually made by the Company. Each commissions payment shall be accompanied by a statement showing the commissions accrued and adjustments made for the applicable monthly reporting period and any other information necessary for the proper determination of the amount of commissions payable hereunder.

c.     Representative shall be responsible for, and shall pay, all Federal, State and local income taxes, social security, unemployment compensation, worker's compensation, insurance coverage and other such payments or obligations of Representative's sales representatives and other employees.

d.     The Company shall keep accurate books of account containing information which may be necessary for the purpose of demonstrating the commissions payable to Representative. Said books shall be available to Representative per year upon reasonable request to the Company in writing for a period of two (2) years following the end of the monthly reporting period to which they pertain, and may be inspected by an independent public accountant selected by and paid for by the Representative for the

11

purpose of verifying the statements of the Company and the commissions paid to Representative.

e.    Representative and Principal agree to refund any overpayment of commissions within thirty (30) days of notification of such overpayment by the Company. In the event the Company has not received payment from any customer account upon which a commission was paid within sixty (60) days from the date of invoice, the Company reserves the right to charge back to Representative the full amount of the commission paid on such sale. Upon eventual payment of the outstanding monies, the Company will pay 100% of the original commission amount. Company also reserves the right to charge back any overpayment of commissions.

f.    In the event that Representative fails to comply with the Company's written policies and procedures, the Company reserves the right to set-off and/or reduce the commission amount due to Representative, including set offs for late fees/charges and inventory and instrument related fees/charges.

9.    **Legal Relationship.**

a.    It is understood and agreed that each party to this Agreement is an independent contractor, that nothing in this Agreement or in the contractual relationship between the Company, Representative and Principal shall make Representative or Principal an employee, agent or legal representative of the Company, and neither Representative nor Principal will enjoy any of the benefits of an employee. Neither Representative nor Principal has the right or power to create any obligation or to bind the Company in any manner or thing whatsoever. The Company shall neither have nor exercise any control over the manner in which Representative and Principal perform their duties under this Agreement. Representative and Principal acknowledge that they have paid no franchise fee or other similar consideration for the rights conferred by the Company pursuant to this Agreement, and the Company acknowledges that it has received no such fee or other similar consideration from Representative or Principal.

b.    Representative and Principal agree and acknowledge that all rights and intangibles concerning the Territory belong to the Company and both Representative and Principal hereby disclaim same for themselves and their successors. Included in these rights and intangibles without limitation are the following:

(i)    Neither Representative nor Principal may enter into any arrangement, agreement or promise with any other party concerning changes to the Company's representative or representation in the Territory. Any decision concerning the appointment of a successor representative(s) in the Territory rests solely with Company management.

(ii)    Under no circumstances shall Representative or Principal develop any rights in the Territory which may be sold, assigned or transferred to another party. Any and all compensation to Representative from the sale of Company Products in the Territory shall cease upon retirement, or death of

12

Representative or Principal or termination or non-renewal of this Agreement, except as provided herein.

(iii)    If any rights or intangibles become vested in Representative or Principal by law or otherwise, despite acknowledgement and disclaimer, Representative and Principal agree to immediately assign any and all such rights or intangibles to Company upon request or upon termination or expiration of this Agreement.

## 10.    Term.

The term of this Agreement shall expire on December 31, 2004 unless terminated earlier as provided herein.

a.    The Company may at its election and on thirty (30) days' prior written notice take the following actions if any of the following events occur:

i.    The Company may alter the Territory and/or remove one or more sales areas, including by way of example rather than limitation, accounts, cities, counties or other portions from Representative's Territory if Representative's total sales performance is less than 90% of overall quota for any two consecutive fiscal quarters on an annualized basis and the Territory's overall net sales growth is less than the average net sales growth for all Company U.S. sales territories. Exercise by the Company of the foregoing right shall not, however, prohibit the Company from terminating this Agreement for failure to achieve required sales performance as set forth in Section 10 a. ii.

ii.    The Company may terminate the Agreement at the end of any fiscal year in which Representative's sales performance is less than 90% of overall quota and the Territory's overall net sales growth is less than the average net sales growth for all Company U.S. sales territories. The Company may provide written notice of such termination on or after the end of the fiscal year in which quota was not achieved. Upon or after issuing a notice of termination pursuant to this Section 10(a)(ii), the Company at its election may also give written notice requiring Representative and Principal immediately to cease the activities described in Section 4(a) above and immediately to undertake the obligations described in Section 11(a) below.

b.    This Agreement may be terminated, effective immediately upon written notice, if any of the following events occurs:

i.    By the non-breaching party if the other party fails to cure a breach in the performance of its obligations under this Agreement within thirty (30) days after the party seeking to terminate this Agreement gave written notice thereof; provided, however, the parties agree that a breach of one or more of the provisions of Sections 4, 5, 6 or 7 of this Agreement by Representative or Principal shall constitute a material breach incapable of cure, and shall

13

constitute adequate cause for the immediate termination of this Agreement by the Company;

ii.    By the Company if Representative, Principal or any of Representative's sales representatives violates the anti-kickback statute of the Social Security Act, Section 1128B(b)(1) and (2), 42 U.S.C. Section 1320A-F(b) (1) and (2);

iii.    By either party if the other party becomes bankrupt or enters into any arrangements with its creditors or enters into liquidation, dissolution or receivership; or

iv.    By the Company if Representative, or a major part of its assets or stock, becomes subject to the direction or control of a party other than Principal.

v.    By the Company if Principal is not actively involved in the day-to-day Company business of Representative or there is any dispute, disagreement or controversy arising between or among the Principals of Representative which may adversely affect Representative's ability to perform its obligations under this Agreement or the operation, management, reputation, business or interest of Representative or the business or interest of the Company or the reputation of the Products.

11.    **Obligations Upon Termination.**

a.    Upon termination of this Agreement, Representative and Principal agree to immediately discontinue making any statements or representations, express or implied, that it is a representative of or otherwise affiliated in any way with the Company or the Products and return to the Company within fifteen (15) days after the effective date of termination, any and all catalogs, price lists, reprints, samples, literature and other sales materials, that relate to the Products or the Company's business, contain any Confidential Information of the Company or have been furnished to Representative and/or Principal by the Company.

b.    Upon termination of this Agreement, Representative and Principal agree to deliver to the Company upon its request, all Products in Representative's and/or Principal's possession, custody or control at the time notice of termination was delivered to Representative and/or Principal under this Agreement, including any consignment, loaner and/or trial and evaluation inventory.  Representative and the Company shall pay the freight charge for shipping any such Products to the destination named by the Company on a 50/50 basis.  Representative and Principal agree to assist the Company in the recovery of the Products, and Representative and Principal waive any requirement for the posting of a bond or other surety by the Company in the efforts of the Company to recover its Products.

c.    Upon termination of this Agreement by Representative or Principal during its term, or if the Company should terminate this Agreement due to a material breach by Representative or Principal  of any of  their obligations under Section 4 of this Agreement, in addition to any other legal or equitable remedies available to the Company, the Company shall have the right in its sole discretion and for no additional consideration to Representative or Principal:

14

(i)  to direct Representative and/or Principal to immediately assign to the Company all non-competition or similar agreements described in Section 4(g) above; and

(ii)  to solicit, contract with, or hire any sales representatives of Representative and/or Principal.

(iii)  Representative and/or Principal agree that all agreements between Representative and/or Principal and their sales representatives shall contain provisions allowing for the assignment described in this Section 11(c).

d.  Upon termination of this Agreement by Representative or Principal during its term, or if the Company should terminate this Agreement due to a material breach by Representative or Principal of any of their obligations under Section 4(e)-(j) of this Agreement, Representative and Principal agree that the Company or any agent designated by the Company may in its sole discretion, but shall not be required to, hire or otherwise engage any sales representative of Representative or Principal.  Representative and Principal shall transfer to the Company all agreements with such sales representatives containing covenants not to compete and shall release the Company from all claims that Representative and Principal may have related to the Company's hiring or engagement of such sales representatives.  Except in the event of a breach by Representative or Principal of any of the obligations under Section 4(e)-(j) of this Agreement, in which case the provisions of Section 4(k) and 11(c) shall govern and control, the parties shall negotiate in good faith a reasonable fee for the foregoing transfers and releases, and for the services of Representative and Principal in assisting the Company in an orderly transition of the business in the Territory to the Company or a third party designated by the Company and for any exercise of the Company's rights under the first sentence of this Section 11.  If Principal is no longer actively involved in the day-to-day Company business of Representative due to death or a continuing disability that prohibits Principal from being so involved, then the negotiations contemplated under this Section 11(d) shall be conducted with the person who has succeeded Principal in running Representative's business.  The foregoing provision shall not affect the Company's right to terminate the Agreement as provided under Section 10(b)(v).

e.  For a period of ninety (90) days after termination, the Company shall have the right to suspend or hold payment of sums of money owed by Company to Representative, and to exercise a right to offset and deduct from such sums the amount of any indebtedness owed by Representative or Principal to Company.

f.  Provided that there has been no material breach of this Agreement by Principal and/or Representative, termination of this Agreement shall not release the Company from the obligation to pay commissions to Representative and Principal.

15

## 12.    Governing Law/Limitations Period.

a.    This Agreement is made under and shall be construed and interpreted in accordance with and governed by the internal laws of the Commonwealth of Massachusetts applicable to contracts made and performed within the Commonwealth of Massachusetts.  Subject to the additional provisions set forth in Section 13, any claim and/or action arising out of or relating to this Agreement or the validity, inducement, or breach thereof, must be brought against the Company within one (1) year of the event which caused it.

## 13.    Arbitration/Dispute Resolution.

a.    Any controversy or claim arising out of or relating to this Agreement or the validity, inducement, or breach thereof, shall be settled by arbitration before a panel of three (3) arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then pertaining, except where those rules conflict with this provision, in which case this provision controls.  The arbitrators shall be selected from the National Panel of Arbitrators of the AAA.  Each party shall select one arbitrator and the two selected arbitrators shall select the third arbitrator.  If the two selected arbitrators cannot agree on a third arbitrator then the AAA shall select said arbitrator from the National Panel of Arbitrators.  The Parties hereby consent to the jurisdiction of the United States District Court for the District of Massachusetts, Boston Division for the enforcement of this provision and entry of judgment on any award rendered hereunder.  Should such court for any reason lack jurisdiction, any court with jurisdiction shall enforce this clause and enter judgment on any award.

b.    Each arbitrator shall be an attorney who has at least 15 years of experience with a law firm or corporate law department of over 25 lawyers or was a judge of a court of general jurisdiction.  The arbitration shall be held in Boston, Massachusetts and in rendering the award the arbitrators must apply the substantive law of Massachusetts (except where that law conflicts with this clause), except that the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act.  The arbitrators shall be neutral, independent, disinterested, impartial and shall abide by The Code of Ethics for Arbitrators in Commercial Disputes approved by the AAA.  Within 45 days of the initiation of arbitration, the Parties shall reach agreement upon and thereafter follow procedures assuring that the arbitration will be concluded and the award rendered within no more than four months from the selection of the arbitrators.  Failing such agreement, the AAA will design and the Parties will follow procedures that meet such a time schedule.

c.    Each Party has the right before, or if the arbitrators cannot hear the matter within an acceptable period, during the arbitration, to seek and obtain provisional remedies such as attachment, preliminary injunction, replevin, etc., to avoid irreparable harm, maintain the status quo or preserve the subject matter of the arbitration.  The parties agree that any such action shall be brought only in the United States District Court for the District of Massachusetts, Boston Division or in the Superior Court of Suffolk County, Massachusetts.  Each party hereby consents and waives any objection to jurisdiction or venue in each such court.

16

d.    EACH PARTY HERETO WAIVES ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY.  THE ARBITRATOR SHALL NOT AWARD ANY PARTY PUNITIVE, EXEMPLARY, MULTIPLIED OR CONSQUENTIAL DAMAGES, AND EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT TO SEEK SUCH DAMAGES.  NO PARTY MAY SEEK OR OBTAIN PREJUDGMENT INTEREST OR ATTORNEYS' FEES OR COSTS.

### 14.    <u>Miscellaneous</u>.

a.    This Agreement is subject to and expressly conditioned upon the additional provisions set forth in <u>Schedule E</u> and all such provisions shall be deemed to be part of this Agreement for all purposes.  This Agreement with all the Schedules hereto, constitute the entire agreement between Representative, Principal and the Company with respect to its subject matter and supersedes and replaces any and all previous contracts, arrangements, or understandings that may have existed or may exist between the parties.  No modifications or amendments shall be binding on either party unless made in writing and signed by both parties.  The language of this Agreement shall for all purposes be construed as a whole, according to its fair meaning, not strictly for or against either party, and without regard to the identity or status of any person who drafted all or part of it.  Whenever the words "include" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

b.    If any provisions of this Agreement are found to be invalid or unenforceable by a court or arbitrator, such provision shall not affect the remainder of this Agreement, which shall remain in full force and effect.

c.    All notices hereunder shall be in writing and shall be delivered to the other party either personally, by registered mail, return receipt requested, or by overnight courier service.  Notice shall be sent to a party at its address hereinabove set forth or at such other address as the other party shall have theretofore designated.  Notice shall be deemed duly given when actually received or refused by the addressee.

d.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns, but shall not be assignable by Representative or Principal without the written consent of the Company.  Any rights and obligations accruing hereunder to Representative and/or Principal shall be considered personal and shall not be mortgaged, charged, transferred, delegated, subcontracted or assigned, directly or indirectly, voluntarily, by operation of law or otherwise, either in whole or in part, except upon express prior written approval by Company.  Any purported transaction in violation of this Section shall be null and void and of no force or effect.  Representative shall not merge into another corporation, sell all or substantially all of its assets or stock, or experience a change of control or other corporate reorganization, except upon express prior written approval by Company.  If any of the events referred to in this Section occur without the express prior written approval by Company, such event shall constitute a material breach of this Agreement, and Company shall have the right to terminate the Agreement immediately without notice.

17

e.    This Agreement is not effective unless and until signed by all parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as an instrument under seal as of the date and year indicated above.

DEPUY SPINE SALES LIMITED PARTNERSHIP

By: _____
    DePuy Spine Holding Corporation,
    General Partner
    Name:
    Title:

TRINITY SPINE INC.

By: _____
    Name:  John Mieyr
    Title: _President_

The undersigned joins as a party to this Agreement solely as to Sections 2(b); 4(c), 4(e)-(l), 4(n)-(q); 6(a); 7(a); 8(e); 9(a)-(b); 10(a)-(b); 11(a)-(f); 12; 13; and 14(a), 14(d) and has executed this Agreement as an instrument under seal as of the date and year first above written.

WITNESS MY HAND AND SEAL THIS 26 DAY OF Feb, 2004

PRINCIPAL

By: _____, Principal
    Name: John Mieyr

DePuy Spine
Products

Schedule A-1

- Core Products:

Crossover
EZ-X
Frontier
Isola/VSP (Family of Products)
KASS
Modular Cross Connector
Monarch (Family of Products)
MOSS Miami (Family of Products)
TiMX

BowTi
Discovery
Lumbar I/F Cage (Family of Products) - Jaguar
Stackable Cage-Ocelot
Surgical Titanium Mesh (Family of Products)
Cougar Vertebral Body Replacement
Bengal Vertebral Body Replacement
Devex Vertebral Body Replacement
Leopard Vertebral Body Replacement

Kaneda SR
M-2 Plate
PROFILE
University Plate

CONFIDENTIAL

DOC
Peak
Songer
Summit (Family of Products)
Slim-Loc
ACP
Interlaminar Clamp
Sof'wire
Ti-Frame

Bremer Halo Systems
Surgical Positioning Board
Scoliosis Brace

## DePuy Spine Confidential Information
## Not For Distribution

- Miscellaneous:
  BrainLab Vector Vision, VectorVision II & VectorVision Compact

- Alliances Technology
  LifeNet VertiGraft, VG1 & VG2
  LifeNet Cellect
      DBM Cartridge         CEL 25
  Orthologic SpinaLogic Bone Growth Stimulators

- Orthobiologic Products

  Healos
      Healos II 2 strip      2761-60-010  6100A
      Healos II 1 strip      2761-60-005  6101A
  Cellect

| | | |
|---|---|---|
| Selective Retention Device | | 2761-25-001 |
| Empty Cartridge | 2761-26-003 | |
| Healos Cartridge | 2761-26-005 | |
| 3 Hole Needle MiniKit | 2761-24-002 | |
| 1 Hole Needle MiniKit | 2761-24-001 | |
| 3 Hole Full Aspiration Kit | 2761-23-001 | |
| 1 Hole Full Aspiration Kit | 2761-21-001 | |

CONFIDENTIAL

**DePuy Spine Confidential Information**
**Not For Distribution**

Schedule A-2

- Co-Marketed/Non-Exclusive Alliances Technology Products:
  LifeNet I/C Graft Chambers
  Symphony Platelet Concentration System
  Symphony II Platelet Concentration System
  Symphony Graft Delivery System
  Conduit TCP
  Bone Graft Procedure Kits
  LifeNet Optium



CONFIDENTIAL

**DePuy Spine Confidential Information**
**Not For Distribution**

**Schedule B**

Territory

CONFIDENTIAL

**DePuy Spine Confidential Information**
**Not For Distribution**





CONFIDENTIAL

2004 Account List
T572 - Trinity Spine

T572.xls
2/12/2004

| Billing Type | Parent Number | Terr | Address | Number | Alpha Name | City | ST | Postal Code | Long Address |
|---|---|---|---|---|---|---|---|---|---|
| B | | 572 | | 205663 | ALL SAINTS EPISCOPAL HOSPITAL | FORT WORTH | TX | 76101 | 102131 |
| S | 205663 | 572 | | 215371 | ALL SAINTS EPISCOPAL HOSPITAL | FORT WORTH | TX | 76104 | 102131001 |
| S | 210422 | 572 | | *220217 | COLUMBIA PLAZA MED CTR OF FT WORTH | FORT WORTH | TX | 76104 | 297341002 |
| S | 206988 | 572 | | 216670 | COOK-FT WORTH CHILDRENS MED CENTER | FORT WORTH | TX | 76104 | 163535001 |
| S | 206988 | 572 | | 216671 | COOK-FT WORTH CHILDRENS MEDICAL CTR | FORT WORTH | TX | 76104 | 163535002 |
| S | 206988 | 572 | | 216672 | COOK CHILDREN S ORTHOPEDICS | FORT WORTH | TX | 76104 | 163535003 |
| X | | 572 | | 206988 | COOK FT WORTH CHILDRENS MED CENTER | FORT WORTH | TX | 76104 | 163535. |
| S | 211402 | 572 | | 221320 | J P S  HEALTH NETWORK | FORT WORTH | TX | 76104 | 331953001 |
| X | | 572 | | 211402 | JPS HEALTH NETWORK | FORT WORTH | TX | 76104 | 331953. |
| X | | 572 | | 205586 | VENCOR HOSPITAL FORT WORTH WEST | FORT WORTH | TX | 76104 | 101653 |
| X | | 572 | | 258438 | PHYSICIANS METROPLEX HOSPITAL | ARLINGTON | TX | 76018 | 102612 |

*NOTE: 210422 (X) is located outside representative's geographic area.  Related Account #220217 (S) is within T572.

Page 1 of 1

## Schedule C

To be provided –quota schedule broken down by month.

### Annual Quotas

Core:            $1,659,399

Orthobiologic: $77,403

Alliance:        $325,640

Total:           $2,062,442

CONFIDENTIAL

**DePuy Spine Confidential Information**
**Not For Distribution**

**Schedule D-1**

**DePuy Spine**
**Sales Representative**
**2004 Commission Plan**



- DePuy Spine Core Implants and Instruments 12% to quota, 25% over quota

- Healos                                    12% to quota, 25% over quota

- Cellect                                   12% to quota, 25% over quota

- LifeNet VertiGraft                                    10%

- Symphony Platelet Concentration System               10%

- Symphony II Platelet Concentration System            10%

- Symphony Graft Delivery System                       10%

- Orthologic                                           10%

- LifeNet Cellect                                       8%

- LifeNet I/C Graft Chambers                            8%

- Conduit TCP                                           8%

- Bone Graft Procedure Kits                            '8%

- Optium                                                8%

- BrainLab                                              2%*

---

* Rate subject to change due to pending contract negotiations with BrainLab.

## DePuy Spine Confidential Information
## Not For Distribution

<u>**Schedule D-2**</u>

**Monthly Reporting Period**

CONFIDENTIAL

<u>**DePuy Spine Confidential Information**</u>
**Not For Distribution**

**2004 UNIVERSAL CALENDAR**

| | M | T | W | T | F | S | S | | | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAN** (4 Weeks) | 29 | 30 | 31 | | | | | | **JUL** (4 Weeks) | 28 | 29 | 30 | | | | |
| | | | | 1 | 2 | 3 | 4 | | | | | | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| **FEB** (4 Weeks) | 26 | 27 | 28 | 29 | 30 | 31 | | | **AUG** (4 Weeks) | 26 | 27 | 28 | 29 | 30 | 31 | |
| | | | | | | | 1 | | | | | | | | | 1 |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | | | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| **MAR** (5 Weeks) | 23 | 24 | 25 | 26 | 27 | 28 | 29 | | **SEP** (5 Weeks) | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| | | | | | | | | | | 30 | 31 | | | | | |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | | | | | 1 | 2 | 3 | 4 | 5 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 | | | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28 | | | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| **APR** (4 Weeks) | 29 | 30 | 31 | | | | | | **OCT** (4 Weeks) | 27 | 28 | 29 | 30 | | | |
| | | | | 1 | 2 | 3 | 4 | | | | | | | 1 | 2 | 3 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **MAY** (4 Weeks) | 26 | 27 | 28 | 29 | 30 | | | | **NOV** (4 Weeks) | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| | | | | | | 1 | 2 | | | | | | | | | |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| **JUN** (5 Weeks) | 24 | 25 | 26 | 27 | 28 | 29 | 30 | | **DEC** (6 Weeks) | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| | 31 | | | | | | | | | 29 | 30 | | | | | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | | | | | 1 | 2 | 3 | 4 | 5 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27 | | | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| | | | | | | | | | | 27 | 28 | 29 | 30 | 31 | | |
| | | | | | | | | | | | | | | | 1 | 2 |

CONFIDENTIAL



**Schedule E**

Other Products

None

Termination of January 1, 2002 Sales Representative Agreement

The Company agrees to make a payment in the amount of $200,000 to Representative within five (5) business days of execution of this Agreement. Such payment shall be made in consideration of the following terms and conditions:

a. Representative agrees to the termination of the Sales Representative Agreement dated January 1, 2002 (the "2002 Agreement"). The 2002 Agreement is hereby replaced by and superceded with this Agreement.

b. Principal and Representative agree that Charlie Lopez and Rob Walker, who are sales representatives engaged and/or employed by Representative and/or Principal ("Sales Representatives"), may be offered positions by the Company or its representatives as employees, independent contractors and/or sales representatives in any geographic area in which the Company's products are sold, including, without limitation Representative and Principal's former Company sales Territory (as defined in the Sales Representative Agreement). Representative and Principal agree that all restrictive covenants running from the Sales Representatives in favor of Representative and/or Principal will terminate and become unenforceable against the Company.

c. Principal and Representative will use best efforts to work with the Company or its designated representative in good faith to assist and support the hiring of Charlie Lopez and Rob Walker by the Company or the Company's designated representative.

d. Except for claims arising out of this Agreement, Representative and Principal and their assigns, successors, heirs, executors, administrators and anyone else claiming through them, releases and forever discharges the Company and its parent and subsidiary corporations, affiliates, predecessors in interest, successors in interest, officers, directors, shareholders, employees, attorneys, representatives and agents, from any and all past, present and future claims, whether known or unknown.

Section 4 – Obligations of Representative and Principal

Section 4(f) is hereby deleted in its entirety and replaced with the following new Section 4(f):

f. Representative and Principal acknowledge and affirm that they have received Confidential Information (as such term is defined in Section 5(a) of this Agreement)

**DePuy Spine Confidential Information**
**Not For Distribution**

CONFIDENTIAL

and other trade secret information of the Company and further agree to protect that information and that as a material inducement to the Company to enter into this Agreement, and in consideration of the Company entering into this Agreement and the other consideration provided for herein, the receipt and sufficiency of which are hereby acknowledged by Representative and Principal, that for a period of six (6) months following the termination of this Agreement for any reason, including its termination for non-renewal by any party, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly engage in the sale of Competitive Products in the Territory or accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products.

<u>New Products</u>

If the Charite Disc is approved for sale by the FDA in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of the Charite Disc in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to the Charite Disc once it is made available to Representative. Representative agrees to appoint one or more disc specialists who will have primary responsibility for Representative's sales of the Charite Disc.

If the Saber product is approved for sale by the FDA in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of Saber in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to Saber once it is made available to Representative. The Saber product shall be part of the Core Products group.

If the Global ACP Rigid and Dynamic product is approved for sale by the FDA in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of Global ACP Rigid and Dynamic in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to Global ACP Rigid and Dynamic once it is made available to Representative. The Global ACP Rigid and Dynamic product shall be part of the Core Products group.

If the SIS product becomes available for sale in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of SIS in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to SIS once it is made available to Representative. The SIS product shall be part of the Miscellaneous Products group.

<u>**DePuy Spine Confidential Information**</u>
**Not For Distribution**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DEPUY SPINE HOLDING          )
CORPORATION, INC., AS        )
General Partner of DEPUY     )
SPINE SALES LIMITED          )
PARTNERSHIP,                 )
    Plaintiff,           ) CIVIL ACTION NO.
                         ) 05-102770 RGS
VS.                          )
                         )
JOHN MIEYR and TRINITY       )
SPINE, INC.,                 )
    Defendant.           )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

JOHN MIEYR

FEBRUARY 16, 2005

Volume No. 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


    ORAL DEPOSITION of JOHN MIEYR, produced

as a witness at the instance of the Defendant, and

duly sworn, was taken in the above-styled and numbered

cause on the 16th of February, 2005, from 10:54 a.m.

to 12:37 p.m., before Sherry Folchert, CSR in and for the

State of Texas, reported by machine shorthand, at 908 9th

Avenue, Fort Worth, Texas, pursuant to the Texas Rules of

Civil Procedure.

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                February 16, 2005

---

Page 2

APPEARANCES

FOR THE PLAINTIFF:
    Joseph F. Shea
    NUTTER McCLENNEN & FISH, L.L.P.
    World Trade Center West
    155 Seaport Boulevard
    Boston, MA  02210
    617-439-2280
    jshea@nutter.com

FOR THE DEFENDANT:
    Robbyn P. Wysocki
    McCUE WYSOCKI, P.C.
    14135 Midway Road, Suite 250
    Addison, TX  75001
    972-490-0808
    rwysocki@mcwylaw.com

---

Page 4

AGREEMENTS

It is hereby agreed by and between the parties hereto, through their attorneys appearing herein, that any and all objections to any question or answer herein, except as to the form of the question and responsiveness of the answer, may be made upon the offering of this deposition in evidence upon the trial of this cause with the same force and effect as though the witness were present in person and testifying from the witness stand.

It is further agreed by and between the parties hereto, through their attorneys appearing herein, that this deposition may be signed before any notary public in and for the State of Texas, but if the original deposition has not been signed by the witness and returned by the time of the trial or any hearing in the case, the unsigned original or a copy thereof may be returned into Court and used with the same force and effect as though all requirements of the rules and statutes with reference to signature and return had been fully complied with.

---

Page 3

INDEX
                                          PAGE

Appearances . . . . . . . . . . . . . . . . . .    2

Stipulations. . . . . . . . . . . . . . . . .    4

JOHN MIEYR
    Examination by Mr. Shea . . . . . . . . . . .    5
Changes and Corrections . . . . . . . . . . . . .   98
Reporter's Certificate. . . . . . . . . . . . .  100

EXHIBITS

NO. DESCRIPTION                          PAGE
    1  Contract                          44

    2  Amended contract                  52

---

Page 5

PROCEEDINGS
JOHN MIEYR,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. SHEA:
    Q.  Could you state your name, please?
    A.  John Mieyr.
    Q.  Where do you live, Mr. Mieyr?
    A.  4406 Shadywood Lane in Colleyville, Texas.
    Q.  Give me your educational background from the time you graduated from high school.
    A.  Graduated from high school and went to University of Arizona in Tucson, Arizona.  And --
    Q.  I'm sorry.
    A.  Bachelor's of science in biology with a minor in chemistry.  Went to Baylor University in Waco to work on a master's.  When I decided to pursue a career in dentistry, went to Baylor College of Dentistry from '85 to '89.  During that time -- the time I was in college I had been to flight school and also have been a flight instructor.  I worked my way through college and through dental school as a flight instructor.  In '89 decided not to practice dentistry, went to fly for UPS, Merlin Express.  I flew a lear jet for a company while in school out of Love Field here.

2 (Pages 2 to 5)

John Mieyr                                February 16, 2005

Page 6

1       And then UPS has a commuter -- it's
2   actually -- what do they call it? Merlin Express flies
3   short range down to Mexico and here in Texas for UPS.
4   Flew for that airline until the point where they were
5   bought out and went bankrupt. And I came back and was
6   thinking about going back into dentistry and got into the
7   orthopedic -- or implant business and been there since
8   1995.
9       Q.  Did you get your degree in dentistry?
10      A.  No, I don't have the DDS. My senior year I took
11  the MCAT to go to medical school. And I did not board
12  certify in dentistry. All I'm lacking is the board cert.
13      Q.  And when you were getting your MA at Baylor what
14  was that in?
15      A.  Biology.
16      Q.  So switched out of the MA -- MS program?
17      A.  Right.
18      Q.  And you were a flight instructor from '85 to
19  '89, is that right, while you were in dental school?
20      A.  Well, before that. A little bit in college
21  also. I've been a commercially licensed pilot since
22  then.
23      Q.  Then you flew for, what, five, six years?
24      A.  Yeah, I flew a lear jet for a company called Jan
25  Air, J-A-N, Air out of Dallas Love Field, a fleet of lear

Page 7

1   jets and then Merlin Express, which was with UPS.
2       Q.  And in l995 you said you went into the spinal
3   implant business; is that right?
4       A.  No. I went -- back in '94 I went into
5   maxillofacial implants first and did that with a division
6   of Biomet, which was the Lorenz Company. And when a
7   recruiter from Depuy called me and told me this was
8   available -- this is in '96, the summer of '96 when Depuy
9   came available and I joined them then.
10      Q.  You joined Depuy in '96?
11      A.  Correct.
12      Q.  And what was your title then?
13      A.  Spinal specialist.
14      Q.  Where did you work out of?
15      A.  Fort Worth.
16      Q.  And what were your duties as a spinal
17  specialist?
18      A.  We -- primary duty as a spinal specialist is
19  education. Educate physicians on the implants that are
20  out there, the use of them. And of course we try to
21  enjoin the physician to using us for the consults and
22  series use and our implants.
23      Q.  Uh-huh. And where did you operate out of as a
24  spinal specialist? Headquartered?
25      A.  I have an office in Bedford, Texas. Here in

Page 8

1   Tarrant County.
2       Q.  When you were doing that though as a spinal
3   specialist, were you an employee of Depuy?
4       A.  At the beginning, yes. From '96 to probably
5   2000, I believe I was a Depuy employee.
6       Q.  All that time were you a spinal specialist?
7       A.  Correct.
8       Q.  Were your duties essentially the same at that
9   time?
10      A.  Yeah, they've always been the same.
11      Q.  At that time when you were an employee from '96
12  to 2000, did you work out of an office or did you work
13  out of your home office?
14      A.  As an employee, I worked out of the -- Depuy had
15  an office here for us. They had an office in Dallas off
16  of Alpha Road, I believe.
17      Q.  Okay.
18      A.  We had a regional office here in Dallas that we
19  worked out of in the beginning.
20      Q.  And while you work as a spinal specialist did you
21  travel? Did you go to hospitals to educate doctors? Did
22  you just work out of the Dallas office? Were you there
23  most of the day?
24      A.  No, no. You were not in the office -- one
25  percent of the time. You're strictly in the hospitals.

