**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO. 05-CV-10270-RGS

DEPUY SPINE HOLDING CORP., As It )
Is General Partner Of DEPUY SPINE )
SALES LIMITED PARTNERSHIP, )
                                 )
         Plaintiff, )
                                 )
v. )
                                 )
JOHN MIEYR and TRINITY )
SPINE, INC., )
                                 )
         Defendants. )

**SUPPLEMENTAL MEMORANDUM**
**IN SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION**[1]

One year ago, John Mieyr and Trinity Spine[2] (collectively, "Mieyr") terminated their

prior written agreement with DePuy Spine Sales Limited Partnership ("DePuy Partnership")

and entered into the Sales Representative Agreement (the "Agreement") that is the basis of this

suit. In conjunction with signing the Agreement, Mieyr:

- Received a $200,000 payment from DePuy Partnership;

- Negotiated a reduction in the *post* termination non-competition period from one
  year to six months;

- Negotiated the removal of a provision requiring Mieyr to pay DePuy
  Partnership specified amounts under certain circumstances; and

- Reviewed and consulted with his lawyer about the Agreement before signing it.

Now, Mieyr refuses to live up to the terms he negotiated only one year ago.

---

[1] Since the Court issued temporary restraining order on February 11, 2005, Mieyr noticed three depositions
and made himself available for a brief deposition.

[2] John Mieyr owns more than 75% of the stock of Trinity and is its President. Mieyr's wife holds the
other officer positions in Trinity.

## FACTUAL BACKGROUND

In 1996, DePuy Spine, Inc., f/k/a as DePuy AcroMed, Inc., hired John Mieyr. Mieyr had previously worked as a flight instructor and commercial pilot, and also earned a degree as a Doctor of Dental Surgery.[3] DePuy Spine trained Mieyr to sell its spinal implant products, including, notably, developing relationships with orthopaedic surgeons in the Dallas-Fort Worth area. In 2001, Mieyr became an independent sales representative for DePuy Partnership distributing DePuy Spine products. In 2002, Mieyr entered into a Sales Representative Agreement (the "2002 Agreement") with DePuy Partnership (f/k/a DePuy AcroMed Sales Limited Partnership).[4] By its terms, the 2002 Agreement terminated on December 31, 2004. The 2002 Agreement contained a provision stating that for one year after the termination of the 2002 Agreement, Mieyr would not sell competing products in its former sales territory.

In February 2004, after negotiations and consultation with his lawyer, Mieyr and Trinity entered into a new Sales Representative Agreement (the "Agreement") with DePuy Partnership, in conjunction with which DePuy Partnership paid Mieyr $200,000. The Agreement terminated by its terms on December 31, 2004. Before signing the Agreement, Mieyr reviewed a proposed agreement carefully, consulting with his attorney and making handwritten annotations on the draft document. Mieyr then negotiated at least two significant changes to the proposed agreement: the parties omitted a provision that would have required

---

[3] This information comes substantially from the deposition of John Mieyr on Wednesday, February 16, 2005. A transcript was not available in time to list page cites for these factual claims in this brief, although a transcript is now available.

[4] A copy of Mieyr's 2002 Agreement is attached hereto as Exhibit A.

Mieyr to pay $12,500 and $25,000, respectively, to DePuy Partnership if certain stated events occurred; and the parties reduced the period of Mieyr's and Trinity's non-competition provision from one year to six months.

After the Agreement was signed, DePuy Partnership paid Mieyr $200,000 and commissions according to the schedule in the Agreement. As a sales representative, Mieyr was aware of certain of DePuy Partnership's confidential information, including sales quotas, customer lists, sales strategies and perceived growth opportunities, and certain product development information. (Carlson Aff., ¶ 4.) Mieyr continued to receive training on products distributed by DePuy Partnership, including the Charite artificial disc, the only artificial disc presently approved for sale by the Food and Drug Administration. (*Id.* at ¶ 13.)

By its terms, the Agreement terminated on December 31, 2004. In December 2004, DePuy Partnership contacted Mieyr to discuss a plan for notifying and explaining, before December 31, 2004, the transition to DePuy Partnership's customers. (*Id.* at ¶ 10.) Mieyr did not respond. Instead, before termination, Mieyr informed the DePuy Partnership customers with whom he worked that DePuy Partnership had "fired" him and led them to believe that DePuy Partnership was treating him unfairly. Mieyr also began talking to distributors of competitive spinal implant products about distributing their products in his former DePuy Partnership territory. On December 22, 2004, Mieyr sent an e-mail to Jack Carlson, an Area Vice-President, stating: "As advised by my attorneys, since I have not received any monetary compensation not to compete in my former territory, you can expect that I fully intend to keep any and all business that I possibly can." (Emphasis added).

In January 2005, Mieyr and Trinity began distributing competitor's products to DePuy Partnership's customers in Mieyr's former DePuy Partnership territory. Mieyr reported to

DePuy Partnership's customers his view of his dealings with DePuy Partnership and recruited them as partisans. Mieyr, however, did not inform any of DePuy Partnership's customers that he had received $200,000 from DePuy Partnership and negotiated a reduction in the *post*-termination non-competition period from one year to six months.

## ARGUMENT

### I.    DEPUY PARTNERSHIP IS ENTITLED TO A PRELIMINARY INJUNCTION.

Mieyr's conduct, as revealed in the recent depositions, confirms that DePuy Partnership is entitled to a preliminary injunction. Mieyr acknowledges his ongoing actions in breach of the Agreement and there is ample evidence of the loss of good will occasioned by Mieyr's conduct. Allowing Mieyr to walk away from the narrow non-competition provision that he negotiated would undermine the parties' Agreement and reward Mieyr for the very success of his breach.

### A.    DePuy Partnership Has An Overwhelming Likelihood of Success on the Merits.

In consultation with his lawyer, Mieyr negotiated the terms of the non-competition provision. Mieyr testified that when he signed the Agreement, he intended to keep his promise not to compete for six months after the termination. After signing the Agreement, Mieyr performed under and received commissions in accordance with the Agreement, as well as the $200,000 payment specified.

#### 1.    Mieyr Never Alleged Any Breach.

Now, though, Mieyr claims that DePuy Partnership breached the Agreement in October or November 2004 by allowing another representative, at the request of a surgeon, to attend a few surgeries in Mieyr's territory. Mieyr asserts that these events excused him from his obligation not to compete. That claim is without merit.

4

In the fall of 2004, a Dr. Halliday wished to perform spinal surgeries in a hospital in Mieyr's DePuy Partnership territory, but did not wish to work with Mieyr. (Carlson Aff., ¶¶ 5-6.) While Mieyr now asserts that this constituted a breach of the Agreement, Mieyr's contemporaneous e-mail communications reveal that Mieyr was "more than willing to allow Rob [*i.e.,* the other sales representative] to cover these cases however, since I am in the 25% money [*sic*] am not willing to allow this revenue to go to Susan's [*i.e.,* another sales representative's] territory." Mieyr then stated that he "will pay Rob his commission for these cases and the coverage will be seamless for Dr. Halliday."

Mieyr was aware of the surgeries with Dr. Halliday and wished merely to be credited for them under the terms of his Agreement. As he requested, Mieyr in fact received credit – was "in the 25% money" – for the surgeries by Dr. Halliday. (Carlson Aff., ¶ 8.) What Mieyr in fact asserted was that if he did not receive credit for these Dr. Halliday surgeries, DePuy Partnership would be in breach; but on the very day Mieyr requested credit, DePuy Partnership agreed to, and in fact did, credit him for the sales and pay him a commission on them in accordance with the Agreement, just as he demanded. Far from perceiving the Halliday surgeries as breaches of the Agreement, Mieyr demanded – and received – commission payments for those surgeries in accordance with the Agreement.

There was no breach of the Agreement, as Mieyr's own contemporaneous communications reveal. Even if Mieyr had perceived the Halliday surgeries as some sort of breach, he failed to comply with the notice provisions of the Agreement. The Agreement provides that a party cannot terminate the Agreement for breach unless it first gives the breaching party 30 days notice of the breach and opportunity to cure. Despite claiming to have consulted with his lawyer about the Halliday surgeries, Mieyr failed to give any written notice

5

of an alleged breach. Finally, the newly alleged breach would in any event be a *de minimis* breach that could not excuse Mieyr's performance under the Agreement. *See, e.g., Emery v. Merrimack Valley Wood Products*, 701 F.2d 985, 991 (1st Cir. 1983) (former employee could not escape non-competition provision based on allegation that former employer failed to pay commissions; alleged breach was *de minimis*). Mieyr's *post facto* allegation of breach cannot efface his contemporaneous requests for commission payments under the Agreement or mask his failure to give the notice the Agreement required.

### 2. Mieyr Cannot Plausibly Allege Fraudulent Inducement.

Mieyr apparently also maintains that he was fraudulently induced to enter into the Agreement. The facts recited above belie this assertion. According to Mieyr, a DePuy Spine employee told Mieyr in January 2004 that if he met his sales quota in 2004, he would in 2005 receive a long-term distribution agreement.

The Agreement is an integrated document, reciting that it "constitute[s] the entire agreement between Representative, Principal and the Company with respect to its subject matter and supersedes and replaces any and all previous contracts, arrangement, or understandings that may have existed or may exist between the parties." (Agreement, ¶ 14(a).) On February 9, 2004, Mieyr made detailed, handwritten comments on a draft version of the Agreement; he never mentioned (much less demanded the inclusion of) the promise he now relies upon. Indeed, the only comment that Mieyr made about the duration of the Agreement was to note in handwriting that it terminated "12/31/04." Mieyr's lawyer also reviewed both the draft agreement and the actual Agreement before Mieyr signed it. Yet, Mieyr never mentioned or requested the inclusion of the alleged promise that he now claims excuses him from his contractual obligations.

