# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-CV-10270-RGS

| | |
|---|---|
| DEPUY SPINE HOLDING CORPORATION, INC., As It Is General Partner Of DEPUY SPINE SALES LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>JOHN MIEYR and TRINITY SPINE, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED COMPLAINT

### Parties

1.    Plaintiff DePuy Spine Holding Corporation, Inc., a Massachusetts corporation with a principal place of business in Raynham, Massachusetts, is named in its capacity as General Partner of DePuy Spine Sales Limited Partnership ("DePuy Partnership"), a Massachusetts Limited Partnership with a principal place of business in Raynham, Massachusetts.

2.    Upon information and belief, defendant Trinity Spine, Inc. ("Trinity") is a Texas corporation with a principal place of business in Cooleyville, Texas.

3.    Upon information and belief, defendant John Mieyr ("Mieyr") is an individual residing in Cooleyville, Texas.

## Jurisdiction and Venue

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

5.    This Court also has jurisdiction, and venue is proper in this District, pursuant to 28 U.S.C. § 1341 and the consent to jurisdiction and forum selection provisions contained in § 13(a) and (c) of the Sales Representative Agreement between DePuy Partnership and the Defendants.

## Facts Common To All Counts

6.    On or about March 29, 2004, DePuy Partnership entered into a Sales Representative Agreement (the "Agreement") with Trinity and Mieyr.  A true and complete copy of the Agreement is attached hereto as Exhibit A.  Pursuant to the Agreement, Mieyr and Trinity acted as sales representatives for DePuy Partnership in Tarrant County, Texas, distributing the spinal implant products of DePuy Spine, Inc. ("DePuy Spine"), the limited partner of DePuy Partnership.

7.    DePuy Partnership distributes DePuy Spine's spinal implant products, which include so-called interbody products such as cages, plates, and rods, as well as the highly specialized screws used to affix these interbody objects to human bone.  Generally, these devices maintain distance between vertebrae in the human spine.

8.    The spinal implant business is highly competitive.  DePuy Partnership and DePuy Spine devote substantial resources to establishing and maintaining good will with physicians, hospitals, and other health care providers throughout the United States.

9.    Pursuant to the Agreement, DePuy Partnership paid commissions to Trinity on all specified DePuy Spine products sold within Tarrant County until December 31, 2004.

10.    By its terms, the Agreement expired on December 31, 2004. Agreement, § 10.

11.    Trinity and Mieyr covenanted not to sell, and not to accept compensation from anyone providing or selling, competitive products in Tarrant County while the Agreement was in effect and for a six-month period following the Agreement's termination. Agreement, §§ 4(f) (as amended by Schedule E to the Agreement) and 4(h).

12.    Before and during the six months following the termination of the Agreement pursuant to its terms, Trinity and Mieyr violated their obligations by selling competitive spinal implant products in Tarrant County, Texas. Among other things, during this time Trinity and Mieyr sold competitive screws, interbody devices, and allograft bone within Tarrant County.

13.    The Agreement contains an arbitration clause mandating arbitration of disputes arising under the Agreement pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). Agreement, § 13. The Agreement further provides that Massachusetts substantive law shall apply to all disputes involving the Agreement and that the arbitration shall be held in Boston, Massachusetts. Agreement, §§ 12 and 13(c). The Agreement also authorizes the parties to seek provisional remedies from this Court or the Superior Court of Suffolk County, Massachusetts. Agreement, § 13(c).

14.    The Agreement provides that any arbitration must be completed and an award issued within four months from the date the arbitrators are selected. Agreement §13(b).

15.    On February 10, 2005, DePuy Spine filed its complaint and moved for the issuance of a temporary restraining order and preliminary injunction. On that date, the Court issued a temporary restraining order. On February 22, 2005, after a hearing, the Court issued

a preliminary injunction enjoining Mieyr from selling spinal implant products in Tarrant County Texas until July 30, 2005, with the exception of four identified physicians. As to sales to those physicians, the Court stated that DePuy Spine could seek damages.

16.    On February 22, 2005, pursuant to the Agreement, DePuy Spine initiated an arbitration with the AAA. Mieyr filed an answer and counterclaim, participated in the selection of the arbitrators, participated in scheduling conferences, propounded and responded to discovery in accordance with the schedule established by the arbitrators, petitioned the arbitrators to modify the discovery schedule, and agreed to a Hearing date of August 16-18, 2005 in Boston.

17.    The AAA appointed the third arbitrator on April 29, 2005. Pursuant to §13(b) of the Agreement, the arbitration had to be completed and an award entered by August 29, 2005.

18.    On July 18, 2005, the day before the scheduled deposition of John Mieyr, Mieyr stated that he was unavailable for his deposition and petitioned the arbitrators for a continuation of the time within which his deposition could be completed.

19.    A few days later, Mieyr stated that he would not pay the AAA's fees for conducting the arbitration.

20.    In an August 1, 2005 order, the AAA suspended the arbitration and stated that the arbitration would be dismissed unless Mieyr paid the required fees within 30 days. Mieyr failed to do so. Thererafter, the AAA *sua sponte* granted Mieyr until October 4, 2005 to pay the fees. Mieyr still failed to do so and the AAA terminated the arbitration.

### Count I
### (Breach of Contract – Prohibited Sales)

21.    DePuy Partnership reavers and incorporates herein paragraphs 1-20 above.

22.    Trinity's and Mieyr's above-described sales of competitive products while the Agreement was in effect and during the six-month period following the Agreement's termination constitute a breach of the Agreement.

23.    As a result of Trinity's and Mieyr's actions, DePuy Partnership has suffered damages in an amount greater than $75,000.

**Count II**
**(Misappropriation of Trade Secrets/Confidential Information)**

24.    DePuy Partnership reavers and incorporates herein paragraphs 1-23 above.

25.    Trinity and Mieyr acknowledged in the Agreement that they received confidential information and other trade-secret information from DePuy Partnership, including, among other things, customer lists; number and location of sales representatives; names and significance of customers and their employees and representatives; preferences, needs, requirements, purchase histories, and other customer-specific information; business and operations strategies; and sales and marketing strategies. Agreement, §§ 4(f) & 6(a).

26.    Trinity and Mieyr have misappropriated, and continue to misappropriate, trade-secret and other confidential information from DePuy Partnership for their own benefits. As a result of Trinity's and Mieyr's actions, DePuy Partnership has suffered damages in excess of $75,000.

27.    As a result of Trinity's and Mieyr's actions, DePuy Partnership has suffered damages in excess of $75,000.

**Count III**

### (Unfair Competition)

28.    DePuy Partnership reavers and incorporates herein paragraphs 1-27 above.

29.    By taking the actions referenced above, Trinity and Mieyr have engaged in, and continue to engage in, unfair competition.

30.    As a result of Trinity's and Mieyr's actions, DePuy Partnership has suffered damages in excess of $75,000.

### Count IV
### (Breach of Contract – Agreement to Arbitrate)

31.    DePuy Partnership reavers and incorporates herein paragraphs 1-30 above.

32.    By failing to complete the arbitration on the terms and within the time specified in the Agreement, Trinity and Mieyr breached their contractual obligations.