Page 9

1   Didn't travel much, but strictly in -- in hospitals.
2       Q.  Meeting with surgeons?
3       A.  Right.
4       Q.  Trying to get them to buy the product?
5       A.  Well, before you can get a surgeon to buy a
6   product you've got to get them to buy into you. So
7   meeting the surgeons, educating them on me and what I
8   know, what I do and what products I have.
9       Q.  Now while you were working at Depuy as an
10  employee, was the only products you sold Depuy products?
11      A.  Correct.
12      Q.  Did you get a commission or was it a salaried
13  position?
14      A.  In the beginning it was salary. Then they
15  offered -- you had -- you could transfer from salary to
16  straight commission when your commissions became --
17      Q.  Big enough?
18      A.  -- substantial enough to support you. I think I
19  stayed on salary in the beginning for a total of six
20  months.
21      Q.  And then after that first six months while you
22  were an employee at Depuy your income was commission
23  based?
24      A.  Correct, 100 percent.
25      Q.  100 percent. And these commissions were for

3 (Pages 6 to 9)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                            February 16, 2005

| Page 10 |
|---|

1  selling spinal implant products; is that right?
2      A.  Correct.
3      Q.  And I think you said that was in Tarrant County
4  you were doing that?
5      A.  In the beginning, no.  In the beginning I had
6  all of -- from Highway 360, which divides Dallas and
7  Tarrant County, westward.  El Paso.  I had Abilene,
8  Midland, Odessa, Lubbock, Amarillo, Wichita Falls, Waco.
9  I had a huge territory.  The spinal implant business back
10  then was very young.  It was in its infancy.  When I
11  first started we didn't have -- the whole implant
12  business as a whole didn't have a 50th of the implants
13  available that are out there.
14      Q.  When you say you had that large territory at the
15  beginning, that was while you were an employee of Depuy
16  Spine?
17      A.  I had that both as an employee and as a
18  distributor.
19      Q.  Let me focus on the employee part.
20      A.  Correct.
21      Q.  As an employee, you had that large area?
22      A.  Correct.
23      Q.  And that included Tarrant County?
24      A.  Correct.  And some of -- I worked in some of
25  Dallas County then also.

| Page 11 |
|---|

1      Q.  And -- okay.  What about -- what are you doing
2  now?  Where do you work now?
3      A.  Tarrant County still.
4      Q.  For whom do you work?
5      A.  I work for myself.
6      Q.  Is that through Trinity Spine?
7      A.  Correct.
8      Q.  Is that a --
9      A.  It's a Texas C Corporation.
10      Q.  Are you the sole shareholder?
11      A.  No.
12      Q.  Are you the majority shareholder?
13      A.  Yes.
14      Q.  And are your other shareholders family members?
15      A.  No.
16      Q.  What percentage of the stock, of Trinity, do you
17  own?
18      A.  Probably 80 to 90 percent.
19      Q.  Are you an officer?
20      A.  Yes, president.
21      Q.  And who is the -- what are the other officers?
22      A.  My wife.
23      Q.  Anybody else?
24      A.  No.
25      Q.  And does -- did you -- are there any other

| Page 12 |
|---|

1  salespeople working at Trinity?
2      A.  Currently, no.
3      Q.  Are there any other employees at Trinity other
4  than you?
5      A.  My wife.
6      Q.  What are her duties?
7      A.  She's the vice president.
8      Q.  But does she have day-to-day duties?
9      A.  Absolutely not.  She teaches high school.
10      Q.  And are you distributing some products now
11  through Trinity?
12      A.  Yes.
13      Q.  What products are they?
14      A.  Pedicle screws, cages, cervical plates,
15  allograft bone, pedicle screws.  Really that's about it.
16  We don't have a full line of products.
17      Q.  When you say we, who are you referring to?
18      A.  Trinity Spine.
19      Q.  And who manufactures the pedicle screws that you
20  distribute?
21      A.  I have five different companies.  I have Globus,
22  Vertebron.
23      Q.  How do you spell that?
24      A.  Vertebron, V-E-R-T-E-B-R-O-N.
25      Q.  O-N OR I-N?

| Page 13 |
|---|

1      A.  B-R-O-N.
2      Q.  Thanks.
3      A.  Dynaspine.
4      Q.  D-Y-N-A?
5      A.  Uh-huh.  S-P-I-N-E.
6      Q.  Yep.
7      A.  Spine Vision and Science'X.  That's spelled
8  science and then an apostrophe and an X.
9      Q.  And what about cages?  Whose cages do you
10  distribute?
11      A.  They all have cages.
12      Q.  And you distribute cages for all of them?
13      A.  Uh-huh.
14      Q.  I'm sorry.  You have to answer yes.
15      A.  Yes, yes, yes.
16      Q.  And cervical plates?
17      A.  They all have cervical plates.
18      Q.  And you distribute all of their cervical plates?
19      A.  I can.  I prefer Vertebron and Globus for
20  cervical plates.
21      Q.  Let me rephrase that.  You distribute cervical
22  plates for all of these companies?
23      A.  Correct.
24      Q.  And who manufactures the allograft bone?
25      A.  Dynaspine right now.  But I'm not -- Dynaspine

4 (Pages 10 to 13)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

Page 14

1   is the distributor for the allografts. Who manufactures
2   it is Lost Mountain Tissue Bank.
3       Q.  But you distribute it on behalf of Dynaspine?
4       A.  Not even then, no. I distribute -- they have a
5   distributor in Dallas. All five of these companies have
6   a distributor in Dallas. I don't have a contract with
7   any of these companies. And there's a distributor in
8   Dallas that distributes all of this and I do it under
9   them.
10      Q.  Okay. Who is the company in Dallas?
11      A.  One Source Technology.
12      Q.  Is that inc.?
13      A.  That's an inc., yeah.
14      Q.  Who's the principal of One Source Technology?
15  Do you know?
16      A.  At this point I do not.
17      Q.  Now --
18      A.  One Source Technology does not have Globus.
19  They have all four of those except for Globus. There's
20  another distributor in Dallas for Globus that I contract
21  with.
22      Q.  Who is that?
23      A.  His name is Michael Cole. But I can't think of
24  the name of his company off the bat.
25      Q.  Kole, K-O-L-E?

Page 15

1       A.  Cole, C-O-L-E.
2       Q.  Does Trinity have a contract with Michael Cole
3   or the company of which Michael Cole --
4       A.  No contract.
5       Q.  No contract?
6       A.  No contract.
7       Q.  Any kind of understanding or agreement?
8       A.  Nope.
9       Q.  How is it that you distribute Globus product for
10  Michael Cole?
11      A.  They've asked me to help out.
12      Q.  When did they do that?
13      A.  We get approached by implant companies
14  regularly. Probably the first part of January, tail end
15  of December, first part of January.
16      Q.  So was it Michael Cole that approached you about
17  Globus?
18      A.  Yes. Michael Cole. And I can't remember the
19  other gentleman's name. Two gentlemen that --
20      Q.  If you think of it later on, let me know.
21      A.  Okay. I only met the other guy once.
22      Q.  And was that a telephone conversation you had
23  with Cole or was that in person?
24      A.  Yes, telephone conversation.
25      Q.  Did you know Cole?

Page 16

1       A.  Never met him before.
2       Q.  Okay. And did he explain to you why he was
3   contacting you at that time?
4       A.  Yes.
5       Q.  What did he say?
6       A.  He said his (sic) name was given to him by some
7   other representatives in the business, that I was a good
8   rep.
9       Q.  Who was that?
10      A.  He didn't tell me.
11      Q.  Did you meet with him after that, after you
12  spoke with him on the phone?
13      A.  I met with him at Dallas/Fort Worth Airport,
14  yes.
15      Q.  When was that?
16      A.  First part of January.
17      Q.  Of 2005?
18      A.  Yes, yes.
19      Q.  And what did he say when you met him at the
20  airport?
21      A.  He said that he was told by some other people in
22  the business that I was no longer doing consulting for
23  Depuy and he'd heard that I had a good reputation with my
24  physicians and said if you're looking for some implants
25  to do your -- continue your work, talk to me. And so I

Page 17

1   did.
2       Q.  Okay. And you decided that you would distribute
3   the Globus product for him?
4       A.  Correct.
5       Q.  Did you decide at that time or a later time?
6       A.  That time.
7       Q.  Is there a calendar or something which could
8   refresh your recollection to the exact date that you met
9   with this fellow at the airport?
10      A.  It would have to be after January 3rd because I
11  was in Mexico until then. So it was that first week
12  after New Year's. Exact day, I wouldn't have a
13  recollection.
14      Q.  Okay. And in your discussions with Mr. Cole,
15  did you tell him that you had an agreement with Depuy?
16      A.  No.
17      Q.  Did he ask whether you had one?
18      A.  No.
19      Q.  What about with -- what is it? One Source
20  Technology, is that -- do you have a written agreement
21  with One Source?
22      A.  No.
23      Q.  Do you have some kind of similar understanding
24  with them that you have with Mr. Cole?
25      A.  It's an at-will understanding.

5 (Pages 14 to 17)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                      February 16, 2005

|  | Page 18 |
|---|---|

Page 18

1    Q.  And is it through One Source that you distribute
2  the other four manufacturer's products?
3    A.  Correct. I'm not an employee, no.
4    Q.  And there's no --
5    A.  Independent.
6    Q.  -- written agreement?
7    A.  Strictly independent.
8    Q.  And who do you deal with at One Source
9  Technology?
10    A.  The two gentlemen that I deal with was Jeff
11  Berndt.
12    Q.  Burnt or Burn?
13    A.  Berndt, B-E-R-N-D-T.
14    Q.  Yeah.
15    A.  Tim Tucker.
16    Q.  And how did it come about that you distributed
17  these spinal implant products for these other four
18  manufacturers on behalf of One Source? Did they contact
19  you?
20    A.  Yeah, they're good friends of mine.
21    Q.  When did they first contact you about
22  representing these four products?
23    A.  About the same time Globus did, first week in
24  January.
25    Q.  And was that over the telephone or in person?

Page 19

1    A.  In person. We live very close together.
2    Q.  Did you meet at your house?
3    A.  No.
4    Q.  Where did you meet?
5    A.  We met at a restaurant, but I don't remember
6  which one.
7    Q.  Okay. With both Berndt and Tucker or just one
8  or the other?
9    A.  Both.
10    Q.  And what was the substance of that discussion?
11    A.  They knew that I was -- my agreement with Depuy
12  had terminated.
13    Q.  Uh-huh.
14    A.  And they wanted me to come on board with them.
15    Q.  How did they know that your agreement with Depuy
16  had terminated?
17    A.  They're ex-Depuy employees also. They're
18  ex-Depuy employees.
19    Q.  Had you told them that your agreement with Depuy
20  had terminated?
21    A.  It's a very small world in the spine. Most
22  people knew my agreement with -- in fact, some of the
23  reps out here knew my agreement with Depuy was
24  terminating before I did. I heard it through the
25  grapevine before I knew about it officially.

Page 20

1    Q.  Who did you hear it from?
2    A.  I heard it at All Saints Hospital from another
3  ex-Depuy employee named Marty Nichols.
4    Q.  When was that?
5    A.  It was back in November.
6    Q.  Of 2004?
7    A.  Uh-huh.
8    Q.  Yes?
9    A.  Yes. And I called Jack Carlson on it.
10    Q.  After Mr. Nichols said that to you --
11    A.  Uh-huh.
12    Q.  -- what did you say to Mr. Carlson?
13    A.  I told him what I heard. I asked him if it was
14  true. He adamantly denied it.
15    Q.  He what?
16    A.  He adamantly denied it.
17    Q.  What else did he say? Do you remember?
18    A.  Who?
19    Q.  Jack Carlson, when you called him in November.
20    A.  Didn't say anything else. Our conversation with
21  Carlson were brief.
22    Q.  Now when you talked to Mr. Tucker and
23  Mr. Berndt, did you tell them that you had an agreement
24  with Depuy?
25    A.  No.

Page 21

1    Q.  Did they ask you about that?
2    A.  No, we all had the same agreements.
3    Q.  Did they ask you if you had any agreement that
4  prohibited you from working for them or distributing
5  products for them?
6    A.  No.
7    Q.  Where do you sell the spinal products of these
8  five companies that you've been selling since January
9  2005? Where do you sell them?
10    A.  You mean the hospitals? Location?
11    Q.  Well, however you want to describe it. What's
12  the easiest way to describe where you sell these
13  products?
14    A.  I'm going to change your term "sell." I haven't
15  sold since probably five or six years ago. I made my
16  reputation with my physicians then. For the last few
17  years -- now I have standing orders on operation days. I
18  come in and do the consults. Selling was done years ago.
19  They know me and what I have and...
20    Q.  Well, you supply products to doctors, right?
21    A.  Correct.
22    Q.  And you get paid for it?
23    A.  Correct.
24    Q.  You get a commission from it?
25    A.  Correct.

6 (Pages 18 to 21)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

Page 22

1    Q.  So where do you do that?
2    A.  Tarrant County.
3    Q.  What places in Tarrant County?
4    A.  Every -- I can go to any hospital in Tarrant
5    County that the physician calls me to.
6    Q.  Which ones have you gone to since January 1,
7    2005?
8    A.  Baylor All Saints and John Peter Smith.
9    Q.  No others?
10   A.  No.
11   Q.  And is one of the products that you distribute
12   the Globus Assure product?
13   A.  I'm trying to think what Assure is.  Is that the
14   cage?
15   Q.  It's a interior cervical plate.  Are you
16   familiar with that?
17   A.  I'm not familiar with the name if it.  But, yes,
18   I do have interior cervical plates that I have
19   distributed for Globus, yes.  I guess it is named Assure.
20   Q.  And you're aware that's a 5/10 K product?
21   A.  No.
22   Q.  Do you know what -- do you have an understanding
23   of what a 5/10 K product is?
24   A.  Absolutely.
25   Q.  What do you understand that to mean?

Page 23

1    A.  They are 5/10 K'd by the FDA, it's not FDA
2    approved yet.  It's got a 5/10 K -- right now they're
3    doing studies on it.
4    Q.  All right.  And -- strike that.
5        At some point did you tell the doctor --
6    strike that.
7        Is there a group of doctors that you worked
8    with regularly over the past couple of years?
9    A.  Absolutely.
10   Q.  Who are they?
11   A.  The primary group?
12   Q.  Yes.
13   A.  Dr. Sazy.  That's whose office you're in right
14   now.
15   Q.  We're in his office right now?
16   A.  That's correct.  Dr. Mitchell.
17   Q.  Yeah.
18   A.  Dr. Gray.
19   Q.  Yes.
20   A.  And Dr. Hubbard.
21   Q.  Yes.
22   A.  And that's the primary group.
23   Q.  All right.  Did you tell Dr. Sazy at some point
24   that you were not going to be distributing Depuy products
25   any longer?

Page 24

1    A.  No, he knows.
2    Q.  Did you tell him?
3    A.  Sure.
4    Q.  When did you tell him?
5    A.  Jack Carlson notified me the 18th, so I probably
6    told Dr. Sazy on the 19th or 20th.
7    Q.  18th of what?
8    A.  December.  It was on a Saturday morning.  I
9    believe that's the correct date.  It was a Saturday
10   morning phone call.
11   Q.  And what about Dr. Mitchell, did you tell him
12   that you weren't going to be distributing Depuy products?
13   A.  Yes.
14   Q.  When did you tell him?
15   A.  Sometime after that.  If not the next day or
16   two.
17   Q.  During that week after the 18th?
18   A.  Probably the week before Christmas, yeah.  Right
19   before Christmas I'm sure.
20   Q.  All right.  How about Dr. Gray, did you tell him
21   you weren't going to be distributing Depuy products?
22   A.  Yes, because he had a surgery scheduled for
23   after Christmas and I told him that the group in Dallas
24   was going to have to do it, that I'm not going to be with
25   them any longer.

Page 25

1    Q.  Is that what happened, the group in Dallas
2    covered it?
3    A.  Yes.
4    Q.  Who is the group in Dallas?
5    A.  Susan Brownell's group.
6        THE COURT REPORTER:  What was the last
7    name?
8        THE WITNESS:  Brownell, B-R-O-W-N-E-L-L.
9    BY MR. SHEA:
10   Q.  Is that Spinal Concepts?
11   A.  No, that's Spinal Consultants, Inc.
12   Q.  And did you tell Dr. Hubbard that you were no
13   longer distributing the Depuy product?
14   A.  Yes.
15   Q.  When did you do that?
16   A.  Probably about the same time I told
17   Dr. Mitchell, right before Christmas.  We hadn't done any
18   cases -- things slow down quite a bit before Christmas.
19   I hadn't seen them.  I didn't pick up the phone and call
20   him.
21   Q.  Yeah.  Now did you tell Dr. Sazy that you were
22   going to be distributing other manufacturer's spinal
23   implant products?
24   A.  I -- I said I will find something else to do.  I
25   didn't know what I would distribute.  I had several

PREFERRED LEGAL SERVICES, INC.
214.750.0047

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                February 16, 2005

Page 26

1  options at the time, opportunities. Many companies were
2  interviewing me at the time.
3     Q.  Why was that? Why were many companies
4  interviewing you?
5     A.  I'm a good consultant.
6     Q.  Why were you interviewing with many companies?
7     A.  Because my -- Jack Carlson told me I wasn't
8  getting a new contract on December 18th.
9     Q.  So you started interviewing after December,
10 correct? Is that your testimony?
11    A.  Correct.
12    Q.  And who were --
13    A.  I had been contacted by many prior to that. I
14 started getting suspicious back in October.
15    Q.  Uh-huh. When did you -- who were the people
16 with whom you interviewed?
17    A.  The companies?
18    Q.  Yeah.
19    A.  Oh, God. Sofamar-Danek, SpineTech, NuVasive.
20    Q.  How do spell that?
21    A.  N-U-V-A-S-I-V-E.
22    Q.  Okay.
23    A.  Obviously, with medical -- One Source Technology
24 and with Globus.
25    Q.  Yeah.

Page 27

1     A.  Good night. There's been quite a few. Many
2  companies were interested.
3     Q.  But you remember interviewing with
4  Medtronic-Sofamar-Danek?
5     A.  These are the ones I gave the most consideration
6  to, correct.
7     Q.  Now who did you meet with at
8  Medtronic-Sofamar-Danek?
9     A.  The local distributor.
10    Q.  Who is that?
11    A.  Brad Rummer and his area manager Trace Mayhem.
12    Q.  And how about at SpineTech, who did you meet
13 with them?
14    A.  I don't remember that gentleman's name.
15    Q.  And did you meet in Dallas with somebody from
16 SpineTech?
17    A.  Yes.
18    Q.  What about NuVasive, who did you meet with?
19    A.  Joe Loy.
20    Q.  Where is he located?
21    A.  Here in Dallas. They're all here.
22    Q.  Is he a distributor or an employee?
23    A.  He's a regional manager.
24    Q.  Now when you met with Mr. Rummer, did he ask you
25 if you had any kind of written agreement with Depuy?

Page 28

1     A.  We're all aware of each other's agreements.
2     Q.  Did he ask you about that?
3     A.  No.
4     Q.  Did you provide him with a copy of the
5  agreement?
6     A.  Absolutely not.
7     Q.  Did SpineTech ask you if you had any agreement
8  with --
9     A.  No.
10    Q.  Did -- when you met with this fellow at
11 SpineTech, did he ask you whether you had a written
12 agreement with Depuy?
13    A.  No.
14    Q.  Did you mention the fact that you had a written
15 agreement with Depuy?
16    A.  No.
17    Q.  And NuVasive, did Mr. Loy ask you about whether
18 you had a written agreement with Depuy?
19    A.  No.
20    Q.  Did you tell Mr. Loy that you had a written
21 agreement with Depuy?
22    A.  No.
23    Q.  Do you remember any other companies that you
24 interviewed with in this December 2004 time frame?
25    A.  Not in particular. The ones that I mentioned

Page 29

1  are the ones foremost in importance that I was
2  considering looking at. The rest were insignificant.
3     Q.  Were you offered a job at
4  Medtronics-Sofamar-Danek?
5     A.  Yes.
6     Q.  And you chose not to take it?
7     A.  Correct.
8     Q.  Why is that?
9     A.  I got offered a higher commissions elsewhere.
10    Q.  And what about SpineTech, were you offered a job
11 there?
12    A.  No.
13    Q.  And what about NuVasive, were you offered a job
14 there?
15    A.  Potentially.
16    Q.  Okay. And what do you mean by that?
17    A.  We were moving in that direction.
18    Q.  And what happened?
19    A.  I chose to take the path that I've chosen.
20    Q.  And a moment ago I think you said that you have
21 this relationship with One Source and with Globus. But
22 just to make sure I understand, there's actually an
23 intermediary step between you and Globus, right?
24    A.  Absolutely.
25    Q.  It's this person --

8 (Pages 26 to 29)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                              February 16, 2005

Page 30

1     A.  Michael Cole.
2     Q.  You don't remember the name of his company?
3     A.  No.  He has a -- he has his own private -- it's
4  like a Trinity Spine type company, but I don't remember
5  the name of his company.
6     Q.  Okay.  And as you understand it, Michael Cole is
7  a distributor for Globus?
8     A.  Correct.
9     Q.  And you act as a distributor in turn for
10  Mr. Cole?
11    A.  No, I act as an independent -- independent
12  consultant is my title.
13    Q.  Working with Mr. Cole?
14    A.  I've never physically worked with Mr. Cole, no.
15    Q.  Okay.  Well, when you need the Globus product,
16  you need the screws, for instance, how do you get them?
17    A.  I stock them.
18    Q.  How do you stock them?  Where do you get them?
19    A.  Oh, I call -- I'll call Mr. Cole's office and
20  say I need screws and they send them to me.
21    Q.  That's what I mean.  You contact him, rather
22  than Globus?
23    A.  Right.
24    Q.  And is that true for your relationship with One
25  Source, as well?  Do you contact One Source for supplies?

Page 31

1     A.  Yes.
2     Q.  You don't contact the manufacturer directly?
3     A.  Correct.  Except for Dynaspine.  Now, Dynaspine
4  it's just easier for me to call them directly.  I call
5  them.
6     Q.  And when did you tell Dr. Sazy that you were
7  going to be distributing these other products?
8     A.  When did I give him the specific products I
9  distribute or when did I tell him I was going to leave
10  and distribute others?
11    Q.  That you were going to be distributing other
12  products?  When did you tell him that?
13        MS. WYSOCKI:  Objection; vague.
14        THE WITNESS:  I don't understand the
15  question.  When did I come to him with products or when
16  did I say I'm going to leave and go elsewhere?
17  BY MR. SHEA:
18    Q.  The latter question.  When did you tell him that
19  you were going to go elsewhere?
20    A.  He knew I was leaving -- Jack Carlson called me
21  Saturday morning, the 18th, and said you're not getting a
22  new contract.  And I told Dr. Sazy -- I think we had
23  dinner the next day and I told him then.
24    Q.  Did you tell him that you were going to stay in
25  the spinal implant area or that you were going to look

Page 32

1  for some other work?
2     A.  No, this -- this is my work.  I'm staying in
3  spinal -- spinal consulting area.
4     Q.  So you did tell him that you were going to stay
5  in the spinal consulting area?
6     A.  Absolutely.
7     Q.  And that was your intention from the moment Jack
8  Carlson told you that --
9     A.  (Witness indicates.)
10    Q.  -- that your contract was terminated?
11    A.  This is my line of work, yes.
12    Q.  So it was your intention from that moment?
13    A.  Yes.
14    Q.  And when did you tell Dr. Sazy that, in fact,
15  you now had a new line of spinal implant products that
16  you could distribute to him?
17    A.  In January when I made this agreement with
18  Michael Cole and Globus and with Mr. Berndt and Tucker
19  and with One Source, the first week of January.
20    Q.  And did you request Dr. Sazy that he use your
21  products?
22    A.  No.
23    Q.  Did you have an understanding that he was going
24  to use your product then?
25    A.  He made that very clear to me when I told him I

Page 33

1  was no longer with Depuy.
2     Q.  Okay.  What about Dr. Mitchell, did you tell
3  Dr. Mitchell that you had a new line of product, spinal
4  implant product, that you could distribute?
5     A.  No, I told him as well that I would no longer be
6  with Depuy.
7     Q.  Right.  But at some point did you tell him that
8  you --
9     A.  I told him I was going to continue to be a
10  consultant.  I didn't know with what.
11    Q.  But eventually he learned that you had this
12  relationship with One Source and with Globus?
13    A.  Correct.  Right.
14    Q.  Did you tell that to Dr. Mitchell?
15    A.  No, he didn't discover it until we had surgery.
16    Q.  When was that?
17    A.  The first surgery was probably mid January.
18    Q.  And at that time, rather than using Depuy
19  products, you used Globus or one of those other
20  manufacturer's products?
21    A.  Correct.
22    Q.  And Dr. Mitchell didn't care?
23    A.  No.
24    Q.  You didn't tell him beforehand?
25    A.  I called him probably the night before the

9 (Pages 30 to 33)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                            February 16, 2005

Page 34

1  surgery and said, you know, I don't have Depuy anymore.
2  He said I couldn't care less. A screw is a screw. As
3  long as you're going to be in the room it doesn't matter.
4      Q. Okay. And that was sometime in mid January you
5  think?
6      A. I can -- yeah, I can tell you the exact date if
7  you need it.
8      Q. Do you keep a calendar of your surgeries?
9      A. I do.
10     Q. And what about Dr. Hubbard, when did you tell
11 him that you were going to be distributing this other
12 group of spinal implant products?
13     A. Same time.
14     Q. Mid January?
15     A. First week in January.
16     Q. And, again, did you tell him before the surgery?
17     A. His -- his office calls me on Monday for
18 Wednesday cases. So his office called me on Monday and I
19 said I don't have the Depuy bone anymore. Dr. Hubbard
20 only uses bone. He doesn't use instrumentation.
21     Q. Or implants?
22     A. Right. No, he does not. He does not -- on a
23 rare occasion he'll use a cervical plate, but he hasn't
24 used any with me in months.
25     Q. Okay. What is this about bone?

Page 35

1      A. Human bone -- Depuy had human bone, Dynaspine
2  had human bone. A human bone is human bone. It doesn't
3  matter who manufactures it. He just scheduled the case.
4      Q. What about Dr. Gray, did you tell him that you
5  had this new group of products, spinal implant products?
6      A. I don't have products for Dr. Gray. Globus and
7  other guys do not make a system for scoliosis. So Dr.
8  Gray is --
9      Q. Dr. Gray does only scoliosis?
10     A. Correct. He's a -- he's the chief of
11 orthopedics here at Children's Hospital, Cook's Children.
12 He only does scoliosis cases.
13     Q. You don't distribute --
14     A. I have no product for scoliosis,
15 no. But he will not use Depuy now also.
16     Q. So you haven't sold any competing products to
17 Dr. Gray?
18     A. I've not consulted in his OR, no.
19     Q. Since January 1, 2005?
20     A. No.
21     Q. Is that right?
22     A. That's correct.
23     Q. And do you have any plans to get that line --
24 get a scoliosis line so that you can distribute --
25     A. I've had the opportunity. Both SpineVision

Page 36

1  and -- no, SpineVision and Science'X both make a
2  scoliosis product, but it's not one that I am comfortable
3  putting in a patient. I -- I think it's too -- too
4  fidgety and it's not one that I would recommend, so I
5  don't use it.
6      Q. Okay. And you said you had -- at the end of
7  your answer you said something about Dr. Gray won't use
8  Depuy products anymore; is that right?
9      A. Correct.
10     Q. Is that something Dr. Gray told you?
11     A. Correct.
12     Q. Did he tell you why?
13     A. Yes.
14     Q. What did he say?
15     A. The reason that we are important as consultants
16 in surgery is not to bring product. It's to actually
17 facilitate the surgery, to facilitate the time and
18 facilitate the use of instrumentation. Spine
19 Consultants, Inc., they have a rep that works out here in
20 Fort Worth named Rob Walker. He has shown up to
21 Dr. Gray's case twice now with the wrong instrumentation.
22 Dr. Gray quotes him -- calls him, quote, a goon. And
23 will not -- he will use somebody else. He will not use
24 Rob Walker.
25         More important to the instrumentation is

Page 37

1  the consultant and Rob is not a good consultant in
2  Dr. Gray's eyes.
3      Q. Dr. Gray doesn't think that Walker is a good
4  consultant?
5      A. No.
6      Q. Walker once worked for you; is that right?
7      A. No.
8      Q. He was not a rep for --
9      A. No. He's always been with Susan Brownell, Spine
10 Consultants, Inc. He -- I was forced to let him work
11 under me in Fort Worth back in October, which is when
12 Depuy originally breached our contract.
13     Q. Okay.
14     A. But Rob was never an employee of mine. I would
15 not hire him.
16     Q. Now let me go back to when you were an employee
17 of Depuy, did you have a quota at that time?
18     A. Absolutely.
19     Q. And did you have to meet your quota?
20     A. Absolutely.
21     Q. And that was something you were rated on; is
22 that right?
23     A. Correct.
24     Q. Did you get a bonus if you went over quota?
25     A. No.

                                    10 (Pages 34 to 37)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

| Page 38 | Page 40 |
|---|---|

**Page 38**

1    Q.   What about when you became an independent sales
2    rep, did you have a quota in that time?
3    A.   You mean as a distributor?
4    Q.   Yes.
5    A.   Okay. A distributor, absolutely.
6    Q.   And did you cover a specific, specified
7    geographic area when you were a distributor principal?
8    A.   Yes.
9    Q.   Do you remember what -- tell me what your quota
10   was in 2002?
11   A.   No.
12   Q.   2003?
13   A.   No.
14   Q.   Last year?
15   A.   Last year it was right at $2 million and we
16   surpassed quota at 123 percent.
17   Q.   And at some point did Trinity have other sales
18   reps?
19   A.   Yes.
20   Q.   Who were they?
21   A.   Charlie Lopez.
22   Q.   Yeah.
23   A.   He is an employee now for Spine Consultants,
24   Inc.
25   Q.   Yeah.