6

As a matter of law, the subsequent execution of a negotiated, integrated document, with the advice of counsel, undermines a claim of fraudulent inducement based on an alleged incompatible prior promise. While an integration clause cannot automatically insulate a party from liability, "if 'the contract was fully negotiated and voluntarily signed, [then] plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue.'" *Starr v. Fordham*, 420 Mass. 178, 188 (1995) (quoting *Turner v. Johnson & Johnson,* 809 F.2d 90, 97 (1st Cir. 1986)). *See also Garas v. Cambridge Anaesthesia Assoc.*, 1996 Mass. Super. LEXIS 10, at *6-*7 (Mass. Super. Ct. Dec. 30, 1996) (party represented by counsel cannot base fraud claim on alleged oral promise pre-dating and contradicting written contract). As a matter of fact, Mieyr's silence about this supposed promise until DePuy Partnership sought an injunction reveals that it is an after the fact effort to escape his contractual obligations. Contracts are drafted precisely to avoid such creative memory, whether deliberate or inadvertent.

> What a party remembers was said at a business conference is easily colored by what that person wished to be resolved by the discussion. The hoped for result metamorphoses into fact. That is why lawyers draw commercial instruments to state as precisely as they can the rights and duties of the parties, and that is why the parties sign those agreements.

*USTRUST v. Henley & Warren Mgmt., Inc.*, 40 Mass. App. Ct. 337, 343 (1996). Mieyr himself proves the accuracy of the *USTRUST* court's analysis. Mieyr admits that he recently contacted the individual who supposedly made the promise, Tom Slott, who is no longer employed by DePuy Spine.[5] Mieyr testified that Mr. Slott told him, "I never told you any such thing."

---

[5] Slott is an independent distributor of DePuy Spine products.

Mieyr has no other defense on the merits. He himself acknowledges that he intended to comply with the non-competition provision when he signed the Agreement. Mieyr also acknowledges selling competitive spinal implant products in his former DePuy Partnership territory, almost from the moment the Agreement terminated. Because the evidence strongly suggests that Mieyr's claims of breach and fraudulent inducement have been cooked up after the fact to justify his breach, and are legally insufficient in any event. DePuy Partnership has an overwhelming likelihood of success on the merits.

## B.    Mieyr's Actions Cause DePuy Partnership Irreparable Harm.

For almost ten years, DePuy Spine and DePuy Partnership paid Mieyr to distribute its products and develop goodwill with DePuy Partnership's customers. Indeed, Mieyr admits that he did his "selling" years ago. "I haven't sold since probably five or six years ago. I made my reputation with my physicians then." Mieyr admits that as soon as he learned that he would no longer be distributing products for DePuy Partnership, he began trading on that goodwill to his benefit and DePuy Partnership's detriment. Before December 31, 2004, Mieyr told DePuy Partnership's customers that he had been "fired," not that the Agreement expired by its terms; and that he would like to distribute competitive products to them, not that he had within the year received $200,000 from DePuy Partnership and promised not to sell competitive equipment for six months, a period he negotiated down from one year.

Early in January 2005, Mieyr began attending surgeries in his former DePuy Partnership territory, only now he sold those surgeons competitors' products. Mieyr did not miss a beat: he covered surgeries booked while he was operating under the Agreement and merely substituted competitors' products. When DePuy Partnership obtained a temporary restraining order, Mieyr undertook a recruitment campaign among DePuy Partnership's

8

customers, urging them to help him in his dispute with DePuy Partnership. Mieyr still did not reveal to DePuy Partnership's customers that he had a year earlier promised not to sell competitive products in his former territory for six months after termination, or that he allegedly had intended to keep that promise when he made it.

Mieyr's breaches of his Agreement have caused, and continue to cause, DePuy Partnership substantial harm to its goodwill. DePuy Partnership stands not only to lose its business for current products (over $2,000,000 in sales in 2004), but also the opportunity to introduce new products, such as the Charite artificial disc. (Carlson Aff., ¶¶ 12-13.) As a result of Mieyr's ongoing breach, DePuy Partnership will lose not only the sales from such products, but also the goodwill associated with being the first to market with such new products and the opportunity to reap the goodwill and other benefits that flow from being perceived as an innovative market leader. If Mieyr is not enjoined, then he will entrench himself and his competitive products with DePuy Partnership's customers, continue to impugn DePuy Partnership's reputation, and use his status as a former distributor of DePuy Spine products to deprecate them and prevent DePuy Partnership's customers from using new products. Mieyr's continued distribution of competitive spinal implant products in Tarrant County, Texas would create a cumulative, corrosive harm to DePuy Partnership's goodwill and other intangible property.

Finally, Mieyr suggests that the very success of his breach demonstrates that DePuy Partnership cannot suffer irreparable harm. According to Mieyr, since he has recruited three DePuy Partnership's customers to say that they will not use products distributed by DePuy Partnership, DePuy Partnership will not be harmed if Mieyr continues to sell them competitive products. First, this argument has the perverse effect of rewarding successful breachers and

9

guaranteeing that an injunction may issue only if it is not needed. If one cannot recruit the customers one formerly worked with to say that they will no longer use the former product, then an injunction may issue; but if one breaches in spectacular fashion by inducing former customers to say that they will not use the former products, an injunction will not issue.

Second, the argument does not account for the ongoing, cumulative effects of Mieyr's breach. Every day that Mieyr is selling competitive products to DePuy Partnership's customers is another day in which he impugns DePuy Partnership and cements the relationship between the competitors of DePuy Partnership and DePuy Partnership's customers, and keeps out the products DePuy Partnership markets, including new products.

> In light of Orchard's close association with PRISM Client/Server, his departure from Marcam will likely harm that product's reputation in the eyes of Marcam's customers. In promoting Datalogix's competing product, Orchard would be directly or indirectly disparaging Marcam's product. Whether Orchard publicly criticizes PRISM Client/Server, or simply promotes the competing product without explicit criticism, his association with the competing product would be enough to raise doubts in the eyes of Marcam's customers as to the relative value of PRISM Client/Server.

*Marcam Corp. v. Orchard,* 885 F. Supp. 294, 298 (D. Mass. 1995). If Mieyr is enjoined, perhaps, as certain DePuy Partnership customers now say, they will not in fact use the products that DePuy Partnership distributes. But perhaps they will, or will first try competitors' products and then determine that they prefer DePuy Partnership's products. If Mieyr is allowed to continue to breach his Agreement by selling competitive products in Tarrant County, these curative events are less likely to occur, the irreparable harm caused by Mieyr's actions will broaden and solidify, and the very magnitude of Mieyr's breach will have excused it.

Unsurprisingly, courts reject efforts like Mieyr's to justify breach by success. In *McFarland v. Schneider,* 1998 Mass. Super. LEXIS 711 (Mass. Super. Ct. Feb. 17, 1998), for

example, a former representative argued that the plaintiff was not entitled to an injunction

because certain of the plaintiff's customers had stated that they would no longer use the

plaintiff's services.

> Mr. Schneider's contention that, whatever the Agreement's validity
> generally, it cannot possibly have preserved any internal or external goodwill
> here because all three of the clients who joined him at his new firm said that
> they would have left Wellington in any event. I am unpersuaded by that
> contention . . . .

> . . . .

> [E]ven if solicitation were stripped away, the findings made here
> demonstrate precisely why an agreement like this one may be particularly
> necessary for a business like Wellington. Wellington hired Mr. Schneider when
> he was inexperienced. Wellington trained Mr. Schneider and provided a forum
> for his considerable talent and skills to flourish. Wellington exposed him to
> clients and encouraged him and them to form a tightly knit relationships. While
> they did so, Wellington provided the support that was essential for those
> relationships to flourish. Wellington did all of that because that is how its
> business, and all successful businesses like it, work. And when Mr. Schneider
> reached a point where he thought that the relationship between himself and the
> clients he was serving was strong enough that at least some of them would go
> with him when he left, that is precisely what he did. Surely an employer's effort
> to prevent that result, if otherwise reasonable, is entirely legitimate.

*Id.* at *149-*50. *See also Fortune Personnel Consultants of Boston, Inc. v. Hagopian*, 1997

Mass. Super. LEXIS 52, at *6-*7 (Mass. Super. Ct. Dec. 30, 1997) (enjoining personnel

recruiter who was trained by her former employer and provided various business leads,

because "taking a potential client who has been developed while under the employ of Fortune,

certainly would constitute an invasion of Fortune's good will"). In the language of

*MacFarland*, Mieyr indeed acted as a "privateer," not only breaching his Agreement, but first

securing payment of $200,000 even for entering into it.

**C.    The Balance of Harms Favors DePuy Partnership.**

As set forth above, DePuy Partneship will suffer ongoing, irreparable harm if Mieyr is not enjoined. Mieyr, on the other hand, will suffer no irreparable or unbargained for harm if he is held to the terms of the Agreement. Mieyr can sell competitive products in any other county in Texas or anywhere else in the world. He can pursue any other career anywhere, including returning to his career as a flight instructor or commercial pilot, or pursuing a career as a dentist.

Significantly, Mieyr admits that he intended to be bound by the non-competition provision when he signed the Agreement and received $200,000. There is no cognizable harm to Mieyr in holding him to the terms of the Agreement. The balance of harms therefore favors entry of a preliminary injunction.

**D.    The Public Interest Favors Entry of A Preliminary Injunction.**

Against the strong public interest in favor of enforcing parties' voluntary agreements, Mieyr argues that a preliminary injunction would implicate patient safety and interfere with Texas physicians' practice of medicine. These arguments do not hold up. The public interest does not exalt Mieyr's perceived abilities over the principles of contract law.

Mieyr is not a physician or nurse. Mieyr (and other sales representative) do not scrub or enter the sterile field during surgery. The representatives organize DePuy Spine products on a tray; nurses then convey the products to the surgeon in the sterile field. Three of DePuy Partnership's customers testified that they like Mieyr and think that helps them complete their hours-long surgeries in an efficient manner. They think that this decreases risks to patients.

In Dr. Mitchell's words, the alleged potential "harm" to patients is the same as if one of his
regular surgical team is sick.