33.    As a result of Trinity's and Mieyr's actions, DePuy Partnership has suffered damages in excess of $75,000.

### Count V
### (Violation of G.L. c. 93A)

34.    DePuy Partnership reavers and incorporates herein paragraphs 1-33 above.

35.    G.L. c. 93A prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce.

36.    Trinity and Mieyr have engaged in trade or commerce within the meaning of G.L. c. 93A.

37.    As set forth above, Trinity and Mieyr willfully and knowingly engaged in unfair or deceptive acts or practices by subverting the arbitration in order to force DePuy Partnership to compromise its claims.

38.    Trinity's and Mieyr's unfair and deceptive acts occurred primarily and substantially in Massachusetts.

39.    As a result of Trinity's and Mieyr's unfair or deceptive acts or practices, DePuy Partnership has suffered damages in excess of $75,000.

### Prayer for Relief

WHEREFORE, DePuy Partnership prays that the Court:

A.    Enter judgment on Count I in DePuy Partnership's favor in an amount to be determined at trial;

B.    Enter judgment on Count II in DePuy Partnership's favor in an amount to be determined at trial;

C.    Enter judgment on Count III in DePuy Partnership's favor in an amount to be determined at trial;

D.    Enter judgment on Count IV in DePuy Partnership's favor in an amount to be determined at trial;

E.    Enter judgment on Count V DePuy Partnership's favor in an amount to be determined at trial, trebled, plus attorneys' fees and costs; and

F.    Provide such other and further relief as the Court deems appropriate in the circumstances.

DEPUY HOLDING CORPORATION, INC.
As It Is General Partner of DEPUY SPINE
SALES LIMITED PARTNERSHIP,

By Its Attorneys,

Joseph F. Shea (BBO #555473)
Eric P. Magnuson (BBO #643805)
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-9628
(617) 439-2000

Dated:  October 27, 2005

## CERTIFICATE OF SERVICE

I hereby certify that in addition to the notice provided by e-filing this document, on October 27, 2005 I served a copy of this document by overnight mail upon Robbyn P. Wysocki, McCue Wysocki, P.C., Suite 250, 14135 Midway Road, Dallas, TX 75001.

Joseph F. Shea

1402186.4

# EXHIBIT A

## SALES REPRESENTATIVE AGREEMENT

THIS AGREEMENT is effective as of the 26th day of January 2004 (the "Effective Date"), and is among DePuy Spine Sales Limited Partnership, a Massachusetts limited partnership, having a place of business at 325 Paramount Drive, Raynham, Massachusetts 02767, (the "Company" ), and , a Trinity Spine Inc., a Texas corporation, having a place of business at 4406 Shadywood Lane, Cooleyville, Texas  76034, ("Representative").

### RECITALS

1.    The Company is engaged in the business of designing, manufacturing and selling devices and instruments for the treatment of spinal and/or neurologic disorders.

2.    Representative is engaged in soliciting sales of medical devices in the Territory (as hereinafter defined).  John Mieyr is the owner of all or substantially all of the outstanding stock of Representative and is an active participant in the business of Representative ("Principal").

3.    The Company desires to engage Representative and Principal to sell the Company's products and Representative and Principal desire to do so, all upon the terms and conditions as hereinafter set forth.  The parties desire to terminate the Sales Representative Agreement dated  January 1, 2002 as of the Effective Date of this Agreement and replace the Sales Representative Agreement dated January 1, 2002 with this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, upon the terms and subject to the conditions contained herein, hereby agree as follows:

1.    **Appointment and Territory.**

a.    Subject to the provisions set forth in this Agreement, the Company appoints Representative and Representative accepts appointment as the Company's Representative to market all those Company products identified on Schedule A ("Products") to customers in the sales territory identified on Schedule B (the "Territory"). Representative's representation of the Products identified on Schedule A-1 shall be represented in the Territory on an exclusive basis.  The Products identified on Schedule A-2 shall be represented in the Territory by Representative on a non-exclusive basis.

b.    From time to time during the term of this Agreement, the Company may, but shall not be required to, offer new products for sale in the Territory ("New Products").  With regard to the marketing of New Products in the Territory, Company shall have the right, in its sole discretion, to:

(i)    on thirty (30) days prior written notice to Representative, require Representative to market and solicit sales of New Products on an exclusive basis in which case such New Product shall be deemed to be added to Schedule A hereof;

(ii)   on thirty (30) days prior written notice to Representative, require Representative to jointly introduce and market such New Products in conjunction with the efforts of the Company or its DePuy and/or Johnson & Johnson Affiliates (as defined below); or

(iii)  introduce and market such New Products on the Company's own behalf or through its DePuy and/or Johnson & Johnson Affiliates (as defined below) on an exclusive basis, in which event such New Products shall not be made available to Representative.

The Company shall have the sole and exclusive right to establish the terms under which New Products will be marketed and to make all decisions regarding such marketing arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Notwithstanding anything to the contrary contained in this Agreement, Company shall not be liable to make any payment to Representative with regard to a New Product if Company introduces and markets such New Product pursuant to Section 1(b)(iii) hereof. All of Representative's obligations regarding Products shall also apply to any New Products which are added to this Agreement.

c.     Representative acknowledges that the Company shall have the right to discontinue the sale in the U.S. of any Product identified on Schedule A-1 or Schedule A-2 or any New Product added during the term of this Agreement at any time. The Company shall use reasonable efforts to provide advance notice of the discontinuance of any Product or New Product. If the Company discontinues the sale of a Product or New Product as provided herein, such Product or New Product shall be removed from this Agreement.

d.     The Company shall have the right to enter into Co-Marketing Arrangements (as defined below) with its DePuy and/or Johnson & Johnson Affiliates (as defined below) related to the marketing, representation and sale of New Products. As used herein, "Co-Marketing Arrangement" means that New Products subject to the arrangement will be marketed, represented and sold in the Territory through the sales forces of the Company and its DePuy and/or Johnson & Johnson Affiliates. The Company reserves the sole right to establish the terms under which New Products will be co-marketed and to make all decisions regarding such Co-Marketing Arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Products currently subject to a Co-Marketing Arrangement are identified on Schedule A-2. As used herein, the term "Affiliates" means any person, corporation, partnership or business organization which, directly or indirectly, controls, is controlled by or is under common control with, the Company.

3

## 2.   **Sales Quotas**.

a.     On an annual basis, after taking into account Representative's sales projections and other information provided to the Company under Section 5(b) hereof, the Company will establish Representative minimum sales quotas for each Product line for each sales area located within Representative's Territory (the "Quotas") as set forth in <u>Schedule C</u>.

b.     Quotas for any New Products offered to Representative and Principal will be established by the Company at or near the launch of each New Product.