**Page 40**

1    A.   I believe -- I'm not certain. I believe it was
2    a three-year contract. But I'm not certain.
3    Q.   And before you signed that agreement did you --
4    you did sign it, right?
5    A.   Correct.
6    Q.   Did you have an opportunity for your lawyer to
7    review it?
8    A.   Absolutely.
9    Q.   And while that 2002 agreement was in effect, did
10   you received commissions from Depuy?
11   A.   Yes.
12   Q.   And do you remember what the commissions were in
13   2001?
14   A.   2001 or 2002?
15   Q.   I'm sorry. 2002. Start with 2002.
16        MS. WYSOCKI:  Objection. Are you asking
17   him how much he made or what the quota was?
18        MR. SHEA:  The commission --
19        THE WITNESS:  The commission rate was --
20        MS. WYSOCKI:  Rate.
21        MR. SHEA:  The commissions paid.
22   BY MR. SHEA:
23   Q.   What were the commissions?
24   A.   Oh, no, I don't remember that.
25   Q.   What about in 2003?

**Page 39**

1    A.   Jamie Wright. And she married one of our
2    surgeons and she's a housewife now.
3    Q.   Anybody else?
4    A.   That's it.
5    Q.   In 2002, Mr. Mieyr, did you enter into a written
6    agreement with Depuy?
7    A.   Yes.
8    Q.   And was -- what did that agreement cover as you
9    understand it?
10        MS. WYSOCKI:  Objection; over broad.
11   BY MR. SHEA:
12   Q.   What was the agreement about?
13        MS. WYSOCKI:  Same objection.
14        MR. SHEA:  You can answer.
15        MS. WYSOCKI:  If you understand his
16   question.
17        THE WITNESS:  What was the agreement that I
18   signed?
19   BY MR. SHEA:
20   Q.   What was it about?
21   A.   To be a distributor principal for Depuy Spine
22   products in 2002.
23   Q.   Just for one year?
24   A.   No, in 2002 it was a multi year.
25   Q.   Do you remember how many years?

**Page 41**

1    A.   I -- I don't remember that as well.
2    Q.   What about 2004?
3    A.   I don't remember that.
4    Q.   Now --
5    A.   The rate changed in 2004.
6    Q.   Coming forward to 2004, did you enter into a new
7    sales representative agreement in 2004?
8    A.   Yes.
9    Q.   And that was in writing, right?
10   A.   Correct.
11   Q.   And you terminated that prior agreement, the
12   2002 sales representative agreement, right?
13   A.   We did.
14   Q.   And in connection with the termination of the
15   2002 agreement, did Depuy pay you some money?
16   A.   Clarify.
17   Q.   Well, you terminated the 2002 agreement, right?
18   A.   They did not pay me money to terminate the
19   agreement, no.
20   Q.   At the time that 2002 agreement was terminated,
21   did you get some money from Depuy?
22   A.   Yes.
23   Q.   How much?
24   A.   $200,000.
25   Q.   What was that for?

11 (Pages 38 to 41)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

Page 42

1    A.  That was to buy my employee, Charlie Lopez.
2    Q.  Uh-huh.
3    A.  And I sold 50 percent of my then existing
4  territory, which was half of Tarrant County.  It was
5  Arlington, North Hills, and mid cities area.
6    Q.  You sold half your territory?
7    A.  Correct.  Susan Brownell acquired half of my
8  territory.  And I agreed not to compete in that
9  territory.
10   Q.  Before you signed the 2004 sales representative
11 agreement with Depuy, did you read it?
12   A.  Yes.
13   Q.  And did you have an opportunity for your lawyer
14 to review it before you signed it?
15   A.  Oh, yes.
16   Q.  And that happened, right?
17   A.  Oh, yes.
18   Q.  And did Depuy provide you with a draft version
19 of the 2004 sales representative agreement?
20   A.  What do you mean a draft, a final copy?
21   Q.  No, they sent you a document and say, here, I
22 want you to sign this?
23   A.  Absolutely.
24   Q.  Did you just sign it, what they sent you?
25   A.  No, no.

Page 43

1    Q.  What happened?
2    A.  We went through -- Ms. Wysocki here was my
3  attorney.  We went through many written amendments that
4  we proposed, that were not accepted by Depuy.  I was told
5  that you either sign it or you have -- you're out of a
6  job, so we signed it under duress.
7    Q.  You signed it under duress?
8    A.  Uh-huh.
9    Q.  I'm sorry?
10   A.  Yes.
11   Q.  You said you and your lawyer made many comments
12 on the document; is that right?
13   A.  Yes.
14   Q.  And you said those changes weren't accepted by
15 Depuy?
16   A.  Correct.
17   Q.  Weren't some of them accepted by Depuy?
18   A.  No.
19   Q.  Not a single one?
20   A.  I believe we were able to change the term of
21 noncompete to six months.  But outside of that, not a
22 single one.
23   Q.  Wasn't there some provision about paying back
24 money if Mr. Lopez didn't go to work for Susan Brownell?
25   A.  That was not in -- I don't believe that was in

Page 44

1  the original contract.  I made that very clear before
2  they even sent me the contract that I would not agree to
3  that.  If it was in the original one, I'm lapsing memory.
4  But I don't believe so.
5        MR. SHEA:  Why don't we mark --
6        (Exhibit No. 1 was marked.)
7  BY MR. SHEA:
8    Q.  First of all, do you recognize the document
9  that's been marked as Exhibit No. 1?
10   A.  This is my note to Mr. Woody, that's correct.
11   Q.  That's the first page?
12   A.  Yes.
13   Q.  And is that -- the first page of Exhibit 1, is
14 that a letter dated February 9, 2004?
15   A.  Yes, it is.
16   Q.  Mr. Woody was an employee of Depuy?
17   A.  Mr. Woody was then acting vice president of
18 sales, U.S.
19   Q.  What about the pages behind the first page of
20 Exhibit No. 1, do you recognize those?
21       THE WITNESS:  That's the one that we tried
22 to mark?
23       MS. WYSOCKI:  Please don't ask me questions
24 on the record.
25       THE WITNESS:  Yes, these are.  This is my

Page 45

1  handwriting in here.
2  BY MR. SHEA:
3    Q.  That's your handwriting on the pages behind?
4    A.  Yes.  You can see many notes that I tried to...
5  Yes, yes.
6    Q.  Okay.  May I look -- Mr. Mieyr, in
7  Exhibit No. 1 in addition to the draft agreement -- sales
8  representative agreement -- there's a Schedule E, which
9  is number -- and there -- there is a Section C which has
10 been crossed out.  Did you cross that out?
11   A.  Yes.
12   Q.  And is that your handwriting to the left of
13 Section C?
14   A.  Correct.  And Rob Walker at the time was not an
15 employee of Trinity Spine.  He was an employee of Spine
16 Consultants, Inc., that they had just hired to live here
17 in Fort Worth and I agreed to let him do some cases
18 with -- I believe his name was Dr. Shaun Henry at
19 Osteopathic Hospital.  He was the first surgeon he worked
20 with, to my recollection.
21   Q.  Well, did you at Trinity have any kind of
22 noncompetition agreement with Mr. Walker?
23   A.  No.  I did with Mr. Lopez but not with
24 Mr. Walker.
25   Q.  And in Section C there was a reference to you

12  (Pages 42 to 45)

John Mieyr                                                    February 16, 2005

Page 46

1  returning $25,000 if Mr. Lopez didn't accept the position
2  with Depuy. Do you see that?
3      A. Correct.
4      Q. And there's another provision saying that you
5  would return 12,500 if Mr. Walker didn't accept a
6  position with Depuy?
7      A. He was already with Depuy, so he...
8      Q. There's -- that is what that provision provided,
9  right?
10     A. That's what it says. It didn't make any sense
11 to me. But that's what it says.
12     Q. And your handwriting says: Stripe C?
13     A. Strike Section C.
14     Q. Oh, strike C. Will not -- and then "not" is
15 underlined. Is that for emphasis?
16     A. Correct.
17     Q. To any part of this. Not responsible for
18 personal or professional actions of C. Lopez or R.
19 Walker; is that right?
20     A. That's correct.
21     Q. And then in the final version of the agreement
22 of the document that you signed was -- were those
23 references to you paying back $25,000 and $12,500, were
24 they taken out?
25     A. That was removed. Yes, it was.

Page 47

1      Q. And in section -- Section 4F of the unsigned
2  sales representative agreement that is part of Exhibit
3  No. 1, you wrote in some handwriting, far left. Do you
4  see that?
5      A. (Read document.) Okay.
6      Q. Could you read that aloud, please?
7      A. Says: Do not agree. Noncompete good for
8  duration of contract only.
9      Q. And isn't there a date under that that you
10 didn't read?
11     A. 12/31/04.
12     Q. Okay.
13     A. Correct.
14     Q. And --
15     A. This was -- I would not compete in that area
16 that I sold back to Depuy for part of this $200,000 for
17 the duration of this contract, which expired 12/31/04.
18     Q. Okay. And what was the period of noncomp in the
19 document that Depuy had sent you?
20     A. One year.
21     Q. They had proposed one year?
22     A. Correct.
23     Q. And then you said only the length of the
24 agreement?
25     A. Only the length of the agreement, correct.

Page 48

1      Q. In the version of the document you signed what
2  was the length of the noncomp?
3      A. Six months.
4      Q. Now you referred a couple of times to selling
5  territory. You sold some territory?
6      A. That was -- right. What Depuy bought from me,
7  correct.
8      Q. Where is the reference to selling territory in
9  the agreement? Do you know? In the sales representative
10 agreement that you signed in 2004?
11         MS. WYSOCKI: Do you have a copy of that?
12         THE WITNESS: I don't have a copy of that
13 agreement in front of me.
14         MR. SHEA: Well, it's --
15 BY MR. SHEA:
16     Q. Is it in that agreement?
17     A. I don't have the agreement in front of me. I
18 don't know.
19     Q. You don't remember?
20     A. No, I don't remember. I don't memorize my
21 contracts.
22     Q. Let me mark a new exhibit -- if you refer to
23 something on Exhibit No. 1, is that going to allow you to
24 answer the question?
25     A. No, I need to see the other contract. We can

Page 49

1  deduce what was sold back to Depuy by the territory
2  that's present in my '03 contract versus what's present
3  in my -- I'm sorry, my '02 contract versus the territory
4  that's present in the '04 contract.
5      Q. Maybe -- my question is, I think, somewhat
6  different. Is there any reference in the 2004 agreement
7  that you signed with Depuy that indicates that you're
8  selling territory back to Depuy or selling territory to
9  Depuy?
10         MS. WYSOCKI: Objection; calls for
11 speculation. He's already said he didn't memorize the
12 contract.
13 BY MR. SHEA:
14     Q. Do you know the answer to that question?
15     A. Say it again.
16     Q. Yeah. Is there any reference in the 2004
17 agreement -- do you recall if there was a reference in
18 the 2004 agreement that you signed with Depuy that
19 indicates that you're selling territory to Depuy?
20     A. Absolutely. Look at the account list.
21     Q. Okay. And what -- looking at the account list
22 what --
23     A. Compare the account list from the contract date
24 of 2002 to the account list on the contract in 2004.
25     Q. And that's what I'm saying, other than comparing

13 (Pages 46 to 49)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                        February 16, 2005

---

Page 50

1  the 2004 agreement to another agreement, is there any
2  reference internally to the 2004 agreement that indicates
3  that you're selling territory back to Depuy?
4      A.  Outside of the account list, not to my
5  knowledge, no.
6      Q.  And you did sign a version of the 2004
7  agreement, right, with Depuy?
8      A.  A version.
9      Q.  And do you remember when you did that?
10     A.  First part of February in '04. I don't remember
11 the exact day, no.
12     Q.  What's the date of your cover letter on Exhibit
13 No. 1?
14     A.  February 9, 2004.
15     Q.  Okay. And the $200,000 that's referred to in
16 Schedule C of Exhibit No. 1, you got that money?
17     A.  Yes.
18     Q.  And Trinity earned commissions on the sale of
19 Depuy products that sold in 2004?
20     A.  Yes.
21     Q.  Did it get paid those commissions in accordance
22 with the schedule that's in your written agreement with
23 Depuy?
24     A.  Yes.
25     Q.  Now when you signed the sales representative

---

Page 51

1  agreement in 2004, did you intend to honor the six-month
2  noncompete provision in it?
3      A.  Absolutely.
4      Q.  So at some point you changed your mind about
5  that?
6      A.  When Depuy breached the contract in October, the
7  contract became null and void.
8      Q.  And they did that in October 2004?
9      A.  That's correct.
10     Q.  Did you tell anybody at Depuy that you thought
11 they had breached --
12     A.  Absolutely.
13     Q.  Who did you tell?
14     A.  Jack Carlson.
15     Q.  How did you tell him?
16     A.  In a letter and on telephone. And I notified my
17 attorney as well.
18     Q.  Is that Ms. Wysocki?
19     A.  Ms. Wysocki, correct.
20     Q.  And what did you tell Mr. Carlson in your
21 telephone conversation with him in October?
22     A.  I pointed out that -- I believe it's in
23 Paragraph 1A of the sales agreement dated 2004.
24     Q.  Let me do this. Let me mark this as Exhibit
25 No. 2.

---

Page 52

1          (Exhibit No. 2 was marked.)
2  BY MR. SHEA:
3      Q.  Do you recognize the document that's been marked
4  as Exhibit No. 2, Mr. Mieyr?
5      A.  Judging by the front page, yes.
6      Q.  What do you recognize that to be?
7      A.  This is the 2004 sales agreement between Depuy
8  and Trinity Spine.
9      Q.  When did you sign it?
10     A.  Let me go back here and look. 26th day of
11 February 2004.
12     Q.  Okay. So it was about -- 17 days after you sent
13 your letter to Mr. Woody?
14     A.  Approximately, yes.
15     Q.  All right. How long had you had the agreement
16 before you sent your letter to Mr. Woody?
17     A.  A day.
18     Q.  So you met with your attorney and turned your
19 comments around and sent them right off?
20     A.  Correct.
21     Q.  And then there was some back and forth after
22 February 9th?
23     A.  Yes.
24     Q.  Now, what did you -- you were telling me what
25 you sent to Mr. Carlson in your discussion in October

---

Page 53

1  2004.
2      A.  Yes.
3      Q.  Refer to this 2004 contract. Yeah.
4      A.  1A: Appointment and territory.
5      Q.  Yeah.
6      A.  1A, about three-fourths of the way down it says:
7  A representative of the products identified shall be
8  represented in the territory on an exclusive -- I
9  emphasis exclusive basis.
10     Q.  Uh-huh.
11     A.  Beginning in October I was forced by Mr. Carlson
12 to allow Susan Brownell's group, Rob Walker, her sales
13 management team was over here, Bret Seiffert to work in
14 my territory for Dr. Andrea Halliday. Dr. Halliday's
15 primary place of practice was Harris Methodist Hospital
16 in Fort Worth, which was part of Trinity Inc.'s
17 territory. She wanted to do some surgeries at Baylor All
18 Saints Hospital, which was part of Trinity Spine's
19 territory. Mr. Carlson forced me to allow Rob Walker and
20 Susan Brownell's group and Spine Consultants, Inc., to do
21 those cases in my territory.
22     Q.  Uh-huh.
23     A.  I had a similar concurring situation with
24 Dr. Mitchell. His primary place of practice was Baylor
25 All Saints Hospital. He wanted to do some surgeries at

---

14 (Pages 50 to 53)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

## Page 54

1  Harris Hospital, which was in Spine Consultant, Inc.'s,
2  territory. And Jack Carlson would not permit that to
3  happen.
4      Q.  When did Dr. Mitchell want to do that?
5      A.  He operates there on a regular basis.
6      Q.  And you wanted to work with him over there?
7      A.  Correct. I was willing to make the swap, have
8  Susan's group work at All Saints with Halliday if I could
9  work in their territory for -- for Dr. Mitchell.
10     Q.  Is that something you proposed to Carlson in
11  October of --
12     A.  Absolutely.
13     Q.  -- 2004?
14     A.  Absolutely.
15     Q.  And you've said that --
16     A.  He declined.
17     Q.  You said that Dr. -- Carlson forced you to allow
18  Walker -- and who was the other fellow?
19     A.  Bret Seiffert.
20     Q.  To work with Dr. Halliday. How did he force
21  you?
22          THE WITNESS: Do we have the letter?
23          MS. WYSOCKI: No, I didn't bring anything.
24          THE WITNESS: Okay. In a letter.
25  BY MR. SHEA:

## Page 55

1      Q.  What did he say in the letter?
2      A.  He said I had no choice. That he was going to
3  have Rob Walker. He said end of the discussion. Rob
4  Walker will be covering Dr. Halliday's cases in my
5  hospital. I'm not to interfere.
6      Q.  Was the letter in October of 2004?
7      A.  Correct.
8      Q.  And was there some other way that you believe
9  that Depuy breached the sales representative agreement
10  that you signed in 2004?
11          THE WITNESS: What about --
12          (Attorney/client discussion.)
13          THE WITNESS: No further breach.
14  BY MR. SHEA:
15     Q.  Now --
16          MS. WYSOCKI: Control --
17          THE WITNESS: Oh, yes. There is. Wait a
18  second. I want you to look at Page 11 here -- yeah, of
19  the contract. I'm sorry. Absolutely, this -- this
20  further fortifies the original breach that we talked
21  about. If you look on Page 11. It's Section 9A, legal
22  relationship.
23  BY MR. SHEA:
24     Q.  Uh-huh.
25     A.  About halfway down. It says: The company shall

## Page 56

1  neither have nor exercise any control over the manner in
2  which representative and principal perform their duties
3  under this agreement.
4      Q.  You think Depuy breached that somehow?
5      A.  Correct. I was prescribed to the dollar amount
6  in Mr. Carlson's letter what I have to pay Rob Walker.
7  That is exercise and control over how I perform my
8  management duties.
9      Q.  Okay. Anything else?
10     A.  I was -- in order to have this contract, I was
11  forced to have an outside office. And thinking when I
12  signed the original agreement in 2002 I would get a
13  multi-year term, I signed a five-year office agreement,
14  which Depuy required you to have.
15     Q.  Required you to have a five --
16     A.  Not a five year, but they required you to
17  have -- hold an outside office. You could not office in
18  your home. You had to have a physical place of business.
19     Q.  Okay.
20     A.  Which is once again exercising control, which is
21  expressly forbidden in Section 9. And then also under 9A
22  there was a hospital in Arlington, Texas, Physicians
23  Metroplex Hospital. The hospital began doing business
24  the 1st of March 2004. Depuy has a policy of hospitals
25  operate on a net 30 pay period. The hospital -- Depuy

## Page 57

1  expected to be paid by the hospital 30 days after
2  receiving an invoice.
3      Q.  Uh-huh.
4      A.  When Physicians Metroplex Hospital became 90
5  days overdue, I notified Depuy that I thought the
6  hospital was in financial trouble. Then acting regional
7  manager Phil Lewis was with me. We went and talked to
8  the CFO of the hospital. He told us they were having
9  some financial problems in collecting from both insurance
10  companies, Texas Workers' Comp and Medicare. We notified
11  Depuy that we thought there were problems with the
12  hospital. This was 90 days after they hadn't paid a
13  bill. We were instructed to continue to do business at
14  that facility. We were instructed to do so for another
15  90 days. This hospital went an entire 180 days without
16  paying a cent for any bills.
17          When the hospital closed, Depuy proceeded
18  to take back all commissions paid to me from the hospital
19  for the sales of implants, not keeping in mind the
20  consultant duties that I had performed there with the
21  doctors and the patients. They took back approximately
22  $32,000 from me, from Trinity Spine, for implants that
23  were sold at that hospital. And they exercised
24  control -- I wanted to stop selling to the hospital when
25  they became 90 days delinquent. Depuy instructed me to

PREFERRED LEGAL SERVICES, INC.
214.750.0047

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

**Page 58**

1  continue selling there, which once again is exercising
2  control over the manner in which I perform my duty.
3      Q.  Now --
4      A.  My call would have been to suspend business
5  until the bill was paid.
6      Q.  Now did you make any sort of complaint to Depuy
7  that they had breached the agreement?
8      A.  Many times.
9      Q.  When was the first time you did that?
10     A.  Probably -- this issue occurred in late
11  September, first of October.  These occurred --
12     Q.  I'm sorry?  Which issue are you referring to?
13     A.  Both the Physicians Metroplex Hospital deal and
14  Rob Walker being allowed to have -- forced to have him
15  work in my territory occurred pretty much concurrently,
16  September, first part of October.
17     Q.  And so how did you notify Depuy that you thought
18  they were in breach of the agreement?
19     A.  I notified Jack Carlson by phone call and
20  letter.
21     Q.  In the letter did you say that you thought he
22  was in breach?
23     A.  Absolutely.  I called it a blatant breach.
24     Q.  Did you -- after that did you continue to accept
25  commissions from Depuy?

**Page 59**

1      A.  Yes.
2      Q.  After you accused them of being in blatant
3  breach?
4      A.  Yes.
5      Q.  Did you continue to perform your duties as you
6  understood them under the sales representative agreement?
7      A.  Yes.
8      Q.  Where was it again that Dr. Halliday wanted to
9  do surgery?
10     A.  Baylor All Saints.
11     Q.  And she did some surgeries at Baylor All Saints
12  as you understand?
13     A.  In May.
14     Q.  Did you get any commissions for those surgeries?
15     A.  I was paid -- what was I paid?  Trinity Spine
16  was paid 12 percent on her surgeries.  And I had to pay
17  Rob Walker nine percent of that.
18     Q.  How much?
19     A.  Nine percent.
20     Q.  So you got three percent on sales?
21     A.  Correct.
22     Q.  What did you normally pay distributors that
23  worked for you?
24     A.  When I was a distributor, I was paid 18 percent.
25  I paid mine nine percent.

**Page 60**

1      Q.  When you had -- when Trinity had its own
2  distributors working for Trinity other than you --
3      A.  Correct.
4      Q.  -- how much did you pay them?
5      A.  Nine percent.
6      Q.  Okay.  How much did Trinity earn?
7      A.  18 percent.
8      Q.  Okay.  And 2004 though, right --
9      A.  The contract was cut down to 12 percent.  Every
10  other distributor in the country made 18 except for
11  Trinity, which was cut down to 12 percent.
12     Q.  In 2004?
13     A.  Correct.
14     Q.  That's the agreement you signed?
15     A.  Correct.
16     Q.  Now you said earlier that you signed the 2004
17  agreement, which we've now marked as Exhibit No. 2, under
18  duress; is that correct?
19     A.  Correct.
20     Q.  What was the nature of the duress you labored
21  under?
22     A.  There's a plethora of corrections in Exhibit 2
23  that we wanted to have made.  They agreed to not paying
24  back the 25,000 and 12,000 for the employees and they
25  agreed to six month instead of one year.  The biggest

**Page 61**

1  objection was the duration of the contract.
2      Q.  Uh-huh.
3      A.  In the 2002 contract I was awarded a three-year
4  contract.  When this came up that they wanted to -- it
5  was presented to me that they wanted to take -- Depuy
6  wanted to retain possession of half my territory.  That's
7  why I referred back to the purchase of my territory.
8  Depuy wanted to retain possession of half my territory
9  and the individual that was working for me.  And that
10  they would, in turn, offer me a one-year contract.  The
11  stress that that induced on myself physically and my
12  family -- I was not really willing to do a one-year
13  contract because I could perceive myself sitting in the
14  exact same situation at the end of 2004 that I was in the
15  end of 2003.
16         Went out to dinner with Tom Slott, who was
17  then the area vice president before Jack Carlson.
18  And Mr. Phil Lewis.  And Tom Slott expressly told me that
19  if I signed this contract and I met my quota, that I
20  would be offered a multi-year contract.  I finished the
21  year the number one distributor percent to quota at 123
22  percent.  Not only was I not offered the multi-year
23  contract, I wasn't offered any contract.
24     Q.  When did you have that dinner with Mr. Slott?
25     A.  That was in January of '04 -- yes '04.

16 (Pages 58 to 61)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

---

Page 62

1   Mr. Slott and Mr. Lewis -- Phil Lewis is no longer with
2   the company. Phil Lewis was my manager at that point.
3       Q.  Now, I guess you received the documents which
4   have been marked as Exhibit No. 1 after you had the
5   dinner with Mr. Slott; is that right?
6       A.  Correct.
7       Q.  And I guess you noticed there was no reference
8   to a multi-year agreement in Exhibit No. 1?
9       A.  That's correct.
10      Q.  And I guess, therefore, you made some comments
11  about the fact that you needed a multi-year contract?
12      A.  Absolutely.
13      Q.  Can you show me in Exhibit 1 where that comment
14  is?
15      A.  They were made verbally to Mr. Slott at that
16  dinner when he told me if I met my quota, I would be
17  awarded a multi-year contract.
18      Q.  Right. I'm talking about when you received
19  Exhibit No. 1 and you saw at that time there was no
20  reference to a multi-year contract, correct?
21      A.  Correct.
22      Q.  So why didn't you make a note to the effect that
23  we need a multi-year contract?
24      A.  I believe there is one in here.
25      Q.  Okay.

---

Page 63

1       A.  Is this the original one or is this? Original
2   in here...
3           At the moment I can't find it. I know it
4   was expressly brought up to Mr. Slott verbally.
5       Q.  Could I ask you to look at Exhibit No. 1,
6   Section 4F, please.
7       A.  (Witness complies.) Yes.
8       Q.  Again, there's some handwriting to the left of
9   that.
10      A.  Uh-huh.
11      Q.  That's your handwriting?
12      A.  Correct.
13      Q.  And isn't it true, Mr. Mieyr, that you yourself
14  wrote in your own handwriting, reviewing this document,
15  that the agreement terminated 12/31/04?
16      A.  Correct.
17      Q.  Okay. I guess you telephoned Mr. Slott
18  recently; is that right?
19      A.  Yes, I've talked to Mr. Slott several times on
20  the phone, yeah.
21      Q.  What did you tell him?
22      A.  I told him anything (sic).
23      Q.  Didn't you tell him you were deposed --
24  Mr. Lewis, didn't you tell him that?
25      A.  No.

---

Page 64

1       Q.  No?
2       A.  No.
3       Q.  Did you tell him that you were going to sue
4   Deputy?
5       A.  No.
6       Q.  When was the last time you spoke to Mr. Slott?
7       A.  Last week.
8       Q.  What did you say to him?
9       A.  I told him that you had a restraining order,
10  temporary -- TRO against me. Asked him when he was going
11  to be in town next. Let's go to dinner. He asked how I
12  was going to react to the TRO. I told him that -- he
13  asked what the TRO was based on. I told that I was
14  fraudulently induced to this agreement back when he was
15  acting vice president. Then I told -- I say you and Phil
16  Lewis and I had dinner at Three Forks restaurant in
17  Dallas and you expressly told me that if I met my quota,
18  you would give me a multi-year contract. He said I never
19  told you any such thing. But of course Mr. Slott still
20  works for the company, so what more would I expect.
21      Q.  What about Phil Lewis, have you spoken to him?
22      A.  Not recently.
23      Q.  Prior to that conversation with Mr. Slott last
24  week, what was the next prior time that you had spoken to
25  Mr. Slott?

---

Page 65

1       A.  I don't recall.
2       Q.  Wasn't it the week before?
3       A.  Not to my knowledge, no. I know I spoke to him
4   in December when Jack Carlson decided not to renew my
5   contract.
6       Q.  Is there any document you know of in writing
7   indicating that Deputy was going to offer you a multi-year
8   contract?
9       A.  Not in writing, no.
10      Q.  If you met your quota?
11      A.  Not in writing.
12      Q.  Just this dinner in January 2004 that you had
13  with Mr. Lewis and Mr. Slott, right?
14      A.  That's correct.
15      Q.  Subsequent to that you received and commented on
16  Exhibit No. 1?
17      A.  Correct.
18      Q.  And then you signed Exhibit No. 2?
19      A.  What is Exhibit No. 2? I have it in front of
20  me. Oh, that's the amended version of Exhibit No. 1,
21  correct. Yes.
22      Q.  And I think I got this -- that's to Exhibit
23  No. 1. Bear with me if I'm repeating myself. But as to
24  Exhibit No. 2, again, before you signed that document,
25  you had an opportunity to consult with your lawyer?

---

17 (Pages 62 to 65)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                      February 16, 2005

Page 66

1   A.  Yes.
2   Q.  And you availed yourself of that opportunity?
3   A.  Yes.
4   Q.  And you decided to go ahead and sign the
5   document that's Exhibit No. 2?
6   A.  (Witness indicates.)  Under duress we did.
7   Q.  The duress is what you told me about already?
8   A.  Correct.
9   Q.  When was the last time you were present at a
10  spinal implant surgery?
11  A.  Present at a surgery?
12  Q.  Uh-huh.
13  A.  Yesterday.
14  Q.  And where was that?
15  A.  That was at Baylor All Saints Hospital.
16  Q.  And what kind of -- who was the doctor?
17  A.  Dr. Sazy.
18  Q.  And what was -- was the nature of the surgery?
19  What kind of surgery was it?
20  A.  A degenerative spine.
21  Q.  And do you know what products were put in?
22  A.  He used pedicle screws and cages.
23  Q.  And do you know who the manufacturer of the
24  pedicle screws was?
25  A.  Globus.

Page 67

1   Q.  And do you know who the manufacturer of the
2   cages was?
3   A.  Globus.
4   Q.  And were those products that you distributed to
5   Dr. Sazy?
6   A.  No.
7   Q.  Who did?
8   A.  A gentleman by the name of Jeff B-O-U-T-T-E,
9   Boutte.  He was present in the surgery as well.
10  Q.  Jeff --
11  A.  B-O-U-T-T-E.
12  Q.  Okay.
13  A.  He was present in the surgery as well.
14  Q.  Anybody -- do you know how Mr. Boutte came to be
15  present in the surgery?
16  A.  I cannot sell anything.  My cases are booked --
17  like I said, I haven't sold a surgery in ages.  I'm
18  covering cases that I've had booked prior to my TRO.  I
19  don't sell the products there.  There's nothing being
20  invoiced and I'm not getting paid.  I'm not going to
21  leave my physician in the hands of someone he does not
22  know or trust in surgery.  Mr. Boutte is new, as is
23  Globus.  I have a long-standing relationship and deep
24  respect for Dr. Sazy.  His cases are complex.
25      If it were you or your spouse, mother,

Page 68

1   father, your child on the table, I think you would want
2   somebody there with a little knowledge under their belt
3   when it comes to consulting with Dr. Sazy.  There's a lot
4   of high priced real estate in the spine where he's
5   operating on.  And I stood there as a consultant.  I was
6   not paid, not compensated.  I strictly consulted on the
7   case for Dr. Sazy.
8   Q.  Mr. Boutte -- does he work for Globus?
9   A.  No, he works for --
10  Q.  One Source?
11  A.  No, for --
12  Q.  Mr. Cole's firm?
13  A.  Mr. Cole.
14  Q.  He's a representative for Mr. Cole, as you
15  understand it?
16  A.  He's not a representative, no.  He's a --
17  strictly just does case coverage.
18  Q.  Now you said you're covering cases that you have
19  already booked --
20  A.  I'm scheduled -- I have surgeries booked into
21  the summer.  The selling's been done way prior to that.
22  I have surgeries -- my surgery schedule's booked well
23  into the summer.
24  Q.  And that's with Dr. Sazy?
25  A.  Dr. Sazy, Dr. Hubbard and Dr. Mitchell.