> Q.    And if one of those people is sick or injured on a particular day, can that
>        impede your practice of medicine?
>
> A.    It can.
>
> Q.    Is that the same sense in which Mr. Mieyr not being in the operating
>        room might impede your practice of medicine?
>
> A.    Well, yes.

Each of these surgeons performs surgeries with other sales representatives from other
companies and each has previously worked with other DePuy Spine representatives.  None of
these doctors would ever perform a surgery if they believed that the risks outweighed the
benefits.  Revealingly, Dr. Sazy, Mieyr's close friend, testified that, while he believed that
performing surgery with another sales representative increased his patients' risks in some
unquantifiable way, he does not reveal this alleged increased risk to his patients before
surgery.  Dr. Mitchell testified that there would be an unquantified increase in patient risk "if I
didn't have an experienced person there."  About half of Dr. Mitchell's spinal surgeries in fact
occur with "experienced person[s]" other than Mieyr.

With deference to the surgical abilities of Drs. Mitchell, Gray, and Sazy, common-
sense demonstrates that they can perform surgery safely even in the absence of John Mieyr.
First, each of them has and continues to do so.  Second, Mieyr could be taken ill, die, move,
or take a new job; but these doctors would not then stop performing orthopaedic surgery, as
they of course acknowledge.  Third (although Mieyr never told DePuy Partnership's customers
this), Mieyr agreed and intended to honor his non-competition clause when he signed it one
year ago.  Whatever the consequences of Mieyr's absence, they result from Mieyr's informed

13

decision to enter into the Agreement; those consequences flow from Mieyr's actions, not DePuy Partnership's.

The same reasoning applies to Mieyr's claim that an injunction requiring him to do what he promised would impede the practice of medicine in Texas. Mieyr promised not to sell competitive products in Tarrant County for six months after termination of the Agreement. Any effect on the practice of medicine in Tarrant County is the consequence of Mieyr's decision to sign the Agreement, not of any action by "a judge in Boston," as Mieyr phrased it.

There is no doubt that some doctors would like to continue using Mieyr as a sales representative, in breach of his Agreement. That fact is a measure of the extent of Mieyr's breach, not a reason for absolving Mieyr of his contractual obligations. The public interest favors DePuy Partnership's Motion for a Preliminary Injunction.

14

## CONCLUSION

For the reasons set forth above and in DePuy Partnership's Memorandum in support of

its motion for a temporary restraining order, the Court should issue a preliminary injunction in

the form requested by DePuy Partnership.

DEPUY HOLDING CORPORATION, INC.
As It Is General Partner of DEPUY SPINE
SALES LIMITED PARTNERSHIP,


By Its Attorneys,


Joseph F. Shea (BBO #555473)
Eric P. Magnuson (BBO #643805)
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-9628

Dated: February 18, 2005


## CERTIFICATE OF SERVICE

I, Joseph F. Shea, hereby certify that, on February 18, 2005, I caused a true copy of
this document to be served by hand on Mieyr's counsel.


Joseph F. Shea


1405266.1


15

## SALES REPRESENTATIVE AGREEMENT

THIS AGREEMENT is effective as of the 1st day of January, 2002, and is among DePuy AcroMed Sales Limited Partnership, a Massachusetts limited partnership, having a place of business at 325 Paramount Drive, Raynham, Massachusetts 02767, (the "Company" ), and Trinity Spine Inc., a Texas corporation, having a place of business at 2404 Woodfield Way, Bedford, Texas 76021, ("Representative").

### RECITALS

1.     The Company is engaged in the business of designing, manufacturing and selling devices and instruments for the treatment of spinal and/or neurologic disorders.

2.     Representative is engaged in soliciting sales of medical devices in the Territory (as hereinafter defined). John Mieyr is the owner of all or substantially all of the outstanding stock of Representative and is an active participant in the business of Representative ("Principal").

3.     The Company desires to engage Representative and Principal to sell the Company's products and Representative and Principal desire to do so, all upon the terms and conditions as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, upon the terms and subject to the conditions contained herein, hereby agree as follows:

### 1.     Appointment and Territory.

a.     Subject to the provisions set forth in this Agreement, the Company appoints Representative and Representative accepts appointment as the Company's Representative to market all those Company products identified on Schedule A ("Products") to customers in the sales territory identified on Schedule B (the "Territory"). Representative's representation of the Core Products identified on Schedule A and the Emerging Technologies Products identified on Schedule A in the Territory shall be on an exclusive basis. The parties agree that all provisions and terms of the February 1, 2001 Sales Representative Agreement between the Company, Representative and Principal will terminate on the date hereof except for those terms and provisions of such Agreement which by its terms survive termination.

       b.    From time to time during the term of this Agreement, the Company may, but shall not be required to, offer new products for sale in the Territory ("New Products"). With regard to the marketing of New Products in the Territory, Company shall have the right, in its sole discretion, to:

      (i)    on thirty (30) days prior written notice to Representative, require Representative to market and solicit sales of New Products on an exclusive basis in which case such New Product shall be deemed to be added to Schedule A hereof;

      (ii)    on thirty (30) days prior written notice to Representative, require Representative to jointly introduce and market such New Products in conjunction with the efforts of the Company or its DePuy and/or Johnson & Johnson Affiliates (as defined below); or

      (iii)    introduce and market such New Products on the Company's own behalf or through its DePuy and/or Johnson & Johnson Affiliates (as defined below) on an exclusive basis, in which event such New Products shall not be made available to Representative.

      The Company shall have the sole and exclusive right to establish the terms under which New Products will be marketed and to make all decisions regarding such marketing arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Notwithstanding anything to the contrary contained in this Agreement, Company shall not be liable to make any payment to Representative with regard to a New Product if Company introduces and markets such New Product pursuant to Section 1(b)(iii) hereof. All of Representative's obligations regarding Products shall also apply to any New Products which are added to this Agreement.

      c.    Representative acknowledges that the Company shall have the right to discontinue the sale in the U.S. of any Product identified on Schedule A or any New Product added during the term of this Agreement at any time. The Company shall use reasonable efforts to provide advance notice of the discontinuance of any Product or New Product. If the Company discontinues the sale of a Product or New Product as provided herein, such Product or New Product shall be removed from this Agreement.

      d.    The Company shall have the right to enter into Co-Marketing Arrangements (as defined below) with its DePuy and/or Johnson & Johnson Affiliates (as defined below) related to the marketing, representation and sale of New Products. As used herein, "Co-Marketing Arrangement" means that New Products subject to the arrangement will be marketed, represented and sold in the Territory through the sales forces of the Company and its DePuy and/or Johnson & Johnson Affiliates. The Company reserves the sole right to establish the terms under which New Products will

be co-marketed and to make all decisions regarding such Co-Marketing Arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Products currently subject to a Co-Marketing Arrangement are identified on <u>Schedule A</u>. As used herein, the term "Affiliates" means any person, corporation, partnership or business organization which, directly or indirectly, controls, is controlled by or is under common control with, the Company.

### 2.    <u>Sales Quotas.</u>

a.    At the beginning of each calendar year during the term of this Agreement, after taking into account Representative's sales projections and other information provided to the Company under Section 5(b) hereof, the Company will establish Representative minimum sales quotas for each Product line for each sales area located within Representative's Territory (the "Quotas") as set forth in <u>Schedule C</u>.

b.    Quotas for any New Products offered to Representative and Principal will be established by the Company at the launch of each New Product.

### 3.    <u>Obligations of the Company.</u>

a.    The Company shall provide Representative with such sales literature, brochures, price lists, samples, and other related materials as the Company deems necessary; provided, however, the Company may charge Representative, and Representative shall pay, a reasonable charge for such materials.

b.    The Company shall conduct periodic sales training programs and provide technical and other information regarding the Products

c.    The Company shall accept and fill customer orders for Products according to its credit and ordering policies and procedures in effect from time to time, provided, however, that the Company may accept or reject any order, in whole or in part, in its sole discretion.

d.    Subject to all of the conditions set forth in this Section 3(d), the Company shall defend, indemnify and hold harmless Representative and its employees and agents, from and against any and all causes of action, claims, suits, proceedings, damages and judgments by third parties (collectively, "Claims"), to the extent that such Claims are based solely on an alleged manufacturing or design defect in a Product sold by Representative. In the event that any Claim is asserted against Representative, Representative shall provide written notice to the Company within ten (10) days after learning of such Claim. The Company will have the right to select counsel, and conduct and control at its expense the defense against and settlement of such Claim in its own name, or if necessary in Representative's name and the Company's defense counsel

may act on Representative's behalf regardless of whether such Claim has also been asserted against the Company. Representative will cooperate with and make available to the Company such assistance and information as may be reasonably requested by the Company, and Representative will have the right to participate in the defense, including representation by independent counsel, at Representative's expense, provided that under such circumstances, Representative will have the right to compromise and settle the Claim only with the prior written consent of the Company. If, in connection with any Claim it is determined by the Company that Representative acted beyond its authority, or failed to comply with any of its obligations under Sections 4 and 7 of this Agreement, the Company shall be immediately relieved of its obligations to Representative under this Section 3(d).