## 3.   **Obligations of the Company**.

a.     The Company shall provide Representative with such sales literature, brochures, price lists, samples, and other related materials as the Company deems necessary; provided, however, the Company may charge Representative, and Representative shall pay, a reasonable charge for such materials.

b.     The Company shall conduct periodic sales training programs and provide technical and other information regarding the Products

c.     The Company shall accept and fill customer orders for Products according to its credit and ordering policies and procedures in effect from time to time, provided, however, that the Company may accept or reject any order, in whole or in part, in its sole discretion.

d.     Subject to all of the conditions set forth in this Section 3(d), the Company shall defend, indemnify and hold harmless Representative and its employees and agents, from and against any and all causes of action, claims, suits, proceedings, damages and judgments by third parties (collectively, "Claims"), to the extent that such Claims are based solely on an alleged manufacturing or design defect in a Product sold by Representative.  In the event that any Claim is asserted against Representative, Representative shall provide written notice to the Company within ten (10) days after learning of such Claim.  The Company will have the right to select counsel, and conduct and control at its expense the defense against and settlement of such Claim in its own name, or if necessary in Representative's name and the Company's defense counsel may act on Representative's behalf regardless of whether such Claim has also been asserted against the Company.  Representative will cooperate with and make available to the Company such assistance and information as may be reasonably requested by the Company, and Representative will have the right to participate in the defense, including representation by independent counsel, at Representative's expense, provided that under such circumstances, Representative will have the right to compromise and settle the Claim only with the prior written consent of the Company.  If, in connection with any Claim it is determined by the Company that Representative acted beyond its authority, or failed to comply with any of its obligations under Sections 4 and 7 of this Agreement, the Company shall be immediately relieved of its obligations to Representative under this Section 3(d).

4

## 4. Obligations of Representative and Principal.

a. Representative agrees that its sales representatives will devote their best efforts and sufficient working time to soliciting sales of each Product line set forth in Schedule A-1 and Schedule A-2 to all applicable accounts and customers in each sales area located in the Territory, perform customary marketing support and service activities for such customers, and meet or exceed the sales Quotas established pursuant to Section 2 hereof for each Product line for each sales area located within Representative's Territory.

b. Representative shall maintain an appropriate place of business in the Territory and an appropriate number of qualified, trained and competent sales representatives, each with the level of expertise necessary to properly solicit sales of Products and to perform support and service activities for customers in the Territory. Representative shall recruit and hire qualified sales representatives based upon a hiring profile provided by the Company. The Company may elect to interview candidates for sales representative positions and to approve or disapprove such candidates based upon the hiring profile. The Company shall have the right to approve the number of sales representatives engaged by Representative, how such sales representatives are trained and deployed, and the sales areas and accounts located within the Territory assigned to such sales representatives.

c. Neither Representative nor Principal, nor any employees, agents, independent contractors, or any owners of any shareholders of the Representative shall solicit sales, accept any customer orders, or sell any Products in their own name or on their own account. In the event any Products are shipped to Representative or any of the aforementioned parties for delivery to a customer, such party will not alter any Products, original packages for Products or repackage the Products in any way prior to delivery. In addition, Representative shall maintain accurate records of the lot number of Products and the names of each of the customers to which such Products were sold and report such information to the Company within ten (10) days following the sale.

d. Representative will not alter or modify the Product(s) in any way prior to delivery to Customers. Representative shall at all times conduct its activities on behalf of the Company in accordance with the labeling limitations on the Products, the terms of this Agreement, the Company's written policies and procedures, and in compliance with applicable state and federal laws in effect from time to time, including the FDA's quality system regulations (QSR) and/or good manufacturing practice (GMP) regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures. Representative shall provide the Company with such information and data as may be requested by Company pursuant to this Agreement.

e. Representative and Principal agree that during the term of this Agreement, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly; (i) sell, offer for sale, promote, receive or solicit orders for products that are competitive with any products of the Company ("Competitive Products"); or (ii) accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products. The determination of what constitutes Competitive Products shall rest solely with the Company's president. Competitive Products, if any,

5

permitted to be sold notwithstanding the provisions of this Section 4(e) shall be identified on Schedule E hereto.

f.    Representative and Principal acknowledge and affirm that they have received Confidential Information (as such term is defined in Section 5(a) of this Agreement) and other trade secret information of the Company and further agree to protect that information and that as a material inducement to the Company to enter into this Agreement, and in consideration of the Company entering into this Agreement and the other consideration provided for herein, the receipt and sufficiency of which are hereby acknowledged by Representative and Principal, that for a period of one year following the termination of this Agreement for any reason, including its termination for non-renewal by any party, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly engage in the sale of Competitive Products in the Territory or accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products.

g.    Representative and Principal acknowledge and affirm that their sales representatives have received Confidential Information (as such term is defined in Section 5(a) of this Agreement) and other trade secret information of the Company and further agree that their sales representatives will protect that information and that they will not knowingly employ, engage or contract with as a sales representative or in any other capacity any person who directly or indirectly (i) sells, offers for sale, promotes, receives or solicits orders for Competitive Products; or (ii) accepts compensation of any kind from any person providing or engaging in the sale of Competitive Products; or (ii) who has not entered an agreement prohibiting the sale of Competitive Products for a one (1) year period following termination of such engagement, employment or contract, all in such manner and to the same extent as Representative and Principal agree to be bound pursuant to this Agreement. Each such agreement between Representative, Principal and their sales representatives shall provide that such provisions are for the benefit of the Company and that the Company may enforce such provisions directly. Representative and Principal agrees to provide the Company with complete copies of all such agreements with its sales representatives and further agrees to modify such agreements as requested by the Company to achieve the purposes of this Section 4(g).

h.    Representative and Principal further agree that during the term of this Agreement, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly (i) sell, offer for sale, promote, receive or solicit orders for any products that are competitive with any products of other subsidiaries of DePuy, Inc. ("DePuy Competitive Products"); or (ii) accept compensation of any kind from any person providing or engaging in the sale of DePuy Competitive Products, without the express written consent of the Company's president and upon such terms as the Company, in its sole discretion, may reasonably impose. DePuy Competitive Products, if any, permitted to be sold notwithstanding the provisions of this Section 4(h) shall be identified on Schedule E hereto.

i.    Representative and Principal further agree that they will not knowingly engage as a sales representative or in any other capacity any person who directly or indirectly engages in the sale of DePuy Competitive Products or accepts compensation of any kind from any person providing or engaging in the sale of DePuy Competitive Products.

j.      Representative and Principal further agree that neither Representative nor Principal nor any member of Principal's immediate family will engage in, derive or accept compensation from or have any other ownership interest in (other than as a passive investor) any other commercial or business activity involved in the sale of medical devices, biologics or other products used in the treatment of any medical condition, without the express written consent of the Company's president and upon such terms as the Company, in its sole discretion, may reasonably impose. This provision shall not be construed as requiring Representative and Principal to discontinue any current commercial or business activities or investments, except to the extent that continuation of those activities or investments would constitute competitive activities prohibited by Sections 4(e) or 4(g). Any activities permitted notwithstanding this Section 4(j) shall be identified on <u>Schedule E</u> hereto.

k.      Upon termination of this Agreement by Representative or Principal during its term, or if the Company should terminate this Agreement due to a material breach by Representative or Principal of any of their obligations under Section 4(e) – (j) of this Agreement, then in addition to any other legal or equitable remedies available to the Company, the Company shall have the right in its sole discretion and for no additional consideration to Representative or Principal:

(i)      to direct Representative and/or Principal to immediately assign to the Company all non-competition or similar agreements described in Section 4(g) above; and

(ii)     to solicit, contract with, or hire any sales representatives of Representative and/or Principal.