Page 69

1   Q.  Anybody else?
2   A.  No.
3   Q.  Now, Mr. Mieyr, has it ever occurred that you
4   have been ill?
5       MS. WYSOCKI:  Objection; vague.  Do you
6   have the chicken pox?  What are you --
7   BY MR. SHEA:
8   Q.  Do you ever get ill?
9   A.  Do I ever get ill?
10  Q.  Yeah.
11      MS. WYSOCKI:  Objection; irrelevant.
12      THE WITNESS:  I'm not going to answer that.
13  Of course.
14  BY MR. SHEA:
15  Q.  You've been ill?
16  A.  Of course.
17  Q.  Did you ever miss work?
18  A.  Yes.
19  Q.  And what happens to a surgery that you have
20  scheduled when you're sick?
21  A.  If I'm sick, Dr. Sazy will cancel his case.
22  Q.  What about Dr. Mitchell?
23  A.  He would probably cancel as well.  I've never
24  been sick for Dr. Mitchell.  I have for Dr. Sazy.
25  Q.  What about Dr. Hubbard?

18 (Pages 66 to 69)

PREFERRED LEGAL SERVICES, INC.
214.750.0047

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

---

Page 70

1    A.  I've never been ill during one of his either.  I
2 have during Dr. Sazy's and he would cancel the case.
3    Q.  Okay.  You said you were in Mexico on vacation
4 recently.
5    A.  Yes.
6    Q.  That's a slow time of year?
7    A.  Yes.
8    Q.  Do you ever go on vacation during the busy time
9 of year?
10    A.  No.  I take my vacations annually from Christmas
11 to New Year's.
12    Q.  So it's your testimony since 1996 that the only
13 time you've been ill or had some other reason to miss,
14 that the surgery has been cancelled?  Is that your
15 testimony?
16    A.  I can't say that for a fact, no.  I've been
17 on -- I've been on vacation for spring break with our
18 adopted daughter.  And at that point I believe -- when I
19 was covering -- when I was with Depuy, they had -- I had
20 Rob Walker or Charlie Lopez cover cases for me, when I
21 had employees, correct.  Charlie Lopez, I knew that he
22 was a good consultant.
23    Q.  But when did you receive the TRO, by the way?
24    A.  Last Friday.  I believe it was last Friday, a
25 week ago, five days ago.

---

Page 71

1    Q.  And you've covered cases all this week?
2    A.  No, just one yesterday.
3    Q.  Okay.  You didn't have any other cases scheduled
4 this week?
5    A.  No.
6    Q.  Do you have cases scheduled during the coming
7 week?
8    A.  Prior --
9    Q.  The coming week?
10    A.  Next Monday?
11    Q.  Actually let me back up.  Do you have any other
12 cases scheduled this week?
13    A.  No.
14    Q.  And you do have some beginning next Monday?
15    A.  Yes.
16    Q.  How many next week?
17    A.  I have to go back and look.
18    Q.  Ballpark figure?
19    A.  Three.
20    Q.  And have you made any plans to have somebody
21 else cover them?
22    A.  Yes.  If necessary, correct.
23    Q.  You said a moment ago that the selling was done
24 a long time ago.
25    A.  Correct.

---

Page 72

1    Q.  What about the invoicing?  When is the invoicing
2 done?
3    A.  The invoicing is done ten days post-surgery.
4 There will be no invoice generated during the time of the
5 TRO.
6    Q.  Ten days post-surgically?
7    A.  Correct.  Invoice is generated when a PO is
8 accepted from the hospital.  When you do a surgery, you
9 write down on a piece of paper -- it's really no more
10 complex than a notebook paper -- the patient's name and
11 what was used.  It then gets turned into the hospital for
12 information for their purchasing department so they can,
13 in turn, bill the patient's insurance.  They have 72
14 hours to construct an initial bill from surgery to a
15 patient.  It takes about ten days for the hospital to
16 issue something called a purchase order.  A purchase
17 order is then issued and sent to the manufacturer,
18 whether it's Depuy or Globus or whatever, and the invoice
19 is then generated after the purchase order is received.
20    Q.  And as I understand it -- is it Boutte or
21 Boutray?
22    A.  Boutte.
23    Q.  Mr. Boutte was present in the surgery with
24 Dr. Mitchell at your request; is that right?
25    A.  Dr. Sazy.

---

Page 73

1    Q.  Dr. Sazy.  He was present at that surgery?
2    A.  Not at my request, no.
3    Q.  Whose request?
4    A.  Globus.
5    Q.  Becaue somebody had to cover the surgery?
6    A.  Correct.  They do -- somebody had to do the
7 invoicing.  I said I cannot bill.  I cannot invoice it.
8 I cannot sell.
9    Q.  Well, is it that they needed somebody to do
10 invoicing or did they need somebody to do cover the
11 surgery?
12    A.  They needed somebody to do the invoices.
13 Actually do the physical bringing of implants and to do
14 the list of what's used.  As far as Mr. Boutte advising
15 Dr. Sazy during the surgery, no.
16    Q.  But did you give any advice to Dr. Sazy during
17 the surgery?
18    A.  Yesterday, probably not.  It went very smoothly.
19    Q.  What kind of advice do you typically give during
20 surgeries?
21    A.  It varies.  If they're -- normally for
22 Dr. Mitchell and Dr. Sazy they do not have a normal
23 assistant.  They do not have someone that comes with them
24 to -- the hospital does have not the luxury of just you
25 are an orthopedic assistant, you're going to cover

---

PREFERRED LEGAL SERVICES, INC.
214.750.0047

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                February 16, 2005

Page 74

1  orthopedic spine cases every day you come to work. The
2  assistants many times that we get have never done a spine
3  case. They're brand new at it. If that's the case, I
4  will set up the order of surgery, basically. I instruct
5  the assistant on the order of instrumentation that we'll
6  use. We'll use this pedicle probe second, a ball tip
7  probe third, we'll use a tap and then we'll go back to a
8  ball tip probe. I basically orchestrate the order of the
9  procedure for the tech because they wouldn't have a clue.
10        Many times the surgeon will look up from
11 an -- the operative field and since they are sterile,
12 they cannot exit the operatively field. If the patient's
13 anatomy presents itself in a little different manner then
14 what they were expecting, he will instruct me to go over
15 to the MRI on the view box and say take a measurement of
16 how wide the pedicle is on the right side of L5. Well,
17 then I would be more than happy to do that.
18        A brand-new layperson that has not been in
19 the OR for ten years wouldn't have a clue how to read an
20 MRI, never mind how to measure a pedicle. That's why I
21 have value to the gentlemen that I work with because I'm
22 able to do that. I'll look at the pedicle and say you
23 have eight millimeters mediolateral. That gives them the
24 gauge of what size screw they can place. Screws come in
25 different diameters, five millimeters, six millimeters,

Page 75

1  seven and eight millimeters (indicating). You want to
2  make sure you do not -- a pedicle is bone -- I can show
3  you on the model if you want to -- well, the pedicle is
4  the bone that attaches basically posterior spine to the
5  anterior spine, which is where you drive the screw
6  through. On the medial side of the pedicle is the spinal
7  cord. High priced real estate. On the lateral side is
8  the exiting nerve route. Once again, a high priced real
9  estate. You cannot breach that pedicle. So it's
10 critical that you know the diameter of the pedicle that
11 you're getting ready to shoot a screw through to not
12 breach on either side, medially or laterally.
13        I will measure that on the x-ray sometimes.
14 If we have a failure of instrumentation, the
15 instrumentation is not performing the way that clinically
16 it should, you need bailout plans, Plan B, a Plan C, a
17 Plan D. And I'll stand up there beside him and see what
18 the implant is doing and try to find a way to --
19     Q. On the surgery you did yesterday with Dr. Sazy
20 who set up the order of the instruments?
21     A. I did.
22     Q. And you said otherwise it was not a very
23 complicated surgery?
24     A. No.
25     Q. Now, you mentioned earlier that you were

Page 76

1  interviewing with Metroncus-Sofamar-Danek , correct?
2     A. Correct.
3     Q. Medtronic-Sofamar-Danek produces spinal
4  implants, right?
5     A. Correct.
6     Q. Including pedicle screws?
7     A. Correct.
8     Q. Cages?
9     A. Correct.
10    Q. Bone, do they have the bone product?
11    A. Yes, they do. They do.
12    Q. And do they also have cervical plates?
13    A. Yes.
14    Q. And they have other plates as well?
15    A. They have the widest variety of anybody of
16 spinal implants there is.
17    Q. As you understand it, does
18 Medtronics-Sofamar-Danek have sales representatives in
19 the Dallas/Fort Worth area?
20    A. Yes. Not -- no. Medtronics-Sofamar-Danek does
21 not. They have a distributor in the Dallas/Fort Worth
22 area who, in turn, has reps under him.
23    Q. In this area?
24    A. Yes, correct.
25    Q. Are there any at the All Saints?

Page 77

1     A. Yes.
2     Q. And you also interviewed with SpineTech; is that
3  right?
4     A. Correct.
5     Q. Again, do they make pedicle screws?
6     A. Yes.
7     Q. Do they make cervical plates?
8     A. Yes.
9     Q. Cages?
10    A. Yes.
11    Q. And do they have employees, sales
12 representatives, in the Dallas/Fort Worth area?
13    A. Yes.
14    Q. Any at the All Saints?
15    A. Of course.
16    Q. In fact, all of the hospitals?
17    A. All hospitals -- all companies are represented
18 at all hospitals, exactly -- I can't say that, no. There
19 are companies that are looking for reps that are very new
20 to the market that don't have representation.
21    Q. Well, let's stick with Medtronics-Sofamar-Danek.
22    A. Okay.
23    Q. They're in -- they cover all the hospitals in
24 the area?
25    A. Yeah.

20 (Pages 74 to 77)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                              February 16, 2005

Page 78

1    Q.  SpineTech as well?
2    A.  Yes.
3    Q.  And a few others, big ones?
4    A.  Sure.
5    Q.  Who are the others?
6    A.  Synthes.
7    Q.  Any others?  Is that kind of the --
8    A.  Blackstone Lab -- Blackstone Spinal Concepts,
9    NuVasive.  That's quite a few.
10   Q.  You said -- you said you sent a letter to
11   Mr. Carlson in October of 2004.  Did he respond?
12   A.  Oh, yes.
13   Q.  How did he respond?
14   A.  He sent my e-mail back to me with red
15   highlighted comments in the e-mail.
16   Q.  Do you remember what the comment -- gist of the
17   comments were?
18   A.  Very, very abrupt and rude and the comment --
19   final comment was this discussion is over.  Rob Walker
20   will be working your territory.
21   Q.  Okay.  So when you said you had written to him,
22   you meant you had e-mailed him?
23   A.  Correct.  It was an e-mail letter, correct.
24   Q.  Was that one letter you sent to Carlson or was
25   that an exchange?

Page 79

1    A.  I've sent several e-mails back and forth.
2    Q.  On that issue?
3    A.  Yes.
4    Q.  Of Walker?
5    A.  Yeah.
6    Q.  Wanting to do surgeries at All Saints?
7    A.  Yeah.
8         (A break was taken from 12:16 p.m.
9          to 12:18 p.m.)
10   BY MR. SHEA:
11   Q.  I want to come back for moment to the surgery
12   you performed yesterday with Dr. Sazy.
13   A.  Uh-huh.
14   Q.  Do you have an understanding who is doing the
15   invoice for that surgery?
16   A.  Absolutely.
17   Q.  Spinal implant.  What is your understanding?
18   A.  Globus Medical.  I do no invoicing, period.
19   Q.  Well, did you ever do invoicing prior to --
20   A.  No.
21   Q.  -- January 1?
22   A.  No.
23   Q.  And yesterday?
24   A.  We've never done invoicing, period.
25   Q.  How do you determine what your commissions are?

Page 80

1    A.  That's prescribed before you ever sign a
2    contract.  You're talking about with Depuy or Globus?
3    Q.  With Globus.
4    A.  Every company pays a known percent.  I mean you
5    can ask what me what Sofamar-Danek paid, I'll tell you
6    what their percentage is.  With Synthes, I'll tell what
7    the percentage is.  I know what any company pays
8    percentage-wise to their reps.
9    Q.  How did Globus tell you what you would be paid?
10   A.  Out and out told me.  I met them at DFW Airport
11   and they said here's what we pay.
12   Q.  Well, since January 1 have you submitted any
13   requests for a commission payment to Globus?
14   A.  I've not been paid by anybody since January 1.
15   Q.  Do you anticipate getting paid by anybody for
16   work you've done since January 1?
17   A.  I -- hopefully in the future, yes.  Not until
18   this suit is resolved here, no.
19   Q.  What about the surgery you did the first two
20   weeks of January?
21   A.  I've not been paid.  Normally you are paid the
22   following month, on or after the 25th.  So 25th of --
23   Q.  How do you -- with your new relationship with
24   One Source and with Mr. Cole's company, how do you get
25   the information to One Source to allow them to know what

Page 81

1    amount commission you think you're entitled to?
2    A.  That's determined by the company that -- I know
3    that -- say, for example, Vertebron pays One Source 25
4    percent.
5    Q.  Uh-huh.
6    A.  When Jeff comes up to me and says, hey, you know
7    Vertebron pays you, I'll pay you X percent.  Great.
8    Sounds good.  We don't have it in writing I will pay
9    you for the most part...
10   Q.  How do you keep track of the surgeries you've
11   done and see that they match up with the commission
12   you're receiving?
13   A.  On my calendar.  I keep a patient sticker.  I
14   know who the patient was, what we put in and what the
15   total amount was.
16   Q.  Now for the surgeries you performed since
17   January 1, 2005, who has submitted -- who has done a
18   submission of the invoice to the hospital or surgeon?
19   A.  Globus Medical or Vertebron, Dynaspine.
20   Whichever company we use at the time.
21   Q.  Is there a person at One Source whose job it is
22   to do that?
23   A.  No, it's not a One Source -- it's the
24   manufacturer.  The manufacturer is the company that is
25   the one that invoices the hospital, not the distributor.

                                    21 (Pages 78 to 81)

Page 82

1   Q.  Okay.  How does, for example, Globus learn that
2  Dr. Sazy used four pedicle screws on a surgery?
3   A.  One Source will notify them.
4   Q.  How does One Source learn?
5   A.  Telephone.
6   Q.  Telephone from who?
7   A.  I'll tell One Source six pedicle screws, five
8  caps, whatever.  And then they'll contact the
9  manufacturer.
10   Q.  All right.  So you reported what was used in the
11  surgery to One Source and One Source then reports to the
12  manufacturer?
13   A.  Correct.
14   Q.  Okay.  Now, do you have any written records of
15  what was used in the surgeries you performed since
16  January 1, 2005, or is it all oral?
17   A.  Yes, I have written.
18   Q.  If you want --
19   A.  I keep written records because if -- and this
20  happens many times.  A physician calls you -- and this is
21  why they continue to utilize you as a consultant because
22  you have a history with their patients.  More times than
23  not in a spinal surgery one surgery leads to another
24  surgery, leads to another surgery.  The physician will
25  call you and say, hey, I did a patient back in January of

Page 83

1  2003.  Jane Doe.  What did we use?  Because a lot of
2  times in their dictation at the hospital they don't
3  dictate the name of the system they used.  And I'll say
4  are you sure it was I that did it with you?  Oh, yeah,
5  I'm sure.  I will go in and look back in my records in
6  January 2003 and I will look up Jane Doe and find out
7  what implants we used and then I can bring the proper
8  instrumentation to extract it or add onto the constraint.
9   Q.  Now how many surgeries do you have scheduled
10  through August of 2005?
11   A.  We have a standing order for Dr. Sazy.  He
12  operates every Tuesday, Wednesday and Friday.  Standing
13  orders for Dr. Hubbard every Tuesday and Wednesday.  And
14  Dr. Mitchell is basically every other Wednesday.
15   Q.  Hubbard is Tuesday and Wednesday?
16   A.  Tuesday, Wednesday.
17   Q.  And Mitchell?
18   A.  Every other Wednesday.  And Sazy every Tuesday,
19  Wednesday and Friday.
20   Q.  Now when you say a standing order, what do you
21  mean by that?
22   A.  They will tell you -- you know, just to bring
23  the equipment and be there with everything at the
24  hospital on those days.
25   Q.  Well, how --

Page 84

1   A.  They don't call me up and say I'm doing a lumbar
2  spine on a Friday for Mrs. Smith.  It's going to be three
3  levels.  You know after working with these gentlemen for
4  the amount of years I have, nearly ten years, you know
5  what they're going to do better than they do.
6   Q.  So how do you know what to bring them?
7   A.  Intuition.  I bring the same -- you bring the
8  same things for every surgery, basically.
9   Q.  Do you bring all the different sizes of screws
10  and so on?
11   A.  Absolutely.
12   Q.  That's what you mean by a standing order, they
13  just expect you to be there?
14   A.  Correct.  Expect you to be there.
15   Q.  And if you told them, look, you know, as of
16  February 25th I'm retiring, I'm not going to be around
17  anymore, they could use another rep to come in and cover
18  those surgeries; is that right?
19   A.  They would -- before I did that I would probably
20  ask them if they knew of a good consultant they would
21  like to have come in and do their surgeries.  They've
22  grown used to me and accustomed to me and trust me.  I
23  would just not threw anybody in to the surgeries.  No, I
24  wouldn't do that to them.
25   Q.  No, no.  I'm not suggesting that you would.  But

Page 85

1  there is -- there are other people they could use other
2  than you.  You may be good --
3   A.  Oh, exactly.  There's other people.  But -- you
4  know, in these guys I'm -- in these guys' eyes I'm the
5  only one in the world they want doing it.
6   Q.  Okay.
7   A.  When I retire, I'll help them find somebody that
8  they deem adequate -- not just adequate in my eyes.
9   Q.  Does Dr. Sazy use any Medtronic products?
10   A.  No.
11   Q.  Does he use any other manufacturer other than --
12  well, strike that.
13      Prior to December 31, 2004, did Dr. Sazy
14  use any products other than -- spinal implant products
15  other than Depuy?
16   A.  He has in the past, yes.
17   Q.  What did he use?
18   A.  He's used Medtronic.  He's used I think some
19  Synthes also.
20   Q.  When did he use that?
21   A.  I couldn't tell you the exact surgery dates.
22   Q.  No, no.  Give me a ballpark of the years.
23   A.  He's used -- he's tried other things, you
24  know... Something new comes out, a surgeon is going to
25  try it.  He's going to call me up and say, hey, Thursday

John Mieyr                                    February 16, 2005

Page 86

1  I want to try this new, whatever it is, from Brad with
2  Sofamar-Danek. That happens now and then.
3      Q.  Okay. And that's happened with Dr. Sazy?
4      A.  It's happens with everybody. Sure.
5      Q.  Up until December 31, 2004, was most of
6  Dr. Sazy's usage of spinal implant products Depuy
7  products?
8      A.  Absolutely.
9      Q.  Since January 3rd, 2005, it's been other
10 products other than Depuy?
11     A.  He hasn't many cases actually. He's in the
12 middle of a personal issue. He hasn't done many
13 surgeries.
14     Q.  Since January 3rd of 2005 --
15     A.  Correct.
16     Q.  -- other products other than Depuy?
17     A.  Yeah. He hasn't done many cases. But, yes, he
18 has.
19     Q.  In regard to Dr. Hubbard, does he regularly use
20 any products other that Depuy?
21     A.  Yes.
22     Q.  What does he use?
23     A.  He uses Danek. He uses -- what do these guys
24 call it? Biomet. He's used them. He's used --
25 Dr. Hubbard has used the gamut. He's used everything.

Page 87

1      Q.  In the calendar year 2004, could you give me an
2  idea what the percentage of Dr. Hubbard usage of Depuy
3  spinal implants was?
4      A.  That would be speculation.
5      Q.  Was it more than 25 percent?
6          MS. WYSOCKI: Objection; calls for
7  speculation.
8          THE WITNESS: I couldn't determine that. I
9  would have no way of knowing. Because in 2004 I did not
10 have Harris Hospital and I have no idea what percentage
11 of implants he used at Harris Hospital. I know he did
12 not like working with Rob Walker at Harris Hospital. But
13 as far as what other companies he uses over there, I
14 don't have any idea.
15 BY MR. SHEA:
16     Q.  Okay. But you do know in general he used
17 Medtronic, Biomet and maybe some others as well?
18     A.  Sure.
19     Q.  And since January 3, 2005, to your knowledge,
20 has Dr. Hubbard used any Depuy products?
21     A.  Yes.
22     Q.  When?
23     A.  The case you before mentioned -- it was in a
24 complaint that was in Rob Walker's affidavit. I was in
25 that case doing bone and he used a cervical plate for

Page 88

1  Depuy that date. He used one and didn't like it, but he
2  did use one.
3      Q.  Any other --
4      A.  I think he's used some of Depuy's bone over at
5  Harris Hospital, but I'm not sure.
6      Q.  Are there any other occasions since January 3,
7  2005, in which, to your knowledge, Dr. Hubbard used a
8  Depuy spinal implants product, other than the single case
9  you just described?
10     A.  I think he's done more than one case. I'm not
11 certain.
12     Q.  You haven't been present when he's done that?
13     A.  Yes, I have. That one case.
14     Q.  Just that one?
15     A.  Yeah.
16     Q.  Other than that, have you been present at any
17 other case of Dr. Hubbard where he's been using Depuy's
18 spinal implant product?
19     A.  I don't believe so. No, I don't think so.
20     Q.  Let me ask you about Dr. Mitchell.
21     A.  Uh-huh.
22     Q.  Did he use Depuy products prior to December 31,
23 2004?
24     A.  Yes.
25     Q.  Exclusively?

Page 89

1      A.  No.
2      Q.  Largely?
3      A.  No, I'd say about 50 percent. He does -- the
4  issue again with me not being able to go over to Harris
5  Hospital, when he practices at Harris Hospital, he uses
6  Stryker Spine. Another one of the big competitors I
7  forgot to mention. S-T-R-Y-K-E-R.
8      Q.  But at the surgeries he does in the hospital you
9  do cover, he used exclusively Depuy products?
10     A.  Correct.
11     Q.  And since January 3, 2005, has he used any
12 Depuy, to your knowledge?
13     A.  No, I think he made it quite clear he would
14 never use anything of theirs again. He's done one spinal
15 case since January 1st of 2005. He did not use Depuy.
16     Q.  And it's your understanding that he's not going
17 to use Depuy products, correct?
18     A.  He told me he made that very clear to Jack
19 Carlson and Susan Brownell.
20     Q.  Now Dr. Hubbard, you said he -- strike that.
21         Let me start over. With regard to
22 Dr. Hubbard, in the hospitals that you covered in 2004,
23 did Dr. Hubbard use Depuy exclusively at those hospitals?
24     A.  No.
25     Q.  Just at those hospitals that you cover, do you

23  (Pages 86 to 89)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

Page 90

1  know what percentage of the spinal implant products were
2  Depuy products?
3     A.  Speculation once again, maybe 25 percent.
4     Q.  And then he used these other companies like
5  Biomet?
6     A.  He uses Danek quite a bit. I'd say Danek was
7  the biggest -- Danek and Synthes I think he's used and
8  maybe Stryker. Dr. Gray, same thing.
9     Q.  What about Dr. Gray?
10    A.  Same thing. He uses a mixture of products. He
11 never was exclusively Depuy.
12    Q.  What percentage would you say -- at the
13 hospitals that you covered in 2004, what percent of
14 Dr. Gray's spinal implant products were Depuy products,
15 roughly?
16    A.  A third.
17    Q.  And since January 1, 2005, do you know whether
18 or not Dr. Gray has used any Depuy spinal implant
19 products?
20    A.  I believe he has.
21    Q.  On how many occasions? Do you know?
22    A.  I think two. I'm not sure. I know a patient
23 they did -- they just did a surgery there on Monday. I
24 don't know what implant they used. I wasn't at the --  I
25 wasn't present at the surgery. I know they did a case

Page 91

1  just this past Monday with Depuy. The child had existing
2  Depuy implants in them already. And so I don't know if
3  they added any more. I do know that Depuy showed up with
4  the wrong instrumentation.
5     Q.  And since last Friday, which was I think the
6  11th --
7     A.  12th.
8     Q.  Yeah. February 2005, is it your testimony that
9  you have attended only one spinal implant surgery?
10    A.  Yes.
11    Q.  And that was the one you told me about with
12 Dr. Sazy?
13    A.  Yesterday, correct.
14    Q.  And your next one is scheduled on Monday?
15    A.  That's correct.
16    Q.  How many that day?
17    A.  Monday, just one. It's not even an implant.
18 It's an ex-plant.
19    Q.  And how about the remainder of next week?
20    A.  One fusion on Wednesday.
21    Q.  With Dr. --
22    A.  Sazy.
23    Q.  And --
24    A.  There's two on Wednesday. There's one on
25 Tuesday  with Sazy and one on Wednesday with Sazy and one

Page 92

1  on Wednesday with Mitchell.
2     Q.  And you intend to -- you intend to attend those
3  surgeries?
4     A.  As an observer, correct.
5     Q.  As an observer?
6     A.  As an observer.
7     Q.  Who else is going to be present at the Tuesday
8  surgery? Do you know?
9     A.  I don't.
10    Q.  Do you know if anybody from Globus is going to
11 be present?
12    A.  More than likely.
13    Q.  Do you know whether any Globus products are
14 being used at the surgery on Tuesday?
15    A.  More than likely.
16    Q.  What products?
17    A.  Globus products, yes.
18    Q.  Which ones?
19    A.  Pedicle screws and cages.
20    Q.  Any -- any products from One Source, are they
21 going to be used there on Friday?
22    A.  It's possible, but doubtful.
23    Q.  What about on the surgery with Dr. Sazy on
24 Wednesday, are there going to be any Globus used?
25    A.  More than likely. Same again. They're

Page 93

1  consistent -- the products usage is consistent --
2     Q.  Screws and cages?
3     A.  -- consistent throughout all their surgeries.
4     Q.  Is it going to be screws and cages?
5     A.  Yes.
6     Q.  And do you know who's going to bring the screws
7  and cages on Tuesday and Wednesday?
8     A.  At this point, I do not.
9     Q.  You've made no arrangements for that?
10    A.  I don't. Michael Cole will make those
11 arrangements.
12    Q.  When you cover surgeries with Dr. Sazy, you
13 bring the screws and cages, right?
14    A.  If I'm going to be a full-fledged consultant,
15 correct -- no, I don't bring them. They stay at the
16 hospital.
17    Q.  The hospital stocks them?
18    A.  Correct. We don't have to bring anything.
19 They're already there.
20    Q.  Do you go to the hospital room and get the
21 materials out and set them up?
22    A.  No, I can't get them out. They are kept
23 sterile -- kept in a sterile area. Sterile processing,
24 wrapping. They're sterile. And they are opened on the
25 back table when we walk in the room.

24 (Pages 90 to 93)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

Page 94

1    Q. And you walk in and put them in the order and --
2    A. If it's a tech that I work with many times, no.
3  They will do it themselves.
4    Q. And with Dr. Mitchell, the Globus screws and
5  cages are going to be used at that surgery next week?
6    A. Dr. Mitchell does not use cages. Just screws.
7    Q. Are screws going to be used?
8    A. I think so.
9    Q. And do you know who the manufacturer --
10   A. That's not guaranteed, but I believe Globus
11 screws will be used. Sometimes you get a patient where
12 you can't use screws.
13   Q. Have you made arrangements for somebody to cover
14 that surgery?
15   A. Not yet.
16   Q. Before you became a distributor for Globus and
17 One Source --
18   A. I'm not a distributor for Globus.
19   Q. Well, you're a distributor for Mr. Cole.
20   A. I'm a sub rep for Mr. Cole, correct. Not a
21 distributor.
22   Q. The products you distribute, somehow work with,
23 are --
24   A. Correct.
25   Q. -- Globus products?

Page 95

1    A. Correct.
2    Q. So before you became -- you don't consider
3  yourself to be distributing those products?
4    A. I'm not a distributor. No, that's -- my title
5  is a distributor. That's who you have the contract with.
6  Mr. Cole has the contract with Globus. I don't possess
7  that contract; therefore, I'm not the distributor.
8    Q. You're a sales rep for Globus?
9    A. I'm an independent contractor.
10   Q. For Globus?
11   A. Correct -- not for Globus, for Mr. Cole. Not
12 for Globus.
13   Q. What do you do with the product?
14   A. I have no relationship whatsoever with Globus.
15 My relationship is with Michael Cole.
16   Q. Okay. You say you don't distribute Globus
17 product; is that correct?
18   A. I sub rep. I independently sub rep them,
19 correct.
20   Q. And you don't consider that selling Globus
21 products; is that right?
22   A. Sure.
23   Q. You do sell them?
24   A. Sure.
25   Q. So before you became -- before you sold Globus

Page 96

1  product and before you sold -- began selling the products
2  that One Source distributes, did Dr. Sazy use any Globus
3  product, to your knowledge?
4    A. Globus is a brand-new company.
5    Q. Did Dr. Sazy --
6    A. Nobody in the United States did.
7    Q. Did -- to your knowledge, did Dr. Sazy use any
8  of the products of the companies that you're now the --
9  independently represent for One Source?
10   A. They're all brand new. Nobody did. Nobody in
11 America did.
12   Q. So he didn't use any of them?
13   A. Nobody did.
14   Q. And that's true, therefore, for Dr. Mitchell as
15 well?
16   A. Correct.
17   Q. Before you started representing these products
18 Dr. Mitchell didn't use them?
19   A. Correct.
20   Q. Nor did Dr. Gray?
21   A. Dr. Gray hasn't used any yet.
22   Q. Nor did Dr. Hubbard?
23   A. Correct.
24   Q. I would --
25       MS. WYSOCKI: You need to wrap it up.

Page 97

1        MR. SHEA: I propose that we head over to
2  see Dr. Mitchell.
3        MS. WYSOCKI: Reserve questions until time
4  of trial.
5        (Proceedings concluded at 12:37 p.m.)