### 4.    **Obligations of Representative and Principal.**

a.    Representative agrees that its sales representatives will devote their best efforts and sufficient working time to soliciting sales of each Product line set forth in Schedule A to all applicable accounts and customers in each sales area located in the Territory, perform customary marketing support and service activities for such customers, and meet or exceed the sales Quotas established pursuant to Section 2 hereof for each Product line for each sales area located within Representative's Territory.

b.    Representative shall maintain an appropriate place of business in the Territory and an appropriate number of trained competent sales representatives, each with the level of expertise necessary to properly solicit sales of Products and to perform support and service activities for customers in the Territory.

c.    Neither Representative nor Principal, nor any employees, agents, independent contractors, or any owners of any shareholders of the Representative shall solicit sales, accept any customer orders, or sell any Products in their own name or on their own account. In the event any Products are shipped to Representative or any of the aforementioned parties for delivery to a customer, such party will not alter any Products, original packages for Products or repackage the Products in any way prior to delivery. In addition, Representative shall maintain accurate records of the lot number of Products and the names of each of the customers to which such Products were sold and report such information to the Company within ten (10) days following the sale.

d.    Representative shall at all times conduct its activities on behalf of the Company in accordance with the labeling limitations on the Products, the terms of this Agreement, the Company's written policies and procedures, and in compliance with applicable state and federal laws in effect from time to time, including the FDA's quality system regulations (QSR) and/or good manufacturing practice (GMP) regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures.

e.      Representative and Principal agree that during the term of this Agreement, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly; (i) sell, offer for sale, promote, receive or solicit orders for products that are competitive with any products of the Company ("Competitive Products"); or (ii) accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products. The determination of what constitutes Competitive Products shall rest solely with the Company's president. Notwithstanding the foregoing provisions of this Section 4(e), during the term of this Agreement, Representative and Principal shall be permitted to continue to distribute and/or sell only those Competitive Products, if any, currently sold by Representative and Principal through the current term of any contract or agreement relating to the distribution and/or sale of such Competitive Products; provided, however, that Representative and Principal agree to invoke any right accorded to them under such contract or agreement to terminate such contract or agreement or cause its non-renewal at the earliest possible opportunity, consistent with the terms of such contract or agreement. Competitive Products, if any, permitted to be sold notwithstanding the provisions of this Section 4(e) shall be identified on <u>Schedule E</u> hereto.

f.      Representative and Principal further agree that as a material inducement to the Company to enter into this Agreement, and in consideration of the Company entering into this Agreement and the other consideration provided for herein, the receipt and sufficiency of which are hereby acknowledged by Representative and Principal, that for a period of one year following the termination of this Agreement for any reason, including its termination for non-renewal by any party, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly engage in the sale of Competitive Products in the Territory or accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products.

g.      Representative and Principal further agree that they will not knowingly engage as a sales representative or in any other capacity any person who directly or indirectly (i) sells, offers for sale, promotes, receives or solicits orders for Competitive Products; or (ii) accepts compensation of any kind from any person providing or engaging in the sale of Competitive Products. Additionally, Representative and Principal agree to use their best efforts to obtain from each of their sales representatives, employees or independent contractors an agreement that such sales representative, employee or independent contractor will not engage in the sale of Competitive Products for a one (1) year period following termination of such engagement or employment, all in such manner and to the same extent as Representative and Principal agree to be bound pursuant to this Agreement. Each such agreement between Representative, Principal and their sales representatives shall provide that such provisions are for the benefit of the Company and that the Company may enforce such provisions directly. Representative and Principal shall, upon request,

provide the Company with complete copies of all such agreements with its sales representatives.

h.      Representative and Principal further agree that during the term of this Agreement, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly (i) sell, offer for sale, promote, receive or solicit orders for any products that are competitive with any products of other subsidiaries of DePuy, Inc. ("DePuy Competitive Products"); or (ii) accept compensation of any kind from any person providing or engaging in the sale of DePuy Competitive Products, without the express written consent of the Company's president and upon such terms as the Company, in its sole discretion, may reasonably impose. Notwithstanding the foregoing, during the term of this Agreement, Representative and Principal shall be permitted to continue to distribute and/or sell only those DePuy Competitive Products, if any, currently sold by Representative and Principal; provided, however, that Representative and Principal agree that they will not acquire any new DePuy Competitive Products as part of their product lines during the term of this Agreement, without the express written consent of the Company's president and upon such terms as the Company, in its discretion, may reasonably impose. DePuy Competitive Products, if any, permitted to be sold notwithstanding the provisions of this Section 4(g) shall be identified on Schedule E hereto.

i.      Representative and Principal further agree that they will not knowingly engage as a sales representative or in any other capacity any person who directly or indirectly engages in the sale of DePuy Competitive Products or accepts compensation of any kind from any person providing or engaging in the sale of DePuy Competitive Products, except on the terms permitted notwithstanding Section 4(g) of this Agreement.

j.      Representative and Principal further agree that neither Representative nor Principal nor any member of Principal's immediate family will engage in, derive or accept compensation from or have any other ownership interest in (other than as a passive investor) any other commercial or business activity involved in the sale of medical devices, biologics or other products used in the treatment of any medical condition, without the express written consent of the Company's president and upon such terms as the Company, in its sole discretion, may reasonably impose. This provision shall not be construed as requiring Representative and Principal to discontinue any current commercial or business activities or investments, except to the extent that continuation of those activities or investments would constitute competitive activities prohibited by Sections 4(e) or 4(g). Any activities permitted notwithstanding this Section 4(j) shall be identified on Schedule E hereto.

k.      If Representative or Principal breaches any of its obligations under any of Sections 4(e) – (j) of this Agreement, then in addition to any other legal or

equitable remedies available to the Company, the Company shall have the right in its sole discretion and for no additional consideration to Representative or Principal:

     (i)    to direct Representative and/or Principal to immediately assign to the Company all non-competition or similar agreements described in Section 4(g) above; and

     (ii)   to solicit, contract with, or hire any sales representatives of Representative and/or Principal.

     Representative and Principal agree that it would be difficult to quantify damages for a breach of Section 4(k)(i) and that Company is entitled to preliminary injunctive relief and specific performance in the event of any such breach.

     l.    Representative shall make its sales representatives available, at its expense, to attend  all national meetings and conferences and, if requested by the Company, shall help with exhibits, workshops, etc. at such meetings and conferences. In addition, Representative and its sales representatives shall attend all applicable regional meetings in the Territory as directed by the Company.

     m.    Representative shall not make any representation or statement, written or otherwise, concerning prices, terms of delivery, terms of payment or conditions of sale except and to the extent that the same is specifically authorized by the Company.  Representative shall have no right or authority to make any price guarantees, offer or agree to any discounts and/or accept any orders on the Company's behalf or return any Products to the Company without prior written authorization by the Company.

     n.    Neither Representative nor Principal will knowingly submit to the Company any information known by Representative or Principal to be false, inaccurate or misleading regarding: (i) sales of Products; (ii) customers to whom Products were sold; (iii) expenses which were or are to be paid or reimbursed in whole or in part by the Company; or (iv) the inventory of Products in the Territory.  Neither Representative nor Principal shall engage in the practice of direct billing of Products to any person.  For purposes of this section, direct billing shall mean any transaction involving a third party's acquisition, use or lease of Product which results in such third party being invoiced or charged a price or rental fee(s) for Product by Representative or Principal or by an entity in which Representative, Principal or a member of Principal's immediate family has a financial interest.

     o.    Representative agrees to conduct its business in compliance with all applicable laws and regulations pertaining to the marketing and sale of the Products, including but not limited to laws and regulations applicable to the marketing and sale of medical products to healthcare providers.  Representative further agrees to conduct its

business in compliance with Company's and Johnson & Johnson's written policies and procedures, including but not limited to sales policies, inventory policies and procedures, instrument policies and procedures, and policies, procedures and guidelines for health care compliance. Representative further agrees that its sales representatives will be bound by the same Company and Johnson & Johnson written policies and procedures, including but not limited to sales policies and procedures, excess inventory policies and procedures, and policies, procedures and guidelines for health care compliance. Representative shall, upon request, provide the Company with a written certification of compliance with all such laws, regulations, policies, procedures and guidelines. Representative agrees that the Company or its designated representatives shall have the right to audit the business and records of Representative for the purpose of determining compliance with all such laws, regulations, policies, procedures and guidelines and the terms of this Agreement; however, Representative shall have the right to redact from its books and records any information that is not related to the above-referenced compliance issues.

p.      Representative and Principal represent and warrant that each of them is free to enter into this Agreement, and that neither Representative nor Principal is bound by any other contract or agreement with any other party that would prohibit either of them from providing the services to the Company required of them pursuant to this Agreement.

5.      **Representative Reports**.

a.      At the Company's request, Representative shall periodically provide information on its activities within the Territory with respect to the Products. Upon request, Representative shall provide the Company with the names, account coverage, and portion of Representative's overall minimum sales quota assigned to each of its sales representatives for the Products in the Territory.

b.      Thirty (30) days prior to the end of each calendar year quarter, Representative shall prepare and submit to the Company a sales projection of Product sales for each Product line in each sales area in the Territory for the subsequent calendar year quarter, in a format requested by the Company. Prior to execution of this Agreement for the first year and no later than November 1 for any subsequent calendar year that this Agreement is in effect, Representative shall prepare and submit to the Company an annual business plan, containing such information as shall be requested by the Company.

c.      Representative will report to Company any and all complaints from any source with respect to Products and such reports shall be promptly made or, at any rate, within the time required by applicable law and regulations. Representative will maintain a record of all complaints it receives consistent with applicable Company, Johnson & Johnson and governmental guidelines.

### 6.   Confidentiality; Trademarks.

      a.    Representative and Principal shall hold in confidence and agree not to disclose or use for their benefit or the benefit of any third party, and to cause Representative's sales representatives not to disclose to others or use (other than pursuant to the terms of this Agreement), any Confidential Information (as hereinafter defined).  Confidential Information shall mean any information that relates to the business of the Company and its Affiliates (including Johnson & Johnson), including without limitation, customer lists, number and location of sales representatives, names and significance of customers and their employees and representatives, preferences, needs and requirements, purchase histories, and other customer-specific information, business and operations strategies, sales and marketing strategies, sales quotas, sales volumes and strategies, products in development, financial information and commissions structure.  As further provided in Section 11, upon termination of this Agreement for any reason, Representative and Principal agree to return to the Company any property or documents that relate to or that contain Confidential Information that are in Representative's and/or Principal's possession, custody or control, but Representative's and Principal's obligation of confidentiality shall survive termination of this Agreement however arising.

      b.    The Products are marketed under certain trademarks that are and shall remain the sole and exclusive property of the Company.  Representative shall have no interest in or right to use the trademarks, except the right to use them solely in connection with the solicitation of sales of the Products in the Territory pursuant to this Agreement.  Representative shall not use any of the trademarks, including the Company's name or logo, as part of its business name, except that Representative will refer to itself as a Sales Representative for the Company on its stationary and business cards which shall be subject to approval in advance by the Company.