Representative and Principal agree that it would be difficult to quantify damages for a breach of Section 4(k)(i) and that Company is entitled to preliminary injunctive relief and specific performance in the event of any such breach.

l.      Representative agrees that its sales representatives shall be adequately trained in the sale and use of the Products and shall attend all training sessions required by the Company and utilize such training materials as provided by Company. In addition, Representative shall make its sales representatives available, at its expense, to attend all national meetings and conferences and, if requested by the Company, shall help with exhibits, workshops, etc. at such meetings and conferences. Representative and its sales representatives shall attend all applicable regional meetings in the Territory as directed by the Company .Representative and Principal agree to cause their sales representatives to attend and participate in training and educational programs regarding the Products and the DePuy and J&J policies and procedures referenced in this Agreement. Representative and Principal agree to train and periodically provide refresher training to all its new and current sales representatives regarding such policies and procedures. Representative shall, upon request, provide the company with a written certification of compliance with all such laws, regulations, policies, procedures and guidelines.

m.      Representative shall not make any representation or statement, written or otherwise, concerning prices, terms of delivery, terms of payment or conditions of sale

except and to the extent that the same is specifically authorized by the Company. Representative shall have no right or authority to make any price guarantees, offer or agree to any discounts and/or accept any orders on the Company's behalf or return any Products to the Company without prior written authorization by the Company.

n.    Neither Representative nor Principal will knowingly submit to the Company any information known by Representative or Principal to be false, inaccurate or misleading regarding: (i) sales of Products; (ii) customers to whom Products were sold; (iii) expenses which were or are to be paid or reimbursed in whole or in part by the Company; or (iv) the inventory of Products in the Territory. Neither Representative nor Principal shall engage in the practice of direct billing of Products to any person. For purposes of this section, direct billing shall mean any transaction involving a third party's acquisition, use or lease of Product which results in such third party being invoiced or charged a price or rental fee(s) for Product by Representative or Principal or by an entity in which Representative, Principal or a member of Principal's immediate family has a financial interest.

o.    Representative and Principal represent that they understand and agree to conduct their business in compliance with all applicable laws and regulations, including but not limited to laws and regulations pertaining to the marketing and sale of medical products to healthcare providers, and in compliance with the AdvaMed Code of Ethics. Representative and Principal further agree to conduct their business in compliance with Company's and Johnson & Johnson's written policies and procedures, including but not limited to sales policies, inventory policies and procedures, instrument policies and procedures, and policies, procedures and guidelines for health care compliance, protection of PHI, and reporting of adverse events to the Company. Representative and Principal further agree that their sales representatives will be bound by the same Company and Johnson & Johnson written policies and procedures, including but not limited to sales policies and procedures, inventory policies and procedures, and policies, procedures and guidelines for health care compliance. Representative and Principal shall not employ or contract with any individual or entity excluded from a Federal health care program as outlined in Sections 1128 and 1156 of the Social Security Act. Representative and Principal shall, upon request, provide the Company with a written certification of compliance with all such laws, regulations, policies, procedures and guidelines. Representative and Principal agree to maintain all records required to substantiate compliance with all such laws, regulations, policies, procedures and guidelines and the terms of this Agreement for the term of the Agreement plus an additional six years. Representative and Principal agree that the Company or its designated representatives shall have the right to audit the business and records of Representative for the purpose of determining compliance with all such laws, regulations, policies, procedures and guidelines and the terms of this Agreement; however, Representative shall have the right to redact from its books and records any information that is not related to the above-referenced compliance issues.

p.    Representative and Principal represent and warrant that each of them is free to enter into this Agreement, and that neither Representative nor Principal is bound by any other contract or agreement with any other party that would prohibit either of them from providing the services to the Company required of them pursuant to this Agreement.

q.    Representative and Principal will notify Company in writing of any changes in the name or corporate structure, including the state of incorporation, under which Representative or Principal intends to do business before such changes are effective.

r.    Representative shall be responsible for all inventory consigned to Representative and shall be financially liable for any lost inventory.  The Company shall have the right to determine appropriate levels of inventory in Representative's possession.  The Company shall have the right to deduct inventory losses from Representative's commissions.

## 5.    **Representative Reports.**

a.    At the Company's request, Representative shall periodically provide information on its activities within the Territory with respect to the Products.  Representative shall provide the Company on a monthly and quarterly basis with the names, account coverage, and portion of Representative's overall minimum sales quota assigned to each of its sales representatives for the Products in the Territory.  The Company shall have the right to approve Representative's allocation of its overall quota to its sales representatives.  Representative agrees to reallocate its overall quotas among its sales representatives upon the Company's request.

b.    Thirty (30) days prior to the end of each calendar year quarter, Representative shall prepare and submit to the Company a sales projection of Product sales for each Product line in each sales area in the Territory for the subsequent calendar year quarter, in a format requested by the Company.  Prior to execution of this Agreement for the first year and no later than November 1 for any subsequent calendar year that this Agreement is in effect, Representative shall prepare and submit to the Company an annual business plan, containing such information as shall be requested by the Company.

c.    Representative will report to Company any and all complaints received from any source with respect to Products, including without limitation, reports of adverse events involving the Products.  Such reports shall be promptly made or, at any rate, within the time required by applicable law and regulations.  Representative will maintain a record of all complaints it receives consistent with applicable Company, Johnson & Johnson and governmental guidelines.

## 6.    **Confidentiality; Trademarks.**

a.    Representative and Principal shall hold in confidence and agree not to disclose or use for their benefit or the benefit of any third party, and to cause Representative's sales representatives not to disclose to others or use (other than pursuant to the terms of this Agreement), any Confidential Information (as hereinafter defined).  Confidential Information shall mean any information that relates to the business of the Company and its Affiliates (including Johnson & Johnson), including without limitation, the terms of this Agreement, including its Schedules, customer lists, number and location of sales representatives, names and significance of customers and their employees and representatives, preferences, needs and requirements, purchase histories, and other customer-specific information, business and operations strategies, sales and marketing

strategies, sales quotas, sales volumes and strategies, products in development, financial information and commissions structure. As further provided in Section 11, upon termination of this Agreement for any reason, Representative and Principal agree to return to the Company any property or documents that relate to or that contain Confidential Information that are in Representative's and/or Principal's possession, custody or control, but Representative's and Principal's obligation of confidentiality shall survive termination of this Agreement however arising. Representative and Principal further acknowledge that they may be receiving and processing Protected Health Information ("PHI") as that term is defined in 45 C.F.R. Section 164.501 from the Company or on its behalf, that has been disclosed subject to a HIPAA authorization, under 45 C.F.R. Section 164.508 or to a Business Associate Agreement(s) between the Company and a healthcare provider or institution, copies of which shall be provided to the Representative by the Company. Representative and Principal will collect, hold, use and disclose such information only for the purposes authorized in the Business Associate Agreement and as expressly directed by the Company. Representative and Principal shall not disclose any PHI to any third party or use PHI for any purpose, commercial or otherwise. Representative and Principal shall either (a) remove any PHI from its records and/or systems no later than thirty (30) days after receipt of such PHI or (b) take reasonable measures to ensure the security and confidentiality of such PHI. Representative's and Principal's failure to comply with this Section shall be considered a material breach of this Agreement and Company shall have the right to immediately terminate this Agreement.

      b.    The Products are marketed under certain trademarks that are and shall remain the sole and exclusive property of the Company. Representative shall have no interest in or right to use the trademarks, except the right to use them solely in connection with the solicitation of sales of the Products in the Territory pursuant to this Agreement. Representative shall not use any of the trademarks, including the Company's name or logo, as part of its business name, except that Representative will refer to itself as a Sales Representative for the Company on its stationery and business cards which shall be subject to approval in advance by the Company.