PREFERRED LEGAL SERVICES, INC.
214.750.0047

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr                                    February 16, 2005

---

**Page 98**

1          CHANGES AND SIGNATURE
2    PAGE  LINE  CHANGE          REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

---

**Page 99**

1        I, JOHN MIEYR, have read the foregoing deposition and
2    hereby affix my signature that same is true and correct,
3    except as noted above.
4
5
6                    _____
                          JOHN MIEYR
7
8
9    THE STATE OF _____)
10   COUNTY OF _____)
11
12      Before me, _____, on this day
13   personally appeared JOHN MIEYR, known to me (or proved to
14   me under oath or through_____) (description of
15   identity card or other document) to be the person whose
16   name is subscribed to the foregoing instrument and
17   acknowledged to me that they executed the same for the
18   purposes and consideration therein expressed.
19      Given under my hand and seal of office this ____ day
20   of _____, 2005.
21
22
                    _____
                    NOTARY PUBLIC IN AND FOR
23                  THE STATE OF _____
24
25

---

**Page 100**

1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
     DEPUY SPINE HOLDING     )
3    CORPORATION, INC., AS   )
     General Partner of DEPUY )
4    SPINE SALES LIMITED     )
     PARTNERSHIP,            )
5       Plaintiff,       ) CIVIL ACTION NO.
                          ) 05-102770 RGS
6    VS.                  )
                          )
7    JOHN MIEYR and TRINITY )
     SPINE, INC.,         )
8       Defendant.        )
9
10      I, Sherry Folchert, do hereby certify that the facts
11   stated by me in the caption to the within and foregoing
12   deposition are true; that the deposition was taken before
13   me pursuant to the agreement of the parties; that the
14   within named witness was duly sworn to testify the truth;
15   that the questions asked and the answers given were taken
16   by me and subsequently transcribed by me and reduced to
17   typewriting by me or under my supervision, and that the
18   within and foregoing typewritten pages constitute and
19   contain a full, true, complete and correct transcript of
20   all proceedings had.
21      That the amount of time used by each party at the
22   deposition is as follows:
23      Robbyn Wysocki - 0 minutes
24      John F. Shea - 1 hour, 47 minutes
25         I further certify that I am neither attorney

---

**Page 101**

1    for, related to nor regularly employed by any of the
2    parties hereto, and further, that I am not a relative or
3    employee of any attorney or counsel employed by the
4    parties hereto, and that I am not in any way financially
5    interested in the outcome of said proceedings.
6        TO CERTIFY WHICH, witness my hand and seal at
7    Fort Worth, Tarrant County, Texas, this _____ day
8    of February, 2005.
9
10
11                   _____
                     SHERRY FOLCHERT, CSR NO. 6259
                     Expiration Date: 12/31/05
12                   Preferred Legal Services, Inc.
                     8235 Douglas Avenue, Suite 1020
13                   Dallas, Texas 75225
                     214-750-0047
14                   Firm No. 157
15
16
17
18
19
20
21
22
23
24
25

---

PREFERRED LEGAL SERVICES, INC.
214.750.0047

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

John Mieyr

February 16, 2005

Page 102

```
 1        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 2
   DEPUY SPINE HOLDING    )
 3 CORPORATION, INC., AS  )
   General Partner of DEPUY )
 4 SPINE SALES LIMITED    )
   PARTNERSHIP,           )
 5    Plaintiff,       ) CIVIL ACTION NO.
                     ) 05-102770 RGS
 6 VS.                  )
                        )
 7 JOHN MIEYR and TRINITY )
   SPINE, INC.,         )
 8    Defendant.        )
 9
10
11
12
13
14
15
16        DEPOSITION OF JOHN MIEYR
17     TAKEN AT THE INSTANCE OF THE DEFENDANT
18        TAKEN ON FEBRUARY 16, 2005
19      COST OF DEPOSITION AND EXHIBITS
20         TO BE PAID BY JOHN SHEA,
21   ATTORNEY FOR DEFENDANT: $_____
22
23
24
25
```

27 (Page 102)

fbc3acbd-faa8-4338-9ed0-cdb33c9478af

# DEPOSITION

# OF

# DAVID GRAY, M.D.

FEBRUARY 16, 2005

David Gray-Rough Draft

February 16, 2005

```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2
     DEPUY SPINE HOLDING       )
 3   CORPORATION, INC., AS     )
     General Partner of DEPUY  )
 4   SPINE SALES LIMITED       )
     PARTNERSHIP,              )
 5        Plaintiff,           )  CIVIL ACTION NO.
                               )  05-102770 RGS
 6   VS.                       )
                               )
 7   JOHN MIEYR and TRINITY    )
     SPINE, INC.,              )
 8        Defendant.           )

 9

10      * * * * * * * * * * * * * * * * * * * * * * * *

11                    ORAL DEPOSITION OF

12                    DAVID GRAY, M.D.

13                   FEBRUARY 16, 2005

14                     Volume No. 1

15      * * * * * * * * * * * * * * * * * * * * * * * *

16

17

18         ORAL DEPOSITION of DAVID GRAY, M.D., produced

19   as a witness at the instance of the Defendant, and

20   duly sworn, was taken in the above-styled and numbered

21   cause on the 16th of February, 2005, from 3:26 p.m.

22   to **24 p.m., before Sherry Folchert, CSR in and for the

23   State of Texas, reported by machine shorthand, at 908 9th

24   Avenue, Fort Worth, Texas, pursuant to the Texas Rules of

25   Civil Procedure.
```

David Gray-Rough Draft

February 16, 2005

```
 1                    A P P E A R A N C E S                    Page 2

 2

 3      FOR THE PLAINTIFF:
             Joseph F. Shea
 4           NUTTER McCLENNEN & FISH, L.L.P.
             World Trade Center West
 5           155 Seaport Boulevard
             Boston, MA   02210
 6           617-439-2280
             jshea@nutter.com
 7

 8      FOR THE DEFENDANT:
             Robbyn P. Wysocki
 9           McCUE WYSOCKI, P.C.
             14135 Midway Road, Suite 250
10           Addison, TX   75001
             972-490-0808
11           rwysocki@mcwylaw.com

12

13      ALSO PRESENT:
             John Mieyr
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                            INDEX

2                                                    PAGE

Appearances . . . . . . . . . . . . . . .      2
3
Stipulations. . . . . . . . . . . . . . .       4
4
DAVID GRAY, M.D.
5      Examination by Ms. Wysocki. . . . . . . . .        5
       Examination by Mr. Shea . . . . . . . . . .       11
6      Further Examination by Ms. Wysocki. . . . .       24
       Further Examination by Shea . . . . . . . .       25
7
Reporter's Certificate. . . . . . . . . . . . .       27
8

9                           EXHIBITS

10    NO EXHIBITS WERE MARKED.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

1                           AGREEMENTS

2

3        It is hereby agreed by and between the parties

4    hereto, through their attorneys appearing herein, that

5    any and all objections to any question or answer herein,

6    except as to the form of the question and responsiveness

7    of the answer, may be made upon the offering of this

8    deposition in evidence upon the trial of this cause with

9    the same force and effect as though the witness were

10   present in person and testifying from the witness stand.

11       It is further agreed by and between the parties

12   hereto, through their attorneys appearing herein, that

13   this deposition may be signed before any notary public in

14   and for the State of Texas, but if the original

15   deposition has not been signed by the witness and

16   returned by the time of the trial or any hearing in the

17   case, the unsigned original or a copy thereof may be

18   returned into Court and used with the same force and

19   effect as though all requirements of the rules and

20   statutes with reference to signature and return had been

21   fully complied with.

22

23

24

25

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 5

```
 1              P R O C E E D I N G S
 2                DAVID GRAY, M.D.,
 3    having been first duly sworn, testified as follows:
 4                   EXAMINATION
 5    MS. WYSOCKI:
 6       Q.   Could you state your name for the record.
 7       A.   My name is David, middle name is Wayne, Gray,
 8    G-R-A-Y.
 9       Q.   What is your occupation?
10       A.   I'm a pediatric orthopedic surgeon.
11       Q.   How long have you been a pediatric orthopedic
12    surgeon?
13       A.   I finished -- since 1992.
14       Q.   Okay.  And that's when you finished your
15    residency?
16       A.   My fellowship.
17       Q.   Okay.  Are you board certified?
18       A.   Yes, I am.
19       Q.   Okay.  In pediatric orthopedic --
20       A.   General orthopedic surgery.  Pediatrics doesn't
21    have a subspecialty board.  It's an orthopedic surgery
22    certification.
23       Q.   How old are you, sir?
24       A.   I am 44.
25       Q.   You said that wincing.
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 6

1     A.    No, I'm thinking.  I don't remember.  44.

2     Q.    Okay.  How long -- how do you know John Mieyr?

3     A.    Just through the -- through my practice.  When I

4 moved here from Atlanta, John was the representative for

5 AcroMed/Depuy --

6            THE WITNESS:  Is it still AcroMed?  But

7 for the Isola instrumentation.  And that's what I've been

8 using in Atlanta.

9 BY MS. WYSOCKI:

10    Q.    And when did you move from Atlanta?

11    A.    Moved here in May of 2001 and started practice

12 in June of 2001 here.

13    Q.    And how long have you worked with John Mieyr?

14    A.    Since probably June of 2001.

15    Q.    How often do you perform surgery?

16    A.    Every week.  Probably two or three days a week.

17 And the spine surgery we're doing depends on the time of

18 year, but on average it's about -- it works about a case

19 a week, roughly.  The winter months are much slower than

20 the summer months because the children prefer to have

21 their surgery in the summer so they don't miss school.

22    Q.    Okay.

23    A.    That's about it.  It's probably 50 cases a year.

24 45, 50 cases a year.

25    Q.    What is your specialty in relation to the spine?

David Gray-Rough Draft

February 16, 2005

Page 7

1      A.    Scolioses.

2      Q.    Is there a standard treatment for scolioses now?

3   What do you do to in the surgery for scolioses?

4      A.    In the surgery we're doing primarily fusions

5   for larger curves.  And we can do a fusion from the front

6   of the spine or the back of the spine or a combination,

7   depending on the size and location of the curve.  And we

8   typically -- most of them are instrumented as well, so we

9   put some sort of metal in there to straighten the spine

10   out as well.

11      Q.    Do you consider yourself well qualified to

12   discuss issues relating to spine surgery?

13      A.    Yes.

14      Q.    Does John Mieyr routinely attend surgery with

15   you?

16      A.    Yes.  In the days we are doing spinal fusion and

17   we're using the company that he represents, yes.

18      Q.    Can you tell me in some detail what John Mieyr's

19   role is in the surgeries that you perform?

20      A.    John really -- his biggest help is on the back

21   table with the nurses.  John does not scrub.  But most of

22   the spine -- the scolioses surgeries there's lots of

23   different instrumentation and lots of different pieces

24   that go together and a lot of equipment.  And they're

25   usually stacked in multiple pans.  There's not enough

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

1     room to spread it all out.

2              So a lot of times when we're  asking --

3     we're asking the scrub nurse for equipment, John's

4     usually helping them locate that and telling them where

5     it is in the pan and stuff.  And also, too, usually the

6     surgeries kind of have some flow to them.  We do certain

7     things in certain order.  And oftentimes he knows where

8     we're getting ready to be in a cases he's says you need

9     to get this out and get this out and so he helps expedite

10    the scrub nurse's role and make it easier for the scrub

11    nurse, which saves us time in the operating room.

12        Q.    Do you take intraoperative x-rays or MRIs?

13        A.    We take interoperative *flora x-rays, yes.

14        Q.    Okay.  Does John assist you in any way with

15    regard to those x-rays?

16        A.    No.

17        Q.    Have you had others perform the functions that

18    John does in surgery?

19        A.    Yes.

20        Q.    Who have you had besides John?

21        A.    Gosh, do you want names or companies?

22        Q.    Names.

23        A.    Names.

24        Q.    Uh-huh.

25        A.    Paul Sieger, who used to be with Danek.  Andy

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 9

```
 1    Hewes -- and Hewes is H-E-W-E-S -- from Stryker.

 2                   MR. SHEA:  What's his first name, Andy?

 3                   THE WITNESS:  Andy, yes, sir.  What is --

 4    Don Harliss.

 5                   MR. MIEYR:  Uh-huh.

 6                   THE WITNESS:  Don Harliss, H-A-R-L-I-S-S.

 7    And he's with Synthes.  And I'm trying to think.  Those

 8    would be the main ones.  And then Rob Walker, recently,

 9    who's with Depuy or Johnson-Johnson now.

10    BY MS. WYSOCKI:

11        Q.   Okay.

12        A.   That would probably be the --

13        Q.   Okay.  Over the course of time that you've

14    been here?

15        A.   Yeah.  Over the years, uh-huh.

16        Q.   And between Paul, Andy -- is it Dan or Don?

17        A.   Don.

18        Q.   Don Harliss, Rob Walker and John Mieyr, who do

19    you prefer to use if you can?

20        A.   I've always preferred John.  Just...

21        Q.   Why?

22        A.   Well, basically when we first came here, I've

23    used it -- I sold the stuff so I was very used to it.

24    Talked to John --

25                   THE WITNESS:  You may have called me before
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 10

1    I got here to give me a heads up.  And then basically

2    because he knows what he's doing.  And, you know, he's

3    been the one -- the nurses have liked him the best, the

4    scrub nurses.  They've been happy with him.  He's not

5    been condensing with them.  It's like he's easy to work

6    with.  So from that standpoint -- and usually you can

7    talk and tl him what you need and he can find stuff and

8    get it for you.

9            And he's bailed us out a couple of times.

10   One time in particular when somebody else was supposed to

11   bring us equipment and didn't and I called John the

12   morning of surgery and he was able to secure a set and

13   bring it in for me.  You know, the Depuy stuff.  So he's

14   been very reliable.

15   BY MS. WYSOCKI:

16     Q.   Okay.  You stated that you've used the Rob

17   Walker recently.  What have been your experience with Rob

18   Walker relating to Depuy product?

19     A.   I just had two experiences with him and I've

20   been -- I just -- it's been a little underwhelming and

21   just not as -- doesn't seem to be quite as familiar with

22   instrumentation and just not as -- you know, not on

23   the -- not quite on the ball with the nurses in the back

24   and stuff.  I guess the big thing with the -- what's

25   weird about this is the scrub nurses they know all the

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 11

```
 1   basic surgical skills and stuff like, you know, scissors

 2   and knives and sewing and all that sort of stuff.  But

 3   most of these people are not really -- they don't really

 4   know our instrumentation because it's something that's

 5   kind of foreign.  It's very different.  It's not

 6   something they get a lot of in nursing school.  So they

 7   don't know the names of all these things.  So while we

 8   have a group of nurses that tend to do the spine stuff,

 9   it's been four or five or six different people -- they're

10   not -- they don't have enough familiarity with it.  So

11   where the rep is so valuable in the operating room is it

12   saves you a lot of time as far as somebody that knows

13   what's going in and they know where the pieces are.  When

14   you ask things -- I need an angled hook pusher or I need

15   an angled rod pusher, I know what it looks like and John

16   knows what it looks, like my co-surgeon knows what it

17   looks like, but oftentimes the scrub nurse can't remember

18   what it looks like.  And they're not sure which pan and

19   then somebody can say, oh, it's here and just point with

20   a lazar pointer and it makes life go easier and stuff.

21            So that's -- that's their biggest role for

22   us.  And you need somebody that works well with your

23   staff (indicating).

24       Q.   And John does?

25       A.   And John does.
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 12

1    Q.    You mentioned time and that he saves time.

2    A.    Uh-huh.

3    Q.    Why is time important in your surgeries?

4    A.    The big thing for us is that the kids are

5    bleeding and by the end of the case when we start the

6    instrument stuff and we start getting an increase in

7    blood loss and stuff.  And some of children we operate

8    are pretty sick with Cereal Palsy and things like that,

9    so -- they neuromuscular disorders and so they start

10   bleeding a lot.  We need to get done.  And so if we're

11   having to spend, you know, a couple of minutes or a

12   minute looking for a piece or this or that and you

13   multiple that by each piece of instrumentation you put

14   in, you know, that can add 30, 40 minutes to the case.

15   So that's what you're trying to save.

16   Q.    Okay.  Is there -- have there been studies

17   regarding the correlation between the length of time and

18   surgical procedure and the risk of complications arising

19   from that surgery?

20   A.    You know I can't quote them but the general

21   impression is there are studies that are out there that

22   do talk about the longer the procedure, risk, infection

23   and also bloods loss go up as well.  So there is

24   correlation between them.

25   Q.    So risk of infection and the and blood loss?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 13

```
 1        A.    And blood loss.

 2        Q.    Okay.  Okay.  So time is of the essence in

 3    surgery?

 4        A.    Yes, ma'am.

 5        Q.    Okay.  When Rob Walker did the cases for you

 6    recently, did he bring the proper equipment with him?

 7        A.    You know I didn't -- the last case I didn't look

 8    at the back table for everything.  But the last case that

 9    we did the equipment that they were handing me to take

10    out the instrumentation was not the correct equipment.

11    So if hook holders didn't match the system that we're

12    using and stuff.  So -- and the rod holders didn't match

13    the size system that we're using.  Rob and I -- I had him

14    come over -- he came actually -- he did on his own.  I

15    didn't have he came over, he came over.  And we looked at

16    the films the week before the case and I asked for a

17    couple of sets that he did bring in that -- that I might

18    need to revise.  So he brought those with him.

19              But when it was time to take the

20    instrumentation out, he had the right sized screw driver

21    and the right sized little handle that takes off one of

22    the little attachments -- the rod.  But the hook holders

23    weren't the right hook holders and the rod holders

24    weren't the right size.

25        Q.    Had you ever had that experience with John
```

David Gray-Rough Draft

February 16, 2005

Page 14

1    Mieyr?

2         A.    No, ma'am.

3         Q.    Okay.  If a judge in Boston were to tell you

4    that you could not use John Mieyr, how would that affect

5    the manner in which you -- the risk to your patients?

6         A.    Well, the biggest problem for us is finding

7    somebody that's competent, qualified, that can help us

8    make the case go faster.  I mean that's what we really

9    need.  So that would be detrimental to me.  And it would

10   be detrimental to the patient, too.  It would take a

11   little bit more time.

12        Q.    If John Mieyr were not able to provide services

13   to you in your practice during the next six months, would

14   you purchase product from Depuy?

15        A.    No.

16        Q.    Why not?

17        A.    Just -- I just don't understand why they would

18   treat somebody that way.  You know, just -- I don't

19   really want to -- personally when I work with somebody

20   who is kind of acting the way they're acting, I'm

21   disappointed.  I think that if they're going to make a

22   business decision about John representing them or not, I

23   think that's fine.  That's their perogative.  But then to

24   try to keep somebody from making a living and does a good

25   job got at what he does -- if they're not willing to

1   compete -- I don't understand that.  It doesn't make

2   sense to me.  And just kind of -- I'm kind of

3   disappointed in that attitude.

4           You would think that they would be

5   interested in -- you know, I -- I'm buying products and

6   stuff from them.  We're the customer in some way.  And we

7   do have options with other equipment and other systems.

8   And don't -- just not the way I operate.  I mean the way

9   I view the world (indicating).  To me it's a little

10  disappointing.

11      Q.   You're not arguing that Depuy didn't have a

12  right to terminate the contract?

13      A.   No, not arguing that.  I'm just saying after

14  that, you know, if they're going to do that, then John's

15  worked and we have surgeons in town that use their

16  equipment and we largely use the equipment because we get

17  good service.  Then, you know, that's their decision.  If

18  they want to do that, fine and dandy.  And, you know, I

19  make my decisions based on the instrumentation -- or what

20  goes in·the patient based on a of couple things.

21          One is the person that I'm using, the

22  representative, are they reliable, can they give me good

23  service?  Can they help the nurses in the OR?  And the

24  other thing is I make the decision based on is the

25  instrumentation the right thing for the patient, too.

David Gray-Rough Draft

February 16, 2005

Page 16

1    And there's been times where I'll call John and say,

2    John, I need such and such.  He says, well, we don't

3    really have anything that quite does that.  I'll ask

4    about something and he'll be honest and he'll tell me

5    that.  And, boom, I say fine.  Great.  Thank you.  And I

6    pick up the phone and I call somebody else who has a

7    different size or something I need.

8                So the decisions are based a couple of

9    things.  One is what's the right instrumentation for the

10   patient?  A lot of companies have similar things but some

11   have little niches here and there.  They do one thing

12   better than the other.  So you pick that.  The second

13   reason is who does the best job for you as far as, you

14   know, representing.  You know who can help you the most?

15   Who is reliable?  That's the key.

16       Q.    Okay.  One of issues that will be in the case in

17   Boston is what good will does Depuy have with you.

18   You've just stated that you won't purchase their product

19   in next six months.  Do they have any good will with you?

20       A.    I'd say no.  You know, if they have had good

21   will or they were interested in good will or interested

22   in my practice and stuff, they would have probably come

23   and talked to me before they made their decisions with

24   John.

25       Q.    Have they been to talk to you since?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 17

1       A.     Yeah, they actually came and talked to me a week

2   ago.   About a week and a half ago they came to me and

3   talked to me about -- said, you know, we made

4   basically -- we've made a business decision not to renew

5   the contract and stuff.   I said okay.   They said we'd

6   like to still try and help out and use us and I just

7   listened to them.   But they didn't tell me they were also

8   filing suit against John.

9       Q.     Who came and talked to you?

10      A.     Jack Carlson -- is that right, Jack Carlson?

11  Rob Walker.   And there was one other gentleman.   I cannot

12  remember his name.   I think he oversees some of the local

13  stuff with Rob in Tarrant County.   I'm not sure.

14      Q.     Who was the one that spoke about the business

15  decision?

16      A.     Jack Carlson.   Mr. Carlson.   He said to me -- he

17  said basically it was my decision to not renew John's

18  contract.   He said it's my decision.   We made it based on

19  a business decision and that's the way business is.   And,

20  you know, if you have an issue, you can bring it to me.

21  And so he was stepped up to the plate with that.   And I

22  said okay.   And that was as far as the conversation went.

23  About that, that's all he said.   But he didn't tell me

24  anything about the other -- about, you know, why we're

25  here now.

David Gray-Rough Draft

February 16, 2005

Page 18

1     Q.   Okay.  If John Mieyr were enjoined and otherwise

2   prohibited by a Boston court from assisting you with

3   surgeries that you've already scheduled in the next six

4   months, would that impede your ability to do those

5   surgeries in any way?

6     A.   Well, it would have an impact on -- as far as

7   our time in the operating room, you know, because he's

8   very efficient.  I mean he's efficient with that.  We

9   don't currently have anything scheduled.  John's been

10   real honest about stuff.  He doesn't have anything that

11   pertains to me right now.

12     Q.   Okay.

13     A.   So we don't have anything set up.

14     Q.   Okay.

15           MS. WYSOCKI:  Pass the witness.

16                 EXAMINATION

17   BY MR. SHEA:

18     Q.   343 Dr. Gray, you began practicing as an

19   orthopedic surgeon in 1993?

20     A.   I finished my fellowship yes, sir, and went into

21   practice.

22     Q.   And at that time did you use any spinal implant

23   products?

24     A.   Yes, I did.

25     Q.   What products did you use?

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 19

```
1        A.    At that time it would have been the Control CD.
2   It was made by Danek.   And Texas Scottish Wright
3   instrumentation, also -- is that Danek?  Correct.  And
4   the other one would be -- we used some *Moss Miami, which
5   was the Depuy products.
6        Q.    And Danek, what is Danek?  Is that --
7        A.    It's just another company.  They're Medtronics
8   now?  I'm not sure.  They provide -- they're another
9   company that makes spinal instrumentation as well.
10       Q.    And you came here -- I think you said in 2001?
11       A.    Yes, sir.
12       Q.    And when you came here to the Fort Worth area in
13  June of 2001, what spinal implant products were you
14  using?
15       A.    I was using Isola, which is made by AcroMed.  At
16  that point, I guess it had been bought by Depuy.  I
17  started using that in -- sometime in the mid '90s when I
18  was in Atlanta.
19       Q.    What kind of product is Isola?  Is it a rod
20  system?
21       A.    It's a rod -- it's a hook, rod and screw system,
22  yes, sir.
23       Q.    And when you speak of screws, you're talking
24  about pedicle screws?
25       A.    Uh-huh.
```

David Gray-Rough Draft

February 16, 2005

Page 20

```
 1      Q.   Is that -- you have to answer yes or no.
 2      A.   Yes, it is.  Pedicle screws or bone screws.
 3      Q.   And you said there were hooks, rods and screws?
 4      A.   Hooks, rods and screws, basically, uh-huh.
 5      Q.   And since you came here in June of 2001, did you
 6   continue to use the Isola system?
 7      A.   Yes, I did.
 8      Q.   And some point did you stop using Isola?
 9      A.   I migrated over to some of the other Depuy
10   products which were Monarch -- and they had a few
11   variations off of the Isola system.  And then used a
12   little bit of Moss Miami as well.
13      Q.   But Monarch was the primary --
14      A.   Yes, sir.
15      Q.    -- that you migrated --
16      A.   Yeah, there was -- it was basically based on
17   some size issues with some of the kids, the size of
18   implants.  You could downsize them a little bit.  And
19   some of the kids the Isola was a little bit bulky.
20      Q.   And did continue to use the Moss Miami and
21   Monarch system up until December 31 of 2004?
22      A.   Yes.
23      Q.   You said, if I heard you correctly, you do about
24   45 to 50 spinal implants per year; is that right?
25      A.   Yes, sir, uh-huh.
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

1     Q.    Is it your testimony that in all of those

2  surgeries in 2004 you used Depuy products?

3     A.    No, I did not.  I do use other products.

4     Q.    How many out of those 45 surgeries involved the

5  use of Depuy products?

6     A.    I probably -- I would think it would be close to

7  ninety percent, I would think.

8     Q.    What about in 2003?  Is it again roughly ninety

9  percent of the surgeries you performed involved the use

10  of Depuy products?

11     A.    I would say that's a fairly accurate statement.

12     Q.    What leads you to use other products?  What path

13  leads you to use the other products that ten percent?

14     A.    The size of the rod.  Sometimes you can get a

15  smaller implant.  Sometimes the screws or the hooks are a

16  little bit smaller.  Some of the other product have

17  different methods of fixation at the pelvis.

18     Q.    And what are those other products that you use,

19  the manufacturers?

20     A.    Would be Synthes, Danek or Medtronics.

21     Q.    Yeah.

22     A.    And then also Stryker, they put some

23  instrumentation out as well.  I can -- I think that would

24  be it.

25     Q.    And the -- did you give us the name of those

David Gray-Rough Draft

February 16, 2005

Page 22

1    reps earlier in your deposition testimony today?

2        A.    I did.

3        Q.    That would be Sieger and --

4        A.    Yes, Paul Sieger, Andy Hewes, et cetera.  Yes,

5    sir.

6        Q.    Those are ail people who have acted as reps for

7    surgeries that you've performed here in the Fort Worth

8    area, right?

9        A.    Yes, sir, they are.

10       Q.    And are you dissatisfied with their performance?

11       A.    No, not dissatisfied with it.

12       Q.    Do you believe that their performance endangered

13   your patients?

14       A.    No, sir.  I wouldn't have -- most -- some of

15   those I've used more than once.  It's a fairly small

16   group and so...

17       Q.    Right.  You -- when you were in Atlanta using

18   the Isolar system --

19       A.    Uh-huh.

20       Q.    -- was there a Depuy or an AcroMed rep who would

21   attend surgeries with you?

22       A.    Yes, sir.

23       Q.    Who was that?

24       A.    Carl Llewllyn -- it's L-L-E-W --

25                (Brief pause in proceedings.)

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

```
 1   BY MR. SHEA:

 2       Q.   In your opinion, was Mr. Llewelln as -- in your

 3   opinion, was Mr. Llewellyn as helpful a rep as Mr. Mieyr?

 4       A.   Yes, sir.

 5       Q.   Okay.  Where do you perform surgeries in the

 6   Fort Worth area?

 7       A.   Cooks Children Hospital.

 8       Q.   Anywhere else or is that it?

 9       A.   No, sir, that's it.

10       Q.   Okay.  Ms. Wysocki asked you a few questions

11   and -- I'm sorry, before we get to that.

12            You said you were underwhelmed with Rob

13   Walker; is that right?

14       A.   Yes, sir.

15       Q.   You've used him on two occasions?

16       A.   Yes, sir.

17       Q.   Do you believe your patients were endangered by

18   his presence?

19       A.   No, sir.

20       Q.   Ms. Wysocki asked you a couple of

21   questions about -- your views about the fact that

22   Mr. Mieyr had been -- his contract had not been renewed.

23   What do you know about the renewal or nonrenewal of

24   Mr. Mieyr's contract?

25       A.   I just know it wasn't renewed.  I don't know any
```

David Gray-Rough Draft

February 16, 2005

Page 24

```
 1    details.

 2        Q.    How did you learn it wasn't renewed?

 3        A.    Mr. Mieyr told me.

 4        Q.    When did he tell you that?

 5        A.    He told me -- we had a case scheduled in

 6    December, like after Christmas.  And there was -- it was

 7    going back and forth.  It was renewed, then it wasn't

 8    renewed and then it was renewed.  And then right after

 9    Christmas we had two cases scheduled.  And we did one

10    case.  And then I think between that and the next case --

11    I can't remember the exact dates.  But right around

12    Christmas or a day or two after, we had two cases coming

13    up.  It was not renewed anymore.  And basically it was

14    going to be done as of -- immediately or as of December

15    31st.  I couldn't remember which.

16        Q.    Somewhere in that time frame Mr. Mieyr told you

17    that he was no longer going to be distributing Depuy

18    products?

19        A.    Yes, sir.  That's when I found out.  I didn't

20    get a phone call.  No one from Depuy called me,

21    otherwise.

22        Q.    Did he Mr. Mieyr tell you why his contract

23    wasn't being renewed?

24        A.    No, sir, we didn't go into that.

25        Q.    Did you ask him?
```

David Gray-Rough Draft                                                    February 16, 2005

Page 25

 1      A.    No.

 2      Q.    Did Mr. Mieyr tell you that he had a written

 3   contract with Depuy?

 4      A.    No, sir, he did not.

 5      Q.    Did he tell you that in February or March of

 6   2004 Depuy had paid him money in connection with entering

 7   into this new agreement?

 8      A.    No, sir.

 9      Q.    And did Mr. Mieyr tell you that at that time

10   after he received that money he agreed that he would not

11   sell spinal implant products in the Tarrant County for

12   six months after the termination of his agreement?

13      A.    No, we did not discuss that.

14      Q.    He didn't mention any of that to you?

15      A.    No, sir.

16      Q.    As you sit here today, you have no information

17   about that?

18      A.    No, sir, I do not.

19      Q.    Now you said that, accordingly, you wouldn't use

20   Depuy products if Mr. Mieyr is not allowed to sell

21   competing products in Tarrant County for six months,

22   right?

23      A.    Yes, sir.

24      Q.    Okay.  And the reason you're not going to do

25   that is because you don't like the way that Depuy has

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft                                    February 16, 2005

Page 26

```
 1    treated Mr. Mieyr?