### 7.   Representations and Warranties.

      a.    Warranties on Products are limited exclusively to the express warranties set forth in the Company's price list (if any) and Product labeling and any other warranties of any kind or description, including warranties of merchantability or fitness, express or implied, are disclaimed unless otherwise specifically stated in writing by the Company.  Representative shall limit its statements and claims regarding the Products, including safety and efficacy, to those which are consistent with the Company's labeling and promotional materials for the Products.  In marketing the Products, Representative and its sales representatives shall use only the promotional materials provided by the Company; and neither Representative nor its sales representatives shall develop, create or use any other promotional material or literature for the marketing of Products.

      b.    Representative shall not make any representations and/or warranties for any Products other than provided in Section 7(a).  In the event

Representative subjects itself to liability to a user-customer by failing to conduct its activities in accordance with the preceding sentence, then Representative alone shall be responsible to the user-customer, and Representative shall not have any recourse against the Company for such matter.

### 8.    Commissions.

a.    During the term of this Agreement, the Company shall pay Representative commissions on all sales of Products made by Representative to customers located within the Territory.  Representative shall not receive commissions on sales of co-marketed Products made in the Territory by Affiliates of the Company, unless otherwise agreed to in writing by the Company.  Such commissions shall be paid on the Net Sales Prices (as defined below), established by the Company from time to time, of the Product at the rates set forth on Schedule D-1, as amended from time to time.  Commission rates on New Products will be established by the Company at the launch of each New Product.  The Company shall have the right to change or decrease the commission rates on Schedule D-1 on one hundred eighty (180) days prior written notice to Representative.  The Company shall not reduce the base commission rates on Schedule D-1 by more than one percent (1%) over the term of this Agreement.  The Company agrees that it shall not reduce the base commission rates on Schedule D-1 during the first two (2) years of the term of the Agreement.  "Net Sales Price" means the gross amounts invoiced by the Company to its customers, less returns and allowances actually allowed or made, freight charges, and taxes, if applicable.  Commissions will be earned when the Company ships the Product and receives a customer purchase order number.

b.    All commissions payable hereunder shall accrue monthly based on the Company's monthly reporting period as identified on Schedule D-2 with respect to all Products shipped with purchase order numbers during such month.  Commissions shall be paid on or before the last day of the month following the monthly reporting period during which such commissions accrued.  Commissions payments shall also reflect any appropriate adjustments, whether for current or past commissions or to take into account discounts, returns and allowances actually made by the Company.  Each commissions payment shall be accompanied by a statement showing the commissions accrued and adjustments made for the applicable monthly reporting period and any other information necessary for the proper determination of the amount of commissions payable hereunder.

c.    Representative shall be responsible for, and shall pay, all Federal, State and local income taxes, social security, unemployment compensation, worker's compensation, insurance coverage and other such payments or obligations of Representative's sales representatives and other employees.

d.    The Company shall keep accurate books of account containing information which may be necessary for the purpose of demonstrating the commissions

payable to Representative. Said books shall be available to Representative per year upon reasonable request to the Company in writing for a period of two (2) years following the end of the monthly reporting period to which they pertain, and may be inspected by an independent public accountant selected by and paid for by the Representative for the purpose of verifying the statements of the Company and the commissions paid to Representative.

e.     In the event the Company has not received payment from any customer account upon which a commission was paid within one hundred twenty (120) days from the date of invoice, the Company reserves the right to charge back to Representative the full amount of the commission paid on such sale. Upon eventual payment of the outstanding monies, the Company will pay 100% of the original commission amount.

f.     In the event that Representative fails to comply with the Company's written policies and procedures, the Company reserves the right to set-off and/or reduce the commission amount due to Representative, including set offs for late fees/charges and inventory and instrument related fees/charges.

9.     **Legal Relationship.**

a.     It is understood and agreed that each party to this Agreement is an independent contractor, that nothing in this Agreement or in the contractual relationship between the Company, Representative and Principal shall make Representative or Principal an employee, agent or legal representative of the Company, and neither Representative nor Principal will enjoy any of the benefits of an employee. Neither Representative nor Principal has the right or power to create any obligation or to bind the Company in any manner or thing whatsoever. The Company shall neither have nor exercise any control over the manner in which Representative and Principal perform their duties under this Agreement. Representative and Principal acknowledge that they have paid no franchise fee or other similar consideration for the rights conferred by the Company pursuant to this Agreement, and the Company acknowledges that it has received no such fee or other similar consideration from Representative or Principal.

b.     Representative and Principal agree and acknowledge that all rights and intangibles concerning the Territory belong to the Company and both Representative and  Principal hereby disclaim same for themselves and their successors. Included in these rights and intangibles without limitation are the following:

(i)     Neither Representative nor Principal may enter into any arrangement, agreement or promise with any other party concerning changes to the Company's representative or representation in the Territory. Any decision concerning the appointment of a successor representative(s) in the Territory rests solely with Company management.

(ii)     Under no circumstances shall Representative or Principal develop any rights in the Territory which may be sold, assigned or transferred to another party.  Any and all compensation to Representative from the sale of Company Products in the Territory shall cease upon retirement, or death of Representative or Principal or termination or non-renewal of this Agreement, except as provided herein.

(iii)    If any rights or intangibles become vested in Representative or Principal by law or otherwise, despite acknowledgement and disclaimer, Representative and Principal agree to immediately assign any and all such rights or intangibles to Company upon request or upon termination or expiration of this Agreement.

**10.    Term.**

The term of this Agreement shall expire on December 31, 2004 unless terminated earlier as provided herein.

a.     The Company may at its election and on thirty (30) days' prior written notice take the following actions if any of the following events occur:

i.     The Company may remove one or more Products from Representative's Territory (A) if Representative's total sales performance is less than 85% of overall quota for any two consecutive fiscal quarters and the Territory's overall net sales growth is less than the average net sales growth for all Company U.S. sales territories; or (B)  at the end of any year in which Representative's sales performance is less than 100% of quota for any Product group within the Territory and the Territory's net sales growth in the Product group is less than the average net sales growth in the Product pathology group for all U.S. Company sales territories. Exercise by the Company of the foregoing rights shall not, however, prohibit the Company from terminating this Agreement for failure to achieve required sales performance as set forth in Section 10 a. ii.  By way of example rather than limitation, Product group shall include:  deformity/degenerative; interbody fusion (excluding bone); cervical; trauma/tumor; bone stimulators; and external bracing.  Product groups may be added and/or changed annually during the quota-setting process.

ii.     The Company may terminate the Agreement at the end of any year in which Representative's sales performance is less than 85% of overall quota and the Territory's overall net sales growth is less than the average net sales growth for all Company U.S. sales territories.

b.    This Agreement may be terminated, effective immediately upon written notice, if any of the following events occurs:

i.    By either party if the other party fails to cure a breach in the performance of its obligations under this Agreement within thirty (30) days after the party seeking to terminate this Agreement gave written notice thereof; provided, however, the parties agree that a breach of one or more of the provisions of Section 4 of this Agreement shall constitute a material breach incapable of cure, and shall constitute adequate cause for the immediate termination of this Agreement;

ii.    By either party if the other party becomes bankrupt or enters into any arrangements with its creditors or enters into liquidation, dissolution or receivership; or

iii.    By the Company if Representative, or a major part of its assets or stock, becomes subject to the direction or control of a party other than Principal.

iv.    By the Company if Principal is not actively involved in the day-to-day Company business of Representative or there is any dispute, disagreement or controversy arising between or among the Principals of Representative which may adversely affect Representative's ability to perform its obligations under this Agreement or the operation, management, reputation, business or interest of Representative or the business or interest of the Company or the reputation of the Products.

## 11.    Obligations Upon Termination.

a.    Upon termination of this Agreement, Representative and Principal agree to immediately discontinue making any statements or representations, express or implied, that it is a representative of or otherwise affiliated in any way with the Company or the Products and return to the Company within fifteen (15) days after the effective date of termination, any and all catalogs, price lists, reprints, samples, literature and other sales materials, that relate to the Products or the Company's business, contain any Confidential Information of the Company or have been furnished to Representative and/or Principal by the Company.

b.    Upon termination of this Agreement, Representative and Principal agree to deliver to the Company upon its request, all Products in Representative's and/or Principal's possession, custody or control at the time notice of termination was delivered to Representative and/or Principal under this Agreement, including any consignment, loaner and/or trial and evaluation inventory. The price to be paid by the Company for any such returned Products shall be the price, if any, at which the Products were sold to Representative. Representative and the Company shall pay the freight charge for shipping any such Products to the destination named by the

Company on a 50/50 basis. Representative and Principal agree to assist the Company in the recovery of the Products, and Representative and Principal waive any requirement for the posting of a bond or other surety by the Company in the efforts of the Company to recover its Products.

    c.    If the Company should terminate this Agreement as a result of Representative's and/or Principal's violation of their obligations under Sections 4(e) through (j) hereof, in addition to any other legal or equitable remedies available to the Company, the Company shall have the right in its sole discretion and for no additional consideration to Representative or Principal:

        (i)    to direct Representative and/or Principal to immediately assign to the Company all non-competition or similar agreements described in Section 4(g) above; and

        (ii)    to solicit, contract with, or hire any sales representatives of Representative and/or Principal.

    d.    Upon expiration or termination of this Agreement, Representative and Principal agree that the Company or any agent designated by the Company may in its sole discretion, but shall not be required to, hire or otherwise engage any sales representative of Representative or Principal. Representative and Principal shall transfer to the Company all agreements with such sales representatives containing covenants not to compete and shall release the Company from all claims that Representative and Principal may have related to the Company's hiring or engagement of such sales representatives. Except in the event of a breach by Representative or Principal of any of the obligations under any of Sections 4(e)-(j), in which case the provisions of Sections 4(k) and 11 (c) shall govern and control, the parties shall negotiate in good faith a reasonable fee for the foregoing transfers and releases, and for the services of Representative and Principal in assisting the Company in an orderly transition of the business in the Territory to the Company or a third party designated by the Company and for any exercise of the Company's rights under the first sentence of this Section 11(d).

    e.    For a period of ninety (90) days after such termination, the Company shall have the right to suspend or hold payment of sums of money owed by Company to Representative, and to exercise a right to offset and deduct from such sums the amount of any indebtedness owed by Representative or Principal to Company.

    f.    Provided that there has been no material breach of this Agreement by Principal and/or Representative, termination of this Agreement shall not release either party from the obligation to make payment of amounts due and payable hereunder.