### 7.    Representations and Warranties.

      a.    Warranties on Products are limited exclusively to the express warranties set forth in the Company's price list (if any) and Product labeling and any other warranties of any kind or description, including warranties of merchantability or fitness, express or implied, are disclaimed unless otherwise specifically stated in writing by the Company. Representative shall make no false or misleading representations with respect to the Products. Representative shall make no express or implied warranties of any kind regarding the Products without Company's prior written consent and approval. Representative and Principal shall not engage in any advertising or promotion of any of the Company's Products, New Products or Co-Marketed Products in any form of media without the Company's prior written consent and approval. Representative shall limit its statements and claims regarding the Products, including safety and efficacy, to those which are consistent with the Company's labeling and promotional materials for the Products. In marketing the Products, Representative and its sales representatives shall use only the promotional materials provided by the Company; and neither Representative nor its sales

representatives shall develop, create or use any other promotional material or literature for the marketing of Products.

b. Representative shall not make any representations and/or warranties for any Products other than provided in Section 7(a). In the event Representative subjects itself to liability to a user-customer by failing to conduct its activities in accordance with the preceding sentence, then Representative alone shall be responsible to the user-customer, and Representative shall not have any recourse against the Company for such matter.

## 8. Commissions.

a. During the term of this Agreement, the Company shall pay Representative commissions on all sales of Products made by Representative to customers located within the Territory. Representative shall not receive commissions on sales of co-marketed Products made in the Territory by Affiliates of the Company, unless otherwise agreed to in writing by the Company. Such commissions shall be paid on the Net Sales Prices (as defined below), established by the Company from time to time, of the Product at the rates set forth on Schedule D-1, as amended from time to time. Commission rates on New Products will be established by the Company at the launch of each New Product. "Net Sales Price" means the gross amounts invoiced by the Company to its customers, less returns and allowances actually allowed or made, freight charges, and taxes, if applicable. Commissions will be earned when the Company ships the Product and receives a customer purchase order number. All commissions shall be subject to the credits and/or charge backs referred to below.

b. All commissions payable hereunder shall accrue monthly based on the Company's monthly reporting period as identified on Schedule D-2 with respect to all Products shipped with purchase order numbers during such month. Commissions shall be paid on or before the last day of the month following the monthly reporting period during which such commissions accrued. Commissions payments shall also reflect any appropriate adjustments, whether for current or past commissions or to take into account discounts, returns and allowances actually made by the Company. Each commissions payment shall be accompanied by a statement showing the commissions accrued and adjustments made for the applicable monthly reporting period and any other information necessary for the proper determination of the amount of commissions payable hereunder.

c. Representative shall be responsible for, and shall pay, all Federal, State and local income taxes, social security, unemployment compensation, worker's compensation, insurance coverage and other such payments or obligations of Representative's sales representatives and other employees.

d. The Company shall keep accurate books of account containing information which may be necessary for the purpose of demonstrating the commissions payable to Representative. Said books shall be available to Representative per year upon reasonable request to the Company in writing for a period of two (2) years following the end of the monthly reporting period to which they pertain, and may be inspected by an independent public accountant selected by and paid for by the Representative for the

purpose of verifying the statements of the Company and the commissions paid to Representative.

e.    Representative and Principal agree to refund any overpayment of commissions within thirty (30) days of notification of such overpayment by the Company.  In the event the Company has not received payment from any customer account upon which a commission was paid within sixty (60) days from the date of invoice, the Company reserves the right to charge back to Representative the full amount of the commission paid on such sale.  Upon eventual payment of the outstanding monies, the Company will pay 100% of the original commission amount.  Company also reserves the right to charge back any overpayment of commissions.

f.    In the event that Representative fails to comply with the Company's written policies and procedures, the Company reserves the right to set-off and/or reduce the commission amount due to Representative, including set offs for late fees/charges and inventory and instrument related fees/charges.

9.    **Legal Relationship.**

a.    It is understood and agreed that each party to this Agreement is an independent contractor, that nothing in this Agreement or in the contractual relationship between the Company, Representative and Principal shall make Representative or Principal an employee, agent or legal representative of the Company, and neither Representative nor Principal will enjoy any of the benefits of an employee.  Neither Representative nor Principal has the right or power to create any obligation or to bind the Company in any manner or thing whatsoever.  The Company shall neither have nor exercise any control over the manner in which Representative and Principal perform their duties under this Agreement.  Representative and Principal acknowledge that they have paid no franchise fee or other similar consideration for the rights conferred by the Company pursuant to this Agreement, and the Company acknowledges that it has received no such fee or other similar consideration from Representative or Principal.

b.    Representative and Principal agree and acknowledge that all rights and intangibles concerning the Territory belong to the Company and both Representative and Principal hereby disclaim same for themselves and their successors.  Included in these rights and intangibles without limitation are the following:

(i)    Neither Representative nor Principal may enter into any arrangement, agreement or promise with any other party concerning changes to the Company's representative or representation in the Territory.  Any decision concerning the appointment of a successor representative(s) in the Territory rests solely with Company management.

(ii)    Under no circumstances shall Representative or Principal develop any rights in the Territory which may be sold, assigned or transferred to another party.  Any and all compensation to Representative from the sale of Company Products in the Territory shall cease upon retirement, or death of

12

Representative or Principal or termination or non-renewal of this Agreement, except as provided herein.

(iii)   If any rights or intangibles become vested in Representative or Principal by law or otherwise, despite acknowledgement and disclaimer, Representative and Principal agree to immediately assign any and all such rights or intangibles to Company upon request or upon termination or expiration of this Agreement.

### 10.    Term.

The term of this Agreement shall expire on December 31, 2004 unless terminated earlier as provided herein.

a.    The Company may at its election and on thirty (30) days' prior written notice take the following actions if any of the following events occur:

i.    The Company may alter the Territory and/or remove one or more sales areas, including by way of example rather than limitation, accounts, cities, counties or other portions from Representative's Territory if Representative's total sales performance is less than 90% of overall quota for any two consecutive fiscal quarters on an annualized basis and the Territory's overall net sales growth is less than the average net sales growth for all Company U.S. sales territories. Exercise by the Company of the foregoing right shall not, however, prohibit the Company from terminating this Agreement for failure to achieve required sales performance as set forth in Section 10 a. ii.

ii.    The Company may terminate the Agreement at the end of any fiscal year in which Representative's sales performance is less than 90% of overall quota and the Territory's overall net sales growth is less than the average net sales growth for all Company U.S. sales territories. The Company may provide written notice of such termination on or after the end of the fiscal year in which quota was not achieved. Upon or after issuing a notice of termination pursuant to this Section 10(a)(ii), the Company at its election may also give written notice requiring Representative and Principal immediately to cease the activities described in Section 4(a) above and immediately to undertake the obligations described in Section 11(a) below.