 2       A.   Yeah.  I'm a little surprised, but also a

 3    little -- kind of -- I'm surprised they wouldn't have

 4    come to us and say we're going to change all this.  All

 5    these changes are coming.  And sit down and try to, you

 6    know -- you would think that if I'm buying products from

 7    you, you would actually come to the person that's --

 8    you're supplying the stuff to and say here what's going

 9    on, here's what we're doing?  How can we make this smooth

10    and the transition and all that sort of stuff.  None of

11    that was done either.

12       Q.   And the first communication you had from Depuy

13    about this was about a week and a half ago you said?

14       A.   Right.  I never had any communication with Depuy

15    other than basically I heard from John.  And then there

16    was an episode or a case -- I guess Susan -- what's her

17    last name?

18                 MS. WYSOCKI:  Brownell.

19                 THE WITNESS:  Brownell came over on one

20    case -- and this was still in December, right as the

21    contract was being terminated, saying, you know, I'm the

22    distributor for Dallas.  I'm going to have the whole

23    territory.  And that was -- but that was after I found

24    out and that was the whole conversation.  I didn't have

25    any other contact.  That's it.
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 27

1      Q.    That was in December that Ms. Brownell

2   introduced herself?

3      A.    Yes.   After I found out that the contract wasn't

4   going to be renewed.   That would have been probably the

5   30th -- 29th or 30th, something like that.

6      Q.    And of course the way you found out the contract

7   wasn't going to be renewed was from Mr. Mieyr?

8      A.    Yes, sir.

9      Q.    Do you know whether Mr. Mieyr was authorized by

10  Depuy to tell you that before December 29th or 30th?

11     A.    No, I don't.

12     Q.    Okay.   But about a week and a half ago you said

13  you had a telephone conversation -- a meeting?

14     A.    They came over, yes, sir.

15     Q.    And you said that they didn't mention anything

16  to you about the lawsuit at that time?

17     A.    No, sir, they did not.

18     Q.    Did you know -- was there a lawsuit at that

19  time?

20     A.    I have no idea.

21     Q.    Now you don't have any -- strike that.

22           Do you have any surgeries, spinal implant

23  surgeries scheduled right now?

24     A.    Yes, I have several scheduled for the summer

25  already.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 28

```
 1      Q.    Scheduled for the summer?

 2      A.    Yes, sir.

 3      Q.    What months?

 4      A.    There's some -- there may be some in between.

 5   There are several other people there.  I'm not sure if

 6   they're on the book officially or not.

 7      Q.    Let's go deal with the official one for a

 8   moment.

 9      A.    Uh-huh.

10      Q.    When you say they're in the -- scheduled in the

11   summer --

12      A.    Yes.

13      Q.    Do you know when?  What month?

14      A.    Probably end of May.  Some starting in June

15   already.

16      Q.    And do you have any surgeries scheduled next

17   week?

18      A.    No, sir -- I'm making sure -- I'm trying to

19   think off the top of my head.

20      Q.    How about from January 1 of 2005 up until today,

21   have you performed any surgeries?

22      A.    Yes, sir, I have.

23      Q.    How many, about?

24      A.    I've assisted with one of my partners.  And then

25   I've had a couple of my own.  I would say three or four
```

David Gray-Rough Draft                                                    February 16, 2005

Page 29

1    cases.

2        Q.    Who was the partner with whom you assisted?

3        A.    One is Ron Burke -- Dr. Ronald Burke.  And the

4    other would be Dr. Gary Douglas.

5        Q.    Douglas?

6        A.    Yes, sir.  Actually, Gary Douglas assisted me in

7    one of the patients because he had followed them years

8    before.

9        Q.    Well, with Dr. Burke, what kind the surgery was

10   that?

11       A.    It was a posterior spinal fusion

12   instrumentation.

13       Q.    And what manufacturer's product were used in

14   that instrumentation?

15       A.    Danek.  The Danek system.

16       Q.    Is that what Dr. Burke uses?

17       A.    Yes, Dr. Burke will use that.

18       Q.    Was there a Danek rep present?

19       A.    Yes, there was.  The name I don't know.

20       Q.    Was it a man or --

21       A.    Yes, it was.  I might think of this name.

22              MR. MIEYR:  Jason?

23              THE WITNESS:  No.

24   BY MR. SHEA:

25       Q.    What about with Dr. Burger --

David Gray-Rough Draft

February 16, 2005

Page 30

```
1       A.    Burke?

2       Q.    No.

3       A.    Or Douglas?

4       Q.    Douglas.  What was -- what kind of surgery was

5    that?

6       A.    It was a posterior spinal fusion as well.

7       Q.    Was there instrumentation?

8       A.    Yes.

9       Q.    What manufacturer?

10      A.    Synthes.  And I picked that because it's -- the

11   profile is lower.  It's not as -- it doesn't stick up as

12   much.  The patient is very skinny (indicating).  And we

13   picked that for two reasons; the small size and the

14   ability to fix to the pelvis.

15      Q.    And was there a Synthes sales rep present?

16      A.    Yes.  Don Harliss.

17      Q.    Did he do a good job?

18      A.    Yes, sir.

19      Q.    What about the Danek rep with Dr. Burke, did he

20   do a good job on that occasion?

21      A.    He did all right.  They don't bring enough of

22   extra pieces for us.  We run out of sizes.  And that's

23   one of our beefs.

24      Q.    What about with the other two surgeries you

25   performed this year, what were they?  I thought you
```

David Gray-Rough Draft

February 16, 2005

Page 31

```
 1   said --

 2       A.    Yeah.

 3       Q.    Did I misunderstand?  You said you did four this

 4   year.

 5       A.    Probably four.  Three of those were Danek

 6   products and then one of them was the -- it would be the

 7   Synthes.

 8       Q.    Okay.  So you haven't use any Depuy products

 9   since January 1, 2005?

10       A.    No, sir, I haven't.

11       Q.    And prior to January 1, 2005, ninety percent of

12   your business used -- or surgical implants were Depuy

13   products?

14       A.    Yes, sir, that would be correct.

15       Q.    And has Mr. Mieyr assisted you in any surgeries

16   since January 1, 2005?

17       A.    No, sir, he has not.

18       Q.    Is he scheduled to?

19       A.    No, sir, he's not.

20       Q.    Does Mr. Mieyr have an M.D.?

21       A.    No, he does not.

22       Q.    Is he a registered nurse or licensed nurse?

23       A.    No, sir.

24       Q.    And are you capable of performing orthopedic

25   surgery safely in the absence of John Mieyr?
```

David Gray-Rough Draft

February 16, 2005

Page 32

```
 1      A.    Yes.

 2      Q.    And have you done that?

 3      A.    Yes.

 4      Q.    And do -- you will be able to continue to do

 5   that?

 6      A.    Yes.

 7      Q.    In your dealings with Mr. Mieyr do you expect

 8   him to keep his word with you?

 9      A.    In the past he always has, yes, sir.

10      Q.    And you expect him to?

11      A.    Yes.

12      Q.    And do you know of any reason why he shouldn't

13   keep his promises to Depuy?

14              MS. WYSOCKI:  Objection; calls for

15   speculation.

16   BY MR. SHEA:

17      Q.    Do you know of any reason why Mr. Mieyr

18   shouldn't keep his promises to Depuy, that you know of?

19      A.    Not that I know of.  I don't know the

20   relationship with Depuy, so...  But, you know, I would

21   expect.

22      Q.    Him to keep his word?

23      A.    Yes, sir.

24      Q.    And you've never seen any agreement between

25   Depuy and Mr. Mieyr?
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 33

```
 1      A.    No, I have not.

 2      Q.    Mr. Mieyr hasn't described any provisions in it

 3   to you?

 4      A.    No, sir, he has not.

 5      Q.    You're not a lawyer?

 6      A.    No, I'm not.  Thank goodness.

 7            MR. SHEA:  On that --

 8            THE WITNESS:  I don't mean that as an

 9   insult.

10            MR. SHEA:  Well, I don't know.

11            THE WITNESS:  Can we go off the record for

12   just a second.

13            (Brief pause in proceedings.) 359.

14            MR. SHEA:  On that note, I have no further

15   questions.  Four o'clock

16                  FURTHER EXAMINATION

17   BY MS. WYSOCKI:

18      Q.    Just to follow up.  Mr. Shea asked you whether

19   you could perform surgeries safely and you said yes but

20   does that in any way affect the answer to my question

21   which was about the nonuse of John Mieyr impeding your

22   ability to perform the surgery as safely as possible?

23      A.    No, it doesn't.  I mean he makes the case go

24   faster.  That's the key.  And that's very helpful.

25      Q.    And critical to safety of the patients?
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 34

```
 1      A.    Yes, uh-huh.

 2                MS. WYSOCKI:  No further questions.

 3                MR. SHEA:  I guess I do.

 4                      FURTHER EXAMINATION

 5    BY MR. SHEA:

 6      Q.    Is your testimony, Dr. Gray, that John Mieyr is

 7    the only sales rep who can allow the surgery to go at the

 8    pace you prefer?

 9      A.    He's provided the best service of anyone in this

10    area to me, yes.  That would be -- for right now, yes.

11    I've been very, very happy with that, yes.

12      Q.    Is it your testimony though that he's the only

13    person that can do it?

14      A.    No, none of us are expendable -- or we're all

15    expendable so in that sense there's other people that

16    could probably step up to the plate.  I haven't had

17    anyone else who has done -- provide the level of service.

18    That's key.

19      Q.    And you do do surgeries with other sales reps?

20      A.    Yes, sir.

21      Q.    And you don't believe that by doing that you're

22    endangering them, right?

23      A.    I'm not going to endanger my patients, no, sir.

24      Q.    And you're not going to do anything that would

25    constitute an unsafe surgery?
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

Page 35

```
 1      A.   No, sir.

 2                  MR. SHEA:  I don't have any other

 3   questions.  401.

 4                  MS. WYSOCKI:  I do.

 5                      FURTHER EXAMINATION

 6   BY MS. WYSOCKI:

 7      Q.   But the use of John effectively adds a level of

 8   safety Depuy to the speed and efficiency in which he

 9   works; is that correct?

10      A.   Yes, ma'am.  From the speed point yes, ma'am.

11                  MS. WYSOCKI:  Pass the witness 402.

12                      FURTHER EXAMINATION

13   BY MR. SHEA:

14      Q.   How many sales reps have you used with Depuy

15   products?  Did you understand my question?  Is that clear

16   enough?  When you're using Depuy products, how many

17   different sales rep have there --

18      A.   Here in my Fort Worth or my career?

19      Q.   Your whole career.

20      A.   Probably five or six.

21      Q.   Okay.  There was Mr. Llewllyn?

22      A.   Mr. Llewllyn.  And I cannot remember who came

23   after him.

24      Q.   Mr. Llewllyn has --

25      A.   And there was somebody before in Baltimore, no
```

Page 36

```
 1   idea.  Can't remember that far back.  And then -- so

 2   that's probably three people.  And then here would be

 3   John Mieyr.  And there's Rob Walker.  And there's one

 4   other young man that came with Rob once, with black hair.

 5             MR. MIEYR:  Mark Robbins?

 6             THE WITNESS:  It may have been.  And stuff

 7   and...

 8   BY MR. SHEA:

 9        Q.   You thought Llewllyn was as quick and helpful as

10   Mieyr, right?

11        A.   Yes, sir.

12        Q.   And you think that Walker isn't as quick and

13   helpful as Mieyr, right?

14        A.   Yes, sir, that's fair enough.

15        Q.   Nonetheless, no danger to your patient when

16   Walker attended those surgeries, right?

17        A.   No.  It just takes more time in the operating

18   room.

19        Q.   All right.

20        A.   And I will -- you know, I know we're arguing

21   around this point -- where it's real critical for us is

22   we will have a patient, when they start bleeding and the

23   anesthesia needs us to get them closed and they have a

24   coagulopathy, we need somebody in the room that can make

25   the nurses -- help the nurses go fast.  Because when I
```

David Gray-Rough Draft                                    February 16, 2005

Page 37

```
 1   have to leave the table and go to the back table and pick

 2   up implants and instruments, that slows the whole process

 3   down.  So there will be times in cases where the stress

 4   level goes up, that we're worried and we need to move and

 5   you need to have people who can assist.  They're not

 6   making medical decisions.  He's not telling us what.

 7   None of those people there on the back table are.

 8            We've got the plan and stuff.  They're not

 9   telling us how to use it.  They're just telling the nurse

10   here it is, boom, boom, boom.  And they're staying ahead

11   of the game and they'll start picking out implants ahead

12   of time.  They'll start reading off numbers.  They'll

13   have lot numbers and all those things.  And you have to

14   pick out all these things ahead of time.  Anything that

15   you can do proactively -- when he picks up a hook and

16   it's put in, you already have the lot number and stuff

17   written down, you don't have to sit and wait on the

18   nurse -- waiting on them to read it off to the rep.

19            Those things add up.  And for us it's very

20   important.  That's why -- why a lot of these decisions

21   made on reps.  That's what differentiates people out.

22   Q.   But you understand that Mr. Mieyr may some day

23   retire?

24   A.   Yes.

25   Q.   You understand that he may some day move?
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

Page 38

```
 1      A.    Yes.

 2      Q.    He may take a new career?

 3      A.    Yes.

 4      Q.    He may keep his promise and not compete for six

 5  months in Tarrant County?

 6                  MS. WYSOCKI:  Objection.

 7                  THE WITNESS:  Yes.

 8  BY MR. SHEA:

 9      Q.    And it's not your testimony that you wouldn't be

10  able to perform surgery if any of those events occurred?

11      A.    No, it's not.

12      Q.    You'd be able to do surgeries?

13      A.    I would.

14      Q.    You would never do a surgery if you thought it

15  was going to endanger your patient?

16      A.    No, I would not.

17      Q.    You would find a rep that would help you do the

18  surgery?

19      A.    Yeah, we would find a way to do something with

20  that.  But in the mean while, you know, the next person

21  that comes along they're going to have to prove that they

22  can have our -- you know...

23      Q.    Next salesman?

24      A.    (Witness indicates.)

25      Q.    Is that what you mean?
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

```
 1      A.   Uh-huh.

 2      Q.   Yes?

 3      A.   Yes.  I'm sorry.

 4      Q.   If you don't say yes or no, she's --

 5      A.   I'm nonverbal.  Yes.

 6      Q.   You're talking about the sales rep?

 7      A.   Yeah.  But they have to come along and they have

 8 to be able to perform at a certain level of service.  It

 9 doesn't matter what the representative -- if they can't

10 do that --

11      Q.   Sure.

12      A.   -- then we don't use them.

13      Q.   Right.  You said that you met with Susan

14 Brownell, right?

15      A.   I just said -- we said hi and how are you.  Just

16 more...

17      Q.   Do you know long she's been a sales

18 representative?

19      A.   No, sir, I do not.

20      Q.   Do you know a fellow named Charlie Lopez?

21      A.   No, I don't.

22      Q.   A sales rep?

23      A.   No, I don't think so.

24      Q.   Used to work with Mr. Mieyr?

25           MR. MIEYR:  He's the one right before --
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

```
 1    little, short Hispanic guy?

 2              THE WITNESS:  Yes.  That -- yes, he came

 3    with Rob, right?  Yes.

 4    BY MR. SHEA:

 5       Q.   You never worked with him prior to right before

 6    December of 2004, is that your testimony?

 7       A.   I don't think so.  I don't remember that.

 8       Q.   Do you know how much experience he has as a --

 9       A.   No, sir.

10       Q.   -- sales rep?

11       A.   No, sir, I do not.

12       Q.   And the only time you've seen him was on -- late

13    December 2004?

14       A.   I would have seen him twice; the day before

15    surgery, I believe, and the day of.  I think he was there

16    the day of.

17       Q.   What about the other sales reps who work with

18    Susan Brownell, do you know any of them?

19       A.   The only other person I know would be Rob Walker

20    and then I met Mr. Carlson --

21       Q.   Yeah.

22       A.   -- who's part of the Depuy organization.  And

23    I -- there's one other person I did meet and I do not

24    remember who they are.  But never in the operating room.

25    He came along to that meeting.
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

1      Q.    Okay.  But it's your testimony, again, that

2  based on what Mr. Mieyr has told you about his

3  termination by Depuy, you're not going to use any of

4  these people to implant Depuy products, right?

5      A.    Yes, sir.

6      Q.    That's your testimony?

7      A.    Yes, sir.

8      Q.    And again that's based on what Mr. Mieyr told

9  you?

10     A.    No, it's based on my own decision.  My -- I

11  was -- all I know is the contract wasn't being renewed.

12     Q.    Right.

13     A.    We weren't -- they didn't -- Depuy didn't come

14  to us ahead of time to say how is this going to impact

15  you, what can we do.  Nothing like that.  These

16  products -- many of the products are very similar.  In

17  other words, that one -- one's not superior than the

18  other from just a pure biomechanical -- they all nuances.

19  And so we -- a lot of -- majority patients, all of these

20  systems can do the same thing.  And a lot of it is based

21  just who would you prefer to work with.  How do you treat

22  people (indicating).

23     Q.    Are you --

24     A.    And are you reliable and stuff.  And so

25  that's -- I mean that's what a lot of those decisions get

David Gray-Rough Draft

February 16, 2005

Page 42

```
 1    made on.

 2         Q.    And over the past three or four years you've

 3    met --

 4         A.    Yes, sir.

 5         Q.    -- with John Mieyr and he's attended

 6    surgeries --

 7         A.    Yes, sir.

 8         Q.    -- where you've implanted a Depuy product?

 9         A.    Yes, sir.

10         Q.    And based on all of those experiences, you

11    decided, well, I like John Mieyr?

12         A.    Yes.  He's provides excellent service and he's

13    done good service for our nurses and stuff in the OR.

14    And got along with them and helped train some of them and

15    teach them.  So I mean -- yeah he's done a good job.

16    He's worked hard for the business.

17         Q.    On that basis, you've decided you're not going

18    to use the Depuy product?

19         A.    Well, I mean I don't see where you're going.

20    I'm not quite sure I understand.

21         Q.    Tell me why you're not going to use Depuy

22    products anymore.  Make sure I understand.

23                   MS. WYSOCKI:  Asked and answered.

24                   THE WITNESS:  Pardon me?

25                   MS. WYSOCKI:  That was an objection.  You
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 43

1    can answer.

2              THE WITNESS:  You know, for me I don't -- I

3    don't like the way this whole scenario has worked out.  I

4    don't think it's right.  I don't think it's right for the

5    patients.  I don't think it's right for us.  When you

6    have somebody that's good, that can do a good job and --

7    you know, if Depuy wants to make a decision about

8    business sort of stuff and let somebody go, that's fine

9    and dandy.  And, you know, if they want to generate good

10   will in the community, that's okay if you let somebody go

11   but I don't really see the reason for us to go through

12   all these other hoops.  If they're afraid they can't

13   compete based on their product -- I mean, I don't -- you

14   know, I don't see --

15             You know, Johnson/Johnson/Depuy is a very

16   large company and to drag somebody and ask somebody to go

17   to Boston to do things -- is what I'm hearing about --

18   you know, just seems a little petty.  I'm not sure who is

19   making that decision but somebody is making that

20   decision.  And they may have some legal right and stuff

21   that I don't understand because I'm not a lawyer with a

22   contract.  But I don't see why you have to be petty on

23   stuff like that.  That's the way it strikes me.  And I

24   think when you're going to treat people, you ought to be

25   upfront.

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

Page 44

```
1                 And if they were going to do something,

2    come to me and say, hey, here's what we're doing and

3    being upfront.  It's kind of the way I want to be treated

4    and stuff.  There's right and there's wrong and there's

5    all these other shades in there.  I know there's

6    disagreement and that's what contracts are for.  You can

7    have disagreements, but I don't have to like the way

8    they've treated John.

9    BY MR. SHEA:

10      Q.    You referred to this whole scenario.  What were

11   you referring to there?

12      A.    Well, I mean, we've doing the deposition and

13   stuff and whatever this case is or the allegations -- I

14   don't know what all the details are and I don't know

15   what's been filed.  But to me, you know, if you're going

16   to let somebody go and not renew their contract, that's

17   one thing.  But then it just seems a little --

18      Q.    What do you refer to something, other hoops that

19   we have to go through?

20      A.    Well, we're doing this deposition and stuff

21   today.

22      Q.    Do you understand who asked that the deposition

23   occur?

24      A.    Yes, I do.

25      Q.    Who asked that this deposition occur?
```

David Gray-Rough Draft

February 16, 2005

Page 45

1      A.    John and his counsel.  So I'm just saying, you

2    know...

3      Q.    How did that come about, by the way?

4      A.    Well, basically that -- what I did was I asked

5    John -- I said, John -- I said, you know, I talked to

6    John recently.  He told me he was having to go to Boston

7    and I said really.  He told me what was -- just basically

8    his lawyer was going to have to go to Boston.  And I said

9    I don't understand why they're doing that.  You provided

10   very good service here in town.  I said is there anything

11   I can do to say that if you provided a good service, is

12   that beneficial.  And that's basically where it came

13   from.

14     Q.    When Mr. Mieyr told you that he had to go to

15   Boston, did he explain why?

16     A.    Well, just basically there's -- I mean I don't

17   understand the -- the terms and stuff.  But basically

18   there's been an attempt to put an injunction against him

19   I guess would be -- that's what he told me.  I think

20   that's correct.

21     Q.    Yeah.  Did he explain to you why anybody was

22   trying to put an injunction on him?

23     A.    No.  I didn't ask him.  I didn't go into all the

24   details.  I did not ask the details of his contract.

25     Q.    And so he didn't explain to you that he promised

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

Page 46

1    not to compete in Tarrant County for six months after the

2    termination of --

3        A.    No, we didn't talk about that.

4        Q.    And again, in this conversation you didn't talk

5    to him about fact that he received money from Depuy to

6    sign that contract?

7        A.    No, we didn't talk about that either.

8        Q.    And you said it seems a little petty to try to

9    keep Mr. Mieyr from selling competing products in Tarrant

10    County.  Is that your view that it's petty?

11        A.    Going to Boston.

12        Q.    Going to Boston.  Put that aside.  What about,

13    you know, trying to have Mr. Mieyr do what he promised to

14    do.  Do you think that's petty?

15        A.    No.  But I think there's ways that people -- you

16    can work that out and you don't have to go to court in

17    Boston.  Just because, you know, it's inconvenient.  You

18    have somebody with very large pockets, as we all know,

19    and it just -- you know, it's like whenever you go up

20    against the big guys and somebody's got large pockets, it

21    doesn't take a whole lot -- you can drag things out.  If

22    you wanted to get things settled and make it equitable

23    for everybody, then deal with it.  I dont' see why you

24    couldn't deal with it just locally.  Just make life

25    easier.  If you really -- that's where I think it's

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 47

```
 1    petty.  I mean that's -- you know, we do have courts in

 2    Texas.

 3                 MR. SHEA:  Okay.  Thanks very much.  I

 4    don't have any other questions.

 5                 MS. WYSOCKI:  I do.

 6                      FURTHER EXAMINATION

 7    BY MS. WYSOCKI:

 8      Q.    414 John Mieyr didn't tell you anything about

 9    Depuy breaching his -- breaching the terms of his

10    contract, did he?

11      A.    No, I don't know any of details of contract.

12      Q.    How do feel about Depuy trying to tell you who

13    you can and can't take into the operating room?

14      A.    It annoys me.  I don't think it's right.

15      Q.    Why is that?

16      A.    I think that we ought to be able to choose and

17    use the people locally who provide good service.  And if

18    a person provides good service and they have products

19    that will do what you need them to do, then I think you

20    ought to have the ability to use them.  And then we make

21    the decision what products we can or can't use.

22      Q.    Do you think that should be your perogative as

23    the surgeon in charge?

24      A.    Yes, I do.

25      Q.    Okay.  How do you feel about a Boston judge
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

Page 48

1  telling you who you can and can't take into the operating

2  room?

3      A.    I don't see where it has relevance here, what

4  we're doing on a day-to-day basis.  I don't think it's

5  relevant.

6      Q.    Do you as a surgeon in the operating room want

7  to be able to choose and pick the best people on your

8  team?

9      A.    Yes.

10     Q.    Why is that?

11     A.    Because if things work well in the operating

12  room and they go smooth, it's better for your patients.

13              MS. WYSOCKI:  No further questions 415

14                  FURTHER EXAMINATION

15  BY MR. SHEA:

16     Q.    It annoys you -- I think Ms. Wysocki just asked

17  you whether it annoyed you that -- as you see it Depuy is

18  telling you who you can take into the operating room.  Is

19  that the way you see it?

20     A.    Well, yes, it annoys -- if -- what bothers me is

21  to say that I can't use John if John has another set of

22  instrumentation that would do the same job, I don't see

23  why I shouldn't be able to call John and say can we use

24  that on this case.  You know...  And, again, I've used

25  other stuff.  I mean it if works well, I will use it.  If

David Gray-Rough Draft

February 16, 2005

Page 49

```
 1    it doesn't work well, I don't use it.  I don't use it at

 2    all.

 3       Q.   Does it annoy you that Mr. Mieyr agreed that he

 4    wouldn't compete in Tarrant County for six months?

 5            MS. WYSOCKI:  Objection; calls for facts

 6    not in evidence.  Speculation.

 7            THE WITNESS:  Right.  I don't know.  I

 8    mean -- I mean I don't know the contract.  I don't know

 9    the two sides of the contract.  So I will be very honest.

10    BY MR. SHEA:

11       Q.   Does that annoy you if he promised that he

12    couldn't do that, would that annoy you?

13       A.   Depends on what the terms of the contract are.

14       Q.   Well, if he promised that he wouldn't -- after

15    the termination of the Depuy agreement, he wouldn't

16    compete in Tarrant County, does that annoy you?

17       A.   Well, it would annoy me if anybody didn't keep

18    their word.  If we had an agreement, yes, it would annoy

19    anyone.  But on the flip side, again, I don't have the

20    knowledge of the contract.

21       Q.   Right.

22       A.   I don't know all the dealings back and forth,

23    you know... There's always.

24       Q.   I think that you may be misunderstood my

25    question.  What about the fact that Mr. Mieyr entered
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

Page 50

1   into such an agreement in the first place, if he entered

2   into such an agreement, promising that after the

3   termination of his agreement with Depuy he wouldn't sell

4   spinal implant products in Tarrant County, would that

5   annoy you?

6          MS. WYSOCKI:  Objection; calls for

7   speculation.

8          THE WITNESS:  Depends on what the terms of

9   the agreement are at the time and it depends on how

10  people behave during the terms of that agreement.

11         MR. SHEA:  I don't have any other

12  questions.

13         MS. WYSOCKI:  Thank you, sir.

14

15

16

17

18

19

20

21

22

23

24

25

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft

February 16, 2005

Page 51

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4    DEPUY SPINE HOLDING          )

5    CORPORATION, INC., AS        )

6    General Partner of DEPUY )

7    SPINE SALES LIMITED          )

8    PARTNERSHIP,                 )

9        Plaintiff,               ) CIVIL ACTION NO.

10                                ) 05-102770 RGS

11   VS.                          )

12                                )

13   JOHN MIEYR and TRINITY       )

14   SPINE, INC.,                 )

15       Defendant.               )

16

17

18

19       I, Sherry Folchert, do hereby certify that the facts

20   stated by me in the caption to the within and foregoing

21   deposition are true; that the deposition was taken before

22   me pursuant to the agreement of the parties; that the

23   within named witness was duly sworn to testify the truth;

24   that the questions asked and the answers given were taken

25   by me and subsequently transcribed by me and reduced to

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

David Gray-Rough Draft                                                February 16, 2005

Page 52

1    typewriting by me or under my supervision, and that the

2    within and foregoing typewritten pages constitute and

3    contain a full, true, complete and correct transcript of

4    all proceedings had.

5        That the amount of time used by each party at the

6    deposition is as follows:

7        Robbyn Wysocki - ** minutes

8        John F. Shea - ** minutes

9            I further certify that I am neither attorney

10   for, related to nor regularly employed by any of the

11   parties hereto, and, further, that I am not a relative or

12   employee of any attorney or counsel employed by the

13   parties hereto, and that I am not in any way financially

14   interested in the outcome of said proceedings.

15           TO CERTIFY WHICH, witness my hand and seal at

16   Fort Worth, Tarrant County, Texas, this _____ day

17   of February, 2005.

18

19                       _____

20                       SHERRY FOLCHERT, CSR NO. 6259
                         Expiration Date:  12/31/05
21                       Preferred Legal Services, Inc.
                         8235 Douglas Avenue, Suite 1020
22                       Dallas, Texas   75225
                         214-750-0047
23                       Firm No. 157

24

25

David Gray-Rough Draft                                    February 16, 2005

Page 53

```
 1              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
 2
    DEPUY SPINE HOLDING          )
 3  CORPORATION, INC., AS        )
    General Partner of DEPUY     )
 4  SPINE SALES LIMITED          )
    PARTNERSHIP,                 )
 5      Plaintiff,               ) CIVIL ACTION NO.
                                 ) 05-102770 RGS
 6  VS.                          )
                                 )
 7  JOHN MIEYR and TRINITY       )
    SPINE, INC.,                 )
 8      Defendant.               )

 9

10

11

12

13

14

15

16          DEPOSITION OF DAVID GRAY, M.D.

17     TAKEN AT THE INSTANCE OF THE DEFENDANT

18          TAKEN ON FEBRUARY 16, 2005

19      COST OF DEPOSITION AND EXHIBITS

20        TO BE PAID BY ROBBYN WYSOCKI,

21    ATTORNEY FOR DEFENDANT:  $_____

22

23

24

25
```

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

# DEPOSITION

# OF

# WILLIAM MITCHELL, M.D.

FEBRUARY 16, 2005

William Mitchell, M.D.

February 16, 2005

Page 1

1        UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
    DEPUY SPINE HOLDING        )
3   CORPORATION, INC., AS      )
    General Partner of DEPUY   )
4   SPINE SALES LIMITED        )
    PARTNERSHIP,               )
5        Plaintiff,            ) CIVIL ACTION NO.
                               ) 05-102770 RGS
6   VS.                        )
                               )
7   JOHN MIEYR and TRINITY     )
    SPINE, INC.,               )
8        Defendant.            )

9

10      * * * * * * * * * * * * * * * * * * * * * * * *

11                    ORAL DEPOSITION OF

12                 WILLIAM MITCHELL, M.D.

13                   FEBRUARY 16, 2005

14                     Volume No. 1

15      * * * * * * * * * * * * * * * * * * * * * * * *

16

17      ORAL DEPOSITION of WILLIAM MITCHELL, M.D., produced

18  as a witness at the instance of the Defendant, and

19  duly sworn, was taken in the above-styled and numbered

20  cause on the 16th of February, 2005, from 1:02 p.m.