**12.    Governing Law/Limitations Period.**

a.    This Agreement is made under and shall be construed and interpreted in accordance with and governed by the internal laws of the Commonwealth of Massachusetts applicable to contracts made and performed within the Commonwealth of Massachusetts. Subject to the additional provisions set forth in Section 13, any claim and/or action arising out of or relating to this Agreement or the validity, inducement, or breach thereof, must be brought against the Company within one (1) year of the event which caused it.

**13.    Arbitration/Dispute Resolution.**

a.    Any controversy or claim arising out of or relating to this Agreement or the validity, inducement, or breach thereof, shall be settled by arbitration before a panel of three (3) arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then pertaining, except where those rules conflict with this provision, in which case this provision controls. The arbitrators shall be selected from the National Panel of Arbitrators of the AAA. Each party shall select one arbitrator and the two selected arbitrators shall select the third arbitrator. If the two selected arbitrators cannot agree on a third arbitrator then the AAA shall select said arbitrator from the National Panel of Arbitrators. The Parties hereby consent to the jurisdiction of the United States District Court for the District of Massachusetts, Boston Division for the enforcement of this provision and entry of judgment on any award rendered hereunder. Should such court for any reason lack jurisdiction, any court with jurisdiction shall enforce this clause and enter judgment on any award.

b.    Each arbitrator shall be an attorney who has at least 15 years of experience with a law firm or corporate law department of over 25 lawyers or was a judge of a court of general jurisdiction. The arbitration shall be held in Boston, Massachusetts and in rendering the award the arbitrators must apply the substantive law of Massachusetts (except where that law conflicts with this clause), except that the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act. The arbitrators shall be neutral, independent, disinterested, impartial and shall abide by The Code of Ethics for Arbitrators in Commercial Disputes approved by the AAA. Within 45 days of the initiation of arbitration, the Parties shall reach agreement upon and thereafter follow procedures assuring that the arbitration will be concluded and the award rendered within no more than four months from the selection of the arbitrators. Failing such agreement, the AAA will design and the Parties will follow procedures that meet such a time schedule.

c.    Each Party has the right before, or if the arbitrators cannot hear the matter within an acceptable period, during the arbitration, to seek and obtain from the United States District Court for the District of Massachusetts, Boston Division provisional remedies such as attachment, preliminary injunction, replevin, etc., to avoid irreparable harm, maintain the status quo or preserve the subject matter of the

arbitration, and the parties hereby consent to the jurisdiction of such federal district court.

      d.    EACH PARTY HERETO WAIVES ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY. THE ARBITRATOR SHALL NOT AWARD ANY PARTY PUNITIVE, EXEMPLARY, MULTIPLIED OR CONSQUENTIAL DAMAGES, AND EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT TO SEEK SUCH DAMAGES. NO PARTY MAY SEEK OR OBTAIN PREJUDGMENT INTEREST OR ATTORNEYS' FEES OR COSTS.

      **14.**    **Miscellaneous.**

      a.    This Agreement is subject to and expressly conditioned upon the additional provisions set forth in Schedule E and all such provisions shall be deemed to be part of this Agreement for all purposes. This Agreement with all the Schedules hereto, constitute the entire agreement between Representative, Principal and the Company with respect to its subject matter and supersede and replace any and all previous contracts, arrangements, or understandings that may have existed or may exist between the parties. No modifications or amendments shall be binding on either party unless made in writing and signed by both parties. The language of this Agreement shall for all purposes be construed as a whole, according to its fair meaning, not strictly for or against either party, and without regard to the identity or status of any person who drafted all or part of it. Whenever the words "include" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".

      b.    If any provisions of this Agreement are found to be invalid or unenforceable by a court or arbitrator, such provision shall not affect the remainder of this Agreement, which shall remain in full force and effect.

      c.    All notices hereunder shall be in writing and shall be delivered to the other party either personally, by registered mail, return receipt requested, or by overnight courier service. Notice shall be sent to a party at its address hereinabove set forth or at such other address as the other party shall have theretofore designated. Notice shall be deemed duly given when actually received or refused by the addressee.

      d.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns, but shall not be assignable by Representative or Principal without the written consent of the Company. Any rights and obligations accruing hereunder to Representative and/or Principal shall be considered personal and shall not be mortgaged, charged, transferred, delegated, subcontracted or assigned, directly or indirectly, voluntarily, by operation of law or otherwise, either in whole or in part, except upon express prior written approval by Company. Any purported transaction in violation of this Section shall be null and void and of no force or effect. Representative shall not merge into another corporation, sell all or substantially

17

all of its assets or stock, or experience a change of control or other corporate reorganization, except upon express prior written approval by Company. If any of the events referred to in this Section occur without the express prior written approval by Company, such event shall constitute a material breach of this Agreement, and Company shall have the right to terminate the Agreement immediately without notice.

    e.    This Agreement is not effective unless and until signed by all parties hereto.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as an instrument under seal as of the date and year indicated above.

DEPUY ACROMED SALES LIMITED PARTNERSHIP

By: _____
DePuy AcroMed Holding Corporation,
General Partner
Name: _Geu KAMEZA_
Title: _presidy US._

TRINITY SPINE INC.

By: _____
Name: /John Mieyr
Title: _President - Trinity Spine Inc_

The undersigned joins as a party to this Agreement solely as to Sections 4 (c), 4(e)-(k), 4(n), 4(p); 6(a); 9(a)-(b); 11(a)-(e); 12; 13; and 14(a), 14(d) and has executed this Agreement as an instrument under seal as of the date and year first above written.

WITNESS MY HAND AND SEAL THIS 27 DAY OF _November_

PRINCIPAL

By: _____Principal_____
Name: John Mieyr

Schedule A

DePuy AcroMed
Products

- Core Products:

     Def/Deg
     Crossover (launch date to be determined)
     EZ-X (launch date to be determined)
     Frontier (launch date to be determined)
     Isola (Family of Products)
     KASS
     Modular Cross Connector
     Monarch (Family of Products) (launch date to be determined)
     MOSS Miami (Family of Products)
     TiMX
     VSP

     Interbody Fusion
     Bow Tie (launch date to be determined)
     Discovery (launch date to be determined)
     Lumbar I/F Cage
     Stackable Cage
     Surgical Titanium Mesh

     Trauma Tumor
     Kaneda SR
     M-2 Plate
     PROFILE
     University Plate

     Cervical
     DOC
     Peak
     Songer
     Summit (Family of Products)

     External Bracing
     Ace Halo Systems
     Bremer Halo Systems
     Surgical Positioning Board

- Emerging Technologies Products:
     GenSci CollaPro Matrix
     LifeNet VertiGraft, VG1, VG2 & VG3
     Orthologic SpinaLogic Bone Growth Stimulators
     BrainLab VectorVision II & VectorVision Compact

- Current Co-Marketed Products:
     Symphony Platelet Concentration System & Symphony Graft Delivery System