b.    This Agreement may be terminated, effective immediately upon written notice, if any of the following events occurs:

i.    By the non-breaching party if the other party fails to cure a breach in the performance of its obligations under this Agreement within thirty (30) days after the party seeking to terminate this Agreement gave written notice thereof; provided, however, the parties agree that a breach of one or more of the provisions of Sections 4, 5, 6 or 7 of this Agreement by Representative or Principal shall constitute a material breach incapable of cure, and shall

constitute adequate cause for the immediate termination of this Agreement by the Company;

ii.    By the Company if Representative, Principal or any of Representative's sales representatives violates the anti-kickback statute of the Social Security Act, Section 1128B(b)(1) and (2), 42 U.S.C. Section 1320A-F(b) (1) and (2);

iii.    By either party if the other party becomes bankrupt or enters into any arrangements with its creditors or enters into liquidation, dissolution or receivership; or

iv.    By the Company if Representative, or a major part of its assets or stock, becomes subject to the direction or control of a party other than Principal.

v.    By the Company if Principal is not actively involved in the day-to-day Company business of Representative or there is any dispute, disagreement or controversy arising between or among the Principals of Representative which may adversely affect Representative's ability to perform its obligations under this Agreement or the operation, management, reputation, business or interest of Representative or the business or interest of the Company or the reputation of the Products.

## 11.    Obligations Upon Termination.

a.    Upon termination of this Agreement, Representative and Principal agree to immediately discontinue making any statements or representations, express or implied, that it is a representative of or otherwise affiliated in any way with the Company or the Products and return to the Company within fifteen (15) days after the effective date of termination, any and all catalogs, price lists, reprints, samples, literature and other sales materials, that relate to the Products or the Company's business, contain any Confidential Information of the Company or have been furnished to Representative and/or Principal by the Company.

b.    Upon termination of this Agreement, Representative and Principal agree to deliver to the Company upon its request, all Products in Representative's and/or Principal's possession, custody or control at the time notice of termination was delivered to Representative and/or Principal under this Agreement, including any consignment, loaner and/or trial and evaluation inventory. Representative and the Company shall pay the freight charge for shipping any such Products to the destination named by the Company on a 50/50 basis. Representative and Principal agree to assist the Company in the recovery of the Products, and Representative and Principal waive any requirement for the posting of a bond or other surety by the Company in the efforts of the Company to recover its Products.

c.    Upon termination of this Agreement by Representative or Principal during its term, or if the Company should terminate this Agreement due to a material breach by Representative or Principal of any of their obligations under Section 4 of this Agreement, in addition to any other legal or equitable remedies available to the Company, the Company shall have the right in its sole discretion and for no additional consideration to Representative or Principal:

14

      (i)     to direct Representative and/or Principal to immediately assign to the Company all non-competition or similar agreements described in Section 4(g) above; and

      (ii)    to solicit, contract with, or hire any sales representatives of Representative and/or Principal.

      (iii)   Representative and/or Principal agree that all agreements between Representative and/or Principal and their sales representatives shall contain provisions allowing for the assignment described in this Section 11(c).

    d.    Upon termination of this Agreement by Representative or Principal during its term, or if the Company should terminate this Agreement due to a material breach by Representative or Principal of any of their obligations under Section 4(e)-(j) of this Agreement, Representative and Principal agree that the Company or any agent designated by the Company may in its sole discretion, but shall not be required to, hire or otherwise engage any sales representative of Representative or Principal. Representative and Principal shall transfer to the Company all agreements with such sales representatives containing covenants not to compete and shall release the Company from all claims that Representative and Principal may have related to the Company's hiring or engagement of such sales representatives. Except in the event of a breach by Representative or Principal of any of the obligations under Section 4(e)-(j) of this Agreement, in which case the provisions of Section 4(k) and 11(c) shall govern and control, the parties shall negotiate in good faith a reasonable fee for the foregoing transfers and releases, and for the services of Representative and Principal in assisting the Company in an orderly transition of the business in the Territory to the Company or a third party designated by the Company and for any exercise of the Company's rights under the first sentence of this Section 11. If Principal is no longer actively involved in the day-to-day Company business of Representative due to death or a continuing disability that prohibits Principal from being so involved, then the negotiations contemplated under this Section 11(d) shall be conducted with the person who has succeeded Principal in running Representative's business. The foregoing provision shall not affect the Company's right to terminate the Agreement as provided under Section 10(b)(v).

    e.    For a period of ninety (90) days after termination, the Company shall have the right to suspend or hold payment of sums of money owed by Company to Representative, and to exercise a right to offset and deduct from such sums the amount of any indebtedness owed by Representative or Principal to Company.

    f.    Provided that there has been no material breach of this Agreement by Principal and/or Representative, termination of this Agreement shall not release the Company from the obligation to pay commissions to Representative and Principal.

15

## 12.   Governing Law/Limitations Period.

a.      This Agreement is made under and shall be construed and interpreted in accordance with and governed by the internal laws of the Commonwealth of Massachusetts applicable to contracts made and performed within the Commonwealth of Massachusetts. Subject to the additional provisions set forth in Section 13, any claim and/or action arising out of or relating to this Agreement or the validity, inducement, or breach thereof, must be brought against the Company within one (1) year of the event which caused it.

## 13.   Arbitration/Dispute Resolution.

a.      Any controversy or claim arising out of or relating to this Agreement or the validity, inducement, or breach thereof, shall be settled by arbitration before a panel of three (3) arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then pertaining, except where those rules conflict with this provision, in which case this provision controls. The arbitrators shall be selected from the National Panel of Arbitrators of the AAA. Each party shall select one arbitrator and the two selected arbitrators shall select the third arbitrator. If the two selected arbitrators cannot agree on a third arbitrator then the AAA shall select said arbitrator from the National Panel of Arbitrators. The Parties hereby consent to the jurisdiction of the United States District Court for the District of Massachusetts, Boston Division for the enforcement of this provision and entry of judgment on any award rendered hereunder. Should such court for any reason lack jurisdiction, any court with jurisdiction shall enforce this clause and enter judgment on any award.

b.      Each arbitrator shall be an attorney who has at least 15 years of experience with a law firm or corporate law department of over 25 lawyers or was a judge of a court of general jurisdiction. The arbitration shall be held in Boston, Massachusetts and in rendering the award the arbitrators must apply the substantive law of Massachusetts (except where that law conflicts with this clause), except that the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act. The arbitrators shall be neutral, independent, disinterested, impartial and shall abide by The Code of Ethics for Arbitrators in Commercial Disputes approved by the AAA. Within 45 days of the initiation of arbitration, the Parties shall reach agreement upon and thereafter follow procedures assuring that the arbitration will be concluded and the award rendered within no more than four months from the selection of the arbitrators. Failing such agreement, the AAA will design and the Parties will follow procedures that meet such a time schedule.

c.      Each Party has the right before, or if the arbitrators cannot hear the matter within an acceptable period, during the arbitration, to seek and obtain provisional remedies such as attachment, preliminary injunction, replevin, etc., to avoid irreparable harm, maintain the status quo or preserve the subject matter of the arbitration. The parties agree that any such action shall be brought only in the United States District Court for the District of Massachusetts, Boston Division or in the Superior Court of Suffolk County, Massachusetts. Each party hereby consents and waives any objection to jurisdiction or venue in each such court.