21  to 1:24 p.m., before Sherry Folchert, CSR in and for the

22  State of Texas, reported by machine shorthand, at 1651

23  West Rosedale, Suite 100, Fort Worth, Texas, pursuant to

24  the Texas Rules of Civil Procedure.

25

William Mitchell, M.D.

February 16, 2005

```
 1                A P P E A R A N C E S                      Page 2

 2

 3     FOR THE PLAINTIFF:
           Joseph F. Shea
 4         NUTTER McCLENNEN & FISH, L.L.P.
           World Trade Center West
 5         155 Seaport Boulevard
           Boston, MA  02210
 6         617-439-2280
           jshea@nutter.com
 7

 8     FOR THE DEFENDANT:
           Robbyn P. Wysocki
 9         McCUE WYSOCKI, P.C.
           14135 Midway Road, Suite 250
10         Addison, TX  75001
           972-490-0808
11         rwysocki@mcwylaw.com

12

13     ALSO PRESENT:
           John Mieyr
14

15

16

17

18

19

20

21

22

23

24

25
```

William Mitchell, M.D.

February 16, 2005

Page 3

1                              INDEX

2                                                        PAGE

   Appearances . . . . . . . . . . . . . . . . .        2
3
   Stipulations. . . . . . . . . . . . . . . . .        4
4
   WILLIAM MITCHELL, M.D.
5      Examination by Ms. Wysocki. . . . . . . . .       5
       Examination by Mr. Shea . . . . . . . . . .      11
6      Further Examination by Ms. Wysocki. . . . .      24
       Further Examination by Shea . . . . . . . .      25
7
   Reporter's Certificate. . . . . . . . . . . .       27
8

9                            EXHIBITS

10  NO EXHIBITS WERE MARKED.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

William Mitchell, M.D.

February 16, 2005

1                              AGREEMENTS                          Page 4

2

3          It is hereby agreed by and between the parties

4    hereto, through their attorneys appearing herein, that

5    any and all objections to any question or answer herein,

6    except as to the form of the question and responsiveness

7    of the answer, may be made upon the offering of this

8    deposition in evidence upon the trial of this cause with

9    the same force and effect as though the witness were

10   present in person and testifying from the witness stand.

11         It is further agreed by and between the parties

12   hereto, through their attorneys appearing herein, that

13   this deposition may be signed before any notary public in

14   and for the State of Texas, but if the original

15   deposition has not been signed by the witness and

16   returned by the time of the trial or any hearing in the

17   case, the unsigned original or a copy thereof may be

18   returned into Court and used with the same force and

19   effect as though all requirements of the rules and

20   statutes with reference to signature and return had been

21   fully complied with.

22

23

24

25

William Mitchell, M.D.

February 16, 2005

Page 5

```
 1              P R O C E E D I N G S
 2              WILLIAM MITCHELL, M.D.,
 3    having been first duly sworn, testified as follows:
 4                      EXAMINATION
 5    MS. WYSOCKI:
 6         Q.    Please state your name.
 7         A.    William Horace Mitchell.
 8         Q.    What is your occupation, sir?
 9         A.    Orthopedic surgeon.
10         Q.    And how long have you been practicing orthopedic
11    surgery?
12         A.    In Fort Worth 34 and a half years in private
13    practice.  Since I finished residency and came here.
14         Q.    How old are you, sir?
15         A.    66.
16         Q.    Okay.  How do you know John Mieyr?
17         A.    I've been using him for spinal surgery for five
18    or six years.  And that's how I know him.  He's helped me
19    do back surgeries and pedicle screws.
20         Q.    Okay.  Do you regularly perform surgery?
21         A.    Yes.
22         Q.    How many times a month or a weekly basis?
23         A.    On average, probably three cases a week.
24         Q.    Is that all spinal?
25         A.    It's not all spinal.  Probably half of what I do
```

William Mitchell, M.D.

February 16, 2005

Page 6

1   is spinal surgery.

2        Q.    Okay.  Do you consider yourself well qualified

3   to discuss issues with -- relating to spine surgery?

4        A.    Yes.

5        Q.    Does John Mieyr routinely attend surgery with

6   you when you're working on spines?

7        A.    Yes.

8        Q.    What is John Mieyr's role in the surgeries that

9   you perform?

10        A.    Well, he brings the screws, rods, equipment to

11   insert it, and gives advice.  One thing about John, he's

12   always there on time.  He's dependable and gives

13   excellent service, contrary to some past experiences that

14   I've had.

15        Q.    Could the functions that John provides to you --

16   such as when you say giving advice in surgery, could you

17   perform those functions yourself in surgery?

18        A.    Well, I can't bring the equipment.

19        Q.    Right.

20        A.    And set it up.

21        Q.    I'm talking about the consulting part, the

22   advice part of John's role in surgery.

23        A.    Well, certainly I use my own opinion and

24   expertise.  But it's always good to have somebody's

25   else's input to make a decision.

William Mitchell, M.D.

February 16, 2005

Page 7

1      Q.    Okay.  And could you use someone less

2  experienced than John Mieyr in surgery?

3      A.    I could.  But I surely wouldn't like it.

4      Q.    Why not?

5      A.    You like to have someone with the best

6  experience you can get to help you.

7      Q.    What are some of the risks that your patients

8  face when undergoing surgery on their spine?

9      A.    Relating to the surgery itself?  Certainly

10  there's the risk of infection, breaking loose of the

11  implants, nerve injury, instability of the implants,

12  loosening, Pseudoarthrosis, failure of fusion.

13      Q.    Okay.  How long can your surgical procedures

14  last on a spine?

15      A.    The longest I've had recently was eight hours.

16      Q.    What's the correlation, if any, between the

17  length of time that the surgical procedure takes and risk

18  of complications arising from that surgery?

19      A.    Oh, it goes up significantly.  Essentially,

20  infection, pulmonary complications, blood clots.  Also

21  deep vein thrombosis.  All those rise.

22      Q.    Having an experienced assistant like John Mieyr

23  in surgery with you will he decrease the time of surgery

24  or increase or how does he affect the time?

25      A.    He'll decrease it.

William Mitchell, M.D.

February 16, 2005

Page 8

1    Q.    Okay.  How?

2    A.    Just by having everything there telling the

3  circulating nurse, the scrub nurse, what to have there

4  next, getting the instruments set up, telling them what

5  to do.  And he's very good at that.  He has them trained

6  and so they knew what to do and keeps them apprised of

7  the next step.

8    Q.    Okay.

9    A.    So that it's easier for me and my assistant to

10 continue working.

11   Q.    So you utilizing John in surgery decreases the

12 risk for your patients?

13            THE COURT REPORTER:  Could you speak up,

14 please.

15            THE WITNESS:  That's what my wife tells me.

16            My probably -- most common surgery I do

17 with him is not eight hours.  It's probably two,

18 sometimes -- sometimes three.

19 BY MS. WYSOCKI:

20   Q.    Okay.

21   A.    Last one we did together was a little less than

22 two hours.

23   Q.    Okay.

24   A.    So if you've got everything there and organized,

25 it's a lot faster.

William Mitchell, M.D.

February 16, 2005

Page 9

1      Q.   Okay.  I'm not sure if you had an answer, again,

2   because you're a quiet man, when I asked you if having

3   John in surgery decreases the risk to your patients for

4   complications arising during that surgery.  Did you agree

5   with me?

6      A.   Yes.

7      Q.   If John Mieyr were not able to attend surgeries

8   with you because a judge in Boston tells him he can't,

9   would there be a risk to your patients?

10     A.   Yes, if I didn't have an experienced person

11  there, there would be, yes.

12     Q.   Do you have an experienced substitute that you

13  could use in place of John?

14     A.   I've used some other companies, but I don't like

15  them.  Pretty much all pedicle screws work the same way.

16  I think the big factor is the person you have bringing

17  them and helping the people in your room use them.  The

18  other people I've used are not as experienced.

19     Q.   Okay.  So you choose -- you would choose -- if

20  you had a choice, to use John Mieyr over anybody else?

21     A.   Yes.

22     Q.   Based upon his experience and --

23     A.   Yes.

24     Q.   Okay.  If John Mieyr were not able to provide

25  services to you in your practice during the next six

William Mitchell, M.D.

February 16, 2005

Page 10

1    months, would you purchase products from Depuy in order

2    to use them for your patients?

3        A.    No.

4        Q.    Why not?

5        A.    Well, I don't the other people they have.

6    They're not as experienced as John is, for one reason.

7    And the other reason, I don't like what they did to him

8    and so therefore I would not use them.

9        Q.    Okay.  So is it fair to say that Depuy has no

10    good will with you at the moment?

11        A.    That is correct.

12        Q.    Okay.  If Mr. Mieyr were enjoined or prohibited

13    by a Boston judge from assisting you with the surgeries

14    you will have scheduled, would that impede your ability

15    to complete the surgeries?

16        A.    I would have to find somebody else to do it.  It

17    would impede what I have scheduled, yes.

18        Q.    Okay.  Would an injunction against John Mieyr

19    effectively control the way you practice medicine in the

20    State of Texas?

21        A.    Yes.

22        Q.    In your opinion would an injunction prohibiting

23    John Mieyr from selling spinal implants in the course of

24    your surgery constitute the practice of medicine in the

25    State of Texas?

William Mitchell, M.D.

February 16, 2005

Page 11

1      A.   You'll have explain that to me because I don't

2   know what you mean.

3      Q.   Okay.

4           MS. WYSOCKI:   I withdraw the question.  I

5   pass the witness.

6                        EXAMINATION

7   BY MR. SHEA:

8      Q.   Dr. Mitchell, are you board certified in any

9   areas?

10     A.   Orthopedic surgery.

11     Q.   And do you specialize within that at all?

12     A.   About half of what I do is general orthopedics

13  and the other half is spinal surgery.

14     Q.   Have you ever used Depuy products for spinal

15  surgery?

16     A.   Yes.

17     Q.   What products have you used, by categories?  You

18  don't have to identify them.

19     A.   Pedicle screws and rods.

20     Q.   Do you use cages?

21     A.   No.

22     Q.   Any cervical plates?

23     A.   No.

24     Q.   And for how long have you been using pedicle

25  screws and rods?

William Mitchell, M.D.

February 16, 2005

Page 12

1      A.    Pedicle screws in general for probably 14 years.

2    Depuy's probably for five or six.

3      Q.    And what about the rods?

4      A.    Same length of time.  You have to have a rod in

5    to use the screw.

6      Q.    And you've been using Depuy rods?

7      A.    Right.

8      Q.    For -- and that's been for the time that you've

9    known John Mieyr; is that correct?

10     A.    That's correct.

11     Q.    And did you use Depuy rods and screws right up

12   until December 31, 2004?

13     A.    Yes.

14     Q.    Did you ever use any other brand of pedicle

15   screws?

16     A.    I've used quite a few different brands.

17     Q.    In the past five or six years?

18     A.    Probably half of what I've been doing.  He did

19   go to Harris, but then he wasn't going there, so I was

20   using someone else over there.

21     Q.    When you say he, you're talking about John

22   Mieyr?

23     A.    Yes.

24     Q.    So --

25     A.    When I was at Harris, I used the other people.

William Mitchell, M.D.

February 16, 2005

Page 13

1      Q.    What other people?

2      A.    Synthes and Surgical Dynamics.

3      Q.    Who?

4      A.    Surgical Dynamics.

5      Q.    And, Dr. Mitchell, is it your testimony that you

6   endangered the patients upon whom you operated at Harris

7   because Mr. Mieyr couldn't assist you?

8      A.    If I had my preference, I would rather have had

9   John there.

10      Q.    I understand that might be your preference.  But

11   is it your testimony that any of the patients upon whom

12   you operated were endangered at Harris because Mr. Mieyr

13   wasn't present?

14      A.    I can't say they were endangered.  I think it

15   would be better with Mr. Mieyr.  But I did a good job,

16   yes.

17      Q.    Okay.

18      A.    I would rather have had John.

19      Q.    I understand what you might prefer.  I'm asking

20   what you actually did and you did a perfectly good job at

21   Harris Hospital, didn't you?

22      A.    I think I did a good job, yes.

23      Q.    Using these Synthes screws and rods?

24      A.    Yes.

25      Q.    Do you know whether Synthes screws and rods are

William Mitchell, M.D.

February 16, 2005

Page 14

```
 1    used in Tarrant County?

 2         A.    That's where I used them.

 3         Q.    At Harris Hospital?

 4         A.    Correct.

 5         Q.    And what was the name of the other company you

 6    used?

 7         A.    Surgical Dynamics.

 8         Q.    Have you ever used Globus screws?

 9         A.    Yes.

10         Q.    When did you use them?

11         A.    About a week to ten days ago.

12         Q.    And did you buy them -- those because Mr. Mieyr

13    was representing Globus screws?

14         A.    Yes.

15         Q.    And have you used any Globus rods?

16         A.    Yes.

17         Q.    At that same surgery?

18         A.    That's correct.

19         Q.    And do you have some surgery scheduled in the

20    future using Globus screws?

21         A.    Yes.

22         Q.    When are those scheduled?

23         A.    I'm not sure.

24         Q.    Is it next week?

25         A.    Probably but -- yeah, I don't keep my schedule
```

PREFERRED LEGAL SERVICES, INC.
214.750.0047

William Mitchell, M.D.

February 16, 2005

1   with me.

2       Q.    Okay.

3       A.    My secretary gives me a card with my schedule on

4   it at the beginning of every week.

5       Q.    Okay.  When did Mr. Mieyr tell you that he was

6   no longer going to be distributing Depuy products?

7       A.    At the end of December.

8       Q.    Did he say why?

9       A.    He said he had been fired.

10      Q.    Did he say why?

11      A.    No.

12      Q.    Did he tell you that he had a written agreement

13  with Depuy?

14      A.    No.

15      Q.    Did he tell you that he had received money in

16  order to sign that written agreement with Depuy?

17      A.    I have no knowledge of his agreement.

18      Q.    Did he tell you that?

19      A.    No.

20      Q.    When did Mr. Mieyr tell you that he would be

21  distributing Globus products?

22      A.    Sometime in the last month.  He had two

23  different screws that he was representing.

24      Q.    What were the other one besides Globus?

25      A.    Truthfully, I don't remember the name at the

William Mitchell, M.D.

February 16, 2005

Page 16

1    moment.

2        Q.    Have you used that other --

3        A.    Yes, I used it one time.

4        Q.    With Mr. Mieyr?

5        A.    That's correct.

6        Q.    Since January 2005?

7        A.    That's correct.

8        Q.    And did Mr. Mieyr ask you to attend your

9    deposition today?

10       A.    Yes.

11       Q.    Did he explain to you why?

12       A.    To give my opinion.

13       Q.    About what?

14       A.    About his ability.

15       Q.    Anything else?

16       A.    No.

17       Q.    Have you entered into any agreements with Depuy?

18       A.    No.

19       Q.    You don't have any consulting agreements or

20   anything?

21       A.    No.

22       Q.    Have you ever seen -- strike that.

23             Do you know whether Depuy had a written

24   agreement with Mr. Mieyr?

25       A.    I have no knowledge of his agreement.

Page 17

1    Q.   Well, did he tell you that he had one?

2    A.   No.

3    Q.   And did he tell you that he had agreed that he

4    would not distribute products if his agreement with Depuy

5    was terminated?

6    A.   No.

7    Q.   He never told that to you?

8    A.   No.

9    Q.   And you said you trust Mr. Mieyr; is that right?

10    A.   That's correct.

11    Q.   You expect him to keep his word?

12    A.   He does keep his word, yes.

13    Q.   With you?

14    A.   Correct.

15    Q.   And do you know of any reason why he shouldn't

16    keep his word to Depuy?

17    A.   I have no knowledge of that nor can give an

18    opinion.

19    Q.   Okay.  You expect that he would, right?

20            MS. WYSOCKI:  Objection.

21            THE WITNESS:  I have no knowledge of that,

22    period.

23    BY MR. SHEA:

24    Q.   I want to come back again and ask you about some

25    of the answers you gave to Ms. Wysocki's questioning of

William Mitchell, M.D.

February 16, 2005

Page 18

1    you a moment ago.  You're perfectly capable of performing

2    spinal surgery yourself, aren't you?

3         A.    That's what I do.

4         Q.    For a living, right?

5         A.    Yes.

6         Q.    You're a board certified orthopedic surgeon?

7         A.    That's correct.

8         Q.    And it's your testimony that in order to perform

9    spinal implant surgery you need Mr. Mieyr there to help

10   you?

11        A.    Well, when you're in the operating room you have

12   a lot of people helping you.  You have an

13   anesthesiologist, you have a scrub nurse, you have a

14   circulating nurse.  Maybe somebody saving cells with the

15   cell saver.  He's another person that helps me.

16        Q.    Right.

17        A.    There's a whole team.  He does a good job.

18        Q.    If one of the team members is injured or sick

19   that day, the surgery goes on, right?

20        A.    That's correct.  But perhaps not as well as I

21   would like it.

22        Q.    Well, you wouldn't do the surgery if you thought

23   you were going to endanger one of your patients?

24        A.    No, but there's various degrees of assistants

25   and help.

William Mitchell, M.D.

February 16, 2005

Page 19

1      Q.    Right.  But you're not going to do anything that

2    would threaten the health of your patient, are you?

3      A.    Not to my knowledge, no.

4      Q.    And --

5      A.    But there are surgeons that are more competent.

6    There's scrub nurses that are more competent and there's

7    sale reps that are more competent.  He's the most

8    competent that I know.

9      Q.    Sure.  Sure.  But whether he's competent or not

10   isn't anything that affects the health of your patients,

11   right?

12              MS. WYSOCKI:  Objection; form.

13              THE WITNESS:  If I can get him to help me,

14   I will do it.  That's my answer.

15   BY MR. SHEA:

16     Q.    If you can't you him, you're going to do the

17   surgery?

18     A.    That's right.  But I would rather have him

19   there.

20     Q.    You're making that crystal clear.  I'm asking

21   about patient safety.

22     A.    That has nothing to do with my opinion.

23     Q.    Because it doesn't affect patient safety,

24   relevant to your opinion, when you say that you want

25   Mr. Mieyr there, right?

William Mitchell, M.D.

February 16, 2005

Page 20

1     A.    That's correct.  Because he makes it safer.

2     Q.    And if he's not there, you can still do a safe

3  operation, can't you?

4     A.    Yes.

5     Q.    Now, you said that you not going to buy Depuy

6  product anymore.

7     A.    That's correct.

8     Q.    What did they do to -- I mean that you don't

9  like?

10    A.    They fired him, keeping him from working.

11    Q.    And all of the information you have about what

12  Depuy did to Mr. Mieyr comes from Mr. Mieyr, right?

13    A.    That's correct.

14    Q.    Or his lawyer?

15    A.    She hasn't really told me about it.

16    Q.    All comes from Mr. Mieyr?

17    A.    Yes.

18    Q.    And you stated that in your mind Depuy has no

19  good will with you, correct?

20    A.    That's correct.

21    Q.    And the reason Depuy has no good will with you

22  is because of what it did to Mr. Mieyr, right?

23    A.    That's correct.

24    Q.    As he reported it to you?

25    A.    That's correct.

William Mitchell, M.D.

February 16, 2005

Page 21

```
 1      Q.    Now, Ms. Wysocki asked you if a prohibition on

 2   Mr. Mieyr selling or distributing spinal implant products

 3   for six months would impede you in the practice of

 4   medicine and what was your answer to that question?

 5      A.    It would make it more difficult because I

 6   wouldn't have as good a person there representing the --

 7   whatever screw company I used.

 8      Q.    Well, have you tried -- you tried a few other

 9   screw companies?

10      A.    Yes.

11      Q.    Have you tried Medtronic?

12      A.    Yes.

13      Q.    Synthes?

14      A.    I did use Medtronics for a long time but I quit

15   because their representative was incompetent.

16      Q.    What about Synthes, have you ever used them?

17      A.    Yes.

18      Q.    Biomed?

19      A.    I haven't used Biomed.

20      Q.    And you said there's a team of people that help

21   you in the operating room?

22      A.    Correct.

23      Q.    And if one of those people is sick or injured on

24   a particular day, can that impede your practice of

25   medicine?
```

William Mitchell, M.D.

February 16, 2005

Page 22

1      A.    It can.

2      Q.    Is that the same sense in which Mr. Mieyr not

3   being in the operating room might impede your practice of

4   medicine?

5      A.    Well, yes.

6      Q.    You're going to have a team that you can do the

7   surgery safely with, right?

8      A.    Yes.

9      Q.    Otherwise you wouldn't do the surgery, right?

10     A.    If it were going to be very unsafe, I would

11   cancel it.

12     Q.    Sure.  It's in that sense not having Mr. Mieyr

13   present would impede you in the practice of your

14   medicine?

15     A.    It would make it more difficult.

16     Q.    It's not the team that you most desire?

17     A.    That's correct.

18     Q.    Who is in your operating room team?  Do you have

19   a regular group of people that you work with?

20     A.    All the hospitals usually have people that are

21   different every time you go.  It's probably a different

22   scrub nurse.  They have people that tend to do more back

23   surgery or more knee or more cardiovascular but it's not

24   always the same team, except for my scrub nurse.

25     Q.    Does she travel to the hospital with you?

William Mitchell, M.D.

February 16, 2005

Page 23

```
 1      A.    He.

 2      Q.    Does he travel?

 3      A.    Yes.

 4      Q.    What hospitals do you perform most of your

 5  surgeries at?

 6      A.    All Saints and Harris.

 7      Q.    And I know we went over this briefly.  What

 8  product do you use over at Harris?

 9      A.    Synthes -- over there I usually use Synthes or

10  Surgical Dynamics.

11      Q.    You've known Mr. Mieyr for five or six years,

12  right?

13      A.    That's correct.

14      Q.    Did you know him in a personal relationship or

15  professionally?

16      A.    We've gone out to dinner one time.

17      Q.    When was that?

18      A.    Probably three years ago.

19      Q.    So it's mainly a professional relationship?

20      A.    Yes.

21      Q.    Do you like him?

22      A.    Yes.

23      Q.    And you think he does good work?

24      A.    Yes.

25      Q.    When he was selling Depuy products, you bought
```

William Mitchell, M.D.

February 16, 2005

Page 24

1    Depuy products, right?

2        A.    That's correct.

3        Q.    Now that he's not selling Depuy, you don't want

4    to use Depuy products, right?

5        A.    That's correct.

6              MR. SHEA:  I don't have any other

7    questions.  Thank you.  123

8                    FURTHER EXAMINATION

9    MS. WYSOCKI:

10       Q.    What did John Mieyr tell you about the

11   termination of his relationship with Depuy?

12       A.    It was probably the end of December sometime he

13   came in and told me that.  I guess it was during a case

14   that -- after the first of the year he was not going to

15   be with Depuy anymore, that he had been fired.

16       Q.    Is that all he told you?  Did he...

17       A.    He told me that there was some sort of a

18   political something in the company and that that's the

19   reason that he was fired.

20       Q.    Okay.

21       A.    And he used to be able to go to Harris and that

22   was changed sometime in the last year or so.  I don't

23   know how that came about or why it happened.

24       Q.    Okay.

25       A.    But...

William Mitchell, M.D.

February 16, 2005

1    Q.    So basically he's no longer able to carry Depuy

2    products?

3    A.    That's correct.  That he was fired.

4    Q.    Okay.

5              MS. WYSOCKI:  Pass the witness.

6                    FURTHER EXAMINATION

7    BY MR. SHEA:

8    Q.    Did he tell you that many doctors don't like to

9    work with him?

10    A.    No.

11    Q.    Did he tell you that many doctors said they

12    wouldn't use -- would not use Depuy because they did not

13    want to work with John Mieyr?

14    A.    I know there are some, yes.

15    Q.    How did you know that?

16    A.    Say the question again.

17    Q.    Sure.  Did John Mieyr tell you that there were

18    many doctors that would not work with him?

19    A.    Would not work with John?

20    Q.    Yes.

21    A.    No.

22    Q.    And you don't know anybody that won't work with

23    him?

24    A.    No.

25    Q.    He didn't mention that to you at all?

William Mitchell, M.D.

February 16, 2005

Page 26

```
 1     A.    No.

 2     Q.    And do you have independent knowledge?

 3     A.    Are you talking about since the first of the

 4  year or before?

 5     Q.    Before.

 6     A.    No.

 7              MR. SHEA:  I don't have any other

 8  questions.

 9              MS. WYSOCKI:  Pass the witness.

10              (Proceedings concluded at 1:24 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

William Mitchell, M.D.

February 16, 2005

Page 27

```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2
      DEPUY SPINE HOLDING        )
 3    CORPORATION, INC., AS      )
      General Partner of DEPUY   )
 4    SPINE SALES LIMITED        )
      PARTNERSHIP,               )
 5        Plaintiff,             )  CIVIL ACTION NO.
                                 )  05-102770 RGS
 6    VS.                        )
                                 )
 7    JOHN MIEYR and TRINITY     )
      SPINE, INC.,               )
 8        Defendant.             )

 9

10         I, Sherry Folchert, do hereby certify that the facts

11    stated by me in the caption to the within and foregoing

12    deposition are true; that the deposition was taken before

13    me pursuant to the agreement of the parties; that the

14    within named witness was duly sworn to testify the truth;

15    that the questions asked and the answers given were taken

16    by me and subsequently transcribed by me and reduced to

17    typewriting by me or under my supervision, and that the

18    within and foregoing typewritten pages constitute and

19    contain a full, true, complete and correct transcript of

20    all proceedings had.

21         That the amount of time used by each party at the

22    deposition is as follows:

23         Robbyn Wysocki - 11 minutes

24         John F. Shea - 12 minutes

25              I further certify that I am neither attorney
```

PREFERRED LEGAL SERVICES, INC.
214.750.0047

William Mitchell, M.D.

February 16, 2005

Page 28

1   for, related to nor regularly employed by any of the

2   parties hereto, and, further, that I am not a relative or

3   employee of any attorney or counsel employed by the

4   parties hereto, and that I am not in any way financially

5   interested in the outcome of said proceedings.

6          TO CERTIFY WHICH, witness my hand and seal at

7   Fort Worth, Tarrant County, Texas, this _____ day

8   of February, 2005.

9

10

11                         _____

                           SHERRY FOLCHERT, CSR NO. 6259
12                         Expiration Date:  12/31/05
                           Preferred Legal Services, Inc.
13                         8235 Douglas Avenue, Suite 1020
                           Dallas, Texas   75225
14                         214-750-0047
                           Firm No. 157
15

16

17

18

19

20

21

22

23

24

25

William Mitchell, M.D.                                                February 16, 2005

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

     DEPUY SPINE HOLDING          )
3    CORPORATION, INC., AS        )
     General Partner of DEPUY     )
4    SPINE SALES LIMITED          )
     PARTNERSHIP,                 )
5         Plaintiff,              )  CIVIL ACTION NO.
                                  )  05-102770 RGS
6    VS.                          )
                                  )
7    JOHN MIEYR and TRINITY       )
     SPINE, INC.,                 )
8         Defendant.              )

9

10

11

12

13

14

15

16            DEPOSITION OF WILLIAM MITCHELL, M.D.

17        TAKEN AT THE INSTANCE OF THE DEFENDANT

18              TAKEN ON FEBRUARY 16, 2005

19          COST OF DEPOSITION AND EXHIBITS

20            TO BE PAID BY ROBBYN WYSOCKI,

21        ATTORNEY FOR DEFENDANT:   $_____

22

23

24

25

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DEPUY SPINE HOLDING          )
CORPORATION, INC., AS        )
General Partner of DEPUY     )
SPINE SALES LIMITED          )
PARTNERSHIP,                 )
    Plaintiff,        ) CIVIL ACTION NO.
                             ) 05-102770 RGS
VS.                          )
                             )
JOHN MIEYR and TRINITY       )
SPINE, INC.,                 )
    Defendant.        )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

JOHN SAZY, M.D.

FEBRUARY 16, 2005

Volume No. 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    ORAL DEPOSITION of JOHN SAZY, M.D., produced

as a witness at the instance of the Defendant, and

duly sworn, was taken in the above-styled and numbered

cause on the 16th of February, 2005, from 3:26 p.m.

to 4:17 p.m., before Sherry Folchert, CSR in and for the

State of Texas, reported by machine shorthand, at 908 9th

Avenue, Fort Worth, Texas, pursuant to the Texas Rules of

Civil Procedure.

John Sazy, M.D.-Rough Draft                    February 16, 2005

---

**Page 2**

1         A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
       Joseph F. Shea
4      NUTTER McCLENNEN & FISH, L.L.P.
       World Trade Center West
5      155 Seaport Boulevard
       Boston, MA  02210
6      617-439-2280
       jshea@nutter.com
7
8  FOR THE DEFENDANT:
       Robbyn P. Wysocki
9      McCUE WYSOCKI, P.C.
       14135 Midway Road, Suite 250
10     Addison, TX  75001
       972-490-0808
11     rwysocki@mcwylaw.com
12
13 ALSO PRESENT:
       John Mieyr
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              INDEX
                        PAGE
2
   Appearances . . . . . . . . . . . . . . . . . .   2
3
   Stipulations. . . . . . . . . . . . . . . . .   4
4
   JOHN SAZY, M.D.
5      Examination by Ms. Wysocki. . . . . . . . .   5
       Examination by Mr. Shea . . . . . . . . . . .   18
6      Further Examination by Ms. Wysocki. . . . . .   33
       Further Examination by Mr. Shea . . . . . . .   34
7      Further Examination by Ms. Wysocki. . . . . .   35
       Further Examination by Mr. Shea . . . . . . .   35
8      Further Examination by Ms. Wysocki. . . . . .   47
       Further Examination by Mr. Shea . . . . . . .   48
9
   Reporter's Certificate. . . . . . . . . . . . .   51
10
11              EXHIBITS
12 NO EXHIBITS WERE MARKED.
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1              AGREEMENTS
2
3      It is hereby agreed by and between the parties
4  hereto, through their attorneys appearing herein, that
5  any and all objections to any question or answer herein,
6  except as to the form of the question and responsiveness
7  of the answer, may be made upon the offering of this
8  deposition in evidence upon the trial of this cause with
9  the same force and effect as though the witness were
10 present in person and testifying from the witness stand.
11     It is further agreed by and between the parties
12 hereto, through their attorneys appearing herein, that
13 this deposition may be signed before any notary public in
14 and for the State of Texas, but if the original
15 deposition has not been signed by the witness and
16 returned by the time of the trial or any hearing in the
17 case, the unsigned original or a copy thereof may be
18 returned into Court and used with the same force and
19 effect as though all requirements of the rules and
20 statutes with reference to signature and return had been
21 fully complied with.
22
23
24
25

---

**Page 5**

1          P R O C E E D I N G S
2              JOHN SAZY, M.D.,
3  having been first duly sworn, testified as follows:
4              EXAMINATION
5  MS. WYSOCKI:
6      Q.  Please state your name.
7      A.  430 John A. Sazy, M.D.
8      Q.  And what is your occupation?
9      A.  I'm a orthopedic spinal surgeon.
10     Q.  And how long have you been practicing orthopedic
11 spinal surgery?
12     A.  Well, I've been in Texas for approximately ten
13 years and before that in fellowship training for a year.
14 And before that residency training for four years.  And
15 so I would say including private practice and training
16 probably for the last 14 or 15 years.
17     Q.  How old are you, sir?
18     A.  49.
19     Q.  You stated that you were in fellowship training.
20     A.  Yes.
21     Q.  Can you explain that what that is?
22     A.  It's extended training beyond the normal
23 orthopedic surgery training program.  And -- and my
24 fellowship training was in spinal surgery at one of the
25 premier places in the country to do that, at the Chicago

---

                              2  (Pages 2 to 5)

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

25aa5e23-ca5d-460a-aed6-0962cfc122d9

John Sazy, M.D.-Rough Draft                    February 16, 2005

**Page 6**

1  Spine Fellowship in Chicago with Dr. Ronald DeWaldy, the
2  director.
3      Q.  Does he teach a specific type of spinal
4  surgery --
5      A.  Well --
6      Q.  -- that separates him from --
7      A.  His main focus is adult deformity, which is
8  an -- a particular spinal surgery problem that is some of
9  the more difficult surgeries in spinal surgery. They're
10 more extensive, more complicated than the normal spinal
11 surgical procedures.
12     Q.  Would you say that you now specialize in more
13 complicated surgeries than your average surgeon?
14     A.  Yes.
15     Q.  Okay.
16         MS. WYSOCKI:  Which one goes first?  Which
17 one is earlier?
18         (Exhibit No. 3 was marked.)
19 BY MS. WYSOCKI:
20     Q.  Can you identify for the record what's been
21 marked as Exhibit No. 3?
22     A.  Yeah, it's a brochure.  It was basically an
23 excerpt from a magazine that's called M.D. News.  And
24 this particular one I think was in March of '99, but -- I
25 think so.

**Page 7**

1      Q.  Okay.  What -- and is this an article about you?
2      A.  Yes.  The magazine people came to me and they
3  told me they had heard about me.  I'm not quite sure how
4  they heard me.  They heard about me and they wanted to do
5  a story on me.  But then when they started interviewing
6  me and some of my patients, they wanted to actually make
7  it a cover story -- because they thought it was a good
8  story.  And so that's what this is all about.
9      Q.  Do you own any patents?
10     A.  Yes, I do.
11     Q.  Can you tell the Judge about those patents.
12     A.  I have a patent that's on -- on a spinal surgery
13 fusion device.  It's an intervertebral cage that Depuy
14 bought the rights to and it's marketing that device as --
15 in the form of a -- commercially known Devex, D-E-V-E-X,
16 cage and Leopard cage.
17     Q.  And can you tell the Judge what TLIF is and how
18 you were involved with TLIF?
19     A.  TLIF is an acronym or abbreviation for
20 transfroaminal lateral interbody fusion and I'm
21 associated with that procedure in that -- insofar as, I
22 went to Germany and learned this procedure from Dr.
23 Harms -- Professor Harms.  I'm not sure when that was.
24 Probably around '99 or somewhere around there.  '98 or
25 '99, somewhere around there.  And then I came back and

**Page 8**

1  started performing that kind of an operation.  And at
2  that time there was probably less than 20 surgeons in the
3  country actually doing that procedure.
4          And I started doing it quite a bit and that
5  led to the, you know, thinking about the cages and
6  thinking about the operation and then coming up with
7  ideas about how to improve it, how to make it better, how
8  to make it easier.  And that evolved into the idea for
9  the banana cage and the patent.  And it's just been a
10 great experience.
11     Q.  How many surgeons in the Dallas/Fort Worth area
12 are experienced in the TLIF procedures?
13     A.  Now a lot more than there were probably five
14 years ago or four years ago, I would say -- I would just
15 guess but at least 50 to 100.
16     Q.  Okay.
17     A.  I mean it's a much more common procedure now
18 because of this cage.
19     Q.  Okay.  I've heard something about that you
20 commonly do three-level surgeries.  What does that mean?
21     A.  I wouldn't say commonly, but there are occasions
22 where I do three-level surgeries.  Basically where
23 interbody fusion is performed at three disk levels, L3/4,
24 L4/5 and 5/1.  I've done four-level surgeries when the
25 indication arises.  But, you know, this is removing the

**Page 9**

1  disk, putting in a spacer, a fusion device, and -- with
2  screws and rods and it's a pretty extensive procedure.
3      Q.  You're doing the same procedure in three
4  different places on the spine?
5      A.  Right.
6      Q.  Or four?
7      A.  Correct.
8      Q.  How long a procedure -- how long a surgery is
9  that?
10     A.  I would say the average time would be eight to
11 ten hours.
12     Q.  Okay.
13         (Exhibit No. 4 was marked.)
14 BY MS. WYSOCKI:
15     Q.  Can you identify that for the Judge, please?
16     A.  It's also a magazine excerpt from what's called
17 Exclusively Fort Worth.  It's put out by the Gladney
18 Foundation, which an agency that is involved in teenage
19 pregnancies and placing children and things like that.
20     Q.  And what is this -- what is within the document?
21     A.  Well, this particular issue had to do with
22 highlighting or premiering some of the better doctors in
23 the Fort Worth area.  And they came to me and they asked
24 me if I wanted to be in this.  They heard about me.  You
25 know, I was voted -- you know, they had to vote whether

UNEDITED,  UNPROOFREAD,  UNCORRECTED,  UNCERTIFIED  ROUGH DRAFT

25aa5e23-ca5d-460a-aed6-0962cfc122d9

John Sazy, M.D.-Rough Draft                    February 16, 2005

---

Page 10

1  or not to even offer someone to be in this. So they
2  voted that they would make me the offer to be in it. And
3  so I said sure.
4      Q. And does this describe accurately your
5  background and training?
6      A. Yes. Yes.
7      Q. We're talking about Exhibit 4?
8      A. Yes.
9      Q. Okay. Do you know John Mieyr?
10     A. Yes, I do.
11     Q. How long have you known John Mieyr?
12     A. Oh, probably at least eight years.
13         MR. MIEYR: Ten.
14         THE WITNESS: Maybe ten years.
15         MR. SHEA: This has happened a couple of
16  the times in the other depositions. Can we just let the
17  witness answer. Don't try to prompt his memory.
18         MR. MIEYR: Absolutely.
19  BY MS. WYSOCKI:
20     Q. How long have you worked with John Mieyr?
21     A. So long I can't accurately remember it.
22     Q. How often do you perform surgery, sir?
23     A. Three -- usually three cases week. Sometimes
24  once; sometimes two. But mostly I average two to three
25  spinal surgeries a week.

---

Page 11

1      Q. And do you consider yourself well qualified to
2  discuss issues relating to spine surgery?
3      A. Yes.
4      Q. Okay. Does John Mieyr routinely attend surgery
5  with you?
6      A. Yes.
7      Q. What is John Mieyr's role in the surgeries that
8  you perform, in some detail?
9      A. He gets the -- what we'll -- we'll discuss the
10  case and I'm tell him -- well, I should back this up a
11  little bit. When you asked me about three level
12  surgeries, I guess you're trying to get information with
13  respect to how, you know, major of surgeries that I do.
14     Q. Yes.
15     A. But that's not even a real relevant question
16  because there are times when a two-level surgery can be a
17  lot more complicated than a three-level surgery if it's
18  the four or fifth time that patient's having surgery.
19     Q. Can you explain -- medically why that is?
20     A. Well, because there's -- there could have been,
21  you know, previous damage caused by previous surgeries,
22  you know, the anatomy is completely different, so the
23  normal landmarks that are in the spine that tells you
24  where things probably are located are gone.
25         And so it's much more risky surgery to

---

Page 12

1  perform and depending on the particular nuance of those
2  kind of cases, you know, it's very important that I
3  communicate to John about these cases what I need and,
4  you know, make it ready, to have this ready, have that
5  ready. And because he understand -- he's done this with
6  me for so long he has a very good understanding of what
7  I'm doing because he's seen so many of them that it
8  facilitates the whole preparation for a particular case,
9  and I don't have the worry about it. I know when I tell
10  him that this particular case is this kind of a case and
11  we're going to do this and this and this and he
12  understands exactly what I'm going to do and he'll know
13  exactly what I'm going to need. And then I don't have to
14  worry about things not being there or, you know, that I'm
15  basically prepared to do the case.
16     Q. Do you take intraoperative MRIs or x-rays.
17     A. I take intraoperative x-rays.
18     Q. Does John Mieyr assist in any way with the
19  reading of those x-rays or assisting you?
20     A. Not with the x-rays. Not really, no.
21     Q. Okay. Went back to -- again, I asked you
22  what -- what is John Mieyr's role in the operating room?
23     A. He facilitates the efficiency of the operation
24  by anticipating what I need when I need it, and he
25  orients the -- whoever is assisting me in the field with

---

Page 13

1  being prepared for the next step involved in the surgery
2  so that the whole thing flows like a dance or like an
3  opera or something like that. So it's a very well
4  choreographed situation that he facilitates.
5      Q. Does he affect the time of the surgery? Does
6  his role in the surgery affect how long the surgery
7  takes?
8      A. Yes.
9      Q. How?
10     A. By saving me the time to go over to look for
11  these instruments and saving the assistant, who may not
12  even know what I'm asking for, even if I ask them to go
13  look for these instruments. He anticipates what I need
14  and it's -- it's basically there almost without me having
15  to ask for it. So when you -- if you have to do that 100
16  times or more in that case and figure each one is two or
17  three minutes, then if you just do the math you're saving
18  a lot of time.
19     Q. Figure two or three hours could be added on
20  given -- if you didn't have a person like John Mieyr with
21  you?
22     A. Correct.
23     Q. Okay. What is the correlation, if any, between
24  the length of time a surgical procedure takes and the
25  risk of complication arising from that procedure?

---

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

25aa5e23-ca5e-460a-aed6-0962cfc122d9

John Sazy, M.D.-Rough Draft                    February 16, 2005

Page 14

1   A. It's a direct correlate.
2   Q. Okay.
3   A. Meaning that the longer the time the more things
4   that can go wrong.
5   Q. What kind of things can go wrong given the
6   length of surgery?
7   A. A patient can go blind. They can bleed more.
8   They can be susceptible to infection. They have can have
9   venousthrombosis. They can have pulmonary emboles. They
10  can have fat emboles. The wound can be at higher risk
11  for dehiscence.
12  Q. I don't know that one. What is dehiscence?
13  A. It means it doesn't heal properly.
14  Q. Okay. And all of those -- those complications
15  can arise from a lengthy surgery?
16  A. Yes.
17  Q. Okay. Could you use someone lease experience
18  than John?
19  A. I could.
20  Q. And would you?
21  A. No.
22  Q. Why not?
23  A. Because it would be compromising the care of the
24  patient and it would make my life more difficult. Just
25  another thing for me to worry about. And I mean if I

Page 15

1   wanted to play the Super Bowl, why would I take lesser
2   players into the Super Bowl if I didn't want to win the
3   game.
4   Q. Do you consider the surgery that you do the
5   Super Bowl?
6   A. Every surgery I have to be prepared and planned
7   and rehearsed just like it's going to be another show and
8   you wouldn't want your B-tier actors if you're -- you
9   know, if you can help it. And so that's why I think, you
10  know, having John for all these years is part of the
11  reason why my surgeries are so successful.
12  Q. Have you ever cancelled surgery because John
13  Mieyr could not attend?
14  A. Yes.
15  Q. Would you do so in the future?
16  A. Yes.
17  Q. Okay. If John Mieyr were told that he was not
18  be able to attend surgeries, would there be a risk to
19  your patient?
20  A. There would be an increased risk, yes.
21  Q. If John Mieyr were not able to provide service
22  to you in your practice during the next six months, would
23  you purchase products from Depuy?
24  A. Can you ask me that again?
25  Q. Sure. In the next six months, do you intend to

Page 16

1   purchase products from Depuy Spine?
2   A. No.
3   Q. While not?
4   A. If John is going to be bringing them, then I
5   would. It's not about the screws or the metal or the
6   devices. It's about the service. I can use any screws,
7   any rods, any cages of any company. That's not what it's
8   about. It's about the person bringing that that
9   facilitates the use of those mechanical devices.
10  Q. Has Depuy Spine engendered good will with you as
11  a physician?
12  A. I've had some good will, yeah.
13  Q. Can you describe that?
14  A. Well, they bought my patent. I'm getting
15  royalties from it which astronomical.
16  Q. Does Depuy -- besides your patent have any good
17  will with you today?
18  A. What do you mean by good will?
19  Q. Do you have good feeling and -- and good --
20  A. No, I mean I -- I have good feeling insofar as
21  a -- after years of back and forth discussion, you know,
22  the patent got bought and the cage got performed. It's
23  one of most successful devices on the market today,
24  copied by other companies, et cetera, et cetera. But in
25  general I think that the way they have treated John --

Page 17

1   and other reps actually, not just John, has been really
2   cut throat and I think that it's been immoral, unethical,
3   and, you know, just wrong. He was one of their best reps
4   in the country and I think this way they're treating him
5   is -- is appalling.
6   Q. How do you feel about Depuy Spine trying to tell
7   you who you can and can't take into the operating room?
8   A. I don't think anyone should be able to tell me,
9   not just Depuy Spine, but I don't think anyone should be
10  able to tell me how to do my surgeries.
11  Q. And in essence is Depuy Spine telling you that
12  by trying to prevent John Mieyr from going to surgery
13  with you?
14  A. Well, by -- by them trying to interfere with his
15  participating -- participation in my surgeries will
16  compromise the -- the results of my surgeries and
17  increase the risk to my patients.
18  Q. How do you feel about a Boston judge trying to
19  tell you who you can and can't take -- if in fact a judge
20  does that -- who you can and can't take into the
21  operating room?
22  A. I think that if that Boston judge went to
23  medical school and used to be a spinal surgeon and
24  retired and went to law school and then became a judge,
25  under that condition there -- there may be something to

5 (Pages 14 to 17)

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

25aa5e23-ca5d-460a-aed6-0962cfc122d9

John Sazy, M.D.-Rough Draft                    February 16, 2005

Page 18

1  talk about with respect to opinion. But I still don't
2  think that would change my mind. But -- but bar that,
3  which likely does not exist, I think it's absurd. It
4  would be tantamount to me telling him how to view or
5  decide a particular case, which would also be absurd.
6     Q. You considered making a trip to Boston for the
7  hearing on Friday, didn't you?
8     A. Yes.
9     Q. Why?
10    A. Because I think that John is a great guy and
11 it's very important to my surgeries to have him in my
12 surgeries. And, you know, I think that without John
13 being in my surgeries would make my life a lot more
14 difficult and increase risk to my patients.
15    Q. What is -- if there is one, can you tell me
16 which the average length of your typical surgery is?
17    A. I would say on the short side six hours and on
18 the long side 12 or 13 hours. It just depends on the
19 case.
20    Q. And those risks increase, that we discussed
21 earlier, for every minute in a surgery that's lengthened?
22    A. Sure. Absolutely.
23    Q. And that equates to risk to your patient?
24    A. Absolutely. To even make this more clear, it's
25 very frequent that I have the same anesthetist in my room

Page 19

1  for every case. That means the same person putting my
2  patient to sleep every time. And the reason for that is
3  consistency of care. It would be, you know, the idea
4  here is the more unknown variables that can be eliminated
5  from these kind of procedures makes for a higher degree
6  of predictability and control. And so the same rep, the
7  same anesthesiologist, the same anesthetist, the same
8  people helping me. The same known. The same -- makes
9  it more predictable and so there's no unknown variables
10 and as long as there's no unknown variable then I can
11 feel confident about the results that I can obtain.
12    Q. Have you taken other sales reps, spinal implant
13 sales reps, to surgery before?
14    A. Yes.
15    Q. And what were the results as compared to the
16 service that John Mieyr provides you?
17    A. It's just added length to the case and it
18 added -- added more time to the case and it was, you
19 know, more or less a curiosity on my part to see what
20 another vendor's screws or rods were like. And just to
21 know whether or not -- just to see what they're like out
22 of curiosity and get ideas from it. You know, I'm always
23 thinking up a new thing or trying to just because I enjoy
24 doing it. And, you know, you see something and it
25 stimulates you to think about that thing and that thing

Page 20

1  and all of a sudden it turns into a patent and I don't
2  have to be a doctor anymore.
3         MS. WYSOCKI: Pass the witness. 450
4              EXAMINATION
5  BY MR. SHEA:
6     Q. Dr. Sazy, you came to Fort Worth area about ten
7  years ago; is that right?
8     A. Absolutely, yeah.
9     Q. And were you doing spinal surgeries soon after
10 you came?
11    A. Uh-huh.
12    Q. Could I ask you to say yes or no.
13    A. Within days.
14    Q. It's difficult for the report later on to make
15 sense out of uh-huh. It's unclear. If you could say yes
16 or no.
17    A. Yes.
18    Q. And were you using instrumentation in those
19 surgeries?
20    A. Yes.
21    Q. And what manufacturer's product were you using?
22    A. When I first came to Texas?
23    Q. Yes, sir.
24    A. It was a combination the Sofamar-Danek and
25 Depuy -- or at that time it wasn't -- and also AcroMed.

6 (Pages 18 to 20)

UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

25aa5e23-ca5d-460a-aed6-0962cfc122d9

## John Mieyr

| | |
|---|---|
| **From:** | Carlson, Jack [DPYUS] [JCarlson@DPYUS.JNJ.COM] |
| **Sent:** | Tuesday, October 19, 2004 10:11 AM |
| **To:** | 'John Mieyr' |
| **Subject:** | RE: Chargebacks from Physicians Metroplex Hospital |

John: I have been following up this morning prior to receiving your email on this whole situation at Physicians Metroplex.
I have requested some information from Raynham and expect to have it today or at the latest tomorrow.
I understand your frustration and concern with the process.
It sounds from the information that I have received so far that there was quite a bit of discussion and personal interaction by both you, DS management and Raynham staffs to determine the best course if action based on the financial risk of doing business with the hospital.
I will be back to you once I have concluded review of all available information on this issue.

Jack

> -----Original Message-----
> **From:** John Mieyr [mailto:jspine@comcast.net]
> **Sent:** Tuesday, October 19, 2004 10:52 AM
> **To:** JCARLSON@DPYUS.JNJ.com
> **Subject:** Chargebacks from Physicians Metroplex Hospital
>
> Jack:
>
> I wanted to send you a follow-up e-mail after our telephone conversation Monday regarding the charge backs from Physicians Metroplex Hospital. There are three main reasons that I am requesting an immediate halt to the chargebacks and they are as follows:
>
> o First when it became clear on June 1, that this hospital had crossed the 90 day point and not paid on its invoices that there was trouble. Phil Lewis and I made several visits to the Hospital and spoke with the CEO, and CFO and got absolutely no positive results. I had been communicating regularly with Elaine LeBouff and Phil Lewis and was repeatedly instructed to continue doing business at this account. At the end of July two months later and still no payments later we had a large conference call with the hospital administration, the management partners Leland corporation, the involved doctors and Elaine LeBouff and Pat Tavares from DePuy Spine. After this conference call I was once again instructed to continue doing business at this facility, a bad call that Trinity Spine had no decision to make. Finally at the end of August or first of September some 180 days delinquent on their payments the hospital closes. This was a series of bad decisions made by the people at DePuy not at Trinity Spine since I do not have the authority to make such decisions therefore I cannot be held responsible for poor decisions at the corporate level.
>
> o Secondly, each and every one of these surgeries requires a certain amount of work on my behalf. For example getting the sets to the hospital and from the hospital after every case, and more importantly the numerous hours spent in the surgeries themselves doing what "spine consultants" do, and that is helping the surgeon throughout the case. Regardless if DePuy gets paid or not, my services were performed and I expect to get compensated for that.
>
> o Last, according to the attorney for Trinity Spine Inc. two scenarios will play out for DePuy. The first is that the hospital gets purchased and the new owner will have to pay on the hospital's debts, or there will be a bankruptcy and DePuy will be able to write off the loss as a bad debt. Either way DePuy is whole again while they are taking almost $30,000 out of my pocket. This is nearly 15% of the annual income for Trinity Spine and is not acceptable.

I am asking for your immediate help in this situation Jack, I cannot just sit back and watch this money be taken from my checks. Some $4300 was taken out this month alone and I am asking that this be returned immediately. I sincerely hope that we can reach some mutually beneficial conclusion to this situation. However, before I can allow $30,000 to be taken from me our two respective corporate attorneys will become involved, however unfortunate that may be.

John Mieyr
Trinity Spine Inc.

**2005 Quota
CENTRAL AREA**

**Territory 572, Trinity Spine (J. Mieyr)**

| | 2004 YTD October Sales | 2004 YE LE |
|---|---|---|
| Total - Core | 1,564,857 | 1,800,000 |
| Total Arthroplasty (preliminary/subject to change) | - | - |
| **Total Core & Arthroplasty** | **1,564,857** | **1,800,000** |
| Total Orthobiologics | 348 | 3,000 |
| Conduit TCP | 590 | |
| Symphony | 1,640 | |
| Total Co-Sell | 2,230 | 2,000 |
| Total Alliances | 89,672 | 100,000 |
| **Grand Total** | **$     1,657,107** | **$  1,905,000** |

| 2005 Quota | Growth % 2005 vs 2004 LE |
|---|---|
| 2,000,000 | 11.1% |
| 325,000 | 100.0% |
| **2,325,000** | 29.2% |
| 112,665 | 3655.5% |
|  |  |
| 2,200 | 10.0% |
| 102,000 | 2.0% |
|  |  |
| **$  2,541,865** | **33.4%** |

## John Mieyr

**From:**    Carlson, Jack [DPYUS] [JCarlson@DPYUS.JNJ.COM]
**Sent:**    Monday, November 29, 2004 9:12 AM
**To:**      jspine@comcast.net
**Cc:**      Milner, Priscilla [DPYUS]; Sbrownell@spineconsultantsinc.com
**Subject:** RE: Cases With Dr. Halliday

John: I'm in receipt of your email and your position on the Dr Halliday's cases at All Saints Hospital.
I disagree with your decision and obvious unwillingness to work with me to resolve this customer request to
service her cases. Therefore  you must pay Rob for the case coverage you will duplicate his
commission percentage agreement  that he currently has with Susan Brownell for similar cases. Through a copy
to Susan  I will have her validate his commission percentage. Along with that I will adjust your current quota to
include the net billing of these cases. This adjustment will take place on your next commission statement once we
validate case net billing..

Jack Carlson

> -----Original Message-----
> **From:** Johnson, Kathy [DPYUS]
> **Sent:** Monday, November 29, 2004 8:46 AM
> **To:** Carlson, Jack [DPYUS]
> **Subject:** FW: Cases With Dr. Halliday
>
> Jack:
> Until Dec 31 I will need to be paying Rob Walker and the revenue will need to be credited to territory 572.
> Anything less is a blatant breach of contract.  Sorry, but I just cannot agree with what Susan is asking for
> until I am either part of her organization or gone altogether.
>
> John
>
>
> **From:** Johnson, Kathy [DPYUS] [mailto:KJohns30@DPYUS.JNJ.com]
> **Sent:** Wednesday, November 24, 2004 2:35 PM
> **To:** John Mieyr (E-mail)
> **Subject:** FW: Cases With Dr. Halliday
>
>
> -----Original Message-----
> **From:** Carlson, Jack [DPYUS]
> **Sent:** Wednesday, November 24, 2004 12:56 PM
> **To:** 'susan brownell'; Johnson, Kathy [DPYUS]
> **Subject:** RE: Cases With Dr. Halliday
>
> Kathy: please email this John Mieyr. He doesn't check his depuyspinesales email.
>
> John: Please see comments from Susan below. This will have to be covered by Rob Walker. We will
> manually adjust so that Rob is paid through Susan along with revenue attainment is credited to her
> territory .
> I will copy you on all correspooindance of these adjustments so you know the details.
>
> JC
>
> > -----Original Message-----
> > **From: susan brownell [mailto:sbrownell@spineconsultantsinc.com]**

2/17/2005

**Sent:** Wednesday, November 24, 2004 11:59 AM
**To:** Carlson, Jack [DPYUS]
**Subject:** Cases With Dr. Halliday

Jack:  Dr. Halliday just booked two rather large cases for the second week of December at All
Saints.  Both of these cases would have gone to Danek, but she is gradually turning over more
business to us...almost $80K this month alone.  As you know, she prefers to work with Rob Walker.

How should we handle this?

Susan Brownell
sbrownell@spineconsultantsinc.com
SPINE CONSULTANTS, INC.
7502 Greenville Avenue
Suite 660
Dallas, TX  75231
469/232-9400 – office
469/232-9405 - fax

## John Mieyr

| | |
|---|---|
| **From:** | Carlson, Jack [DPYUS] [JCarlson@DPYUS.JNJ.COM] |
| **Sent:** | Monday, November 29, 2004 10:11 AM |
| **To:** | John Mieyr |
| **Subject:** | RE: Cases With Dr. Halliday |

-----Original Message-----
**From:** John Mieyr [mailto:jspine@comcast.net]
**Sent:** Monday, November 29, 2004 9:33 AM
**To:** 'Carlson, Jack [DPYUS]'
**Subject:** RE: Cases With Dr. Halliday

Jack:
I resent the fact that you consider me unwilling to work with you on these cases. I think that you misunderstood my message. [Carlson, Jack [DPYUS]]  John I didn't misunderstand you at all. I'm trying trying to resolve this to all parties satisfaction and the most important the customer who happens to be a surgeon.  I am more than willing to allow Rob to cover these cases however, since I am in the 25% money I am not willing to allow this revenue to go to Susan's territory. [Carlson, Jack [DPYUS]]  This revenue will be going to Susan because she has the quota for Dr Halliday. You will also get the revue but I will adjust your quota by that same amount. I will pay Rob his commission for these cases and the coverage will be seamless for Dr. Halliday.  I don't think that you have been listening to me when I tell you about similar situations occurring with my doctors when they do cases over at Harris.[Carlson, Jack [DPYUS]]  John: I have been listening to you however I hear and see nothing but threats and lack of flexibility initiative from you.  In fact just this morning Dr. Hubbard scheduled a case over at Harris and called me with the information.  I reminded him that I do not cover Harris and that is Rob's territory, upon getting that info he cancelled the case. Jack, this has been going on all year since I lost Harris.  When my surgeons (Dr. Mitchell, Dr. Hubbard, Dr. Bechtel), do cases over at Harris, they use Danek since I am unable to cover the case.  I do not call you or e-mail you whining every time one of my docs operates at Harris and I don't get the case because they won't work with Rob.  Yes DePuy loses the revenue but this is a territory decision that DePuy made and I don't call crying everytime one of my surgeons operates at Harris.  Furthermore, if you want to adjust my quota to reflect Dr. Halliday's business at All Saints I suggest that you can take out of my quota Dr. Mitchell, Dr. Hubbard and Dr. Bechtel's business that they do over at Harris and add that to Susans.  Overall I think that you would find the numbers to be a wash.[Carlson, Jack [DPYUS]]  My position is clear on what we're going to do with Dr Halliday's cases at All saints. This discussion is over.

JOHN

**From:** Carlson, Jack [DPYUS] [mailto:JCarlson@DPYUS.JNJ.COM]
**Sent:** Monday, November 29, 2004 9:12 AM
**To:** jspine@comcast.net
**Cc:** Milner, Priscilla [DPYUS]; Sbrownell@spineconsultantsinc.com
**Subject:** RE: Cases With Dr. Halliday

John: I'm in receipt of your email and your position on the Dr Halliday's cases at All Saints Hospital. I disagree with your decision and obvious unwillingness to work with me to resolve this customer request to service her cases. Therefore  you must pay Rob for the case coverage you will duplicate his commission percentage agreement  that he currently has with Susan Brownell for similar cases. Through a copy to Susan  I will have her validate his commission percentage. Along with that I will adjust your current quota to include the net billing of these cases. This adjustment will take place on your next commission statement once we validate case net billing..

Jack Carlson

-----Original Message-----
**From:** Johnson, Kathy [DPYUS]
**Sent:** Monday, November 29, 2004 8:46 AM
**To:** Carlson, Jack [DPYUS]
**Subject:** FW: Cases With Dr. Halliday

Jack:
Until Dec 31 I will need to be paying Rob Walker and the revenue will need to be credited to territory 572. Anything less is a blatant breach of contract. Sorry, but I just cannot agree with what Susan is asking for until I am either part of her organization or gone altogether.

John

**From:** Johnson, Kathy [DPYUS] [mailto:KJohns30@DPYUS.JNJ.com]
**Sent:** Wednesday, November 24, 2004 2:35 PM
**To:** John Mieyr (E-mail)
**Subject:** FW: Cases With Dr. Halliday

-----Original Message-----
**From:** Carlson, Jack [DPYUS]
**Sent:** Wednesday, November 24, 2004 12:56 PM
**To:** 'susan brownell'; Johnson, Kathy [DPYUS]
**Subject:** RE: Cases With Dr. Halliday

Kathy: please email this John Mieyr. He doesn't check his depuyspinesales email.

John: Please see comments from Susan below. This will have to be covered by Rob Walker. We will manually adjust so that Rob is paid through Susan along with revenue attainment is credited to her territory .
I will copy you on all correspooindance of these adjustments so you know the details.

JC

    -----Original Message-----
    **From:** susan brownell [mailto:sbrownell@spineconsultantsinc.com]
    **Sent:** Wednesday, November 24, 2004 11:59 AM
    **To:** Carlson, Jack [DPYUS]
    **Subject:** Cases With Dr. Halliday

    Jack: Dr. Halliday just booked two rather large cases for the second week of December at All Saints. Both of these cases would have gone to Danek, but she is gradually turning over more business to us...almost $80K this month alone. As you know, she prefers to work with Rob Walker.

    How should we handle this?

    Susan Brownell
    sbrownell@spineconsultantsinc.com
    SPINE CONSULTANTS, INC.
    7502 Greenville Avenue
    Suite 660
    Dallas, TX 75231
    469/232-9400 - office
    469/232-9405 - fax

2/17/2005

## John Mieyr

**From:**    Carlson, Jack [DPYUS] [JCarlson@DPYUS.JNJ.COM]
**Sent:**    Tuesday, December 21, 2004 7:55 AM
**To:**      'jspine@comcast.net'
**Cc:**      Milner, Priscilla [DPYUS]
**Subject:** Rob's case commissions

John: Following up our discussion yesterday I would request that you send me a acknowledement letter confirming your intent to pay Rob Walker commissions for his case coverage for Dr Halliday at All Saints Hospital.

I would expect you to send this letter to Rob with a copy to Susan Brownell and me.
Please acknowledge commission dollar amount and date that you intend to pay Rob.
Should you elect not to complete this request I will make the arrangements with Sales Admin to have the commissions withdrawn from your final check.

Please contact me directly should you have any questions concerning this request.

Jack Carlson
---------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)