CON

**Schedule B**

Territory

CO

Territory Map
Trinity Spine T572

Territory 572 John Mieyr

**Tom Slott**
**Region Manager**
■ T572 - John Mieyr
■ Acct Based T520 & T572
□ Not Covered by T572

CONFIDENTIAL

11/2/2001

T572C2001.xlsMap

**Account List**
**Trinity Spine T572**

| CUST # | SHIP TO | CUSTOMER NAME | CITY | ST | ZIP | 2000 YEAR END | 2000,Y-T-D, OCT | 2001,Y-T-D, OCT | GROWTH |
|---|---|---|---|---|---|---|---|---|---|
| 100231 | 0 | HANGER PROSTHETICS | FORT WORTH | TX | 76104 | 0 | 0 | 0 | 0 |
| 101653 | 0 | VENCOR HOSPITAL FORT | FORT WORTH | TX | 76104 | 192,320 | 119,205 | 203,355 | 84,150 |
| 102131 | 1 | ALL SAINTS EPISCOPAL | FORT WORTH | TX | 76104 | 31,133 | 25,193 | 15,120 | -10,073 |
| 105394 | 1 | ARLINGTON MEMORIAL H | ARLINGTON | TX | 76012 | 399,911 | 364,841 | 371,510 | 6,669 |
| 105400 | 0 | ARLINGTON ORTHO ASSO | ARLINGTON | TX | 76010 | 0 | 0 | 1,503 | 1,503 |
| 113345 | 0 | BAYLOR MEDICAL CENTE | GRAPEVINE | TX | 76051 | 13,768 | 13,768 | 76,235 | 62,467 |
| 160420 | 0 | MEDICAL CENTER OF AR | ARLINGTON | TX | 76015 | 1,775 | 0 | 17,285 | 17,285 |
| 163535 | 1 | COOK FT WORTH CHILDR | FORT WORTH | TX | 76104 | 0 | 0 | 208,962 | 208,962 |
| 213875 | 0 | HARRIS METHODIST FOR | FORT WORTH | TX | 76101 | 0 | 0 | 0 | 0 |
| 213875 | 1 | HARRIS METHODIST FOR | FORT WORTH | TX | 76104 | 90,623 | 76,513 | 65,300 | -11,213 |
| 213876 | 1 | HARRIS METHODIST SOU | FORT WORTH | TX | 76132 | 0 | 0 | 0 | 0 |
| 213911 | 1 | HARRIS METHODIST HEB | BEDFORD | TX | 76021 | 0 | 0 | 4,155 | 4,155 |
| 217675 | 0 | HILLCREST BAPTIST ME | WACO | TX | 76708 | 0 | 0 | 0 | 0 |
| 217675 | 1 | HILLCREST BAPTIST ME | WACO | TX | 76708 | 14,295 | 10,955 | 22,670 | 11,715 |
| 222373 | 3 | HUGULEY MEMORIAL MED | FORT WORTH | TX | 76134 | 503,650 | 415,665 | 500,451 | 84,786 |
| 283099 | 0 | NORTH HILLS HOSPITAL | COPPELL | TX | 75019 | 440,616 | 393,466 | 0 | -393,466 |
| 283099 | 1 | NORTH HILLS HOSPITAL | NORTH RICHLAND HILLS | TX | 76118 | 15,960 | 0 | 425,595 | 425,595 |
| 297341 | 0 | PLAZA MEDICAL CENTER | COPPELL | TX | 75019 | 0 | 0 | 0 | 0 |
| 297341 | 2 | PLAZA MEDICAL CENTER | FORT WORTH | TX | 76104 | 12,720 | 2,914 | 13,979 | 11,065 |
| 299225 | 0 | PROVIDENCE HEALTH CE | WACO | TX | 76702 | 0 | 0 | 0 | 0 |
| 299225 | 1 | PROVIDENCE HEALTH CE | WACO | TX | 76712 | 8,485 | 8,485 | 0 | -8,485 |
| 331953 | 0 | JPS HEALTH NETWORK | FORT WORTH | TX | 76104 | 0 | 0 | 0 | 0 |
| 331953 | 1 | JPS HEALTH NETWORK | FORT WORTH | TX | 76104 | 44,585 | 19,245 | 17,165 | -2,080 |
| 339713 | 0 | SURGICAL & DIAGNOSTI | HURST | TX | 76053 | 0 | 0 | 1,865 | 1,865 |
| 392720 | 0 | HANGER ORTHOPEDIC | FORT WORTH | TX | 76104 | 0 | 0 | 395 | 395 |
| 403155 | 0 | PROVIDENCE HEALTH CE | WACO | TX | 76712 | 515 | 515 | 530 | 15 |
| 413450 | 114 | HANGER ORTHOPEDIC | HURST | TX | 76053 | 0 | 0 | 0 | 0 |
| 501455 | 0 | SOUTHWEST MED INC | FORT WORTH | TX | 76117 | 0 | 0 | 0 | 0 |
| 508929 | 0 | ALL SAINTS EPISCOPAL | FORT WORTH | TX | 76104 | 0 | 0 | 0 | 0 |
| 510612 | 0 | PROVIDENCE HEALTH CE | WACO | TX | 76712 | 0 | 0 | 0 | 0 |

CONFIDENTIAL

## Schedule C

Quotas

To be provided.



## **Schedule D-1**

### **DePuy AcroMed**
### **Sales Representative**
### **2002 Commission Plan**

- DePuy AcroMed Core Implants and Instruments 18% to prior year, 25% over prior year

- GenSci                                     14%

- LifeNet                                    14%

- Symphony                                   12%

- Orthologic                                 14%

- BrainLab                                   2.5%



**Schedule D-2**

**Monthly Reporting Period**

**2002 UNIVERSAL CALENDAR**

| | M | T | W | T | F | S | S | | | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAN** | 31 | | | | | | | | **JUL** | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| (4 Weeks) | | 1 | 2 | 3 | 4 | 5 | 6 | | (4 Weeks) | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27 | | | | | | | | | |
| **FEB** | 28 | 29 | 30 | 31 | | | | | **AUG** | 29 | 30 | 31 | | | | |
| (4 Weeks) | | | | | 1 | 2 | 3 | | (4 Weeks) | | | | 1 | 2 | 3 | 4 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 | | | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 | | | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| **MAR** | 25 | 26 | 27 | 28 | | | | | **SEP** | 26 | 27 | 28 | 29 | 30 | 31 | |
| (5 Weeks) | | | | | 1 | 2 | 3 | | (5 Weeks) | | | | | | | 1 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 | | | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 | | | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 25 | 26 | 27 | 28 | 29 | 30 | 31 | | | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| **APR** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | | **OCT** | 30 | | | | | | |
| (4 Weeks) | 8 | 9 | 10 | 11 | 12 | 13 | 14 | | (4 Weeks) | | 1 | 2 | 3 | 4 | 5 | 6 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | | | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28 | | | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | | | | | | | | | | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| **MAY** | 29 | 30 | | | | | | | **NOV** | 28 | 29 | 30 | 31 | | | |
| (4 Weeks) | | | 1 | 2 | 3 | 4 | 5 | | (4 Weeks) | | | | | 1 | 2 | 3 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 | | | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | | | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26 | | | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **JUN** | 27 | 28 | 29 | 30 | 31 | | | | **DEC** | 25 | 26 | 27 | 28 | 29 | 30 | |
| (5 Weeks) | | | | | | 1 | 2 | | (5 Weeks) | | | | | | | 1 |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 24 | 25 | 26 | 27 | 28 | 29 | 30 | | | 23 | 24 | 25 | 26 | 27 | 28 | 29 |

**2003 UNIVERSAL CALENDAR**

| | M | T | W | T | F | S | S | | | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAN** | 30 | 31 | | | | | | **JUL** | 30 | | | | | | | |
| (4 Weeks) | | | 1 | 2 | 3 | 4 | 5 | (4 Weeks) | | 1 | 2 | 3 | 4 | 5 | 6 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 | | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26 | | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| **FEB** | 27 | 28 | 29 | 30 | 31 | | | **AUG** | 28 | 29 | 30 | 31 | | | |
| (4 Weeks) | | | | | | 1 | 2 | (4 Weeks) | | | | | 1 | 2 | 3 |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **MAR** | 24 | 25 | 26 | 27 | 28 | | | **SEP** | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| (5 Weeks) | | | | | | 1 | 2 | (5 Weeks) | | | | | | | |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 24 | 25 | 26 | 27 | 28 | 29 | 30 | | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| **APR** | 31 | | | | | | | **OCT** | 29 | 30 | | | | | |
| (4 Weeks) | | 1 | 2 | 3 | 4 | 5 | 6 | (4 Weeks) | | | 1 | 2 | 3 | 4 | 5 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27 | | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| **MAY** | 28 | 29 | 30 | | | | | **NOV** | 27 | 28 | 29 | 30 | 31 | | |
| (4 Weeks) | | | | 1 | 2 | 3 | 4 | (4 Weeks) | | | | | | 1 | 2 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| **JUN** | 26 | 27 | 28 | 29 | 30 | 31 | | **DEC** | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| (5 Weeks) | | | | | | | 1 | (5 Weeks) | | | | | | | |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29 | | 22 | 23 | 24 | 25 | 26 | 27 | 28 |

## 2004 UNIVERSAL CALENDAR

| | M | T | W | T | F | S | S | | | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAN** (4 Weeks) | 29 | 30 | 31 | | | | | **JUL** (4 Weeks) | | 28 | 29 | 30 | | | | |
| | | | | 1 | 2 | 3 | 4 | | | | | | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| **FEB** (4 Weeks) | 26 | 27 | 28 | 29 | 30 | 31 | | **AUG** (4 Weeks) | | 26 | 27 | 28 | 29 | 30 | 31 | |
| | | | | | | | 1 | | | | | | | | | 1 |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | | | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| **MAR** (5 Weeks) | 23 | 24 | 25 | 26 | 27 | 28 | 29 | **SEP** (5 Weeks) | | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| | | | | | | | | | | 30 | 31 | | | | | |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | | | | | 1 | 2 | 3 | 4 | 5 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 | | | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28 | | | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| **APR** (4 Weeks) | 29 | 30 | 31 | | | | | **OCT** (4 Weeks) | | 27 | 28 | 29 | 30 | | | |
| | | | | 1 | 2 | 3 | 4 | | | | | | | 1 | 2 | 3 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **MAY** (4 Weeks) | 26 | 27 | 28 | 29 | 30 | | | **NOV** (4 Weeks) | | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| | | | | | | 1 | 2 | | | | | | | | | |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| **JUN** (5 Weeks) | 24 | 25 | 26 | 27 | 28 | 29 | 30 | **DEC** (6 Weeks) | | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| | 31 | | | | | | | | | 29 | 30 | | | | | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | | | | | 1 | 2 | 3 | 4 | 5 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27 | | | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| | | | | | | | | | | 27 | 28 | 29 | 30 | 31 | | |
| | | | | | | | | | | | | | | | 1 | 2 |

**Schedule E**

Other Products

None

CONFIₗ



325 Paramount Drive
Raynham, MA 02767-0350   U.S.A.

Toll Free Customer Service: +1 (800) 227 6633
Toll Free Receptionist:      +1 (800) 365 6633
Direct Receptionist:         +1 (508) 880 8100
Fax:                         +1 (508) 828 3785

BY FEDERAL EXPRESS

May 9, 2002

Mr. John Mieyr
Trinity Spine Inc.
2404 Woodfield Way
Bedford, TX  76021

Re:    Amendment to Sales Representative Agreement

Dear John:

Enclosed for your files please find one fully-executed copy of the Amendment to Sales
Representative Agreement among you, Trinity Spine, and DePuy AcroMed Sales
Limited Partnership effective February 1, 2002.

Please contact me if you have any questions.  I can be reached at (508) 880-8053.

Very truly yours,

Traci L. Blais
Paralegal

Enclosure

cc:    Cathy Smith
       Jack Carlson
       Priscilla Milner

Amendment to
Sales Representative Agreement

This Amendment to Distributor Agreement is entered into effective February 1, 2002 by and between Trinity Spine Inc. ("Representative"), John Mieyr ("Principal"), and DePuy AcroMed Sales Limited Partnership (the "Company").