16

d.    EACH PARTY HERETO WAIVES ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY.  THE ARBITRATOR SHALL NOT AWARD ANY PARTY PUNITIVE, EXEMPLARY, MULTIPLIED OR CONSQUENTIAL DAMAGES, AND EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT TO SEEK SUCH DAMAGES.  NO PARTY MAY SEEK OR OBTAIN PREJUDGMENT INTEREST OR ATTORNEYS' FEES OR COSTS.

### 14.    <u>Miscellaneous</u>.

a.    This Agreement is subject to and expressly conditioned upon the additional provisions set forth in <u>Schedule E</u> and all such provisions shall be deemed to be part of this Agreement for all purposes.  This Agreement with all the Schedules hereto, constitute the entire agreement between Representative, Principal and the Company with respect to its subject matter and supersedes and replaces any and all previous contracts, arrangements, or understandings that may have existed or may exist between the parties. No modifications or amendments shall be binding on either party unless made in writing and signed by both parties.  The language of this Agreement shall for all purposes be construed as a whole, according to its fair meaning, not strictly for or against either party, and without regard to the identity or status of any person who drafted all or part of it.  Whenever the words "include" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

b.    If any provisions of this Agreement are found to be invalid or unenforceable by a court or arbitrator, such provision shall not affect the remainder of this Agreement, which shall remain in full force and effect.

c.    All notices hereunder shall be in writing and shall be delivered to the other party either personally, by registered mail, return receipt requested, or by overnight courier service.  Notice shall be sent to a party at its address hereinabove set forth or at such other address as the other party shall have theretofore designated.  Notice shall be deemed duly given when actually received or refused by the addressee.

d.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns, but shall not be assignable by Representative or Principal without the written consent of the Company.  Any rights and obligations accruing hereunder to Representative and/or Principal shall be considered personal and shall not be mortgaged, charged, transferred, delegated, subcontracted or assigned, directly or indirectly, voluntarily, by operation of law or otherwise, either in whole or in part, except upon express prior written approval by Company.  Any purported transaction in violation of this Section shall be null and void and of no force or effect. Representative shall not merge into another corporation, sell all or substantially all of its assets or stock, or experience a change of control or other corporate reorganization, except upon express prior written approval by Company.  If any of the events referred to in this Section occur without the express prior written approval by Company, such event shall constitute a material breach of this Agreement, and Company shall have the right to terminate the Agreement immediately without notice.

17

e.    This Agreement is not effective unless and until signed by all parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as an instrument under seal as of the date and year indicated above.

DEPUY SPINE SALES LIMITED PARTNERSHIP

By: _____

DePuy Spine Holding Corporation,
General Partner
Name:
Title:

TRINITY SPINE INC.

By: _____
Name: John Mieyr
Title: President

The undersigned joins as a party to this Agreement solely as to Sections 2(b); 4(c), 4(e)-(l), 4(n)-(q); 6(a); 7(a); 8(e); 9(a)-(b); 10(a)-(b); 11(a)-(f); 12; 13; and 14(a), 14(d) and has executed this Agreement as an instrument under seal as of the date and year first above written.

WITNESS MY HAND AND SEAL THIS 26 DAY OF Feb, 2004

PRINCIPAL

By: _____, Principal
Name: John Mieyr

DePuy Spine
Products

Schedule A-1

- Core Products:

  Crossover
  EZ-X
  Frontier
  Isola/VSP (Family of Products)
  KASS
  Modular Cross Connector
  Monarch (Family of Products)
  MOSS Miami (Family of Products)
  TiMX

  BowTi
  Discovery
  Lumbar I/F Cage (Family of Products) - Jaguar
  Stackable Cage-Ocelot
  Surgical Titanium Mesh (Family of Products)
  Cougar Vertebral Body Replacement
  Bengal Vertebral Body Replacement
  Devex Vertebral Body Replacement
  Leopard Vertebral Body Replacement

  Kaneda SR
  M-2 Plate
  PROFILE
  University Plate

  DOC
  Peak
  Songer
  Summit (Family of Products)
  Slim-Loc
  ACP
  Interlaminar Clamp
  Sof'wire
  Ti-Frame

  Bremer Halo Systems
  Surgical Positioning Board
  Scoliosis Brace

CONFIDENTIAL

**DePuy Spine Confidential Information**
**Not For Distribution**

- **Miscellaneous:**
  BrainLab Vector Vision, VectorVision II & VectorVision Compact

- **Alliances Technology**
  LifeNet VertiGraft, VG1 & VG2
  **LifeNet Cellect**
      DBM Cartridge         CEL 25
  Orthologic SpinaLogic Bone Growth Stimulators

- **Orthobiologic Products**

  **Healos**
  | Healos II 2 strip | 2761-60-010 | 6100A |
  | Healos II 1 strip | 2761-60-005 | 6101A |

  **Cellect**
  | Selective Retention Device | | 2761-25-001 |
  | Empty Cartridge | 2761-26-003 | |
  | Healos Cartridge | 2761-26-005 | |
  | 3 Hole Needle MiniKit | 2761-24-002 | |
  | 1 Hole Needle MiniKit | 2761-24-001 | |
  | 3 Hole Full Aspiration Kit | 2761-23-001 | |
  | 1 Hole Full Aspiration Kit | 2761-21-001 | |



CONFIDENTIAL

**DePuy Spine Confidential Information
Not For Distribution**

Schedule A-2

- Co-Marketed/Non-Exclusive Alliances Technology Products:
  LifeNet I/C Graft Chambers
  Symphony Platelet Concentration System
  Symphony II Platelet Concentration System
  Symphony Graft Delivery System
  Conduit TCP
  Bone Graft Procedure Kits
  LifeNet Optium



**DePuy Spine Confidential Information**
**Not For Distribution**

## **Schedule B**

Territory

CONFIDENTIAL

**DePuy Spine Confidential Information**
**Not For Distribution**



T572.xls
2/12/2004

T572 - Trinity Spine

CONFIDENTIAL

| Billing Type | Parent Number | Terr | Address Number | Alpha Name | City | ST | Postal Code | Long Address |
|---|---|---|---|---|---|---|---|---|
| B | | 572 | 205663 | ALL SAINTS EPISCOPAL HOSPITAL | FORT WORTH | TX | 76101 | 102131 |
| S | 205663 | 572 | 215371 | ALL SAINTS EPISCOPAL HOSPITAL | FORT WORTH | TX | 76104 | 102131001 |
| S | 210422 | 572 | *20217 | COLUMBIA PLAZA MED CTR OF FT WORTH | FORT WORTH | TX | 76104 | 297341002 |
| S | 206988 | 572 | 216670 | COOK-FT WORTH CHILDRENS MED CENTER | FORT WORTH | TX | 76104 | 163535001 |
| S | 206988 | 572 | 216671 | COOK-FT WORTH CHILDRENS MEDICAL CTR | FORT WORTH | TX | 76104 | 163535002 |
| S | 206988 | 572 | 216672 | COOK CHILDREN S ORTHOPEDICS | FORT WORTH | TX | 76104 | 163535003 |
| X | | 572 | 206988 | COOK FT WORTH CHILDRENS MED CENTER | FORT WORTH | TX | 76104 | 163535 |
| X | 211402 | 572 | 221320 | J P S HEALTH NETWORK | FORT WORTH | TX | 76104 | 331953001 |
| X | | 572 | 211402 | JPS HEALTH NETWORK | FORT WORTH | TX | 76104 | 331953 |
| X | | 572 | 205586 | VENCOR HOSPITAL FORT WORTH WEST | FORT WORTH | TX | 76104 | 101653 |
| X | | 572 | 258438 | PHYSICIANS METROPLEX HOSPITAL | ARLINGTON | TX | 76018 | 102612 |

*NOTE: 210422 (X) is located outside representative's geographic area. Related Account #220217 (S) is within T572.

T572.xls
2/12/2004

## Schedule C

To be provided –quota schedule broken down by month.

### Annual Quotas

Core:             $1,659,399

Orthobiologic: $77,403

Alliance:         $325,640

Total:            $2,062,442

CONFIDENTIAL

**DePuy Spine Confidential Information**
**Not For Distribution**

**Schedule D-1**

**DePuy Spine**
**Sales Representative**
**2004 Commission Plan**



- DePuy Spine Core Implants and Instruments 12% to quota, 25% over quota

- Healos                                12% to quota, 25% over quota

- Cellect                               12% to quota, 25% over quota

- LifeNet VertiGraft                    10%

- Symphony Platelet Concentration System    10%

- Symphony II Platelet Concentration System    10%

- Symphony Graft Delivery System        10%

- Orthologic                            10%

- LifeNet Cellect                       8%

- LifeNet I/C Graft Chambers            8%

- Conduit TCP                           8%

- Bone Graft Procedure Kits             8%

- Optium                                8%

- BrainLab                              2%*

---

* Rate subject to change due to pending contract negotiations with BrainLab.

## DePuy Spine Confidential Information
## Not For Distribution

## <u>Schedule D-2</u>

**Monthly Reporting Period**

CONFIDENTIAL

## <u>DePuy Spine Confidential Information</u>
## Not For Distribution

**2004 UNIVERSAL CALENDAR**

| | M | T | W | T | F | S | S | | | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAN** | 29 | 30 | 31 | | | | | **JUL** | | 28 | 29 | 30 | | | | |
| (4 Weeks) | | | | 1 | 2 | 3 | 4 | (4 Weeks) | | | | | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| **FEB** | 26 | 27 | 28 | 29 | 30 | 31 | | **AUG** | | 26 | 27 | 28 | 29 | 30 | 31 | |
| (4 Weeks) | | | | | | | 1 | (4 Weeks) | | | | | | | | 1 |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | | | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| **MAR** | 23 | 24 | 25 | 26 | 27 | 28 | 29 | **SEP** | | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| (5 Weeks) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | (5 Weeks) | | 30 | 31 | | | | | |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 | | | | | 1 | 2 | 3 | 4 | 5 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | | | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28 | | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | | | | | | | | | | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| **APR** | 29 | 30 | 31 | | | | | **OCT** | | 27 | 28 | 29 | 30 | | | |
| (4 Weeks) | | | | 1 | 2 | 3 | 4 | (4 Weeks) | | | | | | 1 | 2 | 3 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | | | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **MAY** | 26 | 27 | 28 | 29 | 30 | | | **NOV** | | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| (4 Weeks) | | | | | | 1 | 2 | (4 Weeks) | | | | | | | | |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| **JUN** | 24 | 25 | 26 | 27 | 28 | 29 | 30 | **DEC** | | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| (5 Weeks) | 31 | | | | | | | (6 Weeks) | | 29 | 30 | | | | | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | | | | | 1 | 2 | 3 | 4 | 5 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 | | | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27 | | | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| | | | | | | | | | | 27 | 28 | 29 | 30 | 31 | | |
| | | | | | | | | | | | | | | | 1 | 2 |

CONFIDENTIAL

**Schedule E**

Other Products

None



Termination of January 1, 2002 Sales Representative Agreement

The Company agrees to make a payment in the amount of $200,000 to Representative within five (5) business days of execution of this Agreement. Such payment shall be made in consideration of the following terms and conditions:

    a.    Representative agrees to the termination of the Sales Representative Agreement dated January 1, 2002 (the "2002 Agreement"). The 2002 Agreement is hereby replaced by and superceded with this Agreement.

    b.    Principal and Representative agree that Charlie Lopez and Rob Walker, who are sales representatives engaged and/or employed by Representative and/or Principal ("Sales Representatives"), may be offered positions by the Company or its representatives as employees, independent contractors and/or sales representatives in any geographic area in which the Company's products are sold, including, without limitation Representative and Principal's former Company sales Territory (as defined in the Sales Representative Agreement). Representative and Principal agree that all restrictive covenants running from the Sales Representatives in favor of Representative and/or Principal will terminate and become unenforceable against the Company.

    c.    Principal and Representative will use best efforts to work with the Company or its designated representative in good faith to assist and support the hiring of Charlie Lopez and Rob Walker by the Company or the Company's designated representative.

    d.    Except for claims arising out of this Agreement, Representative and Principal and their assigns, successors, heirs, executors, administrators and anyone else claiming through them, releases and forever discharges the Company and its parent and subsidiary corporations, affiliates, predecessors in interest, successors in interest, officers, directors, shareholders, employees, attorneys, representatives and agents, from any and all past, present and future claims, whether known or unknown.

Section 4 – Obligations of Representative and Principal

Section 4(f) is hereby deleted in its entirety and replaced with the following new Section 4(f):

    f.    Representative and Principal acknowledge and affirm that they have received Confidential Information (as such term is defined in Section 5(a) of this Agreement)

**DePuy Spine Confidential Information**
**Not For Distribution**

CONFIDENTIAL

and other trade secret information of the Company and further agree to protect that information and that as a material inducement to the Company to enter into this Agreement, and in consideration of the Company entering into this Agreement and the other consideration provided for herein, the receipt and sufficiency of which are hereby acknowledged by Representative and Principal, that for a period of six (6) months following the termination of this Agreement for any reason, including its termination for non-renewal by any party, neither Representative nor Principal nor any member of Principal's immediate family will directly or indirectly engage in the sale of Competitive Products in the Territory or accept compensation of any kind from any person or entity providing or engaging in the sale of Competitive Products.

New Products

If the Charite Disc is approved for sale by the FDA in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of the Charite Disc in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to the Charite Disc once it is made available to Representative. Representative agrees to appoint one or more disc specialists who will have primary responsibility for Representative's sales of the Charite Disc.

If the Saber product is approved for sale by the FDA in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of Saber in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to Saber once it is made available to Representative. The Saber product shall be part of the Core Products group.

If the Global ACP Rigid and Dynamic product is approved for sale by the FDA in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of Global ACP Rigid and Dynamic in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to Global ACP Rigid and Dynamic once it is made available to Representative. The Global ACP Rigid and Dynamic product shall be part of the Core Products group.

If the SIS product becomes available for sale in the United States during the term of this Agreement, the Company shall appoint Representative to solicit sales of SIS in the Territory per the Core commission rates on Schedule D-1. All of Representative's obligations under this Agreement regarding Products shall apply to SIS once it is made available to Representative. The SIS product shall be part of the Miscellaneous Products group.

**DePuy Spine Confidential Information**
**Not For Distribution**