WHEREAS, Representative, Principal and the Company are parties to a Sales Representative Agreement, effective January 1, 2002 (the "Agreement"), under which the Company appointed Representative and Principal as the representative for the Company's products in the sales territory identified therein;

WHEREAS, The Company, Representative and Principal have mutually agreed to redefine Representative's sales territory to remove the following accounts from Representative's Territory: Account No. 217675 Hillcrest Baptist, Account No. 299225 Providence Health Center, Account No. 403155 Providence Health Center, and Account No. 510612 Providence Health Center (collectively referred to as the "Removed Territory"). Representative's Territory has been redefined on the map and account list attached hereto as Amended Schedule B.

NOW THEREFORE, in consideration of the mutual covenants and for good and valuable consideration set forth in this Amendment, the parties hereby agree as follows:

1.      Representative and Principal agree to the deletion of the Removed Territory from Schedule B of the Agreement. In addition, Representative and Principal agree to the substitution of Amended Schedule B attached hereto as Representative's current Sales Territory.

2.      Except as provided herein, all provisions and terms of the Agreement remain in force and unchanged.

DEPUY ACROMED SALES LIMITED PARTNERSHIP

By: _____
DePuy AcroMed Holding Corporation, General Partner
Name: _____
Title: _____

TRINITY SPINE Inc.

By: _____
Name: John Mieyr
Title: President

PRINCIPAL

By: _____
John Mieyr, Principal



CONFIDENTIAL

**Account List**
**Trinity Spine T572**

CONFIDENTIAL

| TER | TER NAME | CUST # | SHIP TO | CUST NAME | CITY | ST | ZIP | 2001 YEAR END SALES | 2001 Y-T-D FEB. | 2002 Y-T-D FEB SALES |
|---|---|---|---|---|---|---|---|---|---|---|
| 572 | JOHN MIEYR | 105394 | 1 | ARLINGTON MEMORIAL H | ARLINGTON | TX | 76012 | 443,585 | 62,030 | 112,505 |
| 572 | JOHN MIEYR | 105400 | 0 | ARLINGTON ORTHO ASSO | ARLINGTON | TX | 76010 | 1,503 | 0 | 0 |
| 572 | JOHN MIEYR | 160420 | 0 | MEDICAL CENTER OF AR | ARLINGTON | TX | 76015 | 36,825 | 0 | 17,075 |
| 572 | JOHN MIEYR | 213911 | 1 | HARRIS METHODIST HEB | BEDFORD | TX | 76021 | 4,155 | 0 | 0 |
| 572 | JOHN MIEYR | 101653 | 0 | VENCOR HOSPITAL FORT | FORT WORTH | TX | 76104 | 244,295 | 57,130 | 6,990 |
| 572 | JOHN MIEYR | 102131 | 1 | ALL SAINT'S EPISCOPAL | FORT WORTH | TX | 76104 | 15,120 | 0 | 12,345 |
| 572 | JOHN MIEYR | 163535 | 1 | COOK FT WORTH CHILDR | FORT WORTH | TX | 76104 | 245,282 | 0 | 78,110 |
| 572 | JOHN MIEYR | 213875 | 1 | HARRIS METHODIST FOR | FORT WORTH | TX | 76104 | 78,545 | 0 | 23,135 |
| 572 | JOHN MIEYR | 213876 | 1 | HARRIS METHODIST SOU | FORT WORTH | TX | 76132 | 0 | 4,415 | 0 |
| 572 | JOHN MIEYR | 222373 | 3 | HUGULEY MEMORIAL MED | FORT WORTH | TX | 76134 | 0 | 4,415 | 0 |
| 572 | JOHN MIEYR | 297341 | 2 | PLAZA MEDICAL CENTER | FORT WORTH | TX | 76104 | 584,208 | 74,170 | 78,248 |
| 572 | JOHN MIEYR | 331953 | 1 | JPS HEALTH NETWORK | FORT WORTH | TX | 76104 | 13,979 | 0 | 0 |
| 572 | JOHN MIEYR | 382720 | 0 | HANGER ORTHOPEDIC | FORT WORTH | TX | 76104 | 21,481 | 17,165 | 0 |
| 572 | JOHN MIEYR | 501455 | 0 | SOUTHWEST MED INC | FORT WORTH | TX | 76117 | 395 | 395 | 0 |
| 572 | JOHN MIEYR | 113345 | 0 | BAYLOR MEDICAL CENTE | GRAPEVINE | TX | 76051 | 0 | 0 | 0 |
| 572 | JOHN MIEYR | 339713 | 0 | SURGICAL & DIAGNOSTI | HURST | TX | 76053 | 103,655 | 22,170 | 0 |
| 572 | JOHN MIEYR | 413450 | 114 | HANGER ORTHOPEDIC | HURST | TX | 76053 | 1,865 | 0 | 1,967 |
| 572 | JOHN MIEYR | 283099 | 1 | NORTH HILLS HOSPITAL | NORTH RICHLAND HILLS | TX | 76118 | 0 | 0 | 0 |
| 572 | JOHN MIEYR | 191875 | 0 | OSTEOPATHIC MEDICAL | FORT WORTH | TX | 76107 | 480,515 | 61,320 | 147,959 |
| 572 | JOHN MIEYR | 191875 | 1 | OSTEOPATHIC MEDICAL | FORT WORTH | TX | 76107 | 0 | 0 | 0 |
| 572 | JOHN MIEYR | 191875 | 1 | OSTEOPATHIC MEDICAL | FORT WORTH | TX | 76107 | 42,900 | 0 | 0 |

T572T2002.xlsCustomer list

Amendment to
Sales Representative Agreement

This Amendment to Sales Representative Agreement shall become effective upon the last date of signature of this Amendment by Trinity Spine Inc. ("Representative"), John Mieyr ("Principal"), and DePuy AcroMed Sales Limited Partnership (the "Company").

WHEREAS, Representative, Principal and the Company are parties to a Sales Representative Agreement, effective January 1, 2002 (the "Agreement"), under which the Company appointed Representative and Principal as the representative for the Company's Products, as defined in the Agreement, in the Territory identified therein;

WHEREAS, the Company, Representative and Principal have mutually agreed to redefine the arrangement under which Representative will sell the Company's Emerging Technologies Products.

WHEREAS, the Company, Representative and Principal have mutually agreed to include additional products on Representative's Product List.

NOW THEREFORE, in consideration of the mutual covenants and for good and valuable consideration set forth in this Amendment, the parties hereby agree as follows:

1.    The last sentence of Section 1, Subsection a of the Agreement is hereby deleted in its entirety and replaced with the following language:

> "Representative's representation of the Core Products identified on <u>Schedule A</u> shall be on an exclusive basis.  Representative's representation of the LifeNet Vertigraft and BrainLab Emerging Technologies Products identified on Schedule A in the Territory shall be on an exclusive basis.   Representative's representation of the Orthologic SpinaLogic Bone Growth Stimulators Emerging Technologies Product identified on Schedule A in the Territory shall be on a non-exclusive basis.  "

2.    Company hereby appoints Representative as the non-exclusive representative for the Healos, Cellect, Cellect DBM, Optium, LifeNet I/C Graft Chambers, Conduit TCP, and Bone Graft Procedure Kits new products ("New Products") identified on <u>Supplemental Schedule A</u> attached hereto.

3.    Representative's Commission Plan has been supplemented to include commission rates for the sale of the New Product as indicated on <u>Amended Schedule D</u> attached hereto.

4.    Section 10 a. iii. is added to the Agreement as follows:

10 a. iii.    The Company may remove the New Products from Representative's Territory or remove one or more sales areas, including by way of example rather than limitation, accounts, cities, counties or other portions from Representative's Territory, or redefine Representative's Territory (A) if Representative's sales performance in the Territory with regard to the New Products is less than 85% of quota for the New Products for any two consecutive fiscal quarters; or (B)  at the end of any year in which Representative's sales performance with regard to

the New Products is less than 100% of quota for the New Products within the Territory. Exercise by the Company of the foregoing rights shall not, however, prohibit the Company from terminating this Agreement for failure to achieve required sales performance as set forth in Section 10 a. ii.

6.    Except as provided herein, all provisions and terms of the Agreement remain in force and unchanged.

DEPUY ACROMED SALES LIMITED PARTNERSHIP

By: _____ 6/3/03
DePuy AcroMed Holding Corporation, General Partner
Name:
Title:

TRINITY SPINE INC.

By: _____
Name: John Mieyr
Title: Distributor Principal

PRINCIPAL

By: _____
John Mieyr, Principal

## Supplemental Schedule A

Co-Marketed/Non-Exclusive Products:

Healos

| | | |
|---|---|---|
| Healos II 2 strip | 2761-60-010 | 6100A |
| Healos II 1 strip | 2761-60-005 | 6101A |

Cellect

| | |
|---|---|
| Concentrator | 2761-25-001 |
| Empty Cartridge | 2761-26-003 |
| Healos Cartridge | 2761-26-005 |
| 3 Hole Needle MiniKit | 2761-24-002 |
| 1 Hole Needle MiniKit | 2761-24-001 |
| 3 Hole Full Aspiration Kit | 2761-23-001 |
| 1 Hole Full Aspiration Kit | 2761-21-001 |

Cellect DBM

| | |
|---|---|
| DBM Cartridge | CEL 25 |

Optium

LifeNet I/C Graft Chambers

Conduit TCP

Bone Graft Procedure Kits

## Amended Schedule D-1

### DePuy AcroMed
### Sales Representative
### 2003 Commission Plan

- DePuy AcroMed Core Implants and Instruments 18% to prior year, 25% over prior year

- LifeNet VertiGraft                                  14%

- LifeNet I/C Graft Chambers                          3%

- Symphony Platelet Concentration System             3%

- Symphony II Platelet Concentration System          3%

- Symphony Graft Delivery System                     3%

- Conduit TCP                                        3%

- Bone Graft Procedure Kits                          3%

- Orthologic                                         14%

- BrainLab                                           2.5%

- Healos                                             4%

- Cellect                                            4%

- Cellect DBM                                        3%

- Optium                                             